# Morris, Nichols, Arsht & Tunnell llp

1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

(302) 658-9200
(302) 658-3989 FAX

Brian P. Egan
(302) 351-9454
(302) 498-6216 FAX
began@morrisnichols.com

May 15, 2023

The Honorable Laura D. Hatcher  *VIA ELECTRONIC FILING*
U.S. District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 North King Street
Wilmington, DE 19801

    Re: *Autonomous Devices LLC v. Tesla, Inc.* (C.A. No. 22-1466-MN)

Dear Judge Hatcher:

We represent Defendant Tesla, Inc. ("Tesla") and submit this letter concerning the parties' current dispute over the protective order. The parties have reached agreement on almost all provisions, with the exception of certain provisions relating to two issues: (1) what type of documents may be designated as "HIGHLY CONFIDENTIAL – SOURCE CODE"; and (2) the protections in place for so-designated documents. Tesla's proposed protective order is attached as Exhibit 1.

Both disputes concern the protection of documents detailing Tesla's autopilot (AP) software. As explained in the declaration of Phil Duan, Tesla's Senior Staff Software Engineer for Autopilot, Tesla considers this software to be its most valuable technology and the future of the company. Ex. 2 ¶ 3. It contains trade secrets reflecting the investment of tens of thousands of man hours and over a billion dollars in R&D. *Id.* Tesla's AP software is also its most sensitive (and thus highly guarded) asset. As explained in the declaration of Jake Nocon, Tesla's Director of Security Intelligence, Tesla's software has been a target for repeated attempts at corporate espionage, from actors inside and outside the company. Ex. 3 ¶ 4. Tesla is particularly concerned with threats from well-funded nation-state actors who have expressed interest in AP technology. *Id.* ¶ 5.

Tesla enforces the highest level of internal confidentiality for the AP group, including for documents, computer code, and even information about the engineers themselves. *Id.* ¶ 3. As a general matter, Tesla employees must sign NDAs, and confidential documents can only be accessed by an active Tesla account with sufficient access controls. *Id.* Tesla further employs a team whose job is to monitor for the exfiltration of confidential data, including through the use of electronic monitoring tools. *Id.* The AP group is further sequestered into its own physical and IT-access space that non-AP engineers cannot access. *Id.* Even on Tesla's intranet, information about AP engineers is less available than for non-AP engineers. *Id.* Tesla has gone so far as to develop a custom software

The Honorable Laura D. Hatcher                                                                         May 15, 2023

platform to improve the data security of its AP group. *Id.* Within Tesla, special protections for AP confidential information extend to computer code and documents alike. *Id.* To date, Tesla has only made its AP documents or computer code available for inspection in one prior litigation, in which inspection was limited to a neutral, third-party reviewer who could not print or transport the material. *Id.* ¶ 6; Ex. 10 (*Tesla, Inc. v. Cao*, (N.D. Cal.)) (discussing review process).

With the foregoing in mind, Tesla has proposed protections that will allow discovery to proceed efficiently while protecting its "crown jewels" from inadvertent disclosure or theft. Tesla reserves all rights to challenge the discoverability of any information contemplated by these provisions.

### I.   TESLA'S PROPOSED DEFINITION OF SOURCE CODE IS NECESSARY AND CONSISTENT WITH PRIOR PRACTICE

Tesla proposes that the highest level of protection afforded by the protective order—"HIGHLY CONFIDENTIAL – SOURCE CODE"—should be applied both to its computer code, to the extent made available, and to certain technical documentation describing its computer code. In particular, Tesla proposes that "'Source Code' means computer code, associated comments, and/or revision histories for computer code, *formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs*." Ex. 1 ¶ 2(c). In contrast, Plaintiff proposes that only computer code may be so-designated.

Tesla's definition is necessary to protect its most valuable and sensitive technology from theft or inadvertent disclosure. There is no dispute that computer code warrants the highest confidentiality designation under the protective order. But documents that "describe in detail the algorithms or structure of software designs" pose the same risk. Indeed, when it comes to AP software, Tesla employs heightened measures for technical documentation and computer code alike. Ex. 3 ¶ 3.

Tesla's proposed definition is consistent with prior practice in this and other courts, who have adopted substantially similar definitions of "Source Code." *E.g.*, Ex. 5 ¶ 9 (*Parity Networks, LLC v. Netgear, Inc.*, No. 22-cv-1521 (D. Del. Apr. 3, 2023)); Ex. 6 ¶ 8 n.5 (*Almondnet, Inc. v. Roku, Inc.*, No. 6:21-cv-876 (W.D. Tex. Sept. 16, 2022)). Tesla's proposal is substantially similar to the language used in the "Model Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets" in N.D. Cal. Ex. 4 ¶ 2.9.

### II.   TESLA'S PROPOSED SOURCE CODE PROTECTIONS ARE REASONABLE

"[I]t is well recognized among lower courts that source code requires additional protections to prevent improper disclosure because it is often a company's most sensitive and most valuable property." *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1300 n. 13 (Fed. Cir. 2016); *see also Via Vadis Controlling GmbH v. Skype, Inc.*, 2013 WL 646236, at *3 (D. Del. Feb. 21, 2013) ("Source codes are the most sensitive and confidential property of Respondents . . . extreme measures are ordered to protect their confidentiality.").

The parties agree that documents designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" are to be made available for in-person inspection on a review computer. Ex. 1 ¶ 11. The parties further agree that the inspecting party may request a limited number of printouts of such documents as needed for use in this litigation. *Id.* ¶ 11(c)(vii). However, the parties were not able to reach agreement on the four provisions described below regarding the handling of such printouts.

2

The Honorable Laura D. Hatcher                                                                                      May 15, 2023

**First**, Tesla proposes that printouts of Source Code be limited to no more than 200 aggregate pages and 5 consecutive pages ("200:5") in the first instance, and the parties can meet and confer if Plaintiff believes more are necessary. Ex. 1 ¶ 11(c)(vii). Tesla's proposal is consistent with prior orders. *E.g.*, Ex. 7 ¶ 10(h) (*Torchlight Technologies LLC v. Daimler AG*, No. 22-cv-751, D.I. 96 (D. Del. Feb. 3, 2023)) (100:50 pages); Ex. 8 ¶ 9 (*Nielsen Co. (US), LLC v. TVision Insights, Inc.*, No. 22-cv-1345, D.I. 23) (D. Del. Feb. 9, 2023)) (150:15 pages).

Plaintiff initially proposed a limit of 500:15 pages, followed by its current proposal of 2500:50 pages. "[B]ecause source code is extremely confidential . . . the burden should be on the party trying to convert source code to paper." *Inventor Holdings, LLC v. Wal-Mart Stores Inc.*, 2014 WL 4370320, at *4 (D. Del. Aug. 27, 2014). The documents that are potentially relevant to this case are minimal given the high-level, abstract, and duplicative nature of Plaintiff's patent claims, and therefore, Plaintiff cannot meet its burden to show that 2500 printout pages are necessary.

**Second**, Tesla proposes that Plaintiff identify which Source Code printouts it would like available at deposition rather than have its attorneys travel with copies. Ex. 1 ¶ 11(c)(xii). Allowing Plaintiff to copy and transport Tesla's Source Code creates an unnecessary risk of disclosure, for example if the printouts were left in an airport or hotel room. This risk exists irrespective of Plaintiff's diligence. *See Drone Techs.*, 838 F.3d at 1300 ("[T]here may be circumstances in which even the most rigorous efforts of the recipient of such [sensitive] information to preserve confidentiality in compliance with ... a protective order may not prevent inadvertent compromise."). Indeed, Tesla does not allow its *own engineers* to travel with printouts of AP Source Code. Ex. 2 ¶ 4.

Plaintiff has expressed concern that this provision would give advance notice of what will be discussed at a deposition. This is not a legitimate concern. Plaintiff must disclose the bases for its infringement positions, and there is no reason Plaintiff needs the ability to surprise Tesla employees with Source Code. Nonetheless, Tesla proposed two compromises. First, Tesla agreed to provide a Source Code computer for depositions at its California facilities to negate the need for printouts. As this Court has recognized, access to a computer during depositions is "unnecessary" and "burdensome," but Tesla views it as preferable to allowing attorneys to travel with Source Code. *See Trans Video Elecs. Ltd. v. Time Warner Cable Inc.*, 1:12-cv-1740, D.I. 38 (D. Del. Jan. 22, 2015). Second, Tesla agreed that Plaintiff could be reasonably over-inclusive in requesting deposition printouts. It is thus neither necessary nor reasonable for Plaintiff to travel with printouts.

**Third**, Tesla proposes that Source Code printouts cannot be digitized except for use in excerpts as reasonably necessary. Ex. 1 ¶ 11(c)(xiii). This prohibits the wholesale digitization of Source Code printouts for use as electronic exhibits. Allowing Plaintiff to create digital copies of Source Code would undermine the purpose of requiring Source Code to be produced in hard copy. Respectfully, Plaintiff does not have the resources to adequately secure digitized copies of Source Code. Indeed, Tesla built a custom software platform to address the vulnerabilities in its systems. Ex. 3 ¶ 3.

**Fourth**, Tesla proposes that all Source Code must be returned or destroyed upon final disposition. Ex. 1 ¶ 18(c). Tesla permits that Plaintiff may keep archival copies *if* it redacts Tesla's Source Code. Plaintiff insists that it be allowed to keep unredacted copies of documents containing Source Code or that Tesla be the one to redact them. There is no reason for Plaintiff to maintain copies of Source Code (printed or otherwise) after the conclusion of this matter. Moreover, the request that Tesla redact potentially hundreds of documents for Plaintiff's archives is unreasonable.

The Honorable Laura D. Hatcher													May 15, 2023

        Sincerely,

        */s/ Brian P. Egan*

        Brian P. Egan

BPE/bac
Attachments

cc: All Counsel of Record (via electronic mail; w/attachments)