IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AUTONOMOUS DEVICES LLC,                )
                                       )
            Plaintiff,                 )          **Redacted - Public Version**
                                       )
      v.                               )          C.A. No. 22-1466-MN
                                       )
TESLA, INC.,                           )          ████████████████████████
                                       )
            Defendant.                 )

### LETTER TO THE HONORABLE LAURA D. HATCHER
### REGARDING AUTONOMOUS DEVICE'S OPPOSITION TO
### TESLA'S SOURCE CODE PROTECTIVE ORDER PROVISIONS

OF COUNSEL:
Blair Jacobs
Christina A. Ondrick
John S. Holley
Elizabeth Bernard
MCKOOL SMITH, P.C.
1999 K Street, NW Suite 600
Washington, D.C. 20006
(202) 370-8300

George T. Fishback, Jr.
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8756

Dated: May 22, 2023

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Autonomous Devices, LLC*

Dear Judge Hatcher,

Autonomous Devices LLC ("AD") submits this letter brief to highlight the unnecessary and unfair prejudice resulting from Tesla, Inc.'s ("Tesla") unconventional protective order provisions. Ex. 1 at ¶2(c); D.I. 38 at 2. Most critically, Tesla's provisions attempt to sweep an unknown number of routine technical documents into a single category called "Source Code," thus imposing onerous restrictions on AD's access to Tesla's core technical documents and providing Tesla with a nearly insurmountable tactical advantage through severe access limitations that would inhibit Tesla's ability to gather and analyze necessary evidence to prove its infringement case. *See generally* Ex. 10[1] at 1, 3; Ex. 1 at ¶2(c). AD's proposal should be adopted because it fairly balances the need to protect confidential information with AD's need for continual access to these materials.

## I.    No Good Cause Exists for Tesla's Proposed Inclusion of Technical Documents as "Source Code."

Tesla's arguments fail to provide the "good cause" required for adopting its source code definition. *See Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir. 1993).

*First*, Tesla argues that its technical documents are treated with a high level of confidentiality and disclosed subject to NDA in access-controlled environments. D.I. 38 at 1. This may be true, but that same argument applies to any company's proprietary information. AD's proposed protective order provides the necessary judicial protection to ensure that Tesla's confidential information remains protected at similar, if not greater, levels of protection. *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 22 (D. Del. 1988).

For example, Tesla's NDA is not judicially enforced like this Court's protective orders, Tesla's engineers and other recipients of the information do not have the same professional and ethical obligations as AD's lawyers, and Tesla cannot distinguish its access controls from those regularly used in any litigation involving confidential business information.

Moreover, Tesla's proposed provisions run contrary to how it treats its documents and code. Tesla's security does not prevent its engineers from making entire copies of the accused source code or copying it onto personal Dropbox or iCloud accounts.[2] Ex. 11 at ¶¶ 3, 31; Ex. 12 at ¶26. Also, Tesla's assertions that its technical documents must be treated as "Source Code" is belied by the fact that, in other cases, Tesla has not imposed such a restriction on its technical documents. Ex. 13 at ¶ 8 (source code is "computer code and/or live data"); Ex. 14 at ¶ 8.

*Second*, Tesla contends that its draconian provisions are required based on speculation surrounding "corporate espionage" and "well-funded nation-state actors." D.I. 38 at 1. Not so. AD is a plaintiff in patent infringement litigation seeking to analyze evidence necessary to prove its case, not a state actor or a mole committing corporate espionage. And there is no indication that the protections proposed by AD, provisions commonly accepted in patent litigation involving many large companies in this District, will not adequately protect Tesla's confidential information. Tesla's expanded "Source Code" provision should be rejected because Tesla has failed to provide any concrete evidence showing why its concerns about potential espionage raise to a level different

---

[1] Exhibits 1-9 are attached to Tesla's letter brief.  D.I. 38.

[2] Tesla refused to answer AD's questions about whether Tesla's employees can access the materials implicated by this dispute outside of Tesla's California facility, and whether Tesla has written policies about where code can be accessed. Ex. 10 at 1.

from any case involving confidential secretive business information. The standard provisions in AD's proposed Protective Order balance the parties' interests and fairly address Tesla's concerns.

**Third**, Tesla argues that the Court should adopt Tesla's onerous provisions because there are a few instances of *stipulated* protective orders with similar provisions, and the Northern District of California has an *optional* provision that expands the meaning of "source code." D.I. 38 at 2 (citing Exs. 4, 5, 6). Optional provisions from other courts and stipulations between other parties in cases involving different facts and circumstances are irrelevant to this dispute. Other courts have declined plaintiffs' efforts to expand the scope of "source code." *See, e.g.*, Ex. 15 at 1; *HSM Portfolio LLC v. Fujitsu Ltd.*, 2013 WL 12233636, at *1 (D. Del. Jan. 9, 2013).

## II.   Treating Technical Documents as Source Code Would Unfairly Impact AD's Ability to Prepare and Try its Case

Tesla's proposals would add significant unnecessary delays and expenses to this case. If Tesla's expanded definition of source code is adopted, then each time AD or its experts want to review *any technical* document, counsel and the experts will have to navigate the following process: (1) provide Tesla with 4 to 14-days written notice, (2) fly from Washington, D.C. (where AD's counsel and experts are primarily located) to Tesla's California facility in San Francisco, (3) stay in a hotel, (4) travel to Tesla's office to review documents on a dedicated source code computer on a business day, (5) travel to the airport and fly back to Washington, D.C., and (6) wait for Tesla to either object to the print request or provide a *paper only* copy of the technical document in the mail. Ex. 1 at ¶¶11(a), (b), (c)(vii). That exercise is expensive, oppressive, highly prejudicial and wholly unnecessary. Critically, counsel typically analyze technical documents repetitively as a case theory is refined. Yet, the review of technical documents described above would need to be repeated each time Tesla produces a new technical document,[3] each time Tesla or its expert cites a technical document and each time AD's lawyers or experts want to recall the substance of the document they previously read to use it in case preparation.

While the above prohibitions are punitive standing alone, Tesla's proposal inserts additional restrictions that further impede AD's ability to prepare its case. According to Tesla, AD's lawyers cannot be trusted to travel with technical document printouts because they could be left "in an airport or hotel room." D.I. 38 at 3. Tesla provides no basis for this supposition. Tesla's proposed solution is that *Telsa's lawyers* will bring the documents to any deposition. Ex. 1 at ¶11(c)(xii). Unsurprisingly, Tesla says it needs a manifest of every technical document that will be discussed in a deposition ten days in advance. *Id.* The reason for such a provision is *not* security; Tesla wants a roadmap of the documents AD will use in its depositions to prepare its witnesses based on prior disclosure of the very documents to be used at a deposition. As with the draconian provisions concerning inspection discussed above, providing Tesla with a roadmap of depositions would result in unprecedented prejudice and is simply not necessary. Not only do Tesla's proposed provisions unfairly provide work-product-protected information with waiver implications, but it also unfairly impacts AD's ability to prepare for depositions, given that documents selected for use in depositions often are selected shortly before or even on the day of the deposition. Tesla's suggested provisions are clearly intended to provide Tesla with a significant unfair advantage in the discovery process, and they should be rejected.

---

[3] While Tesla has not produced a single document to date, it is routine for companies to produce documents on a "rolling basis," thus resulting in numerous productions during fact discovery.

Moreover, this Court has acknowledged that technical documents with less than 50 lines of code are not source code documents. Ex. 18 at ¶13. Tesla also implicitly concedes that technical documents differ from source code. During the meet and confer process, Tesla conceded that PDF printouts of technical documents do not pose the same risks as disclosing source code by agreeing to provide AD with unlimited printing of technical documents. Ex. 10 at 6. Nevertheless, producing documents in print, but not electronic form, only prevents AD from efficiently reviewing and analyzing documents. *See, e.g.*, *Member Servs, Inc. v. Security Mutal Life Ins.*, 2007 WL 2907520, at *1, 7 (N.D.N.Y. Oct. 3, 2007) (dismissing the chance of electronic documents being misappropriated when paper documents were produced).

Tesla's attempt to expand source code protection to potentially all of its technical documents creates an unfair minefield that would unfairly impair AD's ability to review, analyze, and use Tesla's core technical documents throughout discovery and in trial. The Court should deny Tesla's restrictions for lack of "good cause." *Leucadia*, 998 F.2d at 166.

### III.    AD's Responses to the Four Points Raised at the End of Tesla's Letter

*First*, AD proposes that printouts of actual source code be limited to 2,500 aggregate pages and 50 consecutive pages (2500:50). AD's source code experts suggested these limits given the specialized code involved in this case. Ex. 10 at 1. AD offered to consider 1500:50 limits but warned that doing so would result in significant additional time at the source code computer, which would be unduly burdensome for both parties. *Id.* AD's limits are also consistent with limits agreed to by other large companies with extremely valuable source code, such as Amazon and Ericsson. Ex. 16 at 5 (1500:25); Ex. 17 at 10(k) (1500:50). Tesla's 200:5 limit is simply insufficient, given the number of patents and the complicated technologies involved in this case. Ex. 18 at 11 (granting 500 pages where "source code review is not critical to the facts of [the] case.")

*Second*, AD agrees to not travel with actual source code but cannot agree to provide advanced notice of the technical documents it will discuss in a deposition for the reasons discussed above. Also, given that many technical depositions will likely occur in person, AD's attorneys need to travel with their working versions of the technical documents to ensure efficient, effective and fair depositions.

*Third*, AD agrees not to digitize Tesla's source code except for use in excerpts and exhibits as reasonably necessary. For the above reasons, AD cannot agree to fly to California whenever it wants to review technical documents electronically, which is eminently unfair.

*Fourth*, AD is not insisting on keeping unredacted copies of documents with Tesla's source code. D.I. 38 at 3. Instead, given Tesla's concerns about its information, AD offered Tesla the opportunity to provide redacted versions of archival documents. Such a provision is not standard in Tesla's other protective orders nor in most protective orders. Ex. 14 at ¶25; Ex. 4 at ¶15; Ex. 5 at ¶ 4; Ex. 6 at ¶26. AD wants to ensure that Tesla has the opportunity to provide redacted versions of archival documents so there is no dispute about what AD can or cannot keep for its archival purposes.

3

Respectfully submitted,

*/s/ Karen E. Keller*

Karen E. Keller (No. 4489)


cc:    Clerk of the Court (by CM/ECF and Hand Delivery)
        All Counsel of Record (by CM/ECF and Email)

# Exhibit 10

## John Holley

| | |
|---|---|
| **From:** | John Holley |
| **Sent:** | Thursday, May 11, 2023 9:11 PM |
| **To:** | Moore, Ian; Autonomous_Tesla |
| **Cc:** | Tesla_AD_Attorneys |
| **Subject:** | RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx |

Hi Ian,

Thank you for providing Tesla's responses.  We have a few follow-up questions and comments to make sure that the dispute is fairly framed.

Tesla says that the discovery material in the *Arigna* case is different from the material in this case.
- Has Tesla ever produced the discovery material implicated in this case (e.g., Autopilot source code, the Neural Network source code, or the non-computer-code documents) in any other case?  If so, what case(s)?
- Has Tesla have ever allowed any third party, e.g., a supplier, vendor, partner, subsidiary, contractor, or anyone else, to access the discovery material implicated in this case?  If so, did Tesla allow *any* of those third parties to review the code outside of Tesla's California facilities or require the same restrictions that Tesla seeks here?

Tesla also demands that the code be reviewed at Tesla's California facility.
- Since January 1, 2018, has any Tesla employee accessed the discovery material implicated by this case outside of Tesla's California facility?
- Does Tesla have a written policy regarding where the source code implicated by this case can be accessed and whether or not it may be accessed outside of Tesla's California facility?  If so, will Telsa provide us with each version of that policy from January 1, 2018 to now?

Tesla says it is unsure what is meant by a document having a defined type.
- During our meet and confers we repeatedly mentioned Software Specifications, Requirement Specifications and Software Requirement Specifications.  Does Tesla not have these types of documents?
- Also, we understand from our meetings that Tesla controls access to certain documents in the manner Tesla is demanding here.  Is Tesla unable to identify the types of documents with the restrictions Tesla is proposing?  And is Tesla actually unable to estimate the volume of the restricted documents?

Tesla identifies two cases where the parties stipulated to certain provisions surrounding source code.  Please let us know if Tesla is aware of any Court ordering those provisions without a stipulation.  We are unaware of any such instance.

Regarding the volume of printed pages, we are surprised that Tesla is resurrecting the 500-page number.  As we discussed during our meet and confer, we retained a source code expert who informed us that 2,500 pages would be needed for a case with the specialized source code here.  We also informed Tesla that 200 or 500 pages would make proving our case nearly, if not, completely, impossible.  We explained that we would be willing to consider a lower number, such as 1,500 pages, but that number would require significant additional time on the computer to "Swiss cheese" the code snippets needed to prove our case.   Given that Tesla says it is willing to negotiate on the number, please let us know Tesla's proposed limits as soon as possible.

Tesla's requirement that AD disclose its cross-examination documents to Tesla 10-days (or anytime) in advance of a deposition makes little sense and is extremely prejudicial.  It is fundamental that AD have an opportunity to fully cross-examine Tesla's witnesses and experts, and this cannot be done properly if Tesla is tipped off to the documents we will discuss with its witnesses.   Tesla's attempt to mitigate this extreme prejudice by being reasonably over-inclusive is unworkable.  If Tesla is willing to bring every document to the deposition, then perhaps we can reach an agreement, but

1

under no circumstances is Tesla entitled to uncover AD's attorney work product vis-à-vis knowing a subset of documents from which we may ask questions.  Please let us know if Tesla will agree to bring every document to each deposition.

AD does not intend to attach extensive pages of source code to any filing, but it reserves the right to attach relevant portions as an exhibit.  We intend to be reasonable and Telsa may reserve the right to dispute whether AD's exhibits are reasonable.  Please let us know if this is workable for Tesla.

Lastly, AD does not intend to keep archival copies of Tesla's source code once the matter is complete.  That was never AD's position.  And AD will certify that it destroyed Tesla's CBI following the conclusion of this matter.  However, AD does reserve the right to keep an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, even if such materials contain Protected Material.  Typically there are no redaction requirement for archival copies.  But, AD is reasonable, and agrees to allow Tesla to provide AD with redacted archival copies that removes any source code snippets.

Best,
John

**McKool Smith** | John Holley
Principal | Washington | (202) 370-8320

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Tuesday, May 9, 2023 4:00 PM
**To:** John Holley <jholley@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

John,

Tesla provides the following responses to AD's comments/questions:

| AD Comment/Question | Tesla Response |
|---|---|
| These limitations were not in the PO Tesla stipulated to in the *Arigna* case. | The discovery material potentially implicated by this matter is particularly sensitive and was not at issue in *Arigna*, which involved infringement allegations against a third-party component. |
| Do you have an estimate on when Tesla will know what types of documents it has that will fall into this category?<br><br>Does Tesla define its document types? If so, is Tesla willing to define the exact types of documents that fall under this non-computer-code category and figure out the volume of those documents? | Tesla believes that its proposed definition provides adequate guidance as to the type of documents that qualify as source code. The same or similar definitions have been used in prior cases. *E.g., Parity Networks, LLC v. Netgear, Inc.*, No. 22-cv-1521, D.I. 20 (D. Del. Apr. 3, 2023); *Almondnet, Inc. v. Roku, Inc.*, No. 6:21-cv-00876, D.I. 44 (W.D. Tex. Sept. 16, 2022).<br><br>Beyond the proposed definition of source code, Tesla is unsure what is meant by a document having a defined type. |

| | |
|---|---|
| Do you have an estimate on when Tesla will know the approximate volume of documents that will be classified as non-computer-code documents? | Tesla will not know the volume of such documents until document collection is substantially complete. |
| How does Tesla expect us to share these documents with our expert?<br><br>How does Tesla expect us to use these documents in a remote deposition, at a hearing, or at trial? | These documents would be subject to the protocols prescribed in ¶ 11 for the disclosure and review of source code. |
| We understand that Tesla is unwilling negotiate regarding its original suggestion of 200 pages total with 5 consecutive pages.  Is our understanding correct? | Tesla is willing to negotiate but is unwilling to agree to AD's proposal of 2500:50, which is five times higher than AD's original proposal of 500:15, which Tesla previously stated it cannot agree to. |
| We understand that Tesla unwilling to allow AD's lawyers to travel with deposition exhibits, regardless of the security measures employed.  Is our understanding correct? | Tesla is unwilling to allow AD to travel with source code printouts. |
| We understand that Tesla insisting that AD's lawyers reveal what documents it will discuss during a deposition via a 10-day notice to Tesla's lawyers.   Is our understanding correct? | Tesla would not require that AD reveal the documents it will discuss during a deposition. Tesla would require that AD provide notice of what source code printouts it would like available at the deposition, such that Tesla can securely prepare and transport copies. Tesla is flexible as to the notice period.<br><br>If AD's concern is in revealing which specific printouts will be discussed at a deposition, provided AD is reasonable, AD can be over-inclusive in which printouts it requests. |
| We understand that Tesla is unwilling to allow relevant portions of its documents to be attached as an exhibit to any pleading, but the relevant portion can be included in the body of the pleading.  Is our understanding correct? | If AD only intends to use short excerpts of source code, the parties may be able to reach agreement. |
| How does Tesla expect to police the redaction of the archival copies? | Tesla does not understand why AD needs to keep archival copies of Tesla's source code once this matter is complete.<br><br>Tesla requires that AD certify that it has destroyed (through redaction or otherwise) all Tesla source code at the conclusion of this matter. If it were to be later determined that AD failed to do so, Tesla would seek legal recourse against AD, including its attorneys. Tesla trusts that AD will comply with the protective order. |

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue

New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Thursday, May 4, 2023 6:58 PM
**To:** John Holley <jholley@McKoolSmith.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

We expect to be able to provide answers by Monday or Tuesday.



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, May 4, 2023 5:36 PM
**To:** Moore, Ian <Ian.Moore@weil.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

Thanks, Ian.  The 31st works on our end.  Do you have a rough estimate of when you will get answers?

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Thursday, May 4, 2023 5:31 PM
**To:** John Holley <jholley@McKoolSmith.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

Hi John,

May 18th and 22nd work for us. May 29th is Memorial Day, so we'd propose May 31st as the third date instead, if that works for you all.

Tesla is still considering the questions below but may not be able to provide answers by the end of this week.

Best regards,

Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, May 4, 2023 1:55 PM
**To:** Moore, Ian <Ian.Moore@weil.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

Hi Ian,

I'm following up on the comments/questions below.  Will you be able to provide answers this week?

Also, Judge Hatcher's form (Judge Hatcher Motion To Schedule Teleconference.pdf (uscourts.gov)) requires us to identify three dates for the teleconference.   We are free on the 18th, 22nd, and 29th of May.  Please let us know if those dates work on your end.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Tuesday, May 2, 2023 6:30 PM
**To:** Moore, Ian <Ian.Moore@weil.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>
**Subject:** FW: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

Hi Ian,

Thank you for the updates.  Please see our comments/questions in red in-line with your message.

Best,
John

**McKool Smith** | John Holley
Principal | Washington | (202) 370-8320

**McKool Smith** | John Holley
Principal | Washington | (202) 370-8320

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Tuesday, May 2, 2023 3:49 PM
**To:** John Holley <jholley@McKoolSmith.com>
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>
**Subject:** RE: 2023-05-01 - DRAFT Protective Order (redline) (002).docx

John,

We understand that the parties will notify the Court today that there are outstanding PO disputes. Nevertheless, we wanted to provide Tesla's response to the proposals discussed on our last call.

¶ 2(c) (definition of source code): Tesla proposes the following definition of source code:

"'Source Code' means computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs."

Tesla can agree that non-computer-code documents will not count towards the printed page limit, and that printouts of non-computer-code documents will be delivered. Tesla cannot at this time estimate the volume of these documents or specify their exact type beyond the above definition.

- As you can imagine, this definition seems onerous to Plaintiff as it contains very few boundaries and could lead to a scenario where almost all technical documents were subject to source code provisions of the PO. That is not acceptable. For the non-computer-code documents (i.e., formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs) please let us know if you can provide any clarity on the following questions to aid in the assessment of the severity of the proposed definition.
    - Do you have an estimate on when Tesla will know what types of documents it has that will fall into this category?
    - Do you have an estimate on when Tesla will know the approximate volume of documents that will be classified as non-computer-code documents?
    - Does Tesla define its document types? If so, is Tesla willing to define the exact types of documents that fall under this non-computer-code category and figure out the volume of those documents?
        - We want to be reasonable here, but we need to understand the scope of any possible agreement. For example, we don't want a moving target on what does or does not constitute a non-computer-code document. And we cannot agree for Tesla to make vast portions of its production in unsearchable paper format. If there is a limited subset of documents, e.g., a few dozen Software and Requirement Specifications filling roughly a 4-inch binder, then we can likely reach an agreement.
        - Assuming an agreement is reached:
            - How does Tesla expect us to share these documents with our expert?
            - How does Tesla expect us to use these documents in a remote deposition, at a hearing, or at trial?
- We also note that Tesla did not require these limitations in its case against *Arigna Technology Ltd.*, 2:21-cv-00054-JRG-RSP. In that case, Tesla defined "Source Code" as follows:

8.  To the extent a producing Party believes in good faith that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED - ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE".

Plaintiff Arigna Technology Limited ("Plaintiff") and Volkswagen AG; Volkswagen Group of America, Inc.; Bayerische Motoren Werke AG; BMW of North America, LLC; Daimler AG; Mercedes-Benz USA, LLC; Nissan Motor Co., Ltd.; Nissan North America, Inc.; Tesla, Inc.; Tesla Motors TX, Inc.; Toyota Motor Corporation; Toyota Motor North America, Inc.; and General Motors LLC (collectively, "Defendants"), hereby move the Court for entry of a Partially Disputed Protective Order.

The parties have met and conferred and agree on all provisions of the proposed Protective Order for this case with the exception of a single disputed provision, Paragraph 13, regarding whether DESIGNATED MATERIAL of one Defendant may be shown or provided to another Defendant or Defendant's counsel without prior consent by the producing Party. Plaintiff's and Defendants' positions are set forth in the attached proposed Protective Order.

For the following provisions, the parties remain at an impasse:
- ¶ 11(c)(vii) (print limits);
  - We understand that Tesla is unwilling negotiate regarding its original suggestion of 200 pages total with 5 consecutive pages.  Is our understanding correct?  This limitation was not in the *Arigna* PO Tesla agreed to.
- ¶ 11(c)(xii) (deposition printouts);
  - We understand that Tesla unwilling to allow AD's lawyers to travel with deposition exhibits, regardless of the security measures employed.  Is our understanding correct?
  - We understand that Tesla insisting that AD's lawyers reveal what documents it will discuss during a deposition via a 10-day notice to Tesla's lawyers.   Is our understanding correct?
  - These limitations were not in the PO Tesla stipulated to in the *Arigna* case.
- ¶ 11(c)(xiii) (electronic exhibits);

- o We understand that Tesla is unwilling to allow relevant portions of its documents to be attached as an exhibit to any pleading, but the relevant portion can be included in the body of the pleading. Is our understanding correct?
- o Here is what Tesla stipulated to in the *Arigna* case. Notably, it does not include the no-exhibit provision Tesla seeks here.

> h. A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document ("Source Code Documents"), provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

- ¶ 18(c) (redaction of archival copies).
  - o How does Tesla expect to police the redaction of the archival copies? Also, Tesla did not have a redaction requirement in is *Argna* case.

> request. Notwithstanding the foregoing, outside counsel of record shall be entitled to maintain copies of all pleadings, expert reports, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto), trial transcripts and hearing transcripts, and exhibits offered or introduced into evidence at any hearing or trial, emails and their attachments, and their attorney work product which refers or is related to any Protected Material for archival purposes only. Any such archived copies that contain or constitute Protected Material remain subject to this Order and shall be maintained in confidence by outside counsel for the Party retaining the materials. This provision does not apply to the Court, including court personnel and the Court's reporter. Any destruction obligations under this Protective Order shall not apply to electronically-stored information in archival form stored on backup tapes or computer servers that are created only for disaster recovery purposes, provided that such electronic archives are not used as reference materials for a receiving Party's business operations.

Finally, further to our call, Tesla proposes the following additional provision regarding data breaches:

The Receiving Party shall promptly notify the Producing Party within 5 days if it becomes aware of any unauthorized access of the Receiving Party or any unauthorized access of a Party having access to the Producing party's materials.

- o This is fine.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Monday, May 1, 2023 4:00 PM
**To:** Moore, Ian <Ian.Moore@weil.com>
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>
**Subject:** 2023-05-01 - DRAFT Protective Order (redline) (002).docx

Ian,

Thanks for the call just now.  Attached is the document we talked through on the call.  The yellow parts are the disputes that you highlighted.  The red parts are the ones we cannot accept as written.  The blue/green/grey parts are the ones that we are either close on or tentatively agreed upon, subject to client approval.

Please let us know what Telsa says about the redefinition of "Source Code Material" to include only Software/Requirement Specifications.  If you could please provide the exact types of documents and the volume of those documents, it would help reach a resolution, e.g., we don't want to agree to have millions of pages produced in paper form only and we do not want a lack of clarity about what constitutes a Source code like document.

Also, please let us know if Tesla can provide a more reasonable number of source code printouts / consecutive pages.

Thanks,
John



**John Holley**
Principal
Washington, D.C.
Tel: (202) 370-8320
www.mckoolsmith.com

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# Exhibit 11

Fred Norton (SBN 224725)
Bree Hann (SBN 215695)
Matt Turetzky (SBN 280997)
THE NORTON LAW FIRM PC
299 Third Street, Ste 106
Oakland, California 94607
Telephone: (510) 906-4900
Fax: (510) 906-4910
fnorton@nortonlaw.com
bhann@nortonlaw.com
mturetzky@nortonlaw.com

Attorneys for TESLA, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESLA, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>GUANGZHI CAO, an individual,<br><br>Defendant. | **CASE NO.**<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## SUMMARY OF THE ACTION

1. Tesla, Inc. ("Tesla") leads the world in the design and production of all-electric vehicles, as well as clean energy generation and storage products. Defendant Guangzhi Cao was a member of Tesla's Autopilot team, an elite group of engineers developing Tesla's industry-leading Autopilot features, including its full self-driving technology – a crown jewel of Tesla's intellectual property portfolio. As part of the Autopilot team, Cao had access to crucially important, and highly confidential, Tesla trade secrets, including source code.

2. On January 3, 2019, Cao abruptly announced that he was quitting his job at Tesla, effective the very next day. Although he did not tell anyone at the time, Cao had accepted a job doing the same work for Xiaopeng Motors Technology Company Ltd. ("XMotors"), a Tesla imitator also pursuing self-driving and electric vehicle technology.

3. As Tesla has now learned, Cao began searching for a new job by November 2018. Long before he left, Cao began uploading complete copies of Tesla's Autopilot-related source code to his personal iCloud account – more than 300,000 files and directories, in violation of Tesla's policies and its agreements with Cao. Then, as he was looking to leave Tesla, Cao created .zip files of Tesla's complete Autopilot-related source code repositories, making them smaller and easier to move.

4. Unbeknownst to Tesla, Cao had at least a verbal offer from XMotors by November 26, 2018. Cao then traveled to China (the home of XMotors) between December 5 and 9, without telling his manager where he was going or why. He received a written employment offer from XMotors on December 12.

5. Tesla does not know when Cao accepted his job offer. However, as Tesla now knows, Cao deleted over 120,000 files in the month of December and disconnected his iCloud account from his Tesla-issued computer on December 26. Between December 27 and January 1, Cao repeatedly logged into Tesla's secure networks, and he cleared his browser history by January 4, his last day at Tesla.

6. When he left, Cao did not return Tesla's highly confidential information, nor disclose that he had made copies. Tesla thus believes that Cao still has, can access at will, and may be using

1    all the source code needed to replicate Tesla's proprietary Autopilot technology, none of which he
2    has a legal right to possess.

3        7.    Needless to say, Tesla's confidential information is not safe in the hands of XMotors
4    or its employees.  Inspired by and on a mission to beat Tesla, XMotors reportedly designed its
5    vehicles around Tesla's open-source patents and has transparently imitated Tesla's design,
6    technology, and even its business model.  XMotors has also introduced reportedly "Autopilot-like"
7    features (called X-Pilot), and now employs at least five of Tesla's former Autopilot employees,
8    including Cao.  And, as discussed below, this would not be the first time that a new XMotors recruit
9    tried to bring his former employer's trade secrets to XMotors.

10       8.    Tesla has spent hundreds of millions of dollars and more than five years developing
11   Autopilot.  Now that investment is at risk.  Tesla must learn what Cao has done with Tesla's IP, to
12   whom he has given it, and the extent to which Tesla has been harmed.  Tesla files this lawsuit to
13   compel the return of its valuable IP and protect it from further exploitation, and for all other relief as
14   the facts may warrant.

**THE PARTIES**

16       9.    Tesla is a Delaware corporation with its headquarters and principal place of business
17   in Palo Alto, California.

18       10.   Defendant Guangzhi Cao is an individual who, on information and belief, resides in
19   Cupertino, California.  From April 24, 2017 until January 4, 2019, Cao worked for Tesla in Palo
20   Alto, California.

**JURISDICTION AND VENUE**

22       11.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this matter involves
23   claims under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 *et seq*.  This Court has
24   supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367, as the remaining
25   claims form part of the same case or controversy: Cao's access to, taking of, and use of Tesla's
26   intellectual property and confidential information.

27       12.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a
28   substantial part of the events giving rise to the claims occurred in this District.  For example, Tesla

2
COMPLAINT

employed Cao in Palo Alto, which is within the Northern District; Cao downloaded Tesla's source code while physically present at or connected to his Tesla workplace.

**FACTUAL BACKGROUND**

**A. Tesla's Industry-Leading Autopilot Technology And Autopilot Source Code**

13.    Tesla's Autopilot technology is widely regarded as the most advanced, safest, and most reliable technology of any consumer advanced driver-assistance system solution.  Today, Autopilot is an advanced driver assistance system that augments drivers' perception, improves their decision-making, and assists in controlling their vehicles. Autopilot offers advanced driver assistance features including lane-keeping, adaptive cruise control, and automatic parking.  More recently, Tesla introduced Navigate on Autopilot, which guides a car from a highway's on-ramp to off-ramp, including suggesting and making lane changes, navigating highway interchanges, and taking exits (in each case under the driver's supervision).   Tomorrow's Autopilot will make Tesla's vehicles fully autonomous, capable of driving short and long distances without driver involvement.

14.    Tesla has a global fleet of more than 500,000 cars, which have driven more than a billion collective miles with Autopilot activated. Every day, thousands of Autopilot-enabled Tesla vehicles provide real-time feedback to Tesla's servers, yielding voluminous data that Tesla uses to continually improve the Autopilot system.  This fleet gives Tesla exponentially more data than its autonomous vehicle competitors, who generally have only small fleets of prototype vehicles, and has allowed Tesla to accelerate its autonomy technology in a way no other company can.

15.    Tesla uses multiple, highly confidential kinds of source code for its Autopilot features, including the firmware, Autopilot, and neural net source code repositories (the "Autopilot Trade Secrets"). Firmware source code executes core tasks on Tesla's vehicles, such as motor controls, steering, and infotainment functions. Autopilot source code executes Autopilot-related functions, such as semi-autonomous driving, in response to environmental and driver-supplied inputs, and uses the neural net to process (and "see") information from onboard cameras to make decisions.  The neural net source code does not run on Tesla's vehicles directly but is used to "train" the neural net using a massive dataset via machine-learning processes.  Each of these source code repositories is highly valuable in its own right. Taken together, the Autopilot Trade Secrets would

give a competitor an enormous advantage in attempting to replicate Tesla's current self-driving technology, and in anticipating future developments.

16.     Tesla derives independent value from maintaining the secrecy of its source code and other proprietary information related to Autopilot and the functioning of its vehicles. Tesla's source code reveals how Tesla has approached and solved problems in vehicle autonomy, and disclosure of that source code could give competitors an unfair, and unearned, advantage.

17.     For example, unlike many of Tesla's competitors, Tesla's self-driving functionality is primarily based on cameras and radar, without the use of another expensive sensor, LIDAR. The source code reveals in great detail how Tesla has used camera and radar to solve problems in autonomous driving.

18.     As another example, the source code also reflects and contains improvements that are built on Tesla's massive volume of fleet telemetry data. If disclosed to a competitor, that competitor could use Tesla's source code to copy Tesla's work, compete with Tesla, or otherwise accelerate the development of its own vehicle autonomy technology.

19.     Similarly, across all of its source code (including firmware, Autopilot, and neural net source code), Tesla has invested enormous time and expense to write and incrementally improve its source code over time. Disclosure of this source code to Tesla's competitors could give them access to off-the-shelf code that they could use in operating their own vehicles or vehicle autonomy software. If Tesla's source code is disclosed to competitors, those competitors will unfairly receive, for free, the fruit of Tesla's labor and investment over many years to develop, improve, and refine its various kinds of source code.

**B. Tesla Vigorously Protects The Confidentiality Of Its Confidential Information**

20.     Tesla's policies and practices robustly protect confidential and proprietary information, including the Autopilot Trade Secrets. For example, Tesla requires all its employees to enter into agreements that obligate them to safeguard the company's confidential information, including trade secrets and source code. Employees must sign confidentiality agreements as a condition of their employment, such as Tesla's Employee Non-Disclosure and Inventions

Assignment Agreement ("NDA"), and must periodically re-sign as the company revises and updates its agreements.

21.     Tesla secures its physical facilities by restricting access to authorized personnel, and then monitoring actual access with security guards and cameras.  Visitors to Tesla's headquarters in Palo Alto ("Deer Creek"), where the Autopilot team is located, must check in with a receptionist or security guard, sign a nondisclosure agreement, and submit to a photograph.  While at Deer Creek, they must be escorted by a Tesla employee at all times.

22.     Tesla also protects its confidential information with stringent information security policies and practices.  Tesla's network and servers are themselves password-protected and firewall-protected and are accessible only to current Tesla employees with proper credentials. And after an employee resigns or is terminated, Tesla promptly deactivates that user's network, active directory, and email permissions, which cuts off access to Tesla's source code repositories.  In addition, Tesla prohibits employees from storing confidential Tesla information on unsecured systems, such as iCloud, Google Drive, or DropBox – which Cao violated here.

**C. Tesla Guards The Autopilot Source Code Even More Strictly**

23.     The Autopilot Trade Secrets are extremely valuable, and Tesla takes extreme care to keep them secret.  Each of Tesla's 200 Autopilot team members must sign Tesla's NDA, which requires employees to keep confidential all of Tesla's confidential and proprietary information, including technical data, trade secrets, source code, and other business information.  The Autopilot team members are also subject to Tesla's general policies and practices, as described above.  In addition, the Autopilot team is physically separated from the other employees at Deer Creek. Employees with approved access rights to the Autopilot team area must badge into the area and pass through a turnstile, which prevents "tailgating" by other people who are not authorized to enter the restricted area.  This physical separation ensures that other Tesla employees, or authorized guests, cannot see or learn what the Autopilot team is doing.  The Autopilot team's work is top secret, even within Tesla.

24.     Tesla stores the Autopilot Trade Secrets on a Tesla-owned server, protected behind Tesla's firewall.  Of Tesla's approximately 45,000 employees worldwide, only about 800 have

access to the firmware source code, while only about 200 have access to any portion of the Autopilot source code. Access to both firmware and Autopilot source code is granted and monitored by high-level managers in the Autopilot group. Tesla restricts the neural network source code most stringently: currently, only about 40 people have access to this source code, which is granted on a strict "need-to-know" basis and only by the head of Artificial Intelligence at Tesla. As noted above, by virtue of his position and responsibilities, Cao had access to all three types of source code.

**D. XMotors Copies Tesla To Catch Up**

25. Given Tesla's success with its electric and autonomous cars, numerous companies are trying to catch up. One such company is XMotors.[1] XMotors is one of many Tesla-inspired startups, and its copying of Tesla is well documented.[2] For example, XMotors' first vehicle, the G3, has been called a "Tesla clone" based on visual similarities in the vehicles' styling, touchscreen, user interface, instrument cluster, headlights, and more. XMotors has also announced that it will operate a broad "super charging" network (Tesla's global fast-charging network is called the "Supercharger" network), and will operate a direct sales and service network, like Tesla has done since its inception.

26. XMotors has also pursued Tesla's employees. In 2017, XMotors hired a former Tesla Autopilot team member as its Vice President of Autonomous Driving. Tesla is informed and believes that this employee is now responsible for the self-driving research and development team for XMotors. At least five former Autopilot team members have now gone to XMotors, including Cao.

27. XMotors has previously gained notoriety in connection with competitors' trade secrets. In July 2018, a former Apple employee was arrested at the San Jose International Airport

---

[1] On information and belief, the parent company, based in China, is Xiaopeng Motors Technology Company Ltd., often referred to as Xpeng Motors. According to the website www.xmotors.ai,, "XMotors is a fully-owned subsidiary of XPENG Motors." On information and belief, the XMotors entity that hired Cao is formally known as XMotors.ai, Inc.

[2] https://interestingengineering.com/is-xpeng-set-to-be-the-tesla-of-china;
https://qz.com/1362926/chinese-ev-unicorn-xpeng-motors-wouldnt-exist-without-tesla/;
https://electrek.co/2018/12/13/tesla-inspired-ev-startup-xiaopeng-all-electric-suv/;
https://electrek.co/2018/04/10/ev-startup-tesla-clone-alibaba-foxconn-xiaopeng/.

for stealing self-driving intellectual property from Apple.[3] Like Cao, that individual had accepted a job with XMotors and left his old job with valuable trade secrets he had no right to possess.

**E. Cao Agreed to Protect Tesla's Confidential Information**

28.     Cao was subject to confidentiality agreements throughout his employment at Tesla. Even before he was hired, he expressly assented to a non-disclosure agreement as part of his pre-employment interview process. The day before his first day as an employee, on April 23, 2017, he agreed to a Tesla Motors, Inc. Employee Proprietary Information and Inventions Agreement, which included restrictions on his use of Tesla's confidential information. *See* **Exhibit A** (the "First NDA"). On June 4, 2018, Cao agreed to an updated agreement with substantially similar provisions. *See* **Exhibit B** ("Second NDA," and together with Exhibit A, the "NDAs").

29.     The NDAs cover all of Tesla's technical data, trade secrets, source code, and other business information, and require employees to keep that information confidential. *See* Exhibit A at § 1, Exhibit B at § 1. Both NDAs explicitly require an employee, upon termination, to "immediately" return to Tesla all Tesla hard copy and electronic documents and materials. *See* Exhibit A at § 4, Exhibit B at § 4. Both prohibit current and former employees from soliciting Tesla employees on behalf of another company for 12 months after they leave Tesla. *See* Exhibit A at § 8.2; Exhibit B at §§ 9.2.1, 9.2.2.

**F. Cao Misappropriates The Autopilot Trade Secrets**

30.     Cao started as a full-time employee at Tesla on April 24, 2017, as a Staff Computer Vision Scientist, working as part of the team building the neural net that is the foundation for Tesla's self-driving technologies. Because of his position and job duties, Cao had extensive access to Tesla's confidential information, including all of the Autopilot Trade Secrets. While at Tesla, Cao worked on Autopilot with the former Tesla employee who later left to become XMotors' current Vice President of Autonomous Driving.

31.     As Tesla now knows, Cao violated Tesla's policies and his agreements with Tesla from the beginning. Cao used his personal iCloud account from 2017 to 2018 to create backup

---

[3] https://www.reuters.com/article/us-apple-theft/ex-apple-worker-charged-with-stealing-self-driving-car-trade-secrets-idUSKBN1K02RR.

copies of Tesla's highly confidential information, including the Autopilot Trade Secrets. For example, a forensic analysis shows that, between March 25, 2018 and December 26, 2018, he backed up entire repositories for the firmware, Autopilot, and neural net source code repositories – apparently all of the source code to which he had access – including more than 300,000 individual files and directories. Tesla believes that all of this information remains accessible to Cao in his personal iCloud account, in violation of Tesla's policies, Cao's agreements, and his legal obligations.

32.    Between November 2 and November 13, 2018, Cao created .zip files of all of the Autopilot source code. At the same time, he was looking to leave Tesla for another job. Although Tesla does not know when Cao began talking to XMotors about employment, Cao's wife referred to an offer from Xiaopeng in a November 26, 2018 iMessage to Cao. On December 1, Cao began deleting files from his laptop. And from December 5 through 9, 2018, Cao quietly traveled to China, where XMotors is located, without telling his Tesla supervisor where he was going or why.

33.    Three days later, on December 12, Cao received his formal XMotors offer letter, for the position of "Senior Director of Engineering, heading the camera perception team."

34.    Tesla does not know when Cao accepted his offer at XMotors, but he gave notice on January 3, 2019. On December 26, 2018, he logged out of his personal iCloud account, disconnecting that account from his Tesla-issued computer. Between December 27 and January 1, Cao repeatedly logged into Tesla's secure networks; between December 1 and his last day, he deleted more than 120,000 files from his Tesla computer. He cleared his browser history on January 4, 2019, his last day at Tesla. No one at Tesla instructed Cao to take these steps, and no one at Tesla was aware he did so until late February 2019 when his misconduct was discovered as a result of Tesla's investigative efforts.

35.    Cao did not disclose to Tesla that he had copied thousands of files, including the Autopilot Trade Secrets, to his iCloud account. He did not return the electronic copies of those documents when he left the company, as required by the NDAs. There is every reason to believe the Autopilot Trade Secrets remain in Cao's personal iCloud folder today.

36.     Since Cao's departure from Tesla, at least one other Tesla employee has accepted an offer at XMotors.  On January 26, 2019, that other Tesla employee sent texts about how Cao solicited him to join XMotors, including "Guangzhi [Cao] wants me to be their manager," and "I went to eat with Xiaopeng at noon on Monday."  The employee received an offer letter from XMotors.ai, Inc. on February 20, 2019 and left Tesla on February 26, 2019.

37.     According to his current LinkedIn profile, at XMotors Cao is now "[d]eveloping and delivering autonomous driving technologies for production cars," precisely what he was doing for Tesla.

**G. Tesla Faces The Threat Of Immediate And Irreparable Harm**

38.     Absent immediate relief, Tesla believes Cao and his new employer, XMotors, will continue to have unfettered access to Tesla's marquee technology, the product of more than five years' work and over hundreds of millions of dollars of investment, which they have no legal right to possess. Tesla has been damaged by the misappropriation of its confidential information, including because it has incurred substantial investigatory costs, and will suffer immeasurable harm if its confidential information, including the Autopilot Trade Secrets, are subject to further disclosure or misuse.

**FIRST CLAIM FOR RELIEF**

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**

39.     Tesla incorporates by reference all of the preceding paragraphs as if fully set forth herein.

40.     Tesla's confidential, proprietary, and trade secret information, including the Autopilot Trade Secrets, are protected under the DTSA, 18 U.S.C. § 1836 *et seq.*

41.     Tesla's confidential, proprietary, and trade secret information relates to products and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or ordered in, interstate or foreign commerce.

COMPLAINT

42.     The information derives independent economic value by not being accessible, through proper means, to competitors like XMotors.  The information is also not readily available to the public or to Tesla's other competitors.

43.     Tesla takes reasonable measures to keep this information secret and confidential, as described above.  Tesla derives significant economic benefit from maintaining the secrecy and confidentiality of this information.

44.      Cao's conduct constitutes a misappropriation and misuse of Tesla's confidential information in violation of the DTSA because Cao used and/or disclosed the information without Tesla's consent.  Further, Cao acquired the information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use.  Cao owed that duty to Tesla as an agent, employee, and representative of Tesla.

45.     Cao has not returned the information that he took from Tesla.  Upon information and belief, Cao is retaining and using Tesla's trade secret and confidential information.

46.     Cao's conduct constitutes a willful and malicious misappropriation of Tesla's confidential information.

47.     Tesla has suffered and will continue to suffer damage and irreparable harm, absent immediate injunctive relief.  Because Tesla's remedy at law is inadequate, Tesla seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and the competitive and other benefits that information confers.

48.     Thus, Tesla is entitled to preliminary injunctive relief, restitution, compensatory and exemplary damages, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1836.

## SECOND CLAIM FOR RELIEF

**Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act**

49.     Tesla incorporates by reference all of the preceding paragraphs as if fully set forth herein.

50.     At all times relevant to this Complaint, the California Uniform Trade Secrets Act, California Civil Code §§ 3426-3426.11 ("CUTSA") was in effect.

51.     Tesla developed and owns trade secrets as defined by CUTSA, as described above.

52.     The information derives independent economic value by not being accessible, through proper means, to competitors like XMotors.  The information is also not readily available to the public or to Tesla's other competitors.

53.     Tesla derives significant economic benefit from maintaining the secrecy and confidentiality of this information.

54.     Tesla takes reasonable measures to maintain its trade secrets, as described above.

55.     Cao's conduct constitutes a misappropriation and misuse of Tesla's confidential information in violation of CUTSA because Cao used and/or disclosed the information without Tesla's consent.  Further, Cao acquired the information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use.  Cao owed that duty to Tesla as an agent, employee, and representative of Tesla.

56.     Cao has not returned the information that he took from Tesla.  Upon information and belief, Cao is retaining and using Tesla's trade secret and confidential information

57.     Cao's conduct constitutes a willful and malicious misappropriation of Tesla's trade secrets and confidential information.

58.     As a consequence of the foregoing, Tesla has suffered and will continue to suffer damages and irreparable harm.

59.     Unless Cao is preliminarily and permanently enjoined from the foregoing conduct, Tesla faces the threat of irreparable harm as described above.  Tesla has also suffered damages. Additionally, Tesla is entitled to an award of punitive damages and attorneys' fees pursuant to CUTSA based on Cao's willful and malicious misappropriation of Tesla's trade secrets.

## THIRD CLAIM FOR RELIEF

### Breach of Contract

60.     Tesla incorporates by reference all of the preceding paragraphs as if fully set forth herein.

61.     The NDAs are valid, enforceable contracts and Tesla and Cao are parties to both contracts.

62.     Tesla did all, or substantially all, of the significant things that the NDAs required of Tesla.

63.     Through his conduct described herein, Cao breached his contractual obligations to Tesla, including the confidentiality obligations and non-solicit restrictions in the NDA §§ 1, 4, 9.2 and Second NDA §§ 1, 4, and 8.

64.     As a direct and proximate result of the foregoing breaches, Tesla has suffered, and will continue to suffer, damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### Breach of Employee's Duty of Loyalty

65.     Tesla realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

66.     By virtue of his position as an employee of Tesla, Cao owed a duty of loyalty to Tesla, at least insofar as he was entrusted with Tesla's highly sensitive, valuable confidential information, including the Autopilot Trade Secrets.

67.     Through his conduct described herein, Cao breached his duty to Tesla.

68.     As a direct and proximate result of the foregoing breaches, Tesla has suffered, and will continue to suffer, damages in an amount to be proven at trial.

69.     In doing the things herein alleged, Cao acted willfully, maliciously, oppressively, and with full knowledge of the adverse effects on Tesla, and with willful and deliberate disregard of the consequences to Tesla, so as to constitute oppression, fraud, and malice. Tesla is therefore entitled to exemplary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Tesla respectfully prays for relief as follows:

A.     For preliminary and permanent injunctive relief enjoining Cao and all persons or entities acting in concert or participation therewith, from:

(1) retaining, disclosing, or using any Tesla confidential and proprietary information in any manner, such as the Autopilot Trade Secrets, including without limitation to design, develop, or offer products or services in the autonomous driving industry;

(2) directly or indirectly soliciting any employee or contractor of Tesla to terminate their employment with, or otherwise cease their relationship with, Tesla for a period of one year following the termination of Cao's employment with Tesla; and

B.    For preliminary and permanent injunctive relief requiring Cao to submit to ongoing auditing of his personal and work-related systems and accounts to monitor for unlawful retention or use of Tesla's confidential and proprietary information;

C.    For compensatory damages in an amount to be proven at trial;

D.    For prejudgment interest according to law;

E.    For recovery of attorneys' fees, costs, and expenses incurred in this action; and

F.    For such other and further relief as the Court may deem just and proper.

Dated: March 20, 2019                  THE NORTON LAW FIRM PC

By: _____*/s/ Fred Norton*_____
Fred Norton
Attorneys for Plaintiff
Tesla, Inc.

## **DEMAND FOR JURY TRIAL**

Plaintiff Tesla, Inc. hereby demands a trial by jury of all issues so triable.

Dated: March 20, 2019                  THE NORTON LAW FIRM PC

By: _____*/s/ Fred Norton*_____
Fred Norton
Attorneys for Plaintiff
Tesla, Inc.

Case 3:19-cv-01463-SVK Document 1-1 Filed 03/21/19 Page 1 of 5



# EXHIBIT A

COMPLAINT of TESLA, INC., a Delaware corporation V. GUANGZHI CAO, AN INDIVIDUAL

**TESLA MOTORS, INC.**
**EMPLOYEE PROPRIETARY INFORMATION**
**AND INVENTIONS AGREEMENT**

In consideration of my employment or continued employment by **TESLA MOTORS, INC.** (the "*Company*"), and the compensation now and hereafter paid to me, I hereby agree as follows:

**1.** **PROPRIETARY INFORMATION.** At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. "*Proprietary Information*" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company, its parents, subsidiaries, or affiliated entities, customers and suppliers, or any other party with whom the Company agrees to hold information of such party in confidence, including but not limited to information relating to products, processes, know-how, designs, formulas, methods, developmental or experimental work, improvements, discoveries, inventions, ideas, source and object codes, data, programs, other works of authorship, and plans for research and development. During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

**2.** **ASSIGNMENT OF INVENTIONS.**

**2.1** **Proprietary Rights.** The term "*Proprietary Rights*" shall mean all trade secret, patent, patent application, copyright, mask work, rights in databases, and other intellectual property rights throughout the world, including any registrations of or applications to register such rights.

**2.2** **Moral Rights.** The term "*Moral Rights*" shall mean any rights to claim authorship of or credit on any Company Inventions (defined below), to object to or prevent the modification or destruction of any Company Inventions, or to withdraw from circulation or control the publication or distribution of any Company Inventions, and any similar right, existing under judicial or statutory law of any country or subdivision thereof in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

**2.3** **Inventions.** The term "*Inventions*" shall mean all trade secrets, inventions, mask works, ideas, processes, formulas, source and object code, data, databases, programs, other works of authorship, improvements, discoveries, developments, designs and techniques that I make or conceive or first reduce to practice or create, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets.

**2.4** **Prior Inventions.** I have set forth on **Exhibit A, PRIOR INVENTIONS DISCLOSURE, to this Agreement** a complete list of all inventions that I have, alone or jointly with others, made prior to the commencement of my employment with the Company that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "*Prior Inventions*"). If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use, copy, distribute, and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

**2.5** **Labor Code Section 2870 Notice.** I have been notified and understand that the provisions of Section 2.6 of this Agreement do not apply to any Company Invention (defined below) that qualifies fully under the provisions of Section 2870 of the California Labor Code, which states as follows:

*ANY PROVISION IN AN EMPLOYMENT AGREEMENT WHICH PROVIDES THAT AN EMPLOYEE SHALL ASSIGN, OR OFFER TO ASSIGN, ANY OF HIS OR HER RIGHTS IN AN INVENTION TO HIS OR HER EMPLOYER SHALL NOT APPLY TO AN INVENTION THAT THE EMPLOYEE DEVELOPED ENTIRELY ON HIS OR HER OWN TIME WITHOUT USING THE EMPLOYER'S EQUIPMENT, SUPPLIES, FACILITIES, OR TRADE SECRET INFORMATION EXCEPT FOR THOSE INVENTIONS THAT EITHER: (1) RELATE AT THE TIME OF CONCEPTION OR REDUCTION TO PRACTICE OF THE INVENTION TO THE EMPLOYER'S BUSINESS, OR ACTUAL OR DE-MONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT OF THE EMPLOYER; OR (2) RESULT FROM ANY WORK PERFORMED BY THE EMPLOYEE FOR THE EMPLOYER. TO THE EXTENT A PROVISION IN AN*

1.

EMPLOYMENT AGREEMENT PURPORTS TO REQUIRE AN EMPLOYEE TO ASSIGN AN INVENTION OTHERWISE EXCLUDED FROM BEING REQUIRED TO BE ASSIGNED UNDER CALIFORNIA LABOR CODE SECTION 2870(a), THE PROVISION IS AGAINST THE PUBLIC POLICY OF THIS STATE AND IS UNENFORCEABLE.

**2.6      Works for Hire; Assignment of Inventions.**  I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment are "works for hire" under the Copyright Act and that the Company will be considered the author and owner of such copyrightable works.  I agree to assign, and do hereby assign, to the Company all my right, title and interest in and to any and all Inventions that (i) are developed using equipment, supplies, facilities or trade secrets of the Company, (ii) result from work performed by me for the Company, or (iii) relate to the Company's business or actual or demonstrably anticipated research and development (the **"Company Inventions"**).  I agree to assign, and do hereby irrevocably transfer and assign, to the Company all Proprietary Rights and Moral Rights in or with respect to any Company Inventions.  I also hereby forever waive and agree never to assert any and all Moral Rights I may have in or with respect to any Company Inventions, even after termination of my work on behalf of the Company.

**2.7      Obligation to Keep Company Informed.**  I will promptly and fully disclose in writing to the Company all Inventions, including any that may be covered by Section 2870.

**2.8      Assistance**.  I agree to assist in every proper way and to execute those documents and to take such acts as are reasonably requested by the Company to obtain, sustain and from time to time enforce patents, copyrights and other rights and protections relating to Company Inventions in the United States or any other country.  I appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for the purposes set forth in this paragraph.  My obligations under this paragraph will continue beyond the termination of my employment with the Company, provided that the Company will compensate me at a reasonable rate after such termination for time or expenses actually spent by me at the Company's request on such assistance.

**3.      NO CONFLICTING OBLIGATION.**  I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company.  I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

**4.      RETURN OF COMPANY DOCUMENTS.**  Upon termination of my employment with the Company for any reason whatsoever, voluntarily or involuntarily, and at any earlier time the Company requests, I will deliver to the person designated by the Company all originals and copies of all documents and other property of the Company in my possession, under my control or to which I may have access.  I will not reproduce or appropriate for my own use, or for the use of others, any property, Proprietary Information or Company Inventions.

**5.      LEGAL AND EQUITABLE REMEDIES.**  Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

**6.      NOTICES.**  Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

**7.      EMPLOYMENT.**  I agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

**8.      NON-SOLICITATION.**

**8.1      During and after the termination of my employment with the Company, I will not directly or indirectly solicit or otherwise take away customers or suppliers of the Company if, in so doing, I use or disclose any trade secrets or proprietary or confidential information of the Company.  I agree that the non-public names and addresses of the Company's customers and suppliers, and all other confidential information related to them, including their buying and selling habits and special needs, created or obtained by me during my employment, constitute trade secrets or proprietary or confidential information of the Company.

**8.2      During the term of my employment and for one (1) year following any termination of my employment with the Company, I will not, directly or indirectly (whether for compensation or without compensation), solicit any employee or contractor of the Company to terminate their employment with, or otherwise cease their relationship with, the Company.

25962/00090/DOCS/1717571.4

**GENERAL PROVISIONS**. This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. In case any one or more of the provisions contained in this Agreement shall, for any

reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee. The Company may assign any of its rights or obligations under this Agreement. No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior or contemporaneous discussions or agreements between us regarding such subject matter. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement. This Agreement shall be effective as of the first day of my employment with the Company.

Dated:_____

_____
**(Signature)**

_____
**(Printed Name)**

_____
**(Address)**

_____

**Accepted and Agreed To:**

**TESLA MOTORS, INC.**

_____
**(Signature)**

_____
**(Printed Name)**

_____
**(Title)**

25962/00090/DOCS/1717571.4

**EXHIBIT A**

| | |
|---|---|
| **TO:** | Tesla Motors, Inc. |
| **FROM:** | |
| **DATE:** | |
| **SUBJECT:** | **Prior Inventions** |

1.      <u>**Except as listed in Section 2 below**</u>, the following is a complete list of all inventions or improvements that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

_____

_____

_____

☐      Additional sheets attached.

2.      Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. _____ | _____ | _____ |
| 2. _____ | _____ | _____ |
| 3. _____ | _____ | _____ |

☐      Additional sheets attached.

**\*\*\* WARNING** - If you sign (or eSign) this document and do **<u>not</u>** fill in anything in sections 1 or 2 on page 4, we assume that you do not have any inventions.

# EXHIBIT B

COMPLAINT of TESLA, INC., a Delaware corporation V. GUANGZHI CAO, AN INDIVIDUAL

# TESLA, INC. EMPLOYEE NON-DISCLOSURE AND INVENTIONS ASSIGNMENT AGREEMENT

In consideration of my employment or continued employment by **TESLA, INC.** (collectively with its divisions, subsidiaries and affiliates, the **"Company"**) and the compensation now and hereafter paid to me, I agree as follows:

1. **PROPRIETARY INFORMATION.** At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. **"Proprietary Information"** shall mean all information, in whatever form and format, to which I have access by virtue of and in the course of my employment by the Company. Proprietary Information includes without limitation technical data, trade secrets, know-how, research and development, products, features, concepts, ideas, plans, designs, formulas, methods, processes, discoveries, improvements, source and object codes, data, programs, lists of or information relating to, employees, suppliers, and customers, financial information and other business information, Inventions, and works of authorship. Notwithstanding the foregoing, Proprietary Information excludes any information that is or lawfully becomes part of the public domain. I agree that, in any dispute related to this Agreement, I will bear the burden of proving by clear and convincing evidence the applicability of this exclusion. This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the protection of trade secrets or confidential or proprietary information.

2. **ASSIGNMENT OF INVENTIONS.**

   2.1 **Proprietary Rights.** The term **"Proprietary Rights"** shall mean all trade secret, patent, copyright, mask work, and other intellectual property rights throughout the world, including any registrations of or applications to register such rights.

   2.2 **Moral Rights.** The term **"Moral Rights"** shall mean any rights to claim authorship of or credit on any Company Inventions (defined below), to object to or prevent the modification or destruction of any Company Inventions, or to withdraw from circulation or control the publication or distribution of any Company Inventions, and any similar right, existing

under judicial or statutory law of any country or subdivision thereof in the world, or under any treaty, regardless of whether or not such right is denominated or generally referred to as a "moral right."

   2.3 **Inventions.** The term **"Inventions"** shall mean any idea, concept, discovery, invention, development, research, technology, work of authorship, trade secret, software, firmware, content, audiovisual material, tool, process, technique, know-how, data, plan, device, apparatus, specification, design, prototype, circuit, layout, mask work, algorithm, program, code, documentation, or other material or information, tangible or intangible, whether or not it may be patented, copyrighted, trademarked, or otherwise protected (including all versions, modifications, enhancements, improvements, and derivative works thereof).

   2.4 **Prior Inventions.** I have set forth on <u>**Exhibit A**</u>, **PRIOR INVENTIONS DISCLOSURE, to this Agreement** a complete list of all inventions that I have, alone or jointly with others, conceived, developed, or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as **"Prior Inventions"**). If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process, or machine, the Company is hereby granted a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use, copy, distribute, and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

   2.5 **Labor Code Section 2870 Notice.** I have been notified and understand that the provisions of Section 2.6 of this Agreement do not apply to any Company Invention (defined below) that qualifies fully as a nonassignable invention under the provisions of Section 2870 of the California Labor Code, which states:

   *ANY PROVISION IN AN EMPLOYMENT AGREEMENT WHICH PROVIDES THAT AN EMPLOYEE SHALL ASSIGN, OR OFFER TO ASSIGN, ANY OF HIS OR HER RIGHTS IN AN INVENTION TO HIS OR HER EMPLOYER SHALL NOT APPLY TO AN INVENTION THAT THE EMPLOYEE DEVELOPED ENTIRELY ON HIS OR HER OWN TIME WITHOUT USING THE*

*EMPLOYER'S EQUIPMENT, SUPPLIES, FACILITIES, OR TRADE SECRET INFORMATION EXCEPT FOR THOSE INVENTIONS THAT EITHER: (1) RELATE AT THE TIME OF CONCEPTION OR REDUCTION TO PRACTICE OF THE INVENTION TO THE EMPLOYER'S BUSINESS, OR ACTUAL OR DE-MONSTRABLY ANTICIPATED RESEARCH OR DEVELOPMENT OF THE EMPLOYER; OR (2) RESULT FROM ANY WORK PERFORMED BY THE EMPLOYEE FOR THE EMPLOYER. TO THE EXTENT A PROVISION IN AN EMPLOYMENT AGREEMENT PURPORTS TO REQUIRE AN EMPLOYEE TO ASSIGN AN INVENTION OTHERWISE EXCLUDED FROM BEING REQUIRED TO BE ASSIGNED UNDER CALIFORNIA LABOR CODE SECTION 2870(a), THE PROVISION IS AGAINST THE PUBLIC POLICY OF THIS STATE AND IS UNENFORCEABLE.*

**2.6    Works for Hire; Assignment of Inventions.** I acknowledge and agree that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works for hire" under the U.S. Copyright Act and that the Company will be considered the author and owner of such works. I further agree to assign, and do hereby assign, to the Company all my right, title and interest in and to any and all Inventions that (i) are developed using equipment, supplies, facilities, trade secrets, or Proprietary Information of the Company, (ii) result from work performed by me for the Company, or (iii) relate at the time of conception or reduction to practice of the invention to the Company's business, or actual or demonstrably anticipated research and development of the Company (the **"*Company Inventions*"**). I agree to assign, and do hereby irrevocably transfer and assign, to the Company all Proprietary Rights and Moral Rights in or with respect to any Company Inventions. I forever waive and agree never to assert any and all Moral Rights I may have in or with respect to any Company Inventions, even after termination of my work on behalf of the Company.

**2.7    Obligation to Keep Company Informed.** During the period of my employment and for twelve (12) months after the termination of my employment with the Company, I will promptly and fully disclose in writing to the Company all Inventions authored, conceived, or reduced to practice by me, either alone or jointly with others, in connection with, derived

from, or as a result of the work performed by me during my employment with the Company, or any Proprietary Information to which I had access during or as a result of my employment with the Company. In addition, I acknowledge and agree that all patent applications for such Inventions that are filed by me or on my behalf, whether during my employment or after termination of my employment, are subject to this Agreement and belong to the Company. At the time of each such disclosure, I will advise the Company in writing of any Inventions that I believe fully qualify for protection under Section 2870 of the California Labor Code and will provide to the Company in writing all evidence necessary to substantiate that belief.

**2.8    Notice to Third Parties.** During and after the term of my employment, the Company may, with or without prior notice to me, notify third parties of my agreements and obligations under this Agreement.

**2.9    Assistance**. I agree to assist in every proper way and to execute those documents and to take such acts as are reasonably requested by the Company to obtain, sustain, and from time to time enforce patents, copyrights, and other rights and protections relating to Company Inventions in the United States or any other country. I hereby irrevocably designate and appoint the Secretary of the Company as my attorney-in-fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify, and file any such documents and to do all other lawfully permitted acts to further the purposes of this paragraph with the same legal force and effect as if executed by me. My obligations under this paragraph will continue beyond the termination of my employment with the Company for any reason, provided that the Company will compensate me at a reasonable rate after such termination for time or expenses actually spent by me at the Company's request on such assistance.

**3.    RECORDS.** I agree to keep and maintain adequate and current written records of all Inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times. I will promptly disclose all such Inventions in writing to the Company and will supplement any such disclosures to the extent the Company may request. If I have any doubt as to whether or not to disclose an Invention to the Company, I will disclose it.

**4.    RETURN OF COMPANY RECORDS.** Upon the termination of my employment for any reason, or at such earlier time as the Company may request, I shall immediately return to the Company all originals and copies of all hard copy and electronic documents, files

2

and other property of the Company in my possession or control or to which I may have access, including all records referred to in Section 3 above, regardless of the storage medium (e.g., internal or external hard drives, solid-state drives, USB flash drives, flash memory cards, and cloud storage).

**5.      NO CONFLICTING OBLIGATIONS.** I represent that my performance of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. Without limiting the foregoing, I agree that during my employment by the Company I will not improperly use or disclose any confidential information or trade secrets of any former employer or any other person to whom I have an obligation of confidentiality; I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person; and I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, is common knowledge in the industry or otherwise in the public domain, or is otherwise provided or developed by the Company. I have not entered into and will not enter into any agreement or understanding, either written or oral, in conflict herewith.

**6.      LEGAL AND EQUITABLE REMEDIES.** I acknowledge and agree that violation of this Agreement by me may cause the Company irreparable harm and that the Company shall therefore have the right to enforce this Agreement and any of its provisions by injunction, specific performance, or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

**7.      NOTICES.** Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or, if sent by certified or registered mail, three (3) days after the date of mailing.

**8.      EMPLOYMENT.** I understand and agree that nothing in this Agreement shall confer any right with respect to continuation of employment, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

**9.      NON-SOLICITATION.**

        **9.1**      During and after the termination of my employment with the Company, I will not directly or indirectly solicit or otherwise take away customers or suppliers of the Company if, in so doing, I use or disclose any of the Company's trade secrets, including without limitation the non-public names and addresses of the Company's customers and suppliers and/or other confidential information related to them, including their buying and selling habits and special needs.

        **9.2**      I acknowledge that the Company has invested, and will continue to invest, significant time and money to recruit and retain its employees. I recognize that in the course of my employment I have obtained or will obtain valuable information about the Company's employees and contractors, and their respective talents and areas of expertise.

                **9.2.1**      I agree that during the term of my employment and for twelve (12) months thereafter, I will not directly or indirectly, for my own account or for others, solicit (or assist another in soliciting) for employment or for the performance of services any Company employee or contractor with whom I had contact or of whom I became aware during the period of my employment. Nor will I, for my account or for others, in any way induce or attempt to induce any such individual to terminate his or her employment by or performance of services for the Company.

                **9.2.2**      During and after the termination of my employment with the Company, I will not directly or indirectly hire or otherwise take away any of the Company's employees (as an employee or an independent contractor) if, in so doing, I use or disclose any of the Company's trade secrets, including without limitation the non-public names and addresses of the Company's employees and/or other confidential information related to them, including their skills, experience, current projects or assignments for the Company and specialized experience in Company technology and Inventions.

**10.      18 U.S.C. § 1833 NOTICE**. I have been given notice of the immunity provided by 18 U.S.C. § 1833(b)(1), which provides:

        *IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made- (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely*

3

*for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.*

## 11. GENERAL PROVISIONS.

**11.1** This Agreement will be governed by and construed according to the laws of the State of California, as such laws are applied to agreements entered into and to be performed entirely within California between California residents. I agree to submit to the jurisdiction of, and that exclusive jurisdiction over and venue for any action or proceeding arising out of or relating to this Agreement shall lie, in the state and federal courts located in Santa Clara or San Francisco Counties, California.

**11.2** If any provision of this Agreement is found to be excessively broad as to duration, geographical scope, activity or subject, such provision shall be construed or reformed by limiting and reducing it to the extent required to render it enforceable under applicable law. If any provision of this Agreement is found to be invalid, illegal or unenforceable and cannot be construed so as to render it enforceable, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Nothing in this Agreement is intended to restrict, or shall be interpreted as restricting, my right to engage in activity protected by Section 7 of the National Labor Relations Act or any other applicable state or federal law.

**11.3** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns. The Company may assign any of its rights or obligations under this Agreement

**11.4** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.

**11.5** This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior or contemporaneous discussions or agreements between us regarding such subject matter. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged.

**11.6** Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement. This Agreement shall be effective as of the first day of my employment with the Company.

Dated: _____

_____
(Signature)

_____
(Printed Name)

_____
(Address)

_____

4

Exhibit A

**TO:**      Tesla, Inc.

**FROM:**

**DATE:**

**SUBJECT:**    Prior Invention

1.    **Except as listed in Section 2 below**, the following is a complete list of all inventions or improvements that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☐   Additional sheets attached.

2.    Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to inventions or improvements generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention or Improvement | Party(ies) | Relationship |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

☐   Additional sheets attached.

**\*\*\* WARNING** - If you sign (or eSign) this document and do **not** fill in anything in sections 1 or 2 on Exhibit A, we assume that you do not have any inventions.

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Tesla, Inc., a Delaware corporation

### DEFENDANTS
Guangzhi Cao, an individual

**(b)** County of Residence of First Listed Plaintiff    Santa Clara
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Santa Clara
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*   Fred Norton (224725)
The Norton Law Firm, 299 3rd St. Ste 106, Oakland 94607
510.906.4900

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| | 340 Marine | | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | 790 Other Labor Litigation | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | | 862 Black Lung (923) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 190 Other Contract | | | 462 Naturalization Application | 864 SSID Title XVI | 890 Other Statutory Actions |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 865 RSI (405(g)) | 891 Agricultural Acts |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

(X marks: 190 Other Contract; 195 Contract Product Liability; 230 Rent Lease & Ejectment; 890 Other Statutory Actions)

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 USC 1836

Brief description of cause:
Trade secret misappropriation and breach of contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:
JUDGE                                        DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*    ☐ **SAN FRANCISCO/OAKLAND**    ☐ **SAN JOSE**    ☐ **EUREKA-MCKINLEYVILLE**

DATE    March 20, 2018    **SIGNATURE OF ATTORNEY OF RECORD**    Fred Norton

Case 1:22-cv-01466-MN Document 13 Filed 05/30/23 Page 44 of 149 PageID #: 3370
Case 3:19-cv-01405-SVK Document 1-53 Filed 03/21/19 Page 2 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit 12

1 JOSEPH C. ALM, State Bar No. 294362
Tesla, Inc.
2 901 Page Avenue
Fremont, CA 94538-734
3 Email: jalm@tesla.com
Phone: (650) 681-5000
4

5 *Counsel for Plaintiff*
TESLA, INC.
6

7 UNITED STATES DISTRICT COURT

8 NORTHERN DISTRICT OF CALIFORNIA

9 SAN JOSE DIVISION

10 TESLA, INC.,                              )  Case No.: _____
                                            )
11          Plaintiff,                       )  **COMPLAINT**
                                            )
12      v.                                  )
                                            )  **(1) Violation of the Defend Trade Secrets**
13                                           )  **Act (18 U.S.C. § 1831 *et seq.*)**
   ALEX KHATILOV                            )
14                                           )  **(2) Violation of the California Uniform**
                                            )  **Trade Secrets Act (Cal. Civ. Code § 3426**
15          Defendant.                       )  ***et seq.*)**
                                            )
16                                           )
                                            )  **(3) Breach of Contract**
17                                           )
                                            )  **JURY TRIAL DEMANDED**
18 _____ )

19

20

21

22

23

24

25

26

27

28

1     Plaintiff Tesla, Inc. ("Tesla" or "Plaintiff"), complains and alleges against Defendant Alex
2     Khatilov ("Khatilov" or "Defendant"), as follows:

3                               **<u>NATURE OF THE ACTION</u>**

4           1.     This case is about Tesla protecting its trade secrets from premeditated theft by a
5     (now) former employee, and making sure it does not happen again.  Within three days of being
6     hired by Tesla, Defendant brazenly stole thousands of trade secret computer scripts that took Tesla
7     years to develop.  Then, he lied about it and tried to delete the evidence of his theft when quickly
8     confronted by Tesla's security team, forcing Tesla to bring this complaint.

9           2.     Tesla hired Defendant as a software automation engineer on December 28, 2020.
10    Within three days, he began stealing thousands of highly confidential software files from Tesla's
11    secure internal network, transferring them to his personal cloud storage account on Dropbox, to
12    which Tesla has no access or visibility.  The files consist of "scripts" of proprietary software code
13    that Tesla has spent years of engineering time to build.  These scripts, when executed, automate a
14    broad range of functions throughout Tesla's business.  Only a select few Tesla employees even
15    have access to these files; and as a member of that group, Defendant took advantage of that access
16    to downloaded files unrelated to his job.

17          3.     Tesla's information security personnel detected Defendant's unauthorized
18    download on January 6, 2021 and confronted Defendant that day and interviewed him.  During
19    this interview he repeatedly claimed that he had only transferred a couple personal administrative
20    documents.  After being prompted, he gave Tesla investigators access to view his Dropbox
21    account, where they discovered Defendant's claims were outright lies: the Tesla investigators
22    found thousands and thousands of Tesla's confidential computer scripts in his Dropbox.
23    Defendant then claimed he somehow "forgot" about the thousands of other files he stole (almost
24    certainly another lie).  Even worse, it became apparent that Defendant had brazenly attempted to
25    destroy the evidence by hurriedly deleting the Dropbox client and other files during the beginning
26    of the interview when investigators were attempting to remotely access his computer.

27          4.     Fortunately, the investigators were able to eventually view the Dropbox account
28    and instructed Defendant to delete all Tesla files that still remained.  But Tesla's ability to rectify

1   Defendants' wrongdoing ended there. Tesla does not know whether Defendant took additional

2   files, whether he copied files from the Dropbox account to other locations in the days before he

3   was caught, or whether he sent any of the files to other persons or entities. Indeed, as soon as

4   Defendant uploaded the stolen files to his Dropbox account, he could have shared or retransferred

5   those files to anyone or any other storage media (whether an external thumb drive, another

6   computer, a mobile device, or another cloud-based storage system). And Tesla would have had

7   no way to know that.

8        5.     This action is based on Defendant's: (1) violation of the Defend Trade Secret Act,

9   18 U.S.C. § 1831, *et seq.*; (2) violation of the California Uniform Trade Secret Act, Cal. Civ. Code

10   § 3426, *et seq.*; and (3) breach of contract.

11                   **THE PARTIES**

12        6.     Plaintiff Tesla is a corporation organized and existing under the laws of Delaware,

13   with its principal place of business located at 3500 Deer Creek Road, Palo Alto, California 94304.

14   Tesla develops, manufactures, sells, and leases electric vehicles and energy generation and storage

15   systems throughout the United States and abroad.

16        7.     Defendant Alex Khatilov is a former Tesla employee who also goes by the names

17   Alex Tilov or Sabir Khatilov. Upon information and belief, he resides at 556 Chestnut Avenue,

18   San Bruno, California 94066.

19               **JURISDICTION AND VENUE**

20        8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

21   1331 and 18 U.S.C. § 1836(c), as it arises under the federal Defend Trade Secrets Act, 18 U.S.C.

22   § 1831 *et seq.*

23        9.     This Court has supplemental jurisdiction over Plaintiff's state law claims under the

24   California Uniform Trade Secret Act, Cal. Civ. Code § 3426, *et seq.* and for breach of contract

25   pursuant to 28 U.S.C. § 1367(a) because Tesla's state law claims are so closely related to its federal

26   claim that they form part of the same case of controversy under Article III of the United States

27   Constitution.

28

10.     Venue is proper in the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1391 because Defendant resides in the Northern District of California and a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

### INTRADISTRICT ASSIGNMENT

11.     A substantial part of the events and omissions which gave rise to the claims asserted took place in Santa Clara County, California.  Thus, pursuant to Civil L.R. 3-2(c) and (e), this action should be assigned to the San Jose Division of this District.

### FACTUAL ALLEGATIONS

#### *Tesla's Trade Secrets and Confidential Information*

12.     Among Tesla's numerous innovations is its development of automated, "Quality Assurance" processes that run a broad range of business functions without human effort, including procurement, materials planning and processing, payables, and purchasing (collectively, the "Tesla Trade Secrets").  For example, much of the manufacturing cycle of Tesla vehicles is managed by these automated processes – from ordering parts to delivering cars.

13.     Tesla employs a team of Quality Assurance Engineers who help identify business tasks to be automated based on input from Tesla's business leaders.  The engineers write computer scripts in Python (a computer programming language) to automate those tasks, and test the automated processes to ensure they function properly.  These scripts are unique to Tesla and run on WARP Drive, the backend software for much of Tesla's business.

14.     Developing this complex system is expensive and time-consuming.  Tesla has spent roughly 200 man-years of work to develop the Quality Assurance scripts – the cumulative hours spent by the Quality Assurance Engineering team over the past twelve years.  The engineers' work is also guided by the business leaders in Tesla, who identify what tasks need to be automated – another large and valuable investment of its time.

15.     The Tesla Trade Secrets are extremely valuable to Tesla, and would be to a competitor.  Access to the scripts would enable engineers at other companies to reverse engineer Tesla's automated processes to create a similar automated system in a fraction of the time and with

a fraction of the expense it took Tesla to build it. Third-party engineers could not compose these scripts based on public information, especially with such minimal time and effort. The scripts also would inform competitors of which systems Tesla believes are important and valuable to automate and how to automate them – providing a roadmap to copy Tesla's innovation.

16.     For these reasons, Tesla takes extensive measures to ensure that the Tesla Trade Secrets remain strictly confidential and are never shared externally. Even within Tesla, access to the scripts is limited to members of the Quality Assurance Engineering team, which is approximately 40 people out of Tesla's roughly 50,000 employees. Who can grant access rights to the Trade Secrets is even more narrowly controlled, with only eight people having the ability to grant access. The engineers who do have access to the scripts are not permitted to download them to personal devices or cloud storage.

17.     Tesla's engineers also sign a comprehensive set of agreements and policies as a condition of their employment which require them to protect Tesla's confidential information and not to disclose or misuse that information, including the Tesla Trade Secrets. These include: an Employee Nondisclosure And Inventions Assignment Agreement ("NDA"), which requires employees to hold Tesla's information "in strictest confidence" and prohibits them from using or disclosing any Tesla "Proprietary Information," including "technical data, trade secrets, know-how, … plans, designs, … methods, processes, … data, programs, … and other business information"; and an Internet Usage Policy that prohibits "transmitting, copying, downloading, or removing trade secret, proprietary, or confidential business information of Tesla without written authorization."

18.     The NDA also requires employees, upon termination, to "immediately return to the Company all originals and copies of all hard copy and electronic documents, files and other property of the Company in [their] possession or control or to which [they] have access … regardless of the storage medium (e.g., internal or external hard drives, solid-state drives, USB flash drives, flash memory cards, and cloud storage)."

19.     Tesla secures its physical facilities by restricting access to authorized personnel, and then monitoring actual access with security guards and cameras. Visitors to Tesla's facilities

1  must check in with a receptionist or security, sign a nondisclosure agreement, and submit to a

2  photograph.  Visitors must also always be escorted by a Tesla employee while at the facilities.

3      20.    Tesla further protects its confidential, trade secret, and proprietary information by

4  using password-protected and firewall-protected networks and servers that are only accessible to

5  current Tesla employees with proper credentials.

6      21.    Tesla also has an Information Security team that monitors its systems for suspicious

7  activity, including unauthorized downloading of confidential information.

8  ***Defendant Alex Khatilov Promises to Protect Tesla's Trade Secrets and Confidential***

9  ***Information as a Condition of His Employment at Tesla***

10      22.    On December 28, 2020, Tesla hired Defendant Alex Khatilov as a Senior Software

11  Quality Assurance Engineer.

12      23.    Defendant's role and responsibility was to prepare and revise computer scripts to

13  help automate Environmental Health and Safety ("EHS") systems.

14      24.    As part of his employment, Tesla provided Defendant a laptop to perform his work.

15      25.    As a condition of his employment, Defendant signed and agreed to abide by the

16  terms of the NDA.

17  ***Defendant's Theft of Tesla's Trade Secrets,  and Attempts to Conceal His Misconduct***

18      26.    On December 31, 2020 – just three days after being hired by Tesla – Defendant

19  began downloading thousands of files from Tesla's networks and transmitted those files to his

20  personal Dropbox account.  The downloading was completed on January 4, 2021.  He also

21  downloaded some additional files on January 6.

22      27.    Tesla's Information Security team detected the downloading of up to approximately

23  26,000 files on January 6 through its monitoring software.  The team immediately reviewed the

24  activity and concluded that it was not an authorized transfer.  Tesla also discovered that the files

25  contained a complete set of all automation scripts produced by the Quality Assurance Engineering

26  team for WARP Drive over the last twelve years.

27      28.    The scripts downloaded by Defendant had nothing to do with his responsibilities

28  for developing scripts on the EHS system, which runs on a separate system from WARP Drive.

29.     Shortly after the Tesla Information Security team discovered Defendant's theft, Tesla personnel confronted Defendant by initiating a videoconference call via Microsoft Teams that same day.  Defendant had been working remotely due to COVID-19.

30.     During the call, Defendant confirmed that he had signed the NDA.  He also confirmed that he installed a Dropbox desktop application on his Tesla-issued laptop, which enabled him to upload files to a personal cloud-based account to which Tesla has no access or visibility.  Defendant claimed, however, that he had only uploaded personal administrative documents to his Dropbox, such as his scanned passport and a copy of his W-4.  When asked to clarify, he reiterated again that he uploaded only personal administrative documents to his Dropbox account, not anything confidential to Tesla.

31.     Tesla personnel prompted Defendant to share his laptop screen to confirm that his Dropbox account did not contain any confidential Tesla files, as he twice claimed.  Defendant delayed accepting the screen share request for over a minute, thus preventing Tesla personnel from viewing his screen or Dropbox files.  During this time, he could be seen on videochat hurriedly deleting information from his computer.

32.     Once Defendant finally shared his screen, he claimed that he had already deleted the Dropbox desktop application during the interview, confirming that Defendant was destroying evidence to try to prevent Tesla from inspecting what he had done.

33.     Although Defendant had deleted the Dropbox desktop application from his laptop, such deletion only disabled the functionality that uploads files to the Dropbox cloud, and did not necessarily delete files uploaded to the account itself.  Tesla personnel thus instructed Defendant to display all files that had already been transferred to Dropbox, which revealed folders containing a large amount of non-administrative material, including many of the Quality Assurance scripts that were detected by Tesla's monitoring software.

34.     Tesla personnel also instructed Defendant to login to the Dropbox website so they could see whether the files he downloaded remained available in his Dropbox account.  This revealed that the same confidential Tesla files seen on his laptop were still available through his cloud storage account.  Defendant agreed to delete the remainder of those files – or at least, the

1   ones that Tesla personnel were able to see during the call. The investigators, however, were only

2   able to view Defendant's screen – they could not actually control his mouse or keyboard in order

3   to delete the files themselves.

4      35.   Tesla personnel then informed Defendant that, despite his claims to the contrary,

5   the Information Security team detected that he removed over 26,000 highly confidential, non-

6   administrative files from the Tesla network over the course of several days. Defendant claimed

7   that he "forgot" he had downloaded them. Defendant was also unable to articulate a business

8   reason for his downloads.

9      36.   Defendant was terse and evasive throughout the interview, providing mostly one-

10  word answers and feigning ignorance. Defendant repeatedly lied to Tesla, claiming (twice) that

11  he had only downloaded and transferred personal administrative files, and then claiming that he

12  "forgot" about downloading thousands of other non-administrative, highly confidential software

13  scripts. He also attempted to destroy evidence of his theft while obstructing Tesla's efforts to

14  access his laptop screen and see what he had taken.

15     37.   After discovering Defendant's theft of the Tesla Trade Secrets, and due to his

16  repeated lying and obfuscation during the investigation, Tesla fired Defendant that day.

17     38.   Although investigators were able to watch Defendant delete the information they

18  found on Defendant's laptop and in his Dropbox account, Tesla could not confirm whether he took

19  additional files, whether the information he downloaded was further transferred from Dropbox to

20  other locations in the days before he was caught, or whether he shared the information with anyone

21  else.

22     39.   As soon as Defendant uploaded the files to his Dropbox account, he had the ability

23  to instantly share or retransfer those files from Dropbox to any other person or location at any time

24  – including loading them onto a thumb drive, emailing them, syncing them to another computer,

25  transferring them to an entirely different cloud-based account, or even printing them. Tesla would

26  have had no way to monitor that activity, which Defendant could have done at any time before he

27  purportedly deleted the files from Dropbox.

28

40.     Moreover, because of COVID-19, this interview had to be conducted remotely, rather than in person.  This remote process necessarily hindered Tesla's ability to ensure complete deletion of the Trade Secrets, since Tesla could not directly control Defendant's devices, perform immediate forensic analysis of the devices, or acquire full access to Defendant's Dropbox.

41.     On information and belief, Tesla did not uncover all of Defendant's theft. Defendant's proven track record of dishonesty and evidence destruction raises grave concerns that he continues to misappropriate Tesla's Trade Secrets.  On information and belief, Defendant has indeed further used and/or disseminated that information.

**First Cause of Action**

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*)**

42.     Tesla re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 38 of this Complaint.

43.     As set forth above, Defendant misappropriated thousands of Quality Assurance automation software scripts constituting "trade secrets" under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*  Tesla is the owner of these Tesla Trade Secrets.

44.     The Tesla Trade Secrets automate business processes underlying the development, manufacturing, sale, and leasing of products and services used in, and intended for use in, interstate and foreign commerce.

45.     The Tesla Trade Secrets derive independent economic value from not being generally known to the public, to Tesla's competitors, or to other persons who can obtain economic value from the disclosure or use of the information.

46.     The Tesla Trade Secrets are not readily ascertainable through proper means or from generally available, public sources.

47.     At all relevant times, Tesla has made reasonable efforts to protect and preserve the secrecy of the Tesla Trade Secrets.

48.     Defendant misappropriated the Tesla Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by, *inter alia*, knowingly acquiring the Tesla Trade Secrets through improper

means, and disclosing and/or using the Tesla Trade secrets without Tesla's express or implied consent.

49. Defendant knew or had reason to know that, at the time he accessed, downloaded and used the Tesla Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that he did not have Tesla's express or implied consent to do so.

50. Defendant acquired the Tesla Trade Secrets by virtue of his employment with Tesla, not through his own independent research and efforts, in direct violation of his legal obligations to Tesla.

51. On information and belief, Defendant failed to fully delete or return the Tesla Trade Secrets that he misappropriated, and continues to use or disclose the Tesla Trade Secrets without Tesla's consent.

52. On information and belief, Defendant has gained, or will gain, substantial benefit from his misappropriation of the Tesla Trade Secrets, to Tesla's substantial detriment.

53. As a result of Defendant's unlawful conduct, the Tesla Trade Secrets have been compromised, and Tesla is substantially threatened by Defendant's further use and/or dissemination of that information.

54. As a direct, proximate, and foreseeable result of Defendant's misappropriation of the Tesla Trade Secrets, Tesla has been damaged in an amount not yet ascertained.

55. Defendant's unlawful actions were willful and malicious, and with the deliberate intent to injure Tesla's business, thereby entitling Tesla to exemplary damages and/or attorneys' fees in an amount to be proven at trial pursuant to 18 U.S.C. § 1836(b)(3)(D).

56. Tesla is entitled to an order requiring Defendant, his agents, and all persons acting in concert with him, from using or disclosing, or threatening to use or disclose, the Tesla Trade Secrets, and restraining Defendant from obtaining any benefit from his wrongful possession and use of the Tesla Trade Secrets. Unless enjoined by this Court, said misappropriation of the Tesla Trade Secrets, actual or threatened, will cause great and irreparable injury to Tesla. Tesla has no adequate or other remedy at law for such acts and threatened acts.

**<u>Second Cause of Action</u>**

**(Violation of California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*)**

57.     Tesla re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 53 of this Complaint.

58.     As set forth above, Defendant misappropriated thousands of Quality Assurance automation software scripts constituting "trade secrets" under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426, *et seq.*  Tesla is the owner of these Tesla Trade Secrets.

59.     The Tesla Trade Secrets derive independent economic value from not being generally known to the public, to Tesla's competitors, or to other persons who can obtain economic value from disclosure or use of the information.

60.     At all relevant times, Tesla has made reasonable efforts to protect and preserve the secrecy of the Tesla Trade Secrets.

61.     Defendant misappropriated the Tesla Trade Secrets within the meaning of Cal. Civ. Code § 3426.1(b) by, *inter alia*, knowingly acquiring the Tesla Trade Secrets through improper means, and disclosing and/or using the Tesla Trade secrets without Tesla's express or implied consent.

62.     Defendant knew or had reason to know that, at the time he accessed, downloaded and used the Tesla Trade Secrets, this information was acquired and obtained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use, and that he did not have Tesla's express or implied consent to do so.

63.     Defendant acquired the Tesla Trade Secrets by virtue of his employment with Tesla, not through his own independent research and efforts, in direct violation of his legal obligations to Tesla.

64.     On information and belief, Defendant failed to fully delete or return the Tesla Trade Secrets that he misappropriated, and continues to use or disclose the Tesla Trade Secrets without Tesla's consent.

65.     On information and belief, Defendant has gained, or will gain, substantial benefit from his misappropriation of the Tesla Trade Secrets, to Tesla's substantial detriment.

66.     As a result of Defendant's unlawful conduct, the Tesla Trade Secrets have been compromised, and Tesla is substantially threatened by Defendant's further use and/or dissemination of that information.

67.     As a direct, proximate, and foreseeable result of Defendant's misappropriation of the Tesla Trade Secrets, Plaintiff has been damaged in an amount not yet ascertained.

68.     Defendant's unlawful actions were willful and malicious, and with the deliberate intent to injure Tesla's business, thereby entitling Tesla to exemplary damages pursuant to Cal. Civ. Code § 3426.3(c) and/or attorneys' fees in an amount to be proven at trial pursuant to Cal. Civ. Code § 3246.4.

69.     Tesla is entitled to an order requiring Defendant, his agents, and all persons acting in concert with him, from using or disclosing, or threatening to use or disclose, the Tesla Trade Secrets, and restraining Defendant from obtaining any benefit from his wrongful possession and use of the Tesla Trade Secrets.  Unless enjoined by this Court, said misappropriation of the Tesla Trade Secrets, actual or threatened, will cause great and irreparable injury to Tesla.  Tesla has no adequate or other remedy at law for such acts and threatened acts.

### **Third Cause of Action**

### **(Breach of Contract)**

70.     Tesla re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 66 of this Complaint.

71.     As a condition of his employment with Tesla, Defendant signed and agreed to abide by 1) the terms of an NDA between himself and Tesla and 2) the terms of an employment agreement contained in the offer letter between Defendant and Tesla.  Both the NDA and the employment agreement prohibited Defendant from, among other things, using or disclosing the Tesla Trade Secrets.

72.     Tesla fully complied with and fulfilled its obligation under the NDA and employment agreement by, among other things, employing the Defendant.

73.     While employed by Tesla, Plaintiff breached the NDA and employment agreement by, without authorization or any business purpose, accessing, downloading, transmitting, and

retaining thousands of Quality Assurance automation software scripts constituting the Tesla Trade Secrets, and storing those scripts on a personal cloud storage account.

74.    On information and belief, Plaintiff further breached his NDA and employment agreement by providing the Trade Secret information to other unknown individuals or entities after that information had been exfiltrated to Dropbox.

75.    Tesla has sustained and will sustain damages as a direct and proximate result of Defendant's breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tesla prays for judgment in its favor and against Defendant Alex Khatilov, inclusive as follows:

1.    Granting temporary, preliminary, and permanent injunctive relief against Defendant, and any persons in active concert or participation with him: (i) enjoining Defendant from obtaining, retaining, using, transmitting, disseminating, or disclosing the Tesla Trade Secrets; (ii) requiring Defendant to immediately return all Tesla equipment, tangible materials, and information that remain in Defendant's possession, custody, or control; (iii) ordering Defendant to identify, and turn over, any property in his possession, custody, or control containing or reflecting the Tesla Trade Secrets, including hard copy documents or any form of electronic storage media; (iv) ordering Defendant to identify any other persons, entities, or locations not within his possession, custody, or control, to which Defendant has transmitted, disseminated, disclosed, or stored any Tesla Trade Secrets; and (v) any other appropriate injunctive relief;

2.    Awarding compensatory damages in an amount to be determined at trial;

3.    Awarding exemplary damages in an amount to be determined at trial;

4.    Awarding interest at the maximum legal rate on all sums awarded;

5.    Awarding reasonable attorneys' fees as permitted by law;

6.    Awarding all costs of suit and investigation herein; and

7.    Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Tesla demands a jury trial on all triable issues.

1   Dated:  January 22, 2021                          *s/ Joseph Alm*
                                                       Joseph Alm
2
                                                       Joseph Alm
3                                                      CA Bar # 294362
                                                       jalm@tesla.com
4                                                      901 Page Ave
                                                       Fremont, CA 94538
5                                                      (650) 681-5000

6
                                                       Counsel for Plaintiff
7                                                      *Tesla, Inc.*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| ARIGNA TECHNOLOGY LIMITED, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:21-cv-00054-JRG-RSP |
| | § | |
| VOLKSWAGEN AG, ET AL. | § | |
| | § | |
| *Defendants*. | § | |

## JOINT PROTECTIVE ORDER

WHEREAS, Plaintiff Arigna Technology Limited and Defendants Volkswagen AG;

Volkswagen Group of America, Inc.; Bayerische Motoren Werke AG; BMW of North

America, LLC; Daimler AG; Mercedes-Benz USA, LLC; Nissan Motor Co., Ltd.; Nissan North

America, Inc.; Tesla, Inc.; Tesla Motors TX, Inc.; Toyota Motor Corporation; Toyota Motor North

America, Inc.; and General Motors LLC, hereafter referred to as "the Parties," believe that certain

information that is or will be encompassed by discovery demands by the Parties involves the

production or disclosure of trade secrets, confidential business information, or other proprietary

information;

WHEREAS, the Parties seek a protective order limiting disclosure thereof in accordance

with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and **ORDERED** that:

1. Each Party may designate as confidential for protection under this Order, in whole or

    in part, any document, information or material that constitutes or includes, in whole or

    in part, confidential or proprietary information or trade secrets of the Party or a Third

    Party to whom the Party reasonably believes it owes an obligation of confidentiality

    with respect to such document, information or material ("Protected Material").

Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows: "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY" or "RESTRICTED CONFIDENTIAL SOURCE CODE" (individually or collectively "DESIGNATED MATERIAL"). The words "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" shall be placed clearly on each page of the Protected Material for which such protection is sought (except deposition and hearing transcripts). For deposition and hearing transcripts, the word "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" (depending on which designation is appropriate) shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice of the designation of some or all of that transcript as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY, or "RESTRICTED CONFIDENTIAL SOURCE CODE." For documents produced in native format, the appropriate designation shall be affixed on the face of the media containing such native format documentation. In addition to the foregoing, to the extent that documents are produced in native electronic form, the addition of a confidentiality designation in the file or folder name shall be sufficient to provide notice of said confidentiality and additional written notice is unnecessary in this situation. Other tangible things not produced in documentary form may be designated by affixing the appropriate designation on a cover page for such material and in a prominent place on the exterior

of the container(s) in which the information or things are stored. For information not reduced to any documentary, tangible, or physical form, or which cannot be conveniently designated as set forth above, the producing Party must inform the receiving Party of the designation of such information in writing. Protected Material of persons or entities who are not Parties to this Action ("Third Parties") may be designated as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY" or "RESTRICTED CONFIDENTIAL SOURCE CODE" in the same manner in which such Protected Material is designated by a Party.

2. Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Highly Confidential – Attorneys' Eyes Only" shall receive the same treatment as if designated "CONFIDENTIAL" or "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, respectively, unless and until such document is redesignated to have a different classification under this Order.

3. With respect to documents, information or material designated "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE," subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; (e) discovery responses, including answers to interrogatories and to requests for admission; and (f) stipulations. All copies, reproductions, extracts,

digests, and complete or partial summaries prepared from any DESIGNATED MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order.

4.  A designation of Protected Material (i.e., "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE,") may be made at any time. Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in whole or in part of a claim for confidential treatment. Any party that inadvertently or unintentionally produces Protected Material without designating it as DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated. The recipient(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.  "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating party, upon order of the Court, or as set forth in paragraph 14 herein:

    a.  outside counsel of record in this Action for the Parties;

    b.  employees of such outside counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

c.  in-house counsel for the Parties who either have responsibility for making decisions dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

d.  up to and including three (3) designated representatives of each of the Parties to the extent reasonably necessary for the litigation of this Action, except that either party may in good faith request the other party's consent to designate one or more additional representatives, the other party shall not unreasonably withhold such consent, and the requesting party may seek leave of Court to designate such additional representative(s) if the requesting party believes the other party has unreasonably withheld such consent;

e.  outside consultants or experts (i.e., not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation and employees of these consultants or experts, provided that: (1) such consultants or experts are not presently employed by the Parties hereto for purposes other than this Action; and (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto and the same is served upon the producing Party or Third Party with a current curriculum vitae of the consultant or expert at least ten (10) days before access to the Protected Material is to be given to that consultant or expert to enable the producing Party or Third Party to object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert. The affected Parties and/or Third Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties and/or Third Parties are unable to resolve any

objection, the objecting Party or Third Party may file a motion with the Court within ten (10) days of the notice, or within such other time as the Parties and/or Third Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party or Third Party shall have the burden of proving the need for a protective order. In the event of such a dispute, no disclosure shall occur until all such objections are resolved by agreement or Court order;

    f.   independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services including mock jurors, mediators and supporting personnel, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

    g.   the Court and its personnel.

6.  A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.  Documents, information, or material produced in this Action, including but not limited to Protected Material designated as DESIGNATED MATERIAL shall be used by the Parties only in the litigation, including any attempt to settle it, and shall not be used for any other purpose. Any person or entity who obtains access to DESIGNATED MATERIAL or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL

or any portion thereof except as may be reasonably necessary in the litigation of this Action. Any such copies, duplicates, extracts, summaries or descriptions shall be classified DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8. To the extent a producing Party believes in good faith that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED - ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE".

9. For Protected Material designated RESTRICTED - ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 5(a–c) and (e–g); provided, however, that access by in-house counsel pursuant to Paragraph 5(c) be limited to in-house counsel who exercise no competitive decision making authority on behalf of the client.

10. For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply:[1]

---

[1] By including provisions within this Protective Order that govern the production of Source Code, the Parties do not concede that any Source Code will likely be produced, is discoverable, or is relevant to the claims and/or defenses asserted in this case. Based on information known at the time this Protective Order was submitted to the Court for its entry and the nature of the patent claims asserted, Defendants have stated that they do not believe they have any relevant Source Code.

a. Access to a Party's Source Code Material shall be provided only on two "stand-alone" computers—that is, the computers may not be linked to any network, including a local area network ("LAN"), an intranet, or the Internet ("Source Code Computers"). Neither the receiving Party's outside counsel nor its outside consultants or experts may connect any devices to the Source Code Computers, nor may they copy, extract, or otherwise take any information from the Source Code Computers in electronic form. In addition, neither the receiving Party's outside counsel nor its outside consultants or experts may modify the files on the Source Code Computers nor may they load anything onto the Source Code Computers absent the consent of the producing Party. Unless otherwise agreed, the Source Code Computers shall be located at the offices of the producing Party's outside counsel;

b. Prior to the first inspection of Source Code Material, the receiving Party shall provide ten (10) days' notice of its intent to inspect Source Code. The receiving Party shall provide three (3) days' notice prior to any additional inspection. If a review of the source code is taking place and the receiving Party requests the review continue to take place on the subsequent business day, the producing Party shall make the Source Code Material available unless it is not possible to do so (e.g., a person to monitor the review is unavailable). When requesting inspection of a Party's Source Code Material on the Source Code Computers, the receiving party shall identify all persons who will inspect the producing Party's Source Code Material on behalf of a receiving Party, including members of a receiving Party's outside law firm. The receiving Party shall make

reasonable efforts to restrict its requests for such access to the Source Code Computers to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m. local time. However, upon reasonable notice from the receiving Party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the Source Code Computers outside of normal business hours. The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel (or at some other mutually agreeable location) shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;

c. The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the Source Code Computers in order to access the produced Source Code Material on the Source Code Computers;

d. No cell phones, PDAs, cameras, recordable or storage media (e.g., USB thumb drive, etc.), or computers (other than a notetaking laptop that is not connected to the Internet) will be permitted inside the source code review room. A telephone and internet access will be provided in a room convenient to and near the source code review room—i.e., a room in close proximity to the source code review room. A reviewer shall be permitted to access the internet and use a personal cell phone in that room. If any individual inspecting Source Code seeks to take notes, all such notes will be taken by hand or on a laptop not connected to the Internet (notetaking laptop);

e. The producing Party will produce Source Code Material in computer searchable format. The receiving Party, at its own expense, may request that the producing Party install licensed software on a Source Code Computer to assist with review of the producing Party's Source Code. The receiving Party must provide the Producing Party with the requested licensed software at least five (5) days in advance of the date upon which the receiving Party wishes to have the additional software tools available for use. The Parties shall promptly meet and confer as to any objection the producing Party may have to the installation of such software. Otherwise, the producing Party will install and confirm installation of said software on the Source Code Computers prior to the date the receiving Party seeks access.

f. The source code is to be provided in native format with, if possible, the original path names (e.g., the directory tree pertinent to the produced files). Native format means electronic files containing native text not produced through any process involving optical character recognition.

g. Access to Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE shall be limited to outside counsel and up to three (3) outside consultants or experts[2] (i.e., not existing employees or affiliates of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above.

---

[2] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or analysis shall count as a disclosure to a single consultant or expert.

h.  A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document ("Source Code Documents"), provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

i.  To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE;

j.  Unless otherwise agreed to by the Parties, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically;

k.  The receiving Party shall be permitted to request a reasonable number of printouts and photocopies of Source Code Material, all of which shall be designated and clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall maintain a log of all such files that are printed or photocopied. The receiving Party shall not print Source Code Material in order to review blocks of Source Code Material elsewhere in the first instance, as the parties agree that the purpose of the protections herein

would be frustrated by printing portions of source code for review and analysis elsewhere;

l.  Should such printouts or photocopies be transferred back to electronic media, such media shall be labeled "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall continue to be treated as such;

m.  If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or expert. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (e.g., a hotel prior to a Court proceeding or deposition); and

n.  A producing Party's Source Code Material may be transported by the receiving Party only at the direction of a person authorized under paragraph 10(g) above to another person authorized under paragraph 10(g) above, on paper or removable electronic media (e.g., a DVD, CD-ROM, or flash memory "stick") via hand carry, Federal Express, or other similarly reliable courier. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet. Source Code Material

otherwise may be transported electronically only for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 10(l) above and is at all times subject to the transport restrictions set forth herein. But, for those purposes only, the Source Code Materials may be loaded onto a stand-alone computer without prior consent from the producing Party or as necessary to file with the Court or serve documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically under seal.

11. Any attorney representing a Party, whether in-house or outside counsel, and any person who is both associated with a Party and permitted to receive the other Party's Protected Material that is designated RESTRICTED – ATTORNEYS' EYES ONLY and/or RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL"), who obtains, receives, has access to, or otherwise learns, in whole or in part, the other Party's HIGHLY SENSITIVE MATERIAL under this Order shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent(s) in suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals. This provision does not prohibit the Parties' counsel of record or experts in this litigation from participating in or representing it in reexamination proceedings, Post-Grant Review proceedings, inter partes review proceedings, or Covered Business Method Review proceedings involving any patent, including the patents-in-suit, provided they (1) do not rely upon or use, directly or indirectly, another Party's HIGHLY SENSITIVE MATERIAL in those proceedings and (2) do not advise on,

consult on, prepare, draft, or edit any amendment to specifications or claims in those proceedings. Further, the Parties' counsel of record or experts in this litigation may not reveal HIGHLY SENSITIVE MATERIAL of another Party to any reexamination, inter partes review, or covered business method review counsel or agent. To ensure compliance with the purpose of this provision, each Party shall create an "Ethical Wall" between those persons with access to HIGHLY SENSITIVE MATERIAL and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of invention of the patent(s) in suit.

12. Nothing in this Order shall require production of documents, information, or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity.[3] If documents, information, or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity. Any Party that inadvertently or unintentionally produces documents, information or other material it reasonably believes are protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or

_____

[3] The Defendants assert that a joint defense and/or common interest privilege exists among Defendants in this action and those named in other pending E.D. Texas cases filed by Arigna involving any of the same Defendants.

unintentionally produced documents, information or other material. The recipient(s) shall (1) gather, destroy, and certify destruction of all copies of such documents, information, or other material to the producing Party; or (2) gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party. The receiving Party may move the Court for an Order compelling production of such information, but the motion shall not assert as a ground for production the fact or circumstances of the inadvertent or unintentional production. If a claim is disputed, the receiving Party shall not use or disclose a document or information for which a claim of privilege or immunity is made pursuant to this Paragraph for any purpose except to challenge the claim of privilege or immunity to the Court until the matter is resolved by agreement of the parties or by a decision of this Court.

13. There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information, and material to protect against disclosure to any unauthorized persons or entities.

14. Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating party, (ii) identified in the DESIGNATED MATERIAL as an

author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party; (v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraphs 9 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

15. Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order. Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as confidential.

16. Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court. The filing party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER"

above the caption and conspicuously on each page of the filing. Exhibits to a filing shall conform to the labeling requirements set forth in this Order. If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on confidential documents, information or material, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

17. The Order applies to pretrial discovery. Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

18. A Party may request in writing to the other Party that the designation given to any DESIGNATED MATERIAL be modified or withdrawn. If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief. Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper. Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions. In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met. Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

19. Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this

Order, and shall sign an acknowledgment that he or she has received a copy of, has read, and has agreed to be bound by this Order. A copy of the acknowledgment form is attached as Appendix A.

20. To the extent that any discovery is taken of persons who are not Parties to this Action ("Third Parties") and in the event that such Third Parties contend the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

21. To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE" any documents, information, or other material, in whole or in part, produced or given by such Third Parties. The Third Parties shall have ten (10) days after production of such documents, information, or other materials to make such a designation. Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "CONFIDENTIAL" in accordance with this Order.

22. The provisions of this Order shall continue to be binding after final termination of this case until a Producing Party agrees otherwise in writing or a court order otherwise directs. Within sixty (60) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall either be returned to the

producing Party or be destroyed. The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request. Notwithstanding the foregoing, outside counsel of record shall be entitled to maintain copies of all pleadings, expert reports, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto), trial transcripts and hearing transcripts, and exhibits offered or introduced into evidence at any hearing or trial, emails and their attachments, and their attorney work product which refers or is related to any Protected Material for archival purposes only. Any such archived copies that contain or constitute Protected Material remain subject to this Order and shall be maintained in confidence by outside counsel for the Party retaining the materials. This provision does not apply to the Court, including court personnel and the Court's reporter. Any destruction obligations under this Protective Order shall not apply to electronically-stored information in archival form stored on backup tapes or computer servers that are created only for disaster recovery purposes, provided that such electronic archives are not used as reference materials for a receiving Party's business operations.

23. The failure to designate documents, information, or material in accordance with this Order, and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof. The entry of this Order and/or the production of documents, information, and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved. Newly

designated DESIGNATED MATERIAL must be treated by the receiving party according to the new designation from the time the receiving party is notified in writing of the change in the designation. If material is designated as containing DESIGNATED MATERIAL subsequent to production or disclosure, the producing party shall reproduce the material with the correct designation. Upon receiving the material with the correct designation, the receiving party shall return or securely destroy all copies that were not properly designated. Any party desiring to change the designation of any previously produced material may do so at any time under the provisions of this section.

24. Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

25. Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information, or other material or its contents.

26. Nothing in this Order shall be construed to constitute an abrogation, waiver, or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

27. Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

**SIGNED this 9th day of August, 2021.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

ARIGNA TECHNOLOGY LIMITED,

       *Plaintiff,*

vs.

VOLKSWAGEN AG ET AL.,

       *Defendants.*

Case No. 2:21-cv-00054-JRG-RSP

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
**PROTECTIVE ORDER**

I, _____, declare that:

1.    My address is _____.

     My current employer is _____.

     My current occupation is _____.

2.    I have received a copy of the Protective Order in this action. I have carefully read and understand the provisions of the Protective Order.

3.    I will comply with all of the provisions of the Protective Order. I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.    Promptly upon termination of these actions, I will return all documents and things designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession, and

1

all documents and things that I have prepared relating thereto, to the outside counsel for the party by whom I am employed.

5. I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _____

# Exhibit 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| UNICORN ENERGY GMBH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:20-CV-00338-JRG |
| | § | |
| TESLA, INC., | § | |
| | § | |
| *Defendant.* | § | |

## STIPULATED PROTECTIVE ORDER

WHEREAS, Plaintiff Unicorn Energy GmbH and Defendant Tesla, Inc. (hereafter referred to as "the Parties," collectively, or "Party," individually), believe that certain information that is or will be encompassed by discovery demands by the Parties discloses or reflects trade secrets, confidential business information, or other proprietary information;

WHEREAS, the Parties seek entry of the following protective order limiting disclosure thereof in accordance with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and ORDERED that:

1. Each Party may designate as confidential for protection under this Order, in whole or in part, any document, information or material that constitutes or includes, in whole or in part, confidential or proprietary information or trade secrets of the Party or persons who are not Parties to this Action ("Third Parties") to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such document, information or material. In this stipulated order, the foregoing documents, information, and materials are referred to as "Protected Material." Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows:

"CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE." The appropriate legend or stamp shall be placed clearly on each page of the Protected Material (except deposition and hearing transcripts) for which such protection is sought. For deposition and hearing transcripts, the appropriate legend or stamp shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice of the designation of some or all of that transcript as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE."

2. Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Confidential - Outside Attorneys' Eyes Only" shall receive the same treatment as if designated "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, unless and until such document is redesignated to have a different classification under this Order.

3. With respect to documents, information or material designated "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" ("DESIGNATED MATERIAL"),[1] subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil

---

[1] The term DESIGNATED MATERIAL is used throughout this Protective Order to refer to the class of materials designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," both individually and collectively.

Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; and (e) stipulations. All copies, reproductions, extracts, digests and complete or partial summaries prepared from any DESIGNATED MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order. DESIGNATED MATERIAL must be stored and maintained by a Receiving Party at a location in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Order. DESIGNATED MATERIAL may not be exported outside the United States except for the purpose of using such material in connection with the preparation for and taking of a deposition outside the United States, so long as the transport and use of such material in connection with the preparation for and taking of a deposition outside the United States complies with any applicable laws.

4.  A designation of Protected Material (i.e., "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE,") may be made at any time. Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in whole or in part of a claim for confidential treatment. Any party that inadvertently or unintentionally produces Protected Material without designating it as DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated. The recipient(s) shall then destroy all copies of the inadvertently

or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.  The "CONFIDENTIAL" designation means that the designating Party reasonably believes, in good faith, that the information or material contains, embodies, refers to, and/or reflects non-public information (regardless of how it is generated, stored, or maintained) that is not generally known and which the designating Party would not normally reveal to Third Parties, such information, for example, may include confidential financial, proprietary, or commercial information or confidential personal information, or other information required by law or agreement to be kept confidential. Any information that is subject to federal, state, or foreign data protection laws or other privacy obligations (including, without limitation, Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the Protection of Natural Persons with Regard to the Processing of Personal Data and on the Free Movement of Such Data, also known as the General Data Protection Regulation ("GDPR")) ("Protected Data") shall also be treated as CONFIDENTIAL. "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating Party, upon order of the Court, or as set forth in paragraph 13 herein:

(a)  outside counsel of record in this Action for the Parties;

(b)  employees of such counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

(c)  in-house counsel for the Parties who either have responsibility for making decisions dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

(d)  up to and including three (3) designated representatives of each of the Parties who are officers or employees of a Party, to the extent reasonably necessary for the litigation of this Action, except that either Party may in good faith request the

other Party's consent to designate one or more additional such representatives, the other Party shall not unreasonably withhold such consent, and the requesting Party may seek leave of Court to designate such additional representative(s) if the requesting Party believes the other Party has unreasonably withheld such consent;

(e)     outside consultants or experts (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation, provided that: (1) such consultants or experts are not presently employed by the Parties hereto for purposes other than this Action; (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto; (3) the Party retaining the consultant or expert serves the Undertaking upon the other Party; (4) the outside consultant or expert resides in and is a citizen of the United States, along with:

>   (i)     a current curriculum vitae of the consultant or expert, including a list identifying the consultant's or expert's current employer and his or her former employers in the previous ten (10) years and a list of all his or her publications from the previous ten (10) years;

>   (ii)    a list identifying by case name, case number, and court/agency of any litigation in which the consultant or expert offered expert testimony (at deposition, hearing, or trial) in the previous four (4) years;

>   (iii)   a list identifying each person or entity for which the consultant or expert has consulted during the previous ten (10) years, including the nature and time period of such consultancy, provided that the proposed expert or consultant is not otherwise prohibited due to confidentiality obligations to a non-party from disclosing such information. Where a proposed expert or consultant cannot disclose information due to a confidentiality obligation to a third party, the expert or consultant shall in good faith disclose such information as the expert or consultant is permitted to provide regarding the nature of the consultancy (such as, e.g., the industry or technology involved in that consultancy, whether the employment or consultancy was for a competitor of a party, etc.) to enable, to the extent possible, the producing Party to determine whether or not to object to the expert or consultant;

and (5) at least ten (10) days have elapsed after service of the Undertaking without the other Party's having served an objection to the disclosure of DESIGNATED MATERIAL to the consultant or expert upon the Party retaining such consultant or expert. The Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties are unable to resolve any objection, the objecting Party may file a motion with the Court within fifteen (15) days of service of the objection, or within such other time as the Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party shall have the burden of proving the need for a protective order. No disclosure shall occur until all such objections are resolved by agreement or Court order;

(f)  independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

(g)  the Court and its personnel as well as any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Order.

6.  A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.  Documents, information or material produced pursuant to any discovery request in this Action, including but not limited to Protected Material designated as DESIGNATED MATERIAL, shall be used by the Parties only in the litigation of this Action and shall not be used for any other purpose.  Any person or entity who obtains access to DESIGNATED MATERIAL or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL or any portion thereof except as may be reasonably necessary in the litigation of this Action.  Any such copies, duplicates, extracts, summaries or descriptions shall be classified DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8.  To the extent a producing Party believes that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED – ATTORNEYS' EYES ONLY."  The "RESTRICTED – ATTORNEYS' EYES ONLY" designation means that the designating Party reasonably believes, in good faith, that the

information or material contains, embodies, refers to, and/or reflects confidential information that the designating Party reasonably believes could cause significant economic and/or competitive harm to the designating Party if disclosed to Third Parties, certain officers, directors, employees, consultants, and/or agents of a receiving Party, which may include, but is not limited to, trade secrets; pricing information; non-public financial, organizational, or operational information; sales, marketing, and strategic forecasts and plans; licenses and licensing agreements; technical information relating to the design, development, engineering, research, testing, operation, and production of products; personal employee information; unpublished pending domestic or foreign patent applications; and other non-public information of similar sensitivity. To the extent such Protected Material includes computer source code, descriptions of computer source code, and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE."

9.    For Protected Material designated RESTRICTED – ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 5(a-c) and (e-g) and persons whom counsel for the designating Party otherwise agree in writing may have access only on a document-by-document basis; provided, however, that access by in-house counsel pursuant to paragraph 5(c) be limited to in-house counsel who exercise no competitive decision-making authority on behalf of the client with respect to any products, whether commercial or contemplated for development in the future, relevant to the subject matter in the patent-in-suit.

10. For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply, unless the producing Party and the receiving Party agree otherwise:

    (a) Access to a Party's Source Code Material shall be provided only on "stand-alone" computer(s) (that is, the computer shall not be linked to any network, including a local area network ("LAN"), an intranet or the Internet). The stand-alone computer(s) ("secured computer") may be connected to a printer, solely for the limited purposes permitted pursuant to paragraphs 10(h) and 10(k) below, but shall not have any other enabled access ports, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source Code Material outside or away from the computer on which the Source Code Material is provided for inspection. No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted into the Source Code Material review room. Additionally, except as provided in paragraph 10(k) below, the secured computer(s) may only be located at the offices of the producing Party's outside counsel;

    (b) The receiving Party shall make reasonable efforts to restrict its requests for such access to the secured computer(s) to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m. However, upon reasonable notice from the receiving Party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the secured computer(s) outside of normal business hours. The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action. All persons who will review a producing party's Source Code Material on behalf of a receiving Party, including members of a receiving Party's outside law firm, shall be identified in writing to the producing Party at least five (5) days in advance of the first time that such person reviews such Source Code Material. All persons viewing Source Code Material shall sign on each day they view Source Code Material a log that will include the names of persons who view the Source Code Material and when they enter and depart;

    (c) The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the secured computer(s) in order to access the produced Source Code Material on the secured computer(s);

    (d) The producing Party will produce Source Code Material in computer searchable format on the secured computer(s) as described above. No copies of all or any portion of the Source Code Material may leave the room in which the Source Code Material is inspected except as otherwise provided herein and the receiving

8

Party will not transmit any Source Code Material in any way from the producing Party's facilities or the offices of its outside counsel of record.  Further, no other written or electronic record of the Source Code Material is permitted except as otherwise provided herein.  The producing Party shall make available a printer with commercially reasonable printing speeds for on-site printing during inspection of the Source Code Material.  The receiving Party may print limited portions of the Source Code Material only when necessary to prepare court filings or pleadings or other papers (including a testifying expert's expert report). Any printed portion that consists of more than ten (10) pages of a continuous block of Source Code Material shall be presumed to be excessive, and the burden shall be on the Receiving Party to demonstrate good cause for such a printed copy.  The Receiving Party may print out no more than fifty (50) pages total absent a showing of good cause.  The receiving Party shall not print Source Code Material in order to review blocks of Source Code Material elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code Material electronically on the secured computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere, and that printing is permitted only when necessary to prepare court filings, infringement contentions, pleadings or other papers (including a testifying expert's expert report).  Upon printing any such portions of Source Code Material, the printed pages shall be collected by the producing Party.  The producing Party shall Bates number, copy, and label "RESTRICTED CONFIDENTIAL SOURCE CODE" any pages printed by the receiving Party;

(e)     Access to Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE shall be made available through the end of expert discovery in this litigation and shall be limited to outside counsel and up to three (3) outside consultants or experts[2] (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above.  A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, or other Court document ("Source Code Document"), provided that the Source Code Document is appropriately marked under this Order, restricted to those who are entitled to have access to it as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders.  Unless otherwise agreed in advance by the Parties in writing, following each day on which inspection is done under this Order, the receiving Party's outside counsel and/or experts shall remove all notes, documents, and all other materials from the Source Code Material review room.  The producing Party shall not be responsible for any items left in the room following each inspection session, and the receiving Party shall have no expectation of

---

[2] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or her analysis shall count as a disclosure to a single consultant or expert.

confidentiality for any items left in the room following each inspection session without a prior agreement to that effect. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code Material, and a copy of such identification will be made and provided to the producing Party. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the secured Source Code Material computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification;

(f)     To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE;

(g)     Except as set forth in paragraph 10(k) below, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically;

(h)     The receiving Party's outside counsel shall be permitted to make no more than three (3) additional paper copies of any portions of a Source Code Material, not including copies attached to court filings or used at depositions, all of which shall be designated and clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall maintain a log of all such files that are printed or photocopied; The receiving Party shall maintain a log of all paper copies of any Source Code Material, which identifies the names of the reviewers and/or recipients of paper copies, the locations where the paper copies are stored, and the dates on which such paper copies were received by such individuals. Upon one (1) day's advance notice to the receiving Party by the producing Party, the receiving Party shall provide a copy of this log to the producing Party.

(i)     Should such printouts or photocopies be transferred to electronic media, such media shall be labeled "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall continue to be treated as such;

(j)     If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or expert. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to

the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (*e.g.*, a hotel prior to a Court proceeding or deposition); and

(k)     A producing Party's Source Code Material may only be transported by the receiving Party at the direction of a person authorized under paragraph 10(e) above to another person authorized under paragraph 10(e) above, on paper via hand carry, Federal Express or other similarly reliable courier. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet. Source Code Material may only be transported electronically for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 10(j) above and is at all times subject to the transport restrictions set forth herein. But, for those purposes only, the Source Code Materials may be loaded onto a secured computer.

11.     The producing Party will produce its Source Code Material in a manner that allows the receiving Party to reasonably inspect the Source Code Material. The producing Party will monitor the receiving Party's inspection only to the extent necessary to ensure that the receiving Party is complying with the terms of this Order. The producing Party shall install tools that are sufficient for viewing and searching the Source Code Material produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business. The receiving Party's outside counsel and/or experts may request that commercially available software tools for viewing and searching Source Code Material be installed on the secured computer, provided, however, that (a) the receiving Party possesses an appropriate license to such software tools; (b) the producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code Material consistent with all of the protections herein. The receiving Party must provide the producing Party with the CD or DVD containing such licensed software tool(s) at least fifteen (15) days in advance of the date upon which the receiving Party wishes to have the additional software tools available for use on the Source Code Material secured computer, with the

understanding that if the producing Party is unable to make the Source Code Material available for inspection within the fifteen (15) days, the producing Party shall inform the receiving Party of the reason it is unable to do so and the Parties shall confer and use good faith to identify an alternative date for inspection. The receiving Party's outside counsel and retained experts or consultants otherwise allowed to view Source Code Material shall be entitled to take handwritten notes relating to the Source Code Material but may not copy more than five (5) successive lines of any individual file of the Source Code Material into the handwritten notes and may not take such notes electronically on the secured computer itself or any other computer. No provision herein gives the producing Party the right to inspect or review any notes and/or other work product of the receiving Party. However, if the producing Party has good cause to believe that the provisions of this Protective Order have been violated, then the producing Party may request that the Court conduct an *in-camera* review of said notes.

12. The Parties agree that productions of Protected Data may require additional safeguards pursuant to federal, state, or foreign statutes, regulations, or privacy obligations and will meet and confer to implement these safeguards if and when needed.

13. Any attorney representing a Party, whether in-house or outside counsel, and any person associated with a Party and permitted to receive the other Party's Protected Material that is designated RESTRICTED -- ATTORNEYS' EYES ONLY and/or RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL"), who obtains, receives, has access to, or otherwise learns, in whole or in part, the other Party's HIGHLY SENSITIVE MATERIAL under this Order shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to

the field of the invention of the patent-in-suit on behalf of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals. To ensure compliance with the purpose of this provision, receiving persons shall not discuss or review DESIGNATED MATERIAL under circumstances where such materials would be exposed to persons involved in the drafting or amending of such patent claims. Nothing in this paragraph shall prevent any attorney or person associated with a receiving Party that has received another Party's or non-Party's DESIGNATED MATERIALS from participating in any post-grant patent proceedings (e.g., reexamination, *inter partes* review, or other post-grant challenges to patents) that is instituted or sought to be instituted challenging the validity of any patents; however, consistent with the foregoing restrictions of this paragraph, said attorney or person may not assist or provide any advice in any manner to the Party owning the challenged patent with respect to drafting, amending, or proposing for substitution to the U.S. Patent and Trademark Office (or any similar agency of a foreign government) patent claims in said post-grant proceeding(s). For the avoidance of doubt, this paragraph shall apply to individuals only and shall not be applied to an entire law firm.

14. Nothing in this Order shall require production of documents, information or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity. If documents, information or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity. Any Party that inadvertently or unintentionally

produces documents, information or other material it reasonably believes are protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or unintentionally produced documents, information or other material. The recipient(s) shall gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party.

15. There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information and material to protect against disclosure to any unauthorized persons or entities.

16. Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating Party, (ii) identified in the DESIGNATED MATERIAL as an author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party; or (v) another person entitled hereunder to

access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

17. Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order. If not designated at the deposition, until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as "RESTRICTED - ATTORNEYS' EYES ONLY."

18. Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court. The filing Party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER" above the caption and conspicuously on each page of the filing. Exhibits to a filing shall conform to the labeling requirements set forth in this Order. If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on DESIGNATED MATERIAL, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

19. The Order applies to pretrial discovery. Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of

this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

20. A Party may request in writing to the other Party that the designation given to any DESIGNATED MATERIAL be modified or withdrawn. If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief. Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper. Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions. In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met. Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

21. Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order, and shall sign an Undertaking that he or she has received a copy of, has read, and has agreed to be bound by this Order. A copy of the Undertaking is attached as Appendix A.

22. To the extent that any discovery is taken of Third Parties and in the event that such Third Parties contend the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

23.    To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL" or "RESTRICTED – ATTORNEYS' EYES ONLY" any documents, information or other material, in whole or in part, produced or given by such Third Parties.   The Third Parties shall have ten (10) days after production of such documents, information or other materials to make such a designation.  Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "RESTRICTED – ATTORNEYS' EYES ONLY" in accordance with this Order.

24.    To the extent a receiving Party receives a subpoena or other compulsory process from a Third Party seeking production or other disclosure of a producing Party's DESIGNATED MATERIAL, that receiving Party shall give written notice to outside counsel for the producing Party immediately, and in no event more than five (5) business days after receipt of the subpoena or other compulsory process, identifying the specific DESIGNATED MATERIAL sought and enclosing a copy of the subpoena or other compulsory process. The receiving Party must also promptly inform in writing the Third Party who caused the subpoena or other compulsory process to issue in the other litigation that some or all of the materials covered by the subpoena or other compulsory process are subject to this Order.  In addition, the receiving Party must deliver a copy of this Order promptly to the Third Party that caused the subpoena or order to issue.  If the producing Party timely seeks a protective order, the receiving Party to whom the subpoena or other compulsory process was issued or served shall not produce the DESIGNATED MATERIAL requested prior to receiving a Court order or consent of the producing Party.   In the event that

DESIGNATED MATERIAL is produced to the Third Party, such material shall be treated as DESIGNATED MATERIAL pursuant to this Order.

25. Within thirty (30) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall at the producing Party's election either be returned to the producing Party or be destroyed. However, outside counsel may retain pleadings, attorney and consultant work product, attorney-client communications, communications with opposing counsel, and depositions for archival purposes. The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request.

26. The failure to designate documents, information or material in accordance with this Order and the failure to object to a designation at a given time shall not preclude a Party from seeking to impose such designation or challenging the propriety thereof at a later date. The producing Party may subsequently inform the receiving Party of the confidential nature of the disclosed DESIGNATED MATERIAL, and the receiving Party shall treat the disclosed DESIGNATED MATERIAL as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," as the case may be, upon receipt of written notice from the producing Party, to the extent the receiving Party has not disclosed this DESIGNATED MATERIAL. Disclosure of such DESIGNATED MATERIAL to persons not authorized to receive that material prior to receipt of the confidentiality designation shall not be deemed a violation of this Order.

However, in the event the material has been distributed in a manner inconsistent with the categorical designation, the receiving Party will take the steps necessary to conform distribution to the categorial designation, i.e., by retrieving all copies of the DESIGNATED MATERIAL, or notes or extracts thereof, in the possession of the persons not authorized under this Order to possess such DESIGNATED MATERIAL and advising the person to whom disclosure was made that the material is confidential and should be treated as provided in the Order. The entry of this Order and/or the production of documents, information and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved.

27. Any Party knowing or believing that any other Party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing Party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

28. Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information or other material or its contents.

29. Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

30. Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

**So ORDERED and SIGNED this 12th day of February, 2021.**

_____

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNICORN ENERGY GmbH | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2:20-cv-338-JRG |
| | ) | |
| TESLA, INC. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
<u>**PROTECTIVE ORDER**</u>

I, _____, declare that:

1.    My address is _____.

       My current employer is _____.

       My current occupation is _____.

2.    I have received a copy of the Protective Order in this action. I have carefully read and understand the provisions of the Protective Order.

3.    I will comply with all of the provisions of the Protective Order. I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action, any information designated as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.    Promptly upon termination of these actions, I will return all documents and things designated as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession, and

all documents and things that I have prepared relating thereto, to the outside counsel for the party by whom I am employed.

5.    I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _____

# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

|  |  |
|---|---|
| **THE TRUSTEES OF**<br>**PURDUE UNIVERSITY,**<br><br>            **Plaintiff,**<br><br>**v.**<br><br>**STMICROELECTRONICS N.V.,**<br>**STMICROELECTRONICS**<br>**INTERNATIONAL N.V., and**<br>**STMICROELECTRONICS, INC.,**<br><br>            **Defendants.** | **Civil Action No. 6:21-cv-00727-ADA**<br><br>**JURY TRIAL DEMAND** |

## ORDER REGARDING DISCOVERY DISPUTES

This Court, having considered the parties' disputes raised during the January 28, 2022 Discovery Hearing, hereby ORDERS the following:

Defendants sought to include the Court's standard source-code restrictions in the parties' protective order, and further to allow Defendants to designate semiconductor design and manufacturing information (*e.g.*, design files, recipes, GDS files, process flows, CAD/CAE files, and similar materials) as subject to the source code restrictions. The Court DENIES the request.

Defendants also sought to include an acquisition bar in the parties' protective order to preclude individuals that have access to a party's Confidential – Attorneys' Eyes Only information from participating in the acquisition of patents (including patent applications), or the rights to any such patents or patent applications with the right to sublicense, relating to the functionality, operation, and design of MOSFET products during the pendency of this Action and for one year after its conclusion, including any appeals.  The Court DENIES the request.

Plaintiff requested that certain third parties subpoenaed by Defendants, namely Purdue Research Foundation, Professor James A. Cooper, Dr. Asmita Saha, and Bahret & Associates (collectively, the "Purdue Affiliated Parties") be considered for the purposes of discovery as part of, or in privity with Plaintiff.  Counsel for Plaintiff and the Purdue Affiliated Parties stipulated that Plaintiff has full and complete control over all relevant documents and materials in the possession, custody and control of the Purdue Affiliated Parties as well as the ability to present each for a deposition, and that the Purdue Affiliated Parties agree to have all disputes related to discovery sought from them by STMicroelectronics, Inc. in connection with the above-styled case decided by the Judge presiding over this case, and submit themselves to the jurisdiction of this Court for such purposes. Based on the representations and stipulations made by counsel for Plaintiff and the Purdue Affiliated Parties, the Court finds that the Purdue Affiliated Parties are not third-parties for the purposes of discovery, and discovery served on these affiliated entities is not warranted before party discovery opens.

SIGNED this 3rd day of February, 2022.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

# Exhibit 16

1
2
3
4
5              UNITED STATES DISTRICT COURT FOR THE
6             WESTERN DISTRICT OF WASHINGTON AT SEATTLE
7

TELEBUYER, LLC,

                Plaintiff,

    v.

AMAZON.COM, INC., AMAZON WEB
SERVICES LLC, VADATA, INC.,

                Defendants.

CASE NUMBER: 13-cv-1677

**ORDER GRANTING DEFENDANT'S MOTION FOR A PROTECTIVE ORDER**

8
9

10        Defendants Amazon.com, Inc., Amazon Web Services LLC, and Vadata, Inc.

11  (collectively, "Amazon") move for a protective order under Fed. R. Civ. P. 26. The proposed

12  protective order, which would supplement the parties' existing protective agreement, covers the

13  disclosure and handling of Amazon's confidential source code, and prohibits counsel and experts

14  from participating in certain patent prosecution and acquisition activities. Having considered the

15  parties' filings together with all other relevant materials, the Court grants Amazon's motion, for

16  the reasons discussed below.


17                        **LEGAL STANDARD**

18        Fed. R. Civ. P. 26 authorizes this Court to issue a protective order upon a showing of

19  good cause. A protective order may require that trade secrets "not be revealed or be revealed

20  only in a specified way." Fed R. Civ. P. 26(c)(1)(G). "If a court finds particularized harm will

21  result from disclosure of information to the public, then it balances the public and private

22  interests to decide whether a protective order is necessary." *Rivera v. NIBCO, Inc.*, 384 F.3d 822,

1

1    827 (9th Cir. 2004). Courts generally require "a specific prejudice or harm." *Id.* (quotation

2    omitted).

3         Because the legality of a "prosecution bar" turns on the interpretation of substantive

4    patent law, Federal Circuit precedent governs the question. *See In re Deutsche Bank Trust Co.*

5    *Americas,* 605 F.3d 1373, 1378 (Fed. Cir. 2010). The Federal Circuit in *Deutsche Bank* set forth

6    a two-step balancing test for deciding whether to include a prosecution bar in a protective order.

7    *Id.* First, the court determines on a case-by-case basis whether individuals who receive

8    confidential information play a role in "competitive decision-making." *Id.* Second, the court

9    weighs the risk of inadvertent disclosure against the potential harm caused by placing restrictions

10   on access to counsel. *Id.* at 1380. In performing this balancing test, courts "should consider such

11   things as the extent and duration of counsel's past history in representing the client before the

12   PTO, the degree of the client's reliance and dependence on that past history, and the potential

13   difficulty the client might face if forced to rely on other counsel for the pending litigation or

14   engage other counsel to represent it before the PTO." *Id.* at 1381. The party seeking to include

15   the prosecution bar has the burden of showing good cause. *Id.* at 1378.

16                                        **ANALYSIS**

17        The parties are quite familiar with the underlying facts and legal arguments. In the

18   interest of rendering a prompt decision, the Court will not review those matters here.

19   **A.  The Necessity of a Protective Order for Source Code**

20        Amazon asks the Court to order restrictions on viewing, handling, printing, and

21   transporting all materials designated as "source code." Telebuyer argues that the parties' existing

22   Protective Agreement adequately protects Amazon's source code, such that adding a specific

23   provision for source code would be unnecessary and burdensome. Telebuyer also argues that the

2

1    harm or prejudice that could be caused by disclosure of documents designated as "source code"

2    is too speculative to outweigh the presumption in favor of public litigation. For the reasons given

3    below, the Court concludes that a specific provision for source code is warranted.

4            **1.    The Parties' Existing Agreement Does Not Provide Equivalent Protection**

5            The Protective Agreement already signed by the parties does not restrict the viewing,

6    handling, transport, or replication of source code. It also contains no prosecution bar. As such, it

7    cannot be said to provide a level of protection that would make additional source code

8    protections superfluous.

9            Telebuyer essentially asks the Court to give its counsel and experts the benefit of the

10   doubt that they will faithfully observe the confidentiality rules to which the parties have already

11   agreed. This assurance does not address Amazon's concerns. The proposed source code

12   provision is designed not only to hold the designated parties to their word, but also to prevent

13   any others from gaining unauthorized access to the information. It restricts how, when, and

14   where the information is displayed, how much can be printed, and how it is transported. The

15   existing agreement does not do these things, and Telebuyer's promise of fidelity to the

16   confidentiality rules, however sincere, is not a substitute.

17           Telebuyer's argument fares no better with respect to the prosecution bar. Source code is

18   "highly confidential, technical information" that creates a "heightened risk of inadvertent

19   disclosure." *Kelora Sys., LLC v. Target Corp.*, 2011 WL 6000759, at *7 (N.D. Cal. Aug. 29,

20   2011) (quoting *Applied Signal Technology, Inc. v. Emerging Markets Communications,* 2011

21   WL 197811, at *2 (N.D. Cal. Jan. 20, 2011)). The Federal Circuit recognized in *Deutsche Bank*

22   that "even the most rigorous efforts of the recipient of such information to preserve

23   confidentiality in compliance with the provisions of such a protective order may not prevent

3

1    inadvertent compromise." 605 F.3d at 1378. This is because "[i]t is very difficult for the human

2    mind to compartmentalize and selectively suppress information once learned, no matter how

3    well-intentioned the effort may be to do so." *Id.* (citing *FTC v. Exxon Corp.,* 636 F.2d 1336,

4    1350 (D.C. Cir. 1980)). Telebuyer's promise that designated individuals would not deliberately

5    or affirmatively disclose Amazon's confidential information is irrelevant. The prosecution bar

6    functions as a guard against inadvertent disclosure and inadvertent misuse of confidential

7    information.

8              **2.    Amazon Has Shown Specific Harm or Prejudice**

9              The "particularized harm" of disclosure is self-evident in this case. *See Rivera*, 384 F.3d

10   at 827. Moreover, the parties' private interest in protecting themselves from the disclosure of

11   proprietary technical information outweighs the public interest in transparent litigation. *Id.*

12             Telebuyer does not dispute the value of Amazon's source code and related documents.

13   Amazon explained that some documents (described as "pseudo-code") do not contain source

14   code but could still be used to derive source code. Amazon also emphasized the investment in

15   time and manpower that goes into developing the source code and related materials, and pointed

16   out the obvious value and highly confidential nature of any documents that "define or otherwise

17   describe in detail" Amazon's algorithms. This is enough of a "particularized harm" to justify a

18   protective order. Amazon need not provide a step-by-step description of precisely how someone

19   might go about taking advantage of Amazon's trade secrets.

20   **B.  "Source Code" Definition**

21             The Court adopts Amazon's proposed definition of "source code," which reads:

22   "computer code and associated comments and revision histories, formulas, engineering

23   specifications, or schematics that define or otherwise describe in detail the algorithms or

4

1    structure of software or hardware designs." Declaration of Eugene Chiu ("Chiu Decl.") [Dkt.

2    #92] Ex. 2, at 6.[1]

3         Telebuyer maintains that the definition given by Amazon is too broad, encompassing

4    routinely disclosed documents that have nothing to do with source code. It is true, for example,

5    that Amazon could designate as source code "engineering specifications" that describe the

6    "structure" of "hardware designs." *Id.* On its face this would seem further removed from the

7    actual code than the other elements included in Amazon's proposed definition. However, at this

8    point in the litigation, Amazon is best qualified to determine whether these elements actually do

9    relate to source code. Telebuyer has given the Court no specific reason not to err on the side of

10   caution when dealing with highly technical materials.

11        Furthermore, Amazon's proposed definition is a verbatim transcription of the model

12   Stipulated Protective Order for source code in the United States District Court for the Northern

13   District of California. *See id.* Ex. 11 at 2. That court has substantial expertise in this area of law,

14   and its model order reflects the cumulative wisdom of the court and the bar in that jurisdiction.

15   **C. Print Restrictions**

16        Amazon proposes a 25-page limit on printing of "any continuous block of Source Code,"

17   unless "reasonably required for printing a source code function or method in its entirety." *Id.* Ex.

18   2 at 9. Amazon also proposes a 1500-page aggregate printing limit. *Id.* The proposal recognizes

19   that the receiving party "may request a meet and confer to discuss the printing of additional

20   code." *Id.*

---

[1] The Court notes a discrepancy between the definition quoted herein and the definition given by Amazon in its briefs to the Court. Amazon's definition in the briefs omits the reference to "hardware." *See* Def's Mot. at 6; Def's Reply Br. at 3. Adding the term "hardware" appears to expand the scope of the definition. However, contrary to Telebuyer's Surreply, the proper remedy is not to strike those portions of Amazon's briefs. *See* Pl's Surreply at 2. The material in Amazon's briefs is not redundant, immaterial, impertinent, or scandalous. *See* Fed. R. Civ. P. 12(f) (describing grounds for striking material from a pleading). It is just erroneous. The Court does not rely upon any arguments stemming from the misquotation. Those arguments have no force, but need not be struck.

1    These requirements appear reasonable. The receiving party still has the option to request

2    more than 25 continuous pages when necessary to print a function or method in its entirety, and

3    the parties are obligated to meet and confer in the event of a dispute concerning the print

4    limitation. Telebuyer argues that it cannot assess the reasonableness of the print limitation until it

5    learns the total volume of documents in the source code. If Telebuyer later discovers that the

6    document volume makes the print limitations unworkable, it may move for an amendment of the

7    protective order.

8    **D.  Transport Restrictions**

9    Amazon proposes that any printed source code transported outside of counsel's office

10   must be kept in the possession of individuals cleared for access to that code, and that the

11   printouts must be hand-carried by one of those individuals. *Id.* at 11. The proposal permits

12   outside counsel to print up to six copies (excluding deposition copies) of any page of the source

13   code, as long as the sole purpose is to create "hard duplicate copies for retention in the offices of

14   persons authorized to access and review the source code." *Id.* at 9-10.

15   Like the print restrictions, the proposed transport restrictions appear reasonable. Telebuyer

16   will have electronic access to the entire source code, some hard copies (subject to the print

17   limitation), and the right to make six duplicates of any page. The sensitivity of the material

18   outweighs Telebuyer's inconvenience.

19   **E.  The Prosecution Bar**

20   Amazon proposes a prosecution bar under which "any person" who reviews certain

21   protected material is subject to a two-year bar on "Prosecution/Acquisition Activity." *Id.* at 26.

22   "Prosecution/Acquisition Activity" includes "any activity related to the prosecution or

23   acquisition of patents or patent applications relating to: 1) e-commerce technology for searching,

6

1  displaying, advertising, offering, and/or selling products and/or services, or 2) traffic control

2  technology for interfacing members for video communication over dial-up telephone." *Id.* at 26-

3  27. The proposed order specifies that "prosecution" includes "original prosecution, reissue,

4  reexamination, or other proceedings affecting the scope or maintenance of patent claims." *Id.* at

5  27.

6    The Court concludes that the proposed prosecution bar is necessary as well as reasonable

7  in scope and duration. The risk of inadvertent disclosure outweighs any potential harm caused by

8  restricting access to counsel. *Deutsche Bank*, 605 F.3d at 1378.

9    **1. The Subject Matter of the Prosecution Bar Reasonably Reflects the Risk that**
10  **Amazon's Source Code May Be Inadvertently Used**
11
12    *Deutsche Bank* instructs that the scope of prohibited activities and the subject matter of

13  the bar must "reasonably reflect the risk presented by the disclosure of proprietary competitive

14  information." 605 F.3d at 1381. A prosecution bar serves little purpose if it bars only some of the

15  activity that could lead to inadvertent use. To "reasonably reflect" the risk of disclosure, a

16  prosecution bar should ordinarily cover the whole universe of confidential information disclosed,

17  and prohibit the full category of patent activities in which that information might be

18  inadvertently used.

19    Amazon directly copied the language in its proposed order from Telebuyer's discovery

20  request and Telebuyer's own patent. *See* Chiu Decl. Exs. 3, 6. Those are appropriate sources

21  from which to draw a description of the prosecution bar's subject matter. The scope of a

22  prosecution bar should match "the areas of technology where there is risk that individuals may

23  inadvertently exploit their new knowledge in future patent prosecution." *Applied Signal*, 2011

24  WL 197811, at *3. The subject matter of the prosecution bar should be "coextensive with the

25  subject matter of the patents-in-suit." *Id.* To the extent Telebuyer objects to the breadth of the

1    description, Telebuyer has made its own bed. A broad discovery request invites a broad

2    protective order.[2]

3          Telebuyer argues that applying the prosecution bar to patent actions on behalf of third-

4    party clients imposes an excessive restriction on access to counsel and experts, when balanced

5    against the harm to Amazon. *See* Pl's Opp. at 11. But, as Amazon points out, the harm is

6    identical whether confidential information is inadvertently used on behalf of Telebuyer or

7    another client. *See Kelora Systems*, 2011 WL 6000759, at *7 (noting the plaintiff's failure to

8    "explicitly address why the court should distinguish activities done on behalf of [the plaintiff]

9    from those same activities when done on behalf of other clients").

10         The Federal Circuit instructed courts to consider several factors in balancing the

11   restrictions on counsel against the risk of disclosure – namely, "the extent and duration of

12   counsel's past history in representing the client before the PTO, the degree of the client's

13   reliance and dependence on that past history, and the potential difficulty the client might face if

14   forced to rely on other counsel for the pending litigation or engage other counsel to represent it

15   before the PTO." 605 F.3d at 1381.

16         Amazon alleges that Telebuyer has no past history with its current outside counsel. In

17   support of this allegation, Amazon offered documents from Telebuyer's past patent actions that

18   show other attorneys representing Telebuyer. *See* Chiu Decl. Ex. 16. Though this evidence is far

19   from conclusive as to the degree of Telebuyer's past history and dependence on counsel,

20   Telebuyer presented no evidence to the contrary. Furthermore, the Court has no reason to doubt

21   that Telebuyer can secure different counsel for future patent actions, at least during the limited

---

[2] The model order from the Northern District of California supports Amazon's proposed language. In the section dealing with the subject matter of the prosecution bar, the model order instructs parties to "insert [the] subject matter of the invention and of highly confidential technical information to be produced." Chiu Decl. Ex. 11 at 13. That is precisely what Amazon did.

1    period of the prosecution bar. Should Telebuyer wish to exempt a particular individual from the

2    prosecution bar, such exemptions are to be considered on an individual basis. *See Deutsche*

3    *Bank*, 605 F.3d at 1381. Telebuyer "must show…(1) that counsel's representation of the client in

4    matters before the PTO does not and is not likely to implicate competitive decision-making

5    related to the subject matter of the litigation so as to give rise to a risk of inadvertent use of

6    confidential information learned in litigation, and (2) that the potential injury to the moving party

7    from restrictions imposed on its choice of litigation and prosecution counsel outweighs the

8    potential injury to the opposing party caused by such inadvertent use." *Id.*; *Kelora Systems*, 2011

9    WL 6000759, at *7.

10          **2.    Reexamination Proceedings**

11          Telebuyer challenges the inclusion of reexamination proceedings in Amazon's proposed

12    definition of "prosecution," on the ground that reexamination proceedings do not involve the

13    same risk of inadvertent use. Pl's Opp. at 11-12.

14          Under the Patent Act, patent owners and third parties may initiate a

15    "reexamination" proceeding to confirm or challenge the validity of a previously issued

16    patent.  *See* 35 U.S.C. §§ 302-307. The statute gives "any person at any time" the right to

17    request a reexamination, and describes the requirements for such a request. *Id*. § 302. The

18    Director of the USPTO then determines whether the reexamination request raises a

19    "substantial new question of patentability." *Id.* § 303. If not, the reexamination request is

20    denied. *Id.* If a substantial new question of patentability does exist, the Director orders a

21    reexamination and gives both the owner and (if different) the requester opportunity to

22    weigh in. *Id.* § 304. At that point, the reexamination goes forward "according to the

1   procedures established for initial examination" – that is, the process undertaken by the

2   USPTO to examine a new patent application. *Id.* § 305.

3         Because reexamination proceedings involve only a comparison of existing patent

4   claims against publicly available prior art, courts often observe that reexamination

5   proceedings present fewer opportunities and incentives for a receiving party to use

6   confidential information.[3] Until recently, courts generally did not include reexamination

7   proceedings within the scope of a prosecution bar. *See Ameranth, Inc. v. Pizza Hut, Inc.*,

8   2012 WL 528248, at *6 (S.D. Cal. Feb. 17, 2012) ("a review of cases directly discussing

9   a prosecution bar applied to reexamination finds near unanimous support *against*

10  extending the bar to cover reexamination").

11         However, a newer line of cases recognizes that even in a reexamination

12  proceeding, a patent owner can use confidential information to restructure or amend its

13  claims so as to improve its litigation position against alleged infringers. *See Shared*

14  *Memory Graphics, LLC v. Apple, Inc.*, 2010 WL 4704420, at *3 (N.D. Cal. Nov. 12,

15  2010) ("Claims may still be restructured in reexamination, and, in a given case, a patent

16  owner may well choose to restructure claims in a manner informed by the alleged

17  infringer's confidential information gleaned from litigation."); *Grobler v. Apple Inc.*,

18  2013 WL 3359274, at *2 (N.D. Cal. May 7, 2013) (prohibiting counsel from drafting or

19  amending claims in reexamination); *EPL Holdings, LLC v. Apple Inc.*, 2013 WL

20  2181584, at *4 (N.D. Cal. May 20, 2013) (same); *Micro Unity Sys. Eng., Inc. v. Dell,*

---

[3] There are several reasons given for the reduced risk. First, confidential information would not be presented to or considered by the PTO in assessing patentability. *See Xerox Corp. v. Google, Inc.*, 270 F.R.D. 182, 184 (D. Del. 2010) (describing confidential information as "basically irrelevant" to the determination of patentability). Second, a patent owner cannot enlarge the scope of its patent claims in a reexamination proceeding, *see* 35 U.S.C. § 305, 314(a), which means that, in theory, "no product that did not infringe a patent before reexamination could ever infringe that patent following reexamination." *Xerox Corp.*, 270 F.R.D. at 184. Finally, common sense suggests that a patentee "will seek to preserve the broadest possible reading of its claims on reexamination regardless of any insight gleaned from…confidential information." *Id.* at 185.

1   *Inc.*, 2005 WL 2299455, at *2-3 (E.D. Tex. Aug. 1, 2005).  These decisions recognize

2   that drafting, amending, restructuring, or otherwise participating in reexamination

3   proceedings may constitute "competitive decision-making," as contemplated by the

4   Federal Circuit in *Deutsche Bank*. *See* 605 F.3d at 1378-79.[4]

5          Thus, where the need to protect confidential information outweighs the burden on the

6   receiving party, *see id.* at 1380, a court may prohibit counsel from participating or consulting on

7   reexamination proceedings, or may limit that participation. *See Grobler*, 2013 WL 3359274, at

8   *2; *EPL Holdings,* 2013 WL 2181584, at *4; *Shared Memory Graphics,* 2010 WL 4704420, at

9   *4. In this case the Court is persuaded that the risk to Amazon's confidential information

10  outweighs the burdens imposed on Telebuyer. Though courts in other cases have permitted

11  counsel to participate in reexamination proceedings, while barring counsel from engaging in

12  drafting or amendment of claims, this Court does not view such distinctions as workable under

13  the present circumstances. The Court notes the breadth and volume of the material requested by

14  Telebuyer, and the possibility of counsel using such information in the PTO proceeding without

15  technically "drafting" or "amending" a claim. Therefore, the Court will prohibit designated

16  individuals from participating in or consulting on any reexamination proceedings concerning the

17  subject matter of this prosecution bar. This order also is consistent with the Northern District's

18  model order, which includes reexamination within the scope of the prosecution bar. *See* Chiu

19  Decl., Ex. 11 at 13.

20         There is one particular circumstance in which the burden on the receiving party may

21  outweigh the risks. Should the producing party initiate the reexamination proceeding, the PTO

22  proceeding might effectively be "part and parcel of the litigation at issue." *Shared Memory*

23  *Graphics*, 2010 WL 4704420, at *4. In such situations, a complete bar on participation in

---

[4] A patent owner might even put its own patent into reexamination for the purpose of restructuring its claim.

11

1   reexamination proceedings would force the receiving party to retain separate counsel for what is

2   essentially the same dispute, another "front" in the litigation. Therefore, upon a grant of leave

3   from the Court, counsel may be permitted to participate in reexamination proceedings brought by

4   the producing party. The scope of permitted activities will determined at that time.

5          **3.      Patent Acquisition Activities**
6
7          Patent acquisition creates the same risks of inadvertent use as patent prosecution, in that

8   "litigation counsel may consciously or subconsciously use their knowledge of…confidential

9   information to advise a client on which patents to acquire." *EPL Holdings,* 2013 WL 2181584, at

10  *4. However, not all activities associated with patent acquisition involve the same obvious level

11  of risk. The court in *EPL Holdings* found "less danger in using or revealing protected

12  information when counsel gives advice on legal matters, such as validity, in the patent

13  acquisition process." *Id.* The Court recognizes that the risk of inadvertent use decreases where

14  counsel is offering a legal assessment of patent validity, infringement, claim scope, or the

15  language of an acquisition contract. Nevertheless, the Court sees little value in attempting to

16  draw, in advance, a fuzzy and unmanageable distinction between purely legal matters and

17  matters that implicate competitive decision-making.

18         **4.      A Two-Year Duration is Reasonable**

19         Amazon proposes a two-year prosecution bar. Telebuyer objects that two years is too

20  long, but gives no concrete reason why, apart from citing to certain cases in which the court

21  approved prosecution bars of less than two years. A two-year bar is suggested in the Northern

22  District's model order, and has been approved in that jurisdiction. *See* Chiu Decl., Ex. 11 at 13;

23  *Kelora Systems*, 2011 WL 6000759 at *7; *Applied Signal*, 2011 WL 197811, at *2. This Court

1    finds that the duration "reasonably reflect[s] the risk presented by the disclosure of proprietary

2    competitive information." *Deutsche Bank*, 605 F.3d at 1381.

3

4                                    **CONCLUSION**

5          For the reasons given above, the Court hereby ORDERS:

6      1)  Amazon's motion is GRANTED.

7      2)  The parties shall comply with the provisions of Section I.C and Section II of Amazon's

8          proposed protective order.

9      3)  The parties shall submit a revised proposed protective order to the Court on or before

10         July 21st, 2014.

11   **SO ORDERED.**

12   July 7, 2014

13
14                              _____
15                              Barbara J. Rothstein
16                              United States District Judge

13

# Exhibit 17

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| KONINKLIJKE KPN N.V., | Case No. 2:22-cv-282-JRG |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON INC., | |
| Defendants. | |

## PROTECTIVE ORDER

WHEREAS, Plaintiff Koninklijke KPN N.V. ("Plaintiff" or "KPN") and Defendants Telefonaktiebolaget LM Ericsson and Ericsson, Inc. (collectively, "Defendants" or "Ericsson"), hereafter referred to as "the Parties," believe that certain information that is or will be encompassed by discovery demands by the Parties involves the production or disclosure of trade secrets, confidential business information, or other proprietary information;

WHEREAS, the Parties seek a protective order limiting disclosure thereof in accordance with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and ORDERED that:

1.    Each Party may designate as confidential for protection under this Order, in whole or in part, any document, information or material that constitutes or includes, in whole or in part, confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such document, information or material ("Protected Material"). Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows:

"CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY" or "RESTRICTED CONFIDENTIAL SOURCE CODE" (individually or collectively "DESIGNATED MATERIAL"). The words "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" shall be placed clearly on each page of the Protected Material for which such protection is sought (except deposition and hearing transcripts).  For deposition and hearing transcripts, the word "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" (depending on which designation is appropriate) shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice of the designation of some or all of that transcript as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY, or "RESTRICTED CONFIDENTIAL SOURCE CODE."  For documents produced in native format, the appropriate designation shall be affixed on the face of the media containing such native format documentation.  In addition to the foregoing, to the extent that documents are produced in native electronic form, the addition of a confidentiality designation in the file or folder name shall be sufficient to provide notice of said confidentiality and additional written notice is unnecessary in this situation.  Other tangible things not produced in documentary form may be designated by affixing the appropriate designation on a cover page for such material and in a prominent place on the exterior of the container(s) in which the information or things are stored.  For information not reduced to any documentary, tangible, or physical form, or which cannot be conveniently designated as set forth above, the producing Party must inform the receiving Party of the designation of such information in writing. Protected Material of persons or entities who are not Parties to this Action ("Third Parties") may be designated as

"CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY" or "RESTRICTED CONFIDENTIAL SOURCE CODE" in the same manner in which such Protected Material is designated by a Party.

2.     Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Highly Confidential – Attorneys' Eyes Only" shall receive the same treatment as if designated "CONFIDENTIAL" or "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, respectively, unless and until such document is redesignated to have a different classification under this Order.

3.     With respect to documents, information or material designated "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE," subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; (e) discovery responses, including answers to interrogatories and to requests for admission; and (f) stipulations. All copies, reproductions, extracts, digests, and complete or partial summaries prepared from any DESIGNATED MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order.

4.     A designation of Protected Material (*i.e.*, "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE,") may be made at any time. Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in

whole or in part of a claim for confidential treatment. Any party that inadvertently or unintentionally produces Protected Material without designating it as DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated. The recipient(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.     "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating party, upon order of the Court, or as set forth in paragraph 14 herein:

a.     Outside counsel of record in this Action for the Parties;

b.     Employees of such outside counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

c.     In-house counsel for the Parties who either have responsibility for making decisions dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

d.     Up to and including three (3) designated representatives of each of the Parties to the extent reasonably necessary for the litigation of this Action, except that either party may in good faith request the other party's consent to designate one or more additional representatives, the other party shall not unreasonably withhold such consent, and the requesting party may seek leave of Court to designate such additional representative(s) if the requesting party believes the other party has unreasonably withheld such consent;

e.     Outside consultants or experts (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of litigation and employees of these consultants or experts, provided that: (1) such consultants or experts are not employed by the Parties hereto for purposes other than as a litigation consultant or expert; and (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto and the same is served upon the producing Party or Third Party with a current curriculum vitae of the consultant or expert at least ten (10) days before access to the Protected Material is to be given to that consultant or expert to enable the producing Party or Third Party to object

4

to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert. The affected Parties and/or Third Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties and/or Third Parties are unable to resolve any objection, the objecting Party or Third Party may file a motion with the Court within ten (10) days of the notice, or within such other time as the Parties and/or Third Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party or Third Party shall have the burden of proving the need for a protective order. In the event of such a dispute, no disclosure shall occur until all such objections are resolved by agreement or Court order;

    f.    Independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services including mock jurors, mediators and supporting personnel, and photocopy, document imaging, database, and translation services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action;

    g.    An author, signatory, or prior recipient of the DESIGNATED MATERIAL, where such person shall be given access only to the specific document or information therein; and

    h.    The Court and its personnel.

6.    A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.    Documents, information, or material produced in this Action, including but not limited to Protected Material designated as DESIGNATED MATERIAL shall be used by the Parties only in the litigation, including any attempt to settle it, and shall not be used for any other purpose. Any person or entity who obtains access to DESIGNATED MATERIAL or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL or any portion thereof except as may be reasonably necessary in the litigation of this Action. Any such copies, duplicates, extracts,

summaries or descriptions shall be classified DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8. To the extent a producing Party believes in good faith that certain Protected Material qualifying to be designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED - ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE".

9. For Protected Material designated RESTRICTED - ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 5(a–b) and (e–g).

10. For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply:

a. Access to a Party's Source Code Material shall be provided only on "stand-alone" computer(s)—that is, the computer(s) may not be linked to any network, including a local area network ("LAN"), an intranet, or the Internet ("Source Code Computer(s)"). Neither the receiving Party's outside counsel nor its outside consultants or experts may connect any devices to the Source Code Computer(s), nor may they copy, extract, or otherwise take any information from the Source Code Computer(s) in electronic form. In addition, neither the receiving Party's outside counsel nor its outside consultants or experts may modify the files on the Source Code Computer(s) nor may they load anything onto the Source Code Computer(s) absent the consent of the producing Party. Unless otherwise agreed, the Source Code Computer(s) shall be located at the offices of the producing Party's outside counsel;

b. Prior to the first inspection of Source Code Material, the receiving Party shall provide fourteen (14) days' notice of its intent to inspect Source Code. The receiving Party shall provide three (3) business days' notice prior to any additional inspection. If a review of the source code is taking place and the receiving Party requests the review continue to take place on the subsequent business day, the

producing Party shall make the Source Code Material available unless it is not possible to do so (e.g., a person to monitor the review is unavailable). When requesting inspection of a Party's Source Code Material on the Source Code Computer(s), the receiving party shall identify all persons who will inspect the producing Party's Source Code Material on behalf of a receiving Party, including members of a receiving Party's outside law firm. The receiving Party shall make reasonable efforts to restrict its requests for such access to the Source Code Computer(s) to normal business hours, which for purposes of this paragraph shall be business days from 8:30 a.m. through 5:30 p.m. local time. However, upon reasonable notice from the receiving Party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the Source Code Computer(s) outside of normal business hours. The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of its outside counsel (or at some other mutually agreeable location) shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;

c.     The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the Source Code Computer(s) in order to access the produced Source Code Material on the Source Code Computer(s);

d.     No input/output devices or electronic devices, including cell phones, PDAs, cameras, camera-enabled devices, recordable or storage media (e.g., USB thumb drive, voice recorders etc.), or computers (other than a notetaking laptop supplied by the producing Party that is not connected to any network, including a LAN, an intranet, or the Internet) will be permitted inside the source code review room. A telephone and internet access will be provided in a room convenient to and near the source code review room—*i.e.*, a room in close proximity to the source code review room. A reviewer shall be permitted to access the internet and use a personal cell phone in that room. If any individual inspecting Source Code seeks to take notes, all such notes will be taken by hand or on a laptop supplied by the producing Party not connected to any network, including a LAN, an intranet, or the Internet (notetaking laptop). Under no circumstances shall a reviewer transcribe any portion of the source code into his or her notes with the exception of file names or routine names as necessary; the reviewer also shall be permitted to take notes regarding the code provided that it is not copied verbatim. At the conclusion of each day, the producing Party shall print in the presence of the reviewer any notes. The producing Party otherwise shall not have any access to the notes and will not under any circumstances review or be permitted to review such notes. Such notes also shall remain on the note taking computer unless and until they are deleted by a reviewer;

e.     The producing Party will produce Source Code Material in computer searchable format. The receiving Party, at its own expense, may request that the producing Party install licensed software on Source Code Computer(s) to assist with review of the producing Party's Source Code. The receiving Party must provide the

7

Producing Party with the requested licensed software at least fourteen (14) days in advance of the date upon which the receiving Party wishes to have the additional software tools available for use. The Parties shall promptly meet and confer as to any objection the producing Party may have to the installation of such software. Otherwise, the producing Party will install and confirm installation of timely requests of said software on the Source Code Computer(s) prior to the date the receiving Party seeks access.

f. The source code is to be provided in native format with, if possible, the original path names (e.g., the directory tree pertinent to the produced files). Native format means electronic files containing native text not produced through any process involving optical character recognition.

g. Access to Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE shall be limited to outside counsel and up to three (3) outside consultants or experts[1] (*i.e.*, not existing employees or affiliates of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above.

h. A receiving Party may include excerpts of Source Code Material in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document ("Source Code Documents"), provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

i. To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE;

j. No person shall copy, email, transmit, upload, download, print, photograph, or otherwise duplicate any portion of the designated Source Code Material, except that the receiving Party may request printouts of Source Code Material as permitted by paragraph 10(k). Unless otherwise agreed to by the Parties, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and orders, must be filed or served electronically;

k. The receiving Party shall be permitted to request a reasonable number of printouts and photocopies of Source Code Material, all of which shall be designated and

---

[1] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or analysis shall count as a disclosure to a single consultant or expert.

clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall maintain a log of all such files that are printed or photocopied. Up to 1500 pages, and 50 consecutive pages, of printed and/or photocopied source code shall be presumed reasonable. The receiving Party shall not print Source Code Material in order to review blocks of Source Code Material elsewhere in the first instance, as the parties agree that the purpose of the protections herein would be frustrated by printing portions of source code for review and analysis elsewhere;

l. Should such printouts or photocopies be transferred back to electronic media, such media shall be labeled "RESTRICTED CONFIDENTIAL SOURCE CODE" and shall continue to be treated as such;

m. If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or experts. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (e.g., a hotel prior to a Court proceeding or deposition); and

n. A producing Party's Source Code Material may be transported by the receiving Party only at the direction of a person authorized under paragraph 10(g) above to another person authorized under paragraph 10(g) above, on paper via hand carry, Federal Express, or other similarly reliable courier. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet. Source Code Material otherwise may be transported electronically only for the purpose of Court proceeding(s) or deposition(s) as set forth in paragraph 10(l) above and is at all times subject to the transport restrictions set forth herein.

11. Any attorney representing a Party, whether in-house or outside counsel, and any person who is both associated with a Party and receives or otherwise learns Protected Material revealing the technical operation of a product or service made, sold, offered for sale, or used by the other the Party that is properly designated RESTRICTED – ATTORNEYS' EYES ONLY and/or RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL") shall not prepare, prosecute, supervise, or assist in the preparation or prosecution of any patent application pertaining to the field of the invention of the patent(s) in suit on behalf

of the receiving Party or its acquirer, successor, predecessor, or other affiliate during the pendency of this Action and for one year after its conclusion, including any appeals. This provision does not prohibit either Party's counsel of record or experts in this litigation from participating in or representing it in reexamination proceedings, Post-Grant Review proceedings, *inter partes* review proceedings, or Covered Business Method Review proceedings involving any patent, including the patents-in-suit, provided they (1) do not rely upon or use, directly or indirectly, the other Party's HIGHLY SENSITIVE MATERIAL in those proceedings and (2) do not advise on, consult on, prepare, draft, or edit any amendment to specifications or claims in those proceedings. Further, the Parties' counsel of record or experts in this litigation may not reveal HIGHLY SENSITIVE MATERIAL of the other Party to any reexamination, *inter partes* review, or covered business method review counsel or agent.

12.     Nothing in this Order shall require production of documents, information, or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity. If documents, information, or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity. Any Party that inadvertently or unintentionally produces any documents, information, or other material it reasonably believes is protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or unintentionally produced documents, information or other material. The recipient(s) shall (1) gather, destroy, and certify destruction of all copies of

such documents, information, or other material to the producing Party; or (2) gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party. The receiving Party may move the Court for an Order compelling production of such information, but the motion shall not assert as a ground for production the fact or circumstances of the inadvertent or unintentional production. If a claim is disputed, the receiving Party shall not use or disclose a document or information for which a claim of privilege or immunity is made pursuant to this Paragraph for any purpose except to challenge the claim of privilege or immunity to the Court until the matter is resolved by agreement of the parties or by a decision of this Court.

13.     There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information, and material to protect against disclosure to any unauthorized persons or entities.

14.     Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating party, (ii) identified in the DESIGNATED MATERIAL as an author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party;

(v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraphs 9 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

15.     Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order. Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as confidential.

16.     Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court. The filing party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER" above the caption and conspicuously on each page of the filing. Exhibits to a filing shall conform to the labeling requirements set forth in this Order. If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on confidential documents, information or material, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

17.     The Order applies to pretrial discovery. Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of

this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

18.     A Party may request in writing to the other Party that the designation given to any DESIGNATED MATERIAL be modified or withdrawn. If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief. Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper. Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions. In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met. Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

19.     Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order, and shall sign an acknowledgment that he or she has received a copy of, has read, and has agreed to be bound by this Order. A copy of the acknowledgment form is attached as Appendix A.

20.     To the extent that any discovery is taken of persons who are not Parties to this Action ("Third Parties") and in the event that such Third Parties contend the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

21.     To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE" any documents, information, or other

material, in whole or in part, produced or given by such Third Parties. The Third Parties shall have ten (10) days after production of such documents, information, or other materials to make such a designation. Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "CONFIDENTIAL" in accordance with this Order.

22.    The provisions of this Order shall continue to be binding after final termination of this case until a Producing Party agrees otherwise in writing or a court order otherwise directs. Within sixty (60) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall either be returned to the producing Party or be destroyed. The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request. Notwithstanding the foregoing, outside counsel of record shall be entitled to maintain copies of all pleadings, expert reports, motions and trial briefs (including all supporting and opposing papers and exhibits thereto), written discovery requests and responses (and exhibits thereto), deposition transcripts (and exhibits thereto), trial transcripts and hearing transcripts, and exhibits offered or introduced into evidence at any hearing or trial, emails and their attachments, and their attorney work product which refers or is related to any Protected Material for archival purposes only. Any such archived copies that contain or constitute Protected Material remain subject to this Order and shall be maintained in confidence by outside counsel for the Party retaining the materials. This provision does not apply to the Court, including court personnel and the Court's reporter. Any destruction obligations under this Protective Order shall not apply to

electronically-stored information in archival form stored on backup tapes or computer servers that are created only for disaster recovery purposes, provided that such electronic archives are not used as reference materials for a receiving Party's business operations.

23.     The failure to designate documents, information, or material in accordance with this Order, and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof. The entry of this Order and/or the production of documents, information, and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved. Newly designated DESIGNATED MATERIAL must be treated by the receiving party according to the new designation from the time the receiving party is notified in writing of the change in the designation. If material is designated as containing DESIGNATED MATERIAL subsequent to production or disclosure, the producing party shall reproduce the material with the correct designation. Upon receiving the material with the correct designation, the receiving party shall return or securely destroy all copies that were not properly designated. Any party desiring to change the designation of any previously produced material may do so at any time under the provisions of this section.

24.     Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

25.     Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information, or other material or its contents.

26.     Nothing in this Order shall be construed to constitute an abrogation, waiver, or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

27.     Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

**So ORDERED and SIGNED this 10th day of February, 2023.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| KONINKLIJKE KPN N.V., | Case No. 2:22-cv-282-JRG |
| Plaintiff, | |
| vs. | JURY TRIAL DEMANDED |
| TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON INC., | |
| Defendants. | |

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
**PROTECTIVE ORDER**

I, _____, declare that:

1.   My address is _____.

My current employer is _____.

My current occupation is _____.

2.   I have received a copy of the Protective Order in this action. I have carefully read and understand the provisions of the Protective Order.

3.   I will comply with all of the provisions of the Protective Order. I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.   Promptly upon termination of these actions, I will return all documents and things designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY,"

1

"RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession, and all documents and things that I have prepared relating thereto, to the outside counsel for the party by whom I am employed.

5.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _____

# Exhibit 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FRAUNHOFER-GESELLSCHAFT ZUR )
FÖRDERUNG DER ANGEWANDTEN )
FORSCHUNG E.V., )
       )
       Plaintiff, )
       )
v. )       Civil Action No. 17-184-JFB-SRF
       )
SIRUS XM RADIO INC., )
       )
       Defendants. )

## MEMORANDUM ORDER

At Wilmington this 13th day of **October, 2017**, the court having considered the parties' discovery dispute submissions and the arguments presented during the September 26, 2017 discovery dispute hearing (D.I. 56; D.I. 57; D.I. 59; D.I. 61; 9/26/17 Tr.), IT IS HEREBY ORDERED THAT the parties' competing proposals regarding various disputed provisions of the proposed protective order are resolved in the manner set forth below.

       **1.**      **Background.** Plaintiff Fraunhofer-Gesellschaft Zur Förderung der angewandten Forschung e.V. ("Fraunhofer") brought this civil action for patent infringement on February 22, 2017, alleging causes of action for infringement of United States Patent Nos. 6,314,289 ("the '289 patent"), 6,931,084 ("the '1084 patent"), 6,993,084 ("the '3084 patent"), and 7,061,997 ("the '997 patent"), which are directed to apparatuses and methods used to receive and decode encoded satellite signals, identify "channel fading" effects, and correct for those offsets using a channel decoder. (D.I. 1 at ¶¶ 15-19)

       **2.**      On May 23, 2017, the court entered a scheduling order setting a document production deadline of January 31, 2018 and a fact discovery deadline of July 31, 2018. (D.I.

26) On August 15, 2017, the court conducted a discovery dispute hearing regarding various provisions of the proposed protective order. (D.I. 39) On September 26, 2017, the court held a discovery dispute teleconference to follow up on unresolved issues regarding the protective order which were raised during the August 15 hearing. (D.I. 54) This Memorandum Order addresses the remaining disputes regarding the definition of source code and additional restrictions on the production of source code beyond those set forth in the Default Standard For Access To Source Code (the "Default Standard").

      **3.**     **Analysis.** As a preliminary matter, the court adopts defendant Sirius XM Radio Inc.'s ("SXM") proposed definition of source code in paragraph 12 of the protective order:

> computer instructions and code, scripts, binaries, object code, data definitions, source code listings, and any of the foregoing expressed in a form suitable for input to an assembler or compiler, along with associated comments found within the source code files. For purposes of clarity, Source Code as defined in this Order shall include any code (such as RTL, HDL, VHDL, Verilog, netlists), hardware-based documents (such as RTL, HDL, VHDL, Verilog, netlists, physical synthesis, schematics, and similar documents) or technical software documents (such as flow charts and design and functional specifications) that disclose code, are required for code compilation, and/or are used for and/or in the generation or building of an ASIC (Application Specific Integrated Circuit) or software directly executed on a microprocessor, micro controller or digital signal processor.

(D.I. 56, Ex. B at ¶ 12)

      **4.**     SXM's proposed definition of source code is broad enough to include both software-based code and hardware-based code such as VHDL, which can be used to fabricate and replicate circuit chips. (8/15/17 Tr. at 57:25-58:5) ("[T]here is a code that we would want to look at. It has to do with how you make the chips. It's called VHDL. And it is code, but it's not a code that's running on the chip. A code that they used that ultimately creates the net list, the terms of the mass, how they make the chips themselves.") Code used to determine how chips are actually made warrants heightened source code protection.

2

**5.**     The evidence submitted in connection with this dispute establishes that the term "source code" encompasses both software-based and hardware-based code.  (D.I. 57, Ex. B at ¶ 10)  SXM's expert, Nigel Jones, states that "[h]ardware code, such as VHDL, is source code that employs a human-readable syntax that can be used to design, fabricate and/or enable the operation of integrated circuits or chips, such as customized circuits for specific or specialized purposes."  (*Id.* at ¶ 11)  Fraunhofer's expert does not expressly deny that VHDL is source code.  (D.I. 60 at ¶¶ 9-11)

**6.**     Defining "source code" to include hardware-based code, including VHDL, is also consistent with this court's case authorities.  *See Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201, 212 (D. Del. 2001) (ordering Intel "to provide to Broadcom VHDL source code," among other material).  In *HSM Portfolio LLC v. Fujitsu Ltd.*, C.A. No. 11-770-RGA, the plaintiff observed that "there is no dispute among the parties as to the agreed treatment of either HDL Code or any physical layout file or other design file that can be used to actually fabricate a chip," and the resulting protective order afforded HDL Code heightened source code protection.  (D.I. 57, Exs. E at 2, H at ¶ 1(f), (l), & (m))  Although Judge Andrews ultimately concluded that source code protection was not warranted for the disputed native circuit schematic files, that conclusion was based on the finding that native circuit schematics could not be used to directly fabricate integrated circuit chips.  (D.I. 57, Exs. D at 2, F at ¶ 19)  In contrast, Fraunhofer's counsel in the present case has expressly indicated that VHDL identifies how the chips themselves are made.  (8/15/17 Tr. at 57:25-58:5)

**7.**     Several of SXM's additional proposals regarding restrictions on the production of source code should be adopted to provide clear guidance and avoid the need to revisit such issues in this case.  As set forth in more detail below, the court adopts SXM's proposals at paragraphs

3

40, 41, 42, 43, 44, and 45. The court grants-in-part SXM's requested relief with respect to paragraph 39. With respect to paragraph 46, the court adopts Fraunhofer's proposed compromise position.

**8.**     SXM's requested relief should be granted-in-part with respect to paragraph 39. Prohibiting the use of recording devices in the source code review room is a reasonable precaution to prevent the dissemination of highly confidential material. However, Fraunhofer should be required to provide a private space at the inspection site where SXM representatives may use electronic devices.

**9.**     SXM's requested relief regarding paragraph 40 should be granted. The provision permits source code reviewers to take notes on the source code computer. As explained during the September 26, 2017 discovery dispute teleconference, the source code reviewers may then request printouts of their notes on relevant code passages to prepare their expert reports.

**10.**     SXM's requested relief should be granted with respect to paragraph 41. Fraunhofer did not specifically address this topic in its letter submissions, and during the September 26, 2017 discovery dispute teleconference, the parties represented that the provision was no longer disputed. Requiring seven days' written notice of individuals planning to attend the source code review, and requiring source code reviewers to sign a log, are not unreasonable or burdensome requests.

**11.**     SXM's proposal should be granted with respect to paragraphs 42 and 43. The number of source code pages that may be printed or copied without the agreement of the producing party should be limited to 500 pages. Fraunhofer has alleged that source code review is not critical to the facts of this case, so it is unlikely that additional pages would be necessary.

4

Moreover, the parties and are not prejudiced from seeking additional relief if the need presents itself.

    **12.**    SXM's requested relief on paragraphs 44 and 45 should be granted, as Fraunhofer represents that it no longer disputes the inclusion of these paragraphs. Placing limitations on when, where, and how printouts and photocopies of source code may be maintained is reasonable to ensure that the highly confidential source code is securely maintained. Likewise, placing limitations on how excerpts of source code may be included in pleadings and other litigation documents protects against the disclosure of highly confidential source code.

    **13.**    The court adopts Fraunhofer's compromise position on paragraph 46. Specifically, documents with fewer than 50 contiguous lines of source code may be produced under the "Highly Confidential – Attorneys' Eyes Only" designation, while documents with more than 50 contiguous lines of source code may be produced in redacted form under the "Highly Confidential – Attorneys' Eyes Only" designation, or in unredacted form under the "Highly Confidential – Attorneys' Eyes Only – Source Code" designation.

    **14.**    **Conclusion.** In view of the foregoing analysis, SXM's request for relief is granted with respect to paragraphs 40, 41, 42, 43, 44, and 45. The court grants-in-part SXM's requested relief with respect to paragraph 39. With respect to paragraph 46, the court adopts Fraunhofer's proposed compromise position.

    **15.**    This Memorandum Order is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Memorandum Order. Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to ten (10) pages each.

**16.**     The parties are directed to the court's Standing Order For Objections Filed Under

Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

www.ded.uscourts.gov.

Sherry R. Fallon
United States Magistrate Judge

6