IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AUTONOMOUS DEVICES LLC, )
)
     Plaintiff, )    **Redacted - Public Version**
)
  v. )    C.A. No. 22-1466-MN
)
TESLA, INC., )
)
     Defendant. )

**LETTER TO THE HONORABLE LAURA D. HATCHER**
**REGARDING THE ONGOING PROTECTIVE ORDER DISPUTE**

<div style="display:flex">

OF COUNSEL:
Blair Jacobs
Christina A. Ondrick
John S. Holley
Elizabeth Bernard
MCKOOL SMITH, P.C.
1999 K Street, NW, Suite 600
Washington, D.C. 20006
(202) 370-8300

George T. Fishback, Jr.
MCKOOL SMITH, P.C.
303 Colorado Street, Suite 2100
Austin, TX 78701
(512) 692-8756

Dated: August 8, 2023

Karen E. Keller (No. 4489)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Autonomous Devices, LLC*

</div>

Dear Judge Hatcher,

Autonomous Devices ("AD") and Tesla, Inc. ("Tesla") have unfortunately reached yet further impasses in Protective Order ("PO") negotiations—caused largely by Tesla's backtracking on numerous previously agreed-upon provisions and through new restrictions Tesla has created, making source code review virtually impossible. Tesla's revisions are inappropriate, oppressive, and contrary to prior agreements of the parties submitted to the Court. The new improper discovery hurdles created by Tesla are summarized on a slide attached as Exhibit A.

## I.    Review of Technical Documents and Source Code on Computers

### A.    Location of Source Code Computer (Disputed Provision No. 1 at ¶11):

At the first hearing, the Court encouraged the parties to "work together" to find a location less burdensome than California, perhaps in Texas. Ex. B (Tr.) at 69:8-70:4. Tesla disregarded the Court's encouragement and insisted on forcing AD's counsel to travel to California absent Court Order. AD respectfully requests the Court to order the production of all source code materials in a less burdensome location, perhaps in Austin or Dallas, Texas. Ex. C (New PO Disputes) at ¶11.

### B.    Production Format of Actual Source Code and Review Tools (Disputed Provision Nos. 1-4 at ¶¶11, 11(c)(1), 11(c)(iii), 11(c)(v)):

In 2019, Tesla stated in a public document that its source code comprised over 300,000 files and directories at that point. Ex. D at ¶3. Tesla made available only 7,534 source code files that it combined into sixteen unworkable PDFs. Ex. E (Holley Decl.) at ¶¶9-12.

**Combining Code So Search Is Impossible and AD Cannot Request Pages As Ordered**: By combining the source code files, Tesla is not producing the code as it is ordinarily maintained. This also essentially eliminates this Court's order permitting AD to have fifteen consecutive pages of source code. Ex. B (Tr.) at 39:9-15. For example, if two files are ten pages each, AD could have both files in their entirety under this Court's ruling, but Tesla's file stacking prevents AD from requesting those two complete files. The combination of documents also makes source code review impossible with source code review tools, as confirmed by AD's source code expert. Ex. F (Dr. Rubin Decl.) at ¶¶12-14.

**Converting Code to PDF Makes Search Impossible**: Source code must be produced as kept in the ordinary course of business so that it can be reviewed and searched using standard software development and code review tools. Ex. F (Dr. Rubin Decl.) at ¶¶6-11. Adobe Reader, the only functional tool provided by Tesla, is not an adequate review tool. *Id.* at 6. By converting the code to PDF, Tesla made reviewing the code functionally impossible. *Id.* at ¶¶8-14; Ex. E (Holley Decl.) at ¶¶9-12. To highlight this issue, AD asked Tesla to reveal the source code review tools Tesla uses in its ordinary course of business. Ex. H (Thread) at 8-11, Tesla refused to answer the question and deleted the relevant provision in paragraph 11(c)(i). Ex. C at ¶11(c)(1).

Tesla provided two flawed reasons for refusing to produce its code in native form: (1) the originally undisputed PO provisions did not expressly require Tesla to produce the C ++ code in its native format, and (2) PDF files are more secure than C ++ files. The previously undisputed protective order provisions flatly contradict Tesla's first excuse. Ex. G (original PO) at ¶¶11, 11(c)(iii). Tesla's second excuse is equally untenable. PDF files are not inherently "more secure" than C ++ files. Ex. F (Dr. Rubin Decl.) at FN1. Simply put, if PDF files are more secure than C ++, then that is how Tesla would maintain them. Tesla's conversion of the code to PDF files was done to frustrate AD's review efforts and is extremely prejudicial and unfair. *Id.* at ¶¶7, 14.

1

Tesla's new proposals, discussed above, each would violate provisions of the prior Protective Order submitted to the Court. Tesla has undermined its prior commitments to the Court by rewriting or deleting previously agreed-upon provisions. *Compare* Ex. G (original PO) at ¶¶11, 11(c)(iii) (agreeing that any Source Code that is produced shall be in "electronic (e.g., native format)" as "it is kept in the ordinary course of business") 11(c)(v) (software allows specialized searching of source code) *with* Ex. C (New PO Disputes) at ¶¶11, 11(c)(iii) (changing production to "computer searchable format") 11(c)(v) (Tesla deleted specialized search features). AD requests that the Court reject Tesla's changes and order Tesla to produce source code as it is maintained in the ordinary course of business. Ex. C (New PO Disputes) at ¶¶11, 11(c)(iii), 11(c)(v).

### C.    Technical Documents Cannot Be Effectively Searched On Tesla's Computers

In addition to restricting the location of review and changing the format of its code to frustrate AD's review efforts, Tesla has placed onerous newfound restrictions on its technical document production so that those documents also cannot reasonably be searched. Ex. E (Holley Decl.) at ¶¶7-8. When AD's counsel attempted to search for a key phrase across all documents within a specific folder, Adobe Reader gave a warning that the "Search has skipped 46 files because either these files are corrupt or you don't have permission to open them." *Id.*

AD was only able to open PDFs on an individual basis and search was limited to a specific keyword. This unsophisticated search functionality is incredibly laborious because Adobe's search functionality also does not permit typical sophisticated searching, such as wildcards, exclusion, reverse exclusion, nearby words, exact words, etc. The burden of individually opening dozens of PDFs to search for a specific word is immense, unnecessary and unprecedented. The Court could fix this unfair process by reconsidering its decision to allow Tesla to designate any technical documents as "source code technical documents."

## II.    Review of Technical Documents and Source Code on Paper

### A.    Tesla's Mislabeling of Documents and Printed Document Procedure:

As previously feared, Tesla has identified several documents as "source code technical documents" that contain no source code information at all. *See, e.g.,* Ex. I-L (provided for *in camera* review). The print on some documents is also too small to read on paper. Ex. L. Under the ambiguous "source code technical documents" designation, Tesla placed the most important and relevant technical documents on the source code computer, thus preventing AD from being able to efficiently review the documents and prohibiting collaboration regarding the documents with colleagues or experts in different locations.

Besides making the electronic review unfairly onerous, Tesla also failed to produce physical documents for weeks before producing *a single copy* in Washington, D.C. There is simply no justification for limiting these documents to a single copy, particularly now that Tesla has conceded that the "source code" documents are transmitted electronically over the internet between different offices of outside Tesla attorneys. Ex. M at 3-6.[1]

---

[1] In the prior hearing, Tesla's counsel relied heavily upon a geographically siloed access system, preventing access even by Tesla employees outside of certain "facilities". Ex. B at 11:21-13:3 ("[W]e haven't even been given access to review them remotely."). However, the fact that Tesla is transmitting the purported "source code technical documents" via FTP site via the internet contradicts statements the Court relied heavily on Tesla's representations that appear now to be inaccurate. *See, e.g.* Ex. B at 13:6-20; 19:16-20:5; 64:11-65:15.

Given Tesla's faulty designation of documents, the repeated electronic transmission of these documents, and the byzantine framework implemented by Tesla, AD respectfully requests relief in the form of electronic production of the technical documents and the elimination of the "source code technical document" designation.

**B.    Number of Copies of Paper Documents and Location (Disputed Provision No. 5 at ¶11(c)(vii))**:

Additionally, Tesla recently reneged on prior agreements and modified the draft PO so that AD *could not make any copies of source code technical documents*. *Compare* Ex. G (Original PO) at ¶11(c)(vii) (permitting five additional copies) *with* Ex. C (New PO Disputes) at ¶11(c)(vii) (no copies). This change makes it impossible for AD to fairly prosecute its case.

Tesla's newly minted *no-copy proposal* eliminates the ability of AD's attorneys and experts, who live in different parts of the country, to collaboratively review and discuss documents. Moreover, the proposal prohibits AD from taking notes on the documents. Finally, Tesla now insists that the single version of technical documents be stamped with anti-copying heat-sensitive ink, thus preventing AD from even making copies to use in a deposition. Tesla's oppressive new requirements eviscerate the undisputed provision in paragraph 11(c)(vii) that AD can "make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), or (2) necessary for deposition." It is prejudicial and unfair for Tesla's technical documents to have the same print restrictions as true source code. The Court should reject this provision in the proposed PO.

Making an oppressive situation worse, Tesla now forbids AD's experts from possessing these technical documents *in any manner*. This provision effectively eliminates AD's ability to prepare and prosecute its case. AD respectfully requests that the Court maintain AD's right to make five additional copies of the technical documents and source code and to share them with AD's experts where the expert resides. Ex. C at ¶11(c)(vii) (plaintiff's proposal).

**III.    Tesla Seeks to Add Draconian Language to Exhibit A**

Beyond the unfair heightened protection for standard technical documents and making review nearly impossible, Tesla goes one step further and now insists on inserting language to Exhibit A of the protective order that asserts that using protective order material can subject a user to "money damages and criminal sanctions." Ex. C at 36. Again, there is no need for "criminal sanctions" in an Exhibit to a Protective Order and risks harassing or threatening AD's experts and others who must sign the PO.

**IV.    The Parties' Require Entry of a Protective Order**

Tesla secured heightened security provisions under factual assertions that appear inconsistent with its latest emails. Tesla has subsequently further modified the PO in a manner that makes it even more discriminatory. Following the Court's order in May, Tesla reneged on prior commitments and rewrote provisions of the PO not previously disputed, thereby frustrating AD's discovery efforts and making the typical review of code and technical documents impossible. This has prejudiced AD's discovery efforts significantly so AD respectfully requests final entry of a PO that eliminates the unfair restrictions Tesla has placed on technical documents.

Respectfully submitted,

*/s/ Emily S. DiBenedetto*

Emily S. DiBenedetto (No. 6779)

cc:     Clerk of the Court (by CM/ECF & Hand Delivery)
        All Counsel of Record (by CM/ECF and Email)

# Exhibit A

# Tesla Discovery Hurdles Created Since Last Discovery Teleconference

- **True Source Code Inspection**:
    - Refused to agree on convenient location as recommended by the Court
        - Insisting on Palo Alto, CA despite Court's suggestion of mutually convenient location, like Texas
    - Produced source code in non-searchable PDF format
        - Rendered source code review tools useless
        - Not how code is kept in the ordinary course of business
        - Produced 2% or less of the relevant code
    - Deprived AD of ability to search technical documents in any effective manner
        - One-by-one keyword searching only
- **Technical Documents**:
    - Produced key documents as "source code" technical documents despite containing no code
        - Weil lawyers are electronically transmitting "source code" technical documents between different Weil offices and to Fish and Richardson offices
    - Limited AD to only 1 copy (rather than 5 additional copies agreed upon)
    - Placed non-copying watermark on documents to prevent additional copies from being made
    - Refused to allow AD attorneys and experts in different locations to have simultaneous access to technical documents
    - Refused to agree to a delivery/destruction schedule that would allow development/reviewing and revising of infringement contentions by lawyers and/or experts in different offices
    - Insisted on "criminal sanctions" threat in all undertakings signed by anybody who signs PO

# Exhibit B

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AUTONOMOUS DEVICES,    )
LLC,                   )
                       )
        Plaintiff,     )  C.A. No. 22-1466-MN-LDH
                       )
v.                     )
                       )
TESLA, INC.,           )
                       )
        Defendant.     )

Wednesday, May 31, 2023
10:00 a.m.

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE LAURA D. HATCHER
         United States District Court Judge

APPEARANCES:

        SHAW KELLER, LLP
        BY:  KAREN KELLER, ESQ.
        BY:  EMILY DiBENEDETTO, ESQ.

            -and-

        McKOOL SMITH
        BY:  JOHN HOLLEY, ESQ.
        BY:  CHRISTINA ONDRICK, ESQ.
        BY:  BLAIR JACOBS, ESQ.
        BY:  GEORGE FISHBACK, ESQ.

                    Counsel for the Plaintiff

---

2

APPEARANCES CONTINUED:

        MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
        BY:  BRIAN EGAN, ESQ.

            -and-

        WEIL, GOTSHAL & MANGES, LLP
        BY:  ANISH DESAI, ESQ.
        BY:  IAN MOORE, ESQ.

                    Counsel for the Defendant

---

3

1          THE COURT:  Good morning, counsel.

2   This is Laura Hatcher.  We are here for a

3   teleconference between the parties regarding a

4   number of disputes in the proposed protective

5   order in AD versus Tesla, civil action number

6   22-1466.  Do we have a court reporter on the

7   line?

8          COURT REPORTER:  Yes, Your Honor.

9   This is Stacy Ingram, covering for Dale.

10         THE COURT:  Good morning, Ms.

11  Ingram.  Thank you for joining us.  Who is line

12  on behalf of plaintiffs, starting with Delaware

13  lawyers first, please?

14         MS. KELLER:  Good morning, Your

15  Honor.  It's Karen Keller from Shaw Keller on

16  behalf of the plaintiff and with me today is

17  Blair Jacobs, Christina Ondrick, John Holley and

18  George Fishback, all of McKool Smith and also

19  Emily DiBenedetto from my office.

20         THE COURT:  Fantastic, Ms. Keller.

21  Thank you so much and welcome to all of you.

22  Can you let me know, if you know ahead of time,

23  who is going to be arguing on behalf of

24  plaintiff today?

---

4

1          MR. JACOBS:  Your Honor, it's

2   Blair Jacobs.  John Holley will be arguing on

3   behalf of the plaintiff.

4          THE COURT:  Very good.  Thank you,

5   Mr. Jacobs and also Mr. Holley.  And who is on

6   the line on behalf of defendant, please,

7   starting with the Delaware lawyers first?

8          MR. EGAN:  Good morning, Your

9   Honor.  This is Brian Egan from Morris Nichols

10  on behalf of Tesla.  Joining me today are Anish

11  Desai and Ian Moore from Weil Gotshal and I

12  believe Mr. Desai will be leading the argument.

13         THE COURT:  Good morning to all of

14  you and welcome.  Okay.  Well, let's go ahead

15  and jump right in and let's start with the first

16  dispute between the parties, which, as I

17  understand, is essentially the definition of

18  source code and that is in the protective order

19  paragraph 2C.  Let's hear from Tesla first,

20  please.  Mr. Desai, go ahead.

21         MR. DESAI:  Thank you, Your Honor.

22  You're right, that's the primary dispute here,

23  the source code definition.  Ultimately it's

24  whether the heightened protection should apply

**5**

1  to not only the actual source code files, but
2  also technical documents that define or
3  otherwise describe in detail algorithms and
4  structure of software hardware.  There is
5  precedent for Tesla's definition.  We've cited
6  the Northern District of California model
7  protective order.  That's exhibit 4.  Has
8  essentially the same definition.  There's a
9  stipulated protective order in Parity Networks
10  versus Netgear, a Delaware case.  That was
11  exhibit 5.  I think that was April of this year.
12  Again, similar definition.  And then I think
13  there was an argument by plaintiffs that there's
14  no example of a disputed protective order and
15  there is actually one.  It's exhibit 16.  It's a
16  case cited by plaintiff, Telebuyer versus Amazon
17  and that had a similar definition where the
18  source code was defined as including
19  specifications, schematics, define or otherwise
20  describe in detail algorithms or structure or
21  software hardware design.  I think there were
22  some important quotes from that case that are
23  fairly an applicable and it was the Court noting
24  that in that case at that point in the

**6**

1  litigation Amazon was best qualified to
2  determine whether these elements actually do
3  relate to source code and that there was no
4  reason to not -- to err on the side of caution
5  when dealing with highly technical materials.
6  The Court pointed to the Northern District of
7  California model PO and adopted the definition
8  that Amazon had proposed.
9       THE COURT:  Let me ask you -- I'm
10  sorry to interrupt, sir.  Let me ask you this.
11  I take Tesla's point and understand and you gave
12  the citation to the Northern District of
13  California, the Netgear case and thanks for
14  pointing out the exhibit 16.  In those
15  protective orders, you know, am I mistaken?  I
16  don't see in those protective orders the
17  follow-on restrictions that seem to be, in my
18  estimation, and I certainly want to hear from
19  counsel for AD on this, the real rub with the
20  definition of source code; and that is, it seems
21  to me it's not so much the definition of code,
22  its been the follow-on restrictions that
23  accompany what's been defined as source code is
24  where the rubber meets the road for the parties.

**7**

1  Do any of those other protective orders contain
2  similarly restrictive provisions with respect
3  to, for example, traveling for depositions?
4       MR. DESAI:  Well, I do think there
5  are examples of protective orders where you
6  would limit the ability to travel with paper
7  copies.  And I think what we've proposed for
8  depositions is an adequate alternative, which is
9  we would have the source code computer available
10  at the deposition, so that would eliminate the
11  need to travel with paper copies.  We've also
12  proposed that they could, you know, have a
13  larger list that they wanted available at
14  depositions, so -- I guess there was a concern
15  about disclosing a road map of their deposition.
16  We can have a larger set available.  I think
17  ultimately the concern, the primary concern with
18  the depositions was they're going to give us
19  advance notice of the source code that they want
20  to question the witnesses about and we don't
21  really see that to be a legitimate concern,
22  because in Delaware cases parties have to put
23  out their contentions and identify the relevant
24  portions for, you know, infringement and so

**8**

1  there should be no surprises anyway.  In fact,
2  if a witness, 30(b)(6) witness, for example,
3  needs to be prepared anyway to testify about
4  source code, so frankly speaking, I don't see
5  there should be any concern about surprising us
6  with our own source code at deposition.
7       The other restriction, there's the
8  page limit restriction and there's certainly now
9  restrictions on page limits for printing.  And,
10  in fact, I think the Delaware default for source
11  code is that it may not be printed, so you're
12  really technically starting with zero.  We're
13  offering 200 pages in the aggregate and really
14  the burden should be on Autonomous to show it
15  needs more and it really hasn't done so.  In
16  fact, they started by offering 500 pages and
17  then as negotiations progressed they increased
18  it to 2,500 and offered 1,500 as a compromise.
19  Kind of a moving target.  Ultimately we think
20  200 pages is the right way to go here and if
21  they can demonstrate a need for more, you know,
22  as time goes on, we can address that, but right
23  now it seems appropriate to start at 200.
24       THE COURT:  Let me ask you this.

9

1  I want to take a step back.  And I appreciate,
2  because I did bring up the restrictions, so I
3  appreciate you focusing on them.  Tesla writes
4  in its letters that the intent of this
5  definition of source code is to protect, quote,
6  certain documents describing its code.  Right?
7  And it proposes, as you and I know, source code
8  means computer code, associated comments, indoor
9  vision history of the computer code, formulas,
10  engineering specs, schematics that define or
11  otherwise describe in detail the algorithms or
12  structure of the software or hardware.  AD's
13  concern, if I understand it correctly, is that
14  this definition would capture a large universe
15  of documents such that basically every technical
16  document falls within the definition.  What's
17  your perspective on that concern as expressed by
18  AD?
19       MR. DESAI:  Well, so we don't
20  intend to mark every technical document in this
21  way.  And in fact, I think the proposal here is
22  going to put a lot of burden on Tesla to
23  carefully review basically every document that
24  we're producing to see whether it fits this

10

1  category and I can say that that process is
2  under way.  And we will be producing technical
3  documents that do not fit under that category.
4  I think, you know, we're going to do our job and
5  we're not going to over designate.  We're going
6  to be -- we're going to look at the definition,
7  look at what's highly sensitive and mark it
8  appropriately.  And if there is a disagreement
9  about whether a document or a set of documents
10  were, you know, over designated, we can discuss
11  that.  But I think the appropriate path is for
12  us to at least get our first cut at this, have
13  an appropriate definition, allow us to give
14  heightened protection to these documents and
15  then have it potential process whereby they can
16  challenge a designation.  So I think that makes
17  the definition appropriate and the question then
18  would be if they think we're over designating,
19  that's a different issue.
20       And I will say in terms of this
21  technology and as you saw in the declaration,
22  this is considered Tesla's most valuable
23  technology and Tesla applies heightened security
24  to both the actual source code files and the

11

1  documents.  They don't distinguish.  And that
2  was, you know, covered in the declaration.  So I
3  think the appropriate path here is for us to
4  adopt the definition and then if there's a
5  dispute later on as to whether we're over
6  designating, that that could be dealt with, but
7  you know, we intend to do our job and
8  appropriately designate.
9       THE COURT:  Thank you.  I
10  appreciate that.  And thank you for including
11  the declarations.  I found that helpful, you
12  know, going to the point about how Tesla is
13  treating the technology in the AP group.  As far
14  as the technical documents that would fall
15  within this proposed definition of source code,
16  are they stored on servers?  Are they accessible
17  outside of the Tesla Bay Area location?  Can
18  they be accessed by Tesla in New York or in
19  Texas or in D.C.  Can you talk to me a little
20  bit about that?
21       MR. DESAI:  You know, Your Honor,
22  I think -- so the AP group, it's limited to --
23  the ability for people to access documents is
24  limited to a subset at the AP group.  To be

12

1  honest with you, Your Honor, I don't believe
2  there are folks in facilities in New York and
3  D.C.  I believe there are facilities in Texas,
4  but to be honest with Your Honor, I don't know
5  at the moment if the AP group is located there
6  such that there would be folks who would be
7  accessing it from that point.  But -- I don't
8  know that that's exactly covered in our
9  declaration, but certainly the declaration does
10  cover how the AP group itself is siloed.
11  Meaning, that the information in the AP group is
12  not accessible widely throughout Tesla.  It's
13  siloed to a select group of individuals.  And
14  that's why in this situation -- and there's, in
15  fact, been specialized software constructed for
16  protecting the AP group's materials.  And that's
17  why in this case we, you know, our protective
18  order is intended to provide as much security as
19  we can, which is -- one of the issues is the
20  location of review.  Right?  I mean, we'd like
21  to have it done at a Tesla facility because
22  that's where we can provide the protections.
23  Your Honor, for the defendant, its lawyers,
24  we're in New York and D.C. primarily and we

13

1  would have -- we'd have to go there to review
2  these materials, so we haven't even been given
3  access to review them remotely.  So these
4  restrictions would apply equally to the
5  plaintiff and the defendant.
6          THE COURT:  So just to be clear,
7  as you're preparing and marking source code as
8  defined by Tesla's proposed definition, outside
9  counsel is flying to California, going to the
10 Tesla facility and one by one going through not
11 in any remote application, not accessing their
12 server, not having shipped the hard drive and
13 designating document by document whether it fits
14 the definition that Tesla proposes.
15         MR. DESAI:  That's correct, Your
16 Honor.  Ian Moore, who is on this call, actually
17 was in California last week.  He lives in D.C.,
18 works in D.C. and that is how we are doing it
19 right now.  We have not been granted access to
20 remotely review Tesla's documents.
21         THE COURT:  I saw a suggestion in
22 the meet and confer materials that were provided
23 that Tesla would agree to not count the non-code
24 technical documents against a proposed page

14

1  limit for printed source code.  What am I to
2  make of that and does it suggest that Tesla
3  agrees on some level that these non-code
4  technical documents are different in source code
5  such that lesser protections might be
6  appropriate?
7          MR. DESAI:  Your Honor, that was
8  certainly a compromise we were offering.  You
9  know, we do believe that the protections are
10 important and I think for the non, quote, source
11 code files, allowing them to print them is
12 acceptable and not counting them, but the point
13 being they're not going to be digitized and not
14 going to be accessible remotely and put on
15 servers and things of that nature.  That was
16 certainly a compromise we were willing to offer.
17         THE COURT:  Tesla agreed -- I'm
18 sorry.  Can Tesla agree, then, that AD can
19 travel with those non source code files as long
20 as they're not digitized?
21         MR. DESAI:  I think I'd have to go
22 back to the protective order to see if there is
23 a restriction on traveling with printouts.
24         THE COURT:  Well, here's a concern

15

1  that I'm getting at.  I am certainly sensitive
2  to Tesla's protections and I don't doubt what
3  you're telling me and the declarations that have
4  been submitted, but there is, as I kind of
5  suggested before, there's tension between
6  including non source code technical documents as
7  source code such that it means that AD cannot
8  take those technical documents, mark them up and
9  annotate the way that lawyers and experts do in
10 preparation for a deposition, carry them to the
11 deposition and use them as an aid and a tool
12 during the deposition.  So that's why I wondered
13 can Tesla agree, then, that for those non code
14 technical documents, not source code, I
15 understand AD is agreeing that it won't travel
16 with source code, that's what I understood from
17 AD letters, but the non code source code
18 documents, can they travel with those?
19         MR. DESAI:  To make sure I
20 understand.  So if we adopt our definition of
21 source code, we would get the protections for
22 these other documents that are not exactly
23 source code files, but we would have an
24 exception for those types of documents they can

16

1  be printed, they wouldn't count to the limit and
2  they would be permitted to travel with them for
3  depositions, et cetera, but would not be
4  permitted to make electronic copies?
5          THE COURT:  Right.  Is that
6  something that would be acceptable to Tesla?
7          MR. DESAI:  I believe it may be
8  acceptable to do that.  Of course our client is
9  not on the call right now, but I believe that
10 would be an acceptable compromise.
11         THE COURT:  Look, I appreciate
12 that.  I know I'm putting you on the spot here,
13 but I'm trying to get to a practical solution
14 that, you know, as I said, protects what Tesla
15 says is very important but also allow plaintiff
16 to not be overly restricted in its ability to
17 prepare and adequately take a deposition
18 session.  Okay.  So I have heard a lot from you,
19 Mr. Desai.  I appreciate it.
20         Mr. Holley, I think you're
21 presenting on behalf of plaintiff.  First, let
22 me give you a chance to respond, if you'd like
23 to generically, to what Mr. Desai said and see
24 if I have a couple follow on questions for you.

17

```
1        MR. HOLLEY:  Thank you, Your
2   Honor.  John Holley on behalf of plaintiff
3   Autonomous Devices.  Your Honor, first of all,
4   no one disputes that technical documents are
5   highly confidential.  Of course they are.  Usual
6   practice is that technical documents are
7   protected by attorney's eyes only designations
8   and that's what we think should happen here.
9            In exhibit 18 to the letter
10  briefing, the Fraunhofer versus Sirius case,
11  Magistrate Judge Fallon struck the right balance
12  we believe.  She said that technical documents
13  with less than 50 continuous lines of code
14  should be marked as attorney's eyes only
15  materials and more than 50 continuous lines of
16  code for a technical document would be a source
17  code document.  And we think that that's a fair
18  definition of a delineation between what is and
19  is not a source code document.
20            Tesla's proposed definition, if I
21  heard counsel correctly, is that they would
22  review the documents and the technical documents
23  and see if it fits Tesla's source code
24  definition, which honestly is very broad and
```

18

```
1   gives Tesla an awful lot of leeway.  We don't
2   have a clear definition of, you know, how Tesla
3   should and should not say this is source code or
4   this is not source code.  And we have some
5   significant concerns about giving all that
6   leeway.  One is if we have only printed copies
7   of technical documents, there's no ability for
8   Autonomous Devices' lawyers or its experts to
9   search those non code documents as is common in
10  electronic discovery.  And that's highly
11  prejudicial to us.  It's very onerous.  We'd
12  have to read each document to see if a key
13  phrase or word is in the documents.
14            During the meet and confer
15  process, Your Honor, counsel for Tesla was, you
16  know, very, very nice and we got together, got
17  along together very well.  And we had asked
18  them, you know, is there a number of documents
19  that you can tell us -- how many documents are
20  going to be these non code source code
21  documents.  Tesla never could answer the
22  question.  We asked them serially during the
23  meet and confer process and in writing.  We
24  never got a clear answer.  And so if Tesla is
```

19

```
1   proposing to provide some small subset of
2   technical documents that we can put into, you
3   know, four inch binder or something, then we're
4   probably speaking past one another.  But if
5   Tesla is proposing to drop, you know, hundreds
6   of thousands of pages of documents on us that we
7   can only review in paper format, that's going to
8   be extremely difficult for Autonomous' lawyers
9   and experts to get their arms around what the
10  important documents are and how they're buried
11  in the printed copies.
12            Did you have any questions about
13  that or if not, I can move on to some of the
14  other points that Mr. Desai talked about.
15            THE COURT:  No.  That's helpful.
16  I guess the one follow on is, you know, look,
17  Tesla has made some showing that it does treat
18  this technology related to AP software group
19  with the highest level of protection and
20  confidentiality.  If Tesla takes those non code
21  technical documents that it would propose to
22  fall within the definition of source code and it
23  treats them with the same level of security as
24  it does for parties traditionally regular source
```

20

```
1   code such that poor Mr. Moore is not even
2   allowed to review them on the east coast and
3   have to fly out to the Tesla facility and he's
4   Tesla's lawyer, why should the Court require
5   lesser protection here in this litigation?
6            MR. HOLLEY:  Sure, Your Honor.  So
7   we know from a couple of public filings actually
8   how Tesla does treat its source code.  We know,
9   I believe it's exhibit 13, which is Tesla
10  exhibit 12.  Bear with me for a second.  Exhibit
11  11.  This is Tesla versus Natu Chou.  And in
12  that case Tesla sued one of its employees for
13  misappropriating Tesla's source code.  Tesla's
14  employee joined the company in 2018 and was able
15  to take complete copies of Tesla's source code
16  and move it to his personal iCloud account.
17  That's 300,000 files and directories and that
18  violated Tesla's policies and non-disclosure
19  agreement.  But at the same time, it does show
20  that Tesla's employees do have a lot of latitude
21  to move the code around.  They're possibly not
22  being monitored as closely as the declarations
23  would lead us to believe.
24            And I believe Mr. Desai had also
```

21

1  suggested that it's possible that Tesla's
2  engineers are able to access this code over
3  servers, just not in D.C. or New York, but
4  perhaps in Texas.  And so, you know, Tesla's
5  employees are certainly able to search these
6  documents on their servers and things of that
7  nature.  So we -- while Tesla certainly is
8  finding -- designating source code and the
9  technical documents as highly confidential, we
10  don't see any reason that this Court's
11  protective order attorney's eyes only isn't
12  going to provide the same or even more
13  protection than Tesla's internal controls
14  provide.  And as a result -- go ahead.  I'm
15  sorry.
16          THE COURT:  No, go ahead, please.
17          MR. HOLLEY:  I was going to say,
18  to tie that all up, it's again, extremely
19  prejudicial to ask Autonomous' lawyers and
20  experts to review the documents in paper format
21  when Tesla engineers and Tesla's lawyers are
22  able to review them in electronic form.  And
23  it's again extremely expensive for us and
24  probably Tesla's lawyers to fly out to

22

1  California any time a word search needs to be
2  done on what is an unbounded number of technical
3  documents.
4          THE COURT:  Okay.  Let me ask --
5  Mr. Desai, let me ask you this question.  You
6  know, Mr. Holley has raised this notion, as I
7  understand it, that there might be, for example,
8  a lengthy technical document that has some
9  portion of it, let's say, I don't know, 50 lines
10  or so that falls into this category of
11  describing code that Tesla tells me is kind of
12  the purpose and the driving force behind this
13  definition.  Would Tesla agree if there was that
14  small portion that kind of falls within
15  describing the code that that portion could be
16  redacted and then the technical document
17  produced electronically to counsel for AD to
18  alleviate some of this concern over searching,
19  you know, the inability to conduct electronic
20  searches and then of course the full document
21  would be available for printing and review off
22  the source code computer?  Is that a compromise
23  that makes any sense and that is workable?
24          MR. DESAI:  Well, I think it could

23

1  be pretty onerous for us to have to redact, but
2  I think let me take a step back.  They will be
3  able to review the documents in electronic form
4  and search.  They just have to do it on location
5  exactly like we are.  And so they do not have to
6  just sift through paper copies.  It's only once
7  they do their searching and spend their time
8  looking at the documents and decide okay, these
9  are the important ones we want to take, print,
10  then they can print them.  But ultimately they
11  can do the review like you would do it on a
12  computer, it just has to be on location.  And
13  that's exactly how we're doing it.  And so I
14  don't think there is -- concern that they won't
15  be able to search I think is overstated.  I
16  think if there are some documents as they do
17  there search that they say, hey, can you produce
18  this in redacted form, I think we could take
19  that on, but I don't think it would be
20  appropriate for us to have to do like three
21  layers of review which is okay, let's figure out
22  which ones should be identified as source code,
23  which one should be plain old technical
24  documents and then which category should we

24

1  redact.  That is, I think, you know, a little
2  bit too burdensome for us to do.
3          And then one other point about
4  this sort of unbounded volume.  Again, we are
5  working hard to try and figure out what the
6  volume is.  I don't believe it's going to be in
7  the hundreds of thousands of pages realm.  I
8  think we're talking about thousands of technical
9  documents here at most.  And I've already
10  confirmed that we're going to be producing
11  technical documents that are not going to be
12  marked as source code.  So it's not as though
13  every single technical document that we're
14  planning on producing is going to fall into this
15  source code category.
16          And then one last point, just to
17  be clear, the theft case I don't think is really
18  important here.  That engineer was caught
19  stealing and what he did was taking his stuff to
20  the cloud was violating Tesla's policies.  And
21  in fact, I think the point is that our security
22  policies enabled us to catch him doing it.  And
23  he was, you know, a case was filed against this
24  engineer for stealing code.  So I don't think

25

1  that's really an appropriate comparison point
2  for this discussion.
3          THE COURT:  Okay.  Counsel for AD,
4  before we move on to the next dispute and I
5  think let me see if you have anything to add.
6          MR. HOLLEY:  Sure.  John Holley
7  for Autonomous Devices.  What I think is
8  important to understand here, Your Honor, is
9  that AD has a burden to prove its case and Tesla
10 does not of a burden with respect to its
11 documents.  So every time that AD or its lawyers
12 or the experts, for example, want to search a
13 document, the option is to either fly to
14 California after a lengthy notice period for 14
15 days, go through the whole exercise of getting
16 to Tesla, searching for the documents and then
17 flying back and that process would have to occur
18 each time we would want to review one of these
19 non code source code documents.  Very different
20 from Tesla, which is effectively responding to
21 the small subset of documents that we would be
22 identifying in our pleadings and expert reports.
23 And so it's highly prejudicial to ask Autonomous
24 to travel to California each time we need to

26

1  search for a document.
2          And on that point, and maybe we'll
3  get to that in a moment, the Delaware default
4  standard is to have an escrow agent hold the
5  source code computers.  And so while it would
6  certainly still be expensive and still require
7  travel, you know, we would ask Your Honor, to
8  the extent that Your Honor is inclined to do so
9  is to move the source code computers to a
10 mutually agreeable escrow agent that's closer to
11 counsel on the east coast so there's not so much
12 travel and burden involved.
13         In addition, one last thing on the
14 searching of documents, is, you know, we've
15 spent significant time searching documents in
16 advance of expert reports, preparing for
17 depositions and effectively Tesla is asking us
18 to do that while we're in their office.  Because
19 it's again, extremely extremely burdensome for
20 us to sift through paper copies while we're
21 preparing reports and preparing for depositions
22 to make outlines and to help our experts draft
23 their reports.
24         THE COURT:  Okay.  Understood.

27

1  Here's what I think we'll do for this one.
2  Here's what I'm currently anticipating, so I
3  want to flag it now for the parties.  Let's go
4  through the remainder of the disputes and I
5  think what I'm anticipating we'll do is we'll
6  take a short recess and then come back once
7  we've gone through all of these and I'll give
8  you the ruling for each of them so you can plan
9  accordingly.
10         So let's move on, as you
11 forecasted Mr. Holley, to the location of source
12 code review.  This is paragraph 11.  My first
13 question is what happened here?  The Court often
14 hopes that parties resolve disputes after a
15 letter is submitted and it seems here we went
16 the other way and we created one.  So it appears
17 to me -- go ahead.  Does somebody want to say
18 something?
19         MR. DESAI:  No, no.  Sorry, Your
20 Honor.  I thought you were done.
21         THE COURT:  Looks to me when Tesla
22 submitted its opening letter everybody was on
23 the same page about the location of the source
24 code and it wasn't concluded in the letter there

28

1  was kind of a subsequent, you know, here is an
2  updated protective order which on further review
3  contained another dispute.  And I understand
4  Tesla wants to do source code review only at its
5  business in the Bay Area and not in D.C. or New
6  York.  So this is kind of a weird procedural
7  posture.  So I heard a little bit from AD just
8  now on this dispute, so I guess let me hear from
9  Tesla, please.
10         MR. DESAI:  Yes, Your Honor.  I
11 think it was always Tesla's intention that it
12 was going to produce the source code at its
13 facility in the Bay Area and I think there was
14 perhaps some ambiguity in the language that we
15 wanted to correct.  But it was basically that
16 Tesla will produce at its location of its
17 choosing and if there was an agreement it could
18 be reproduced elsewhere, but we never had an
19 agreement.  So that was the clarification.
20 Ultimately its always been Tesla's position that
21 it's going to produce it at a place of its
22 choosing where it feels it can provide all the
23 security mechanisms that it needs.  And I think
24 as outlined in the declarations that location is

29

1  Tesla's facility because it's not going -- it's
2  not at Weil's office and I think having this
3  done at outside counsel's office in New York or
4  D.C., I mean, it presents the risks that we're
5  trying to avoid.  It doesn't provide the
6  protections that are outlined, for example, in
7  the declarations and we'd be transporting
8  digital copies, so I think the proposal that we
9  produce in Washington, D.C. or New York is
10  simply not something that Tesla can agree to and
11  I think technically, you know, in my experience
12  source code is typically produced at the
13  location chosen by the producing party.
14         THE COURT:  Well, certainly I've
15  seen many protective orders where the source
16  code is produced at producing party's outside
17  counsel location.  What I have not seen and
18  that's why I was surprised to hear you just now
19  say that in Tesla's view at the office of its
20  counsel means to Tesla the same thing as at a
21  Tesla office in the Bay Area.  I certainly read
22  at the office of its counsel to mean the
23  traditional party's outside counsel offices.
24  That's not what it means, is that right?

31

1  location being the Bay Area and Tesla's
2  preference there is if it's, you know, the Bay
3  Area, the code doesn't need to be traveled with.
4  So that's why we proposed Tesla's facility.  You
5  know, if it was alternatively at Weil's office
6  in the Bay Area, we do have an office there, I'd
7  suppose we could convince our client of that,
8  although they weren't receptive to the idea.
9  But it's an entirely different question, what AD
10  is proposing is that we travel, the source code
11  get shipped or traveled to Washington, D.C. or
12  New York.  I think that's an entirely different
13  issue.
14         THE COURT:  What's Tesla's
15  response to AD's suggestion of using an escrow
16  agent, which I think it points out is in the
17  default standard?
18         MR. DESAI:  I think that would
19  probably be the least preference option, so
20  we're talking about Tesla's facilities and
21  outside counsel and now like a third party.  To
22  figure out a third party escrow agent that would
23  be able to provide the protections we need, I
24  think that will take a significant amount of

30

1         MR. DESAI:  Yeah.  Your Honor, I
2  think the intention there was Tesla's outside
3  counsel -- Tesla's in-house counsel facilities
4  and that was the ambiguity there and we have
5  never -- we have not had access to the source
6  code in our office at Weil in the Bay Area and I
7  think our intention was to have it at Tesla's
8  office so that's why we corrected that
9  ambiguity.  So ultimately the point is is Tesla,
10  that's the location it believes it can provide
11  the security mechanisms that it needs for its
12  source code.
13         THE COURT:  I mean certainly Mr.
14  Desai, would you agree with me that it's a bit
15  unusual -- I mean, I have never seen a
16  requirement to be produced at the business
17  location.  And I think there are probably some
18  pretty well founded concerns about doing it that
19  way at the party instead of the party's counsel.
20  What can you tell me that justifies that extra
21  level of burden and, you know, restriction that
22  I quite literally never seen before?
23         MR. DESAI:  Well, I think also
24  there's two layers here.  One is, you know, the

32

1  time and it will increase the cost and I don't
2  see that as a viable alternative for us.
3         THE COURT:  I think I interrupted
4  you earlier.  Were you trying to say something
5  Mr. Desai?
6         MR. DESAI:  No, no.  I think I
7  covered it.
8         THE COURT:  All right.  Mr.
9  Holley, any response?
10         MR. HOLLEY:  Sure.  I'll pick up
11  right where Mr. Desai left off, Your Honor.  In
12  that employee theft case that we mentioned a
13  moment ago, Tesla actually agreed and suggested
14  to provide a third party with what they called a
15  neutral was, quote, all source code that it
16  contends its employee misappropriated, which is
17  all of the code actually.  And that is exhibit
18  9, page 11, paragraph 5 where that quote is from
19  and the full source code is again described in
20  exhibit 11 at paragraph 3.
21         As Your Honor alluded to, I've
22  also never seen source code produced at a
23  defendant's office.  Been doing this for quite a
24  while, my partners that are on the case have

33

1  also never seen it in their 20 and 30 years of
2  practice.  And so it seems, you know -- it's a
3  new one for us and it appears to be designed
4  just to increase the burden.  It's, again, very
5  difficult and expensive for us to provide all of
6  this notice and to fly off to California each
7  time we want to look at the code and in addition
8  travel to Tesla's offices.  You know, we would
9  be happy to travel to Weil's D.C. office or its
10 New York office.  I understand Mr. Desai says
11 traveling with the computers is difficult, but
12 with modern encryption techniques, it happens
13 all the time where some of my clients, for
14 instance, would even have their internal data
15 people encrypt the computer and they will bring
16 it to our office and then it's our
17 responsibility to make sure it's secure.  And I
18 don't see any reason that Tesla can't do that
19 here.
20        THE COURT:  Mr. Desai, can you
21 respond to that point and can you also respond
22 to Mr. Holey's point about, I think there was a
23 suggestion that Tesla's entire source code had
24 been essentially downloaded and I presume you

34

1  mean including the source code of the AP group
2  and then provided to a third party, a neutral in
3  this case?  Can you respond on those two points,
4  please?
5        MR. DESAI:  Sure.  That was the
6  theft case again, and I think it was portions of
7  the code that were provided, but that was to a
8  neutral, the expert.  It was a neutral expert.
9  He or she was only allowed to see the code.  No
10 experts were allowed in, no outside experts were
11 allowed in and the parties were just able to ask
12 neutral questions about an analysis.  There was
13 no printing.  I think that's an area that was
14 much more onerous than what we're proposing.
15 Here in our proposal, yes, you have to travel.
16        THE COURT:  Before you move on on
17 that point, the mere fact that it was provided
18 to a neutral, I mean, how was it given to the
19 neutral?
20        MR. DESAI:  Give me one second.
21 It was on a source code computer.
22        THE COURT:  So did the neutral
23 come to Tesla's office or was the source code
24 computer somewhere and Tesla brought its code to

35

1  the neutral on a source code computer at a third
2  location?
3        MR. DESAI:  I believe it was a
4  third party escrow's for this theft case where
5  the source code was provided for the purposes of
6  neutral expert to review it, not to print it and
7  then for the parties to be allowed to ask
8  questions to the neutral.  So I think a
9  different setup, but it obviously did involve
10 third party escrow, but it didn't involve
11 printing, it didn't involve outside experts and
12 outside counsel reviewing the code.  So while it
13 did involve the third party escrow, there's
14 obviously a big difference from what we're
15 proposing in this case as far as, you know, what
16 counsel can do with the code and review it while
17 they're in, in California.
18        THE COURT:  No.  That's fair.
19 There's certainly a difference between what was
20 done with it once it was there, but I raised
21 that to what I understood at least one of your
22 points, Mr. Desai, that Tesla was very nervous
23 about its code traveling outside a facility, but
24 it has previously agreed to allow that to

36

1  happen.  Now, what happens once it gets there is
2  different versus the theft case, but it is an
3  example of Tesla voluntarily agreeing to allow
4  its code to travel to a third location.  Let me
5  ask you this.  This was -- I'm curious as to the
6  reaction.  I believe, I don't know, that Tesla
7  is now headquartered in Texas.  I believe, don't
8  know, that outside counsel for both parties have
9  locations in Texas.  Texas is arguably somewhat
10 closer than California.  Did the parties discuss
11 the option of conducting the review in Texas or
12 is that something that isn't worthy of
13 discussion to alleviate some of the dispute here
14 today?
15        MR. DESAI:  Your Honor, this is
16 Anish Desai.  I think we could go back to our
17 client and see if that's an acceptable
18 compromise.  It may be.  We do have an office in
19 Dallas and in Houston and Tesla, I mean
20 obviously it has a presence in Texas and I
21 believe McKook Smith also does have a
22 significant presence in Texas.
23        THE COURT:  Mr. Holley, does that
24 alleviate some of the burden if the review were

37

1 to take place in Texas?  I mean, I am not
2 ruling, but I would suggest that if it were it
3 would be at an outside counsel location in
4 Texas.  What's your position on that?
5         MR. HOLLEY:  Your Honor, this is
6 Blair Jacobs.  Let me handle that one.  We would
7 certainly be willing to accommodate review in
8 Austin or Dallas.  We have offices in both.  But
9 our main concern remains with regard to the
10 scope of the definition of source code.  So if
11 it was, you know, a traditional source code
12 review of just the source code, not technical
13 documents, just the source code and they wanted
14 to do that in Austin or Dallas and they felt
15 that that provided greater protection to the
16 information, we could certainly accommodate
17 that.
18         THE COURT:  Okay.  Okay.  Thank
19 you for that, Mr. Jacobs.  Okay.  Let's move on
20 the to the limits on the source code printing.
21 I think this is a dispute at paragraph 11 C 7.
22 As I understand it, you know, Tesla suggests a
23 limitation on printing of five consecutive
24 pages, no more than 200.  Tesla notes that

38

1 plaintiff originally proposed 500 aggregate with
2 15 consecutive, but now proposes 2,500/50.  I
3 think from the papers, you know, Tesla's
4 position has an argument that 2,500/50 is far
5 too great and that plaintiff can't meet its
6 burdened to show, in light of this confidential
7 nature of source code, that this request is
8 necessary and that 200/5 is sufficient for now.
9 Plaintiff for its part says that the 2,500/50 is
10 needed given the specialized code and indicates
11 that it has an expert whose kind of opined that
12 that would be the number that would be necessary
13 given the various complexities of the case.
14 From the docket I can see that we're pretty
15 early on in discovery.  The bear initials have
16 been exchanged, but I don't think the peak of
17 the required disclosures of the scheduling order
18 have been initiated or completed, so we're at a
19 pretty early stage of discovery, so I'm wary of
20 AD's somewhat large request and I'm also a bit
21 wary of Tesla's, I think, kind of artificially
22 limited request to lower it to 200 pages.  So
23 here's what I think we ought to do for this one.
24 Given the perceived complexity of the accused

39

1 infringing technology as well as the fact that
2 Tesla does seek to include documents beyond the
3 bear minimum definition of source code, I think
4 it's difficult to say that 200 pages of codes
5 would be sufficient.  I know that 500 is a
6 number that's often used and accepted in this
7 jurisdiction even sometimes with a narrower
8 definition of source code than has been proposed
9 here.  So under these circumstances and in the
10 light of the argument cited by the parties in
11 the papers, I think that 500/15 protects Tesla's
12 source code when considered in tandem with the
13 other protections of the protective order, while
14 allowing plaintiff to opportunity to conduct
15 discovery.  But what I'll say is this.  I think
16 if it later becomes apparent that what is
17 reasonably necessary in terms of printed code
18 for the plaintiff exceeds that 500/15, you know,
19 I think the parties can meet and confer in good
20 faith.  Plaintiff will be armed with a bit more
21 information about why it needs more and with a
22 particularized nature be able to say so.  And if
23 the parties can't agree then plaintiff can
24 always come back and apply to modify the

40

1 protective order.  I know I have just largely
2 given you a ruling here without much opportunity
3 to respond, but if there is a short response by
4 either party, I'd be happy to hear it.
5         MR. HOLLEY:  John Holley on behalf
6 of plaintiff, Your Honor.  Can I ask for a point
7 of clarification?  On this 500/15 limitation
8 that you just let us know about, does that
9 include the non code source code documents or is
10 that source code proper?  The reason I ask is
11 Tesla had previously suggested that there would
12 be unlimited copies of the non code source code
13 defined documents.
14         THE COURT:  So I think that what I
15 envision is that Tesla made that offer.  I think
16 it made it with sincerity and Mr. Desai, I
17 think, has been very reasonable so far, so I
18 fully expect that Tesla would honor that and
19 that the parties can work out the details of
20 what counts towards the 500 limit and what does
21 not without much acrimony or issue going
22 forward.
23         MR. HOLLEY:  Okay.  One last point
24 of clarification that we worked with in the past

41

1    when we've had a shorter or less pages is we've
2    often come to agreements with opposing counsel
3    on pages on a rolling basis.  So say, for
4    example, that we have a 500-page limit and AD
5    prints out 400 pages and then realizes, you know
6    what, a hundred of those pages are no good and
7    we can then, you know, delete them and provide a
8    certification to Tesla and get those hundred
9    pages back.  Is that something that we can add
10   here?
11          THE COURT:  As far as I can see,
12   that proposal hasn't been floated and discussed
13   between the parties, so I'd ask you to meet and
14   confer about it.  And certainly on this point or
15   any other, if you get to a point where you have
16   a dispute and you haven't been able to work it
17   out, you can come back, we'll get you on the
18   calendar sooner, but I think that's a fair point
19   to raise with Tesla and at least discuss and see
20   what its position is.
21          MR. HOLLEY:  Okay.
22          MR. DESAI:  Your Honor, this is
23   Anish Desai.  I don't have anything further to
24   add.

43

1    and to the extent we can avoid them being
2    traveled with and we've proposed some reasonable
3    compromises, we can get these depositions done
4    and we can protect the documents and avoid
5    inadvertent disclosure.  We've given the
6    compromises to do that.
7           THE COURT:  I appreciate that.
8    Let me ask you this, Mr. Desia, without any
9    implied aspersions being cast on either you or
10   AD.  If I understand your argument that, you
11   know, having AD's counsel with this source code,
12   traveling with the source code is just too risky
13   given, you know, inadvertent disclosure, left
14   behind on a train, for example, isn't that sort
15   of inadvertent disclosure just as likely to
16   occur with Tesla counsel?  Why is one counsel
17   more likely to be responsible and avoid the
18   inadvertent disclosure than the other?
19          MR. DESAI:  Your Honor, I don't
20   believe we're going to be traveling with
21   printouts of these documents either.  I don't --
22   these highly sensitive materials.  I mean,
23   perhaps the protective order doesn't state that,
24   the restriction on us, but that restriction will

42

1           THE COURT:  Okay.  Thank you.  I
2    think our next dispute, if I'm following
3    correctly, is the use of source code at
4    depositions.  This I think is paragraph 11 B 12.
5    This I think has been talked about in
6    conjunction with largely with the definition of
7    source code.  You I guess let me hear a little
8    bit more.  I'll have a couple of questions, but
9    I suspect that, you know -- well, I'll just stop
10   there.  Let me hear from Tesla first on this
11   dispute, please.
12          MR. DESAI:  I think the major
13   point here, Your Honor, are Tesla does not want
14   attorneys traveling with bulk printouts of these
15   highly sensitive documents.  We've offered to
16   compromises to negate the need for this risk.
17   We've offered a source code computer at
18   depositions and that upon those can be over
19   inclusive to include requesting deposition
20   printouts to avoid revealing which specific
21   documents it will discuss with the deponent.  I
22   think the primary concern here is even though
23   lawyers do take care, obviously when traveling
24   these are extremely highly sensitive materials

44

1    be imposed on us by our own client, so we're not
2    proposing that we be allowed to travel with bulk
3    printouts of these documents while AD's counsel
4    will not be able to.
5           THE COURT:  Well, if Tesla's
6    counsel were to show up at deposition with
7    copies as flagged and foreshadowed by AD, where
8    is the deposition taking place?
9           MR. DESAI:  I think that's -- you
10   know, the location these Tesla individuals are
11   going to be deposed is likely going to take
12   place at a Tesla facility.  Right?  To avoid the
13   need for traveling with these documents.  Which
14   is the same reason why we would propose that a
15   source code computer be available at the
16   depositions and that would be because the
17   depositions would take place at a place where
18   the source code computer can be presented.
19          THE COURT:  Okay.  Mr. Holley, any
20   response to Mr. Desai?
21          MR. HOLLEY:  Sure.  Two things,
22   Your Honor.  We've traveled with technical
23   documents for years.  I've traveled overseas to
24   numerous countries with highly confidential

45

1 technical documents and have never, you know,
2 had an inadvertent reveal of documents or left
3 them behind.  Also, Tesla's proposal doesn't
4 contemplate how they're going to depose AD's
5 experts.  You know, Tesla can't force AD's
6 experts to come to Tesla's facilities, for
7 example.  And so presume Tesla will want to
8 depose our experts on technical documents and
9 they'll have to bring them.
10          That goes to my last point, which
11 is -- these depositions are largely going to be
12 Autonomous' depositions of Tesla's employees and
13 so we have a burden, again, to prove our case.
14 We need to show the documents to the witnesses
15 in order to ensure that, you know, we're getting
16 the evidence that we need to get in.  I know
17 that Mr. Desai earlier said that, you know, the
18 complaint that we raised of not being able to
19 conduct a proper cross-examination without
20 surprises, for example, is not really valid, but
21 that's how examination works.  You ask witnesses
22 things that they're not necessarily prepared or
23 haven't looked at and simply gives them a road
24 map of documents we would like is extremely

46

1 prejudicial to us.  So we would propose that,
2 you know, we treat this case just like every
3 other case where counsel is allowed to travel
4 with technical documents.
5          And one last point is, your honor
6 raised at the beginning of this call, lawyers,
7 myself included and I know my partners and the
8 other folks that are on this call, we all mark
9 up technical documents and use that as a road
10 map for depositions.  And Tesla's proposal is to
11 have us kind of tell them 10 days in advance
12 what documents we'll discuss and that's just not
13 workable, because often times myself, I'll look
14 at a document 20 minutes before a deposition
15 starts and say, oh, this is actually really
16 helpful or maybe something that was not
17 controversial in fact is controversial so I need
18 to pull that document and show it to them and
19 Tesla's proposal just doesn't allow for that
20 flexibility.
21          THE COURT:  Thank you, Mr. Holley.
22 Earlier I asked Mr. Desai about the possibility
23 of kind of carving out for purposes of
24 deposition the non code technical documents to

47

1 allow for that sort of thing to happen, that is,
2 you or other counsel, for the plaintiff to be
3 able to review, mark them up, set out your road
4 map to the deposition, bring them to the
5 deposition and depose Tesla employees.  If that
6 sort of compromise were reached, would that not
7 alleviate much of your concern about the
8 definition of source code as it relates to
9 depositions?
10          MR. HOLLEY:  Sure, Your Honor.  So
11 if source code means source code and not source
12 code and technical documents, then I don't think
13 the parties really have a dispute here because
14 there's no intention to bring printouts of
15 actual source code to depositions.  What the
16 concern here is the type of technical
17 documents that Mr. Desai alluded to being
18 unavailable to us or us having to reveal them
19 way in advance and that's just something that
20 we've never seen in any case that we've ever
21 defended, a large company or brought a case
22 against Google and Apple, they don't ask for
23 road maps of their technical documents 10 days
24 in advance of a deposition.  And, you know, if

48

1 we're able to travel with the technical
2 documents and then ask the source code questions
3 that are source code proper on the source code
4 computer, then there should be no issue here.
5          THE COURT:  Okay.  Mr. Desai, let
6 me ask you this.  Mr. Holley raised the point of
7 certainly Tesla employees depositions, they take
8 place at the Tesla facilities, but what about to
9 the extent Tesla wishes to depose any of
10 plaintiff's folks and the need for potentially
11 source code or technical documents for use in
12 those depositions?  What's your response to that
13 point?
14          MR. DESAI:  Well, I think that was
15 a reference to, Your Honor, experts and I
16 believe actually that's an issue for Tesla to
17 have to deal with.  Whether we believe, you
18 know, that's something that would warrant us
19 loosening the restrictions and we don't,
20 plaintiff will be serving expert reports with
21 their analysis and, you know, to the extent we
22 are unable to travel with printouts of certain
23 documents, I think that will be the situation,
24 but we believe we'll be able to adequately

49

1  depose the experts using their expert reports.
2          THE COURT:  Okay.  Would either
3  party like to say anything more about this
4  paragraph 11 B 12 before we move on to the last
5  dispute?
6          MR. DESAI:  No, Your Honor.
7          MR. HOLLEY:  No, Your Honor.
8          THE COURT:  Okay.  So this is --
9  well, I guess it's the second to last dispute.
10  I did not mean to foreshadow or indicate in any
11  way my feelings about the last two disputes.
12  Dispute number 5, I believe this is Tesla's
13  proposal to add some language regarding
14  digitizing or electronically filing source code.
15  I think this is paragraph C 13, correct?
16  Counsel for Tesla, Mr. Desai, go ahead, please.
17          MR. DESAI:  Your Honor, I think
18  this is for filing of electronic exhibits.  I
19  think the primary point here is that the whole
20  purpose of these protections is to avoid, you
21  know, digitizing these exhibits and this
22  provision is intended to, you know, to confirm
23  that we won't be digitizing things and we've
24  agreed to allow excerpts of source code in

50

1  pleadings, so there's really no reason for
2  plaintiff to need to, you know, further digitize
3  the source code for use as exhibits.
4          THE COURT:  Mr. Holley.
5          MR. HOLLEY:  Yes, Your Honor.  So
6  we view this as another issue in Tesla's efforts
7  to bring burdens on AD.  As Mr. Desai said, the
8  parties have already agreed that images and
9  copies of source code are going to be admitted
10  from pleadings and papers wherever possible.
11  What -- we're probably pretty close to one
12  another actually.  How I see the dispute is
13  Tesla wants us to provide our snippets of source
14  code in the body of pleadings, which often times
15  have page limitations.  And so, you know, if we
16  can add them as exhibits, we have additional
17  space to make our arguments.  But, you know,
18  perhaps there is room for compromise.  And I
19  think this was discussed during the lengthy back
20  and forth with Tesla's counsel is that we could
21  put those snippets as an exhibit to our
22  pleadings.  You know, it would alleviate our
23  concerns here.  There's no intentions for AD to
24  provide wholesale copies of source code or

51

1  highly confidential documents as exhibits, but
2  we do have concerns about, you know, our page
3  limits being squeezed.
4          And then if you'll indulge me for
5  one moment, Your Honor.  Apologize for this.
6  Going back to exhibit 11 C 12 or paragraph 11 C
7  12, the technical documents at a deposition.
8  Just briefly I got to note that, you know, asks
9  how are we going to treat expert reports that
10  are going to have source code in them.  Is
11  Autonomous not able to travel with the expert
12  reports because of the source code and we're
13  just not sure how Tesla envisions that working.
14  We think that it kind of exposes the extremely
15  onerous and burdensome nature of Tesla's
16  proposal.
17          THE COURT:  Okay.  I guess there
18  are two points to proceed with there.  Mr.
19  Desai, let me first hear your response to what
20  sounded like a hope for compromise from Mr.
21  Holley that perhaps there's not really a dispute
22  here given the existing protections of paragraph
23  C 13.  Do you think the parties are adequately
24  on the same page such that this additional

52

1  language is really necessary still?
2          MR. DESAI:  Feels like we're on
3  the same page.  We are not intending to squeeze
4  their page limit.  That's really not the point
5  of this at all.  So to the extent they feel as
6  though snippets that they want to include in the
7  pleadings and papers is going to squeeze their
8  page limits and that they want to put those as
9  an appendix or something of that nature, that
10  seems fine on us.  I think the point here is
11  about digitizing the documents and, you know,
12  not concerned about digitizing the snippets, So
13  it seems like we're on the same page.
14          THE COURT:  Well, let's do this on
15  this point then.  Let me give you -- my thought
16  is that, to me, this additional language that is
17  proposed by Tesla is a little bit confusing in
18  light of the foregoing paragraphs and so I think
19  perhaps this is one you folks could work out
20  with a short meet and confer perhaps by
21  including the word like source code shall not be
22  wholesale digitized, but snippets may be
23  included as exhibits to pleadings.  Something
24  like that, but I think -- I'm confident this is

53

1  something you folks can work out. Sounds like
2  you are very, very nearly on the same page and
3  neither party is trying in any way to be
4  obstructive to another.
5          With that, Mr. Desai, let me ask
6  you to please respond briefly to Mr. Holley's
7  point about let's say AD's expert report
8  contains, as I would expect it would, some
9  portions of Tesla's source code or technical
10 documents that contain source code or refer to
11 source code, what is Tesla's response to Mr.
12 Holley's argument that the current definition
13 and protective order provisions make that
14 unworkable.
15         MR. DESAI: I do think that's a
16 matter of how you draft your report. With these
17 protections in place, I think it's certainly
18 doable to draft a report that doesn't include,
19 you know, wholesale copies of things. The
20 materials that are produced aren't available on
21 the source code computer will be identifiable by
22 some identifier, bates identifier, printouts
23 will be identified with a bates identifier for
24 example and the expert in the report can refer

54

1  to those bates numbers to cite and explain
2  without the need to cut and paste and copy
3  portions of these exhibits into their, into the
4  report. So to the extent there's explanations
5  and descriptions by the expert in their report,
6  that's not going to be a concern. I mean,
7  obviously, first of all, they're only going to
8  have printouts of them to begin with, so the
9  idea that they're going to then be able to put
10 electronic copies of that into the report would
11 violate the whole purpose. And so I think
12 really it's just a matter of how you draft your
13 report. Provide the explanation, provide the
14 analysis and provide citations and that's not
15 going to present a problem.
16         THE COURT: If I may be so bold as
17 to kind of characterize what you're saying, Mr.
18 Desai, you're saying look, there's litigation
19 that takes place all the time that deals with
20 just strict technical source code and when other
21 parties' experts use that technical source code
22 in their expert reports, they're faced with the
23 very same limitations as here and need to refer
24 to only snippets or by production numbers, is

55

1  that what you're saying?
2          MR. DESAI: That's exactly right,
3  Your Honor.
4          THE COURT: Okay. All right. I
5  think I understand both parties' positions on
6  that. Let's move on to the very last dispute
7  here. It's number 6, I think. Archival copies.
8  I think paragraph 18 C. Let me hear briefly
9  from the parties on this point please. Go
10 ahead, Mr. Desai
11         MR. DESAI: I think -- I believe
12 the only issue here is that we don't really see
13 a reason for plaintiff to need to maintain
14 copies and then I think the issue is this
15 proposal that, you know, Tesla be the one that
16 has to go redact. I think ultimately it's not
17 reasonable for us to have to redact documents
18 for AD to archive. I think if that's going to
19 be the situation, then AD should take the first
20 stab at that, at redacting. I just -- we just
21 don't really see a need for archiving these
22 materials after the case is closed or it's over.
23 I mean, you know -- and they're not talking
24 about pleading, motions, trial, deposition.

56

1  Those are all, you know, obviously going to be
2  archived and available. But we just don't see a
3  need for archiving copies of the source code.
4          THE COURT: So this question goes
5  to both of you, but help me understand where the
6  dispute is here. I don't believe that AD wants
7  to archive source code and I think there are
8  provisions in the protective order for, you
9  know, insuring that for the source code
10 productions to been either returned or
11 destroyed. I see AD's proposal as pleadings,
12 motion papers, deposition transcripts, that
13 would not contain source code. The trial
14 exhibits, expert reports, to your point, Mr.
15 Desai, that shouldn't contain source code.
16 Attorney work product, maybe I suppose maybe
17 Tesla's concern is that might include non code
18 technical documents that attorneys have marked
19 up to take a deposition with. Like where is the
20 real issue here? This seems like you guys are
21 very close in terms of --
22         MR. DESAI: I think it's that last
23 part, the attorney work product. I mean, how
24 are we going to go redact and police that,

57

1  right?  As far as, if that has protected
2  material that should be disposed of and I mean,
3  it doesn't seem plausible for us to be able to
4  police that and it doesn't seem to be a need for
5  that to be kept once the case is over.  It seems
6  like that material can be destroyed.  All of the
7  other materials, the pleadings, most papers,
8  trials, hearing -- that's all going to be
9  available, all the final product.  That seems to
10  be the --
11          THE COURT:  I apologize, Mr.
12  Desai.  Why is it insufficient to just, to
13  require that the terms of the protective order
14  be honored and to assume that they will be
15  honored?  Why does that not give Tesla enough
16  protection?
17          MR. DESAI:  I think the problem is
18  they want to keep archival copies of this
19  material.
20          THE COURT:  If it was something
21  that fell into the category of source code,
22  would they not have to keep it in accordance
23  with the protective order's requirements for how
24  source code be kept?

59

1  provisions of the protective order.
2          MR. HOLLEY:  We typically keep
3  them in our office in accordance with how source
4  code should be kept.  From another case --
5  actually we have a giant gun safe that Judge
6  Albright ordered us to put into our office.  And
7  we could put our work product into that safe.
8  One point of clarification I would like to add
9  is Mr. Desai had suggested that there's not
10  going to be source code excerpts in pleadings
11  and reports and depositions.  That's just not
12  consistent with how we've prepared pleadings and
13  reports and depositions in the past.  The
14  deposition, for example, is going to have, have
15  file paths and it's going to discuss the source
16  code in intimate detail.  And so we would like
17  to keep that as an archival copy.  You know,
18  again, Tesla has told us all day today that they
19  treat their code with the utmost security and
20  now when we've offered to allow them to go
21  through and strike out portions of our archival
22  documents, they say no, no, no, we don't want to
23  do that.  AD should do that.  And so it's just
24  inconsistent with the story we've heard today.

58

1          MR. DESAI:  I think maybe I'm not
2  understanding the dispute here.  But I think the
3  issue here is we are okay with archival copies
4  of the pleadings.  It's written in our proposal.
5  And the distinction is where they cross the
6  lines of attorney work product, consultant,
7  expert work product, the issue we think that
8  material that contains the source code, anything
9  that's been defined as source code should either
10  be, if it's kept in archives it should be
11  redacted with that material.  That material
12  should be redacted or unredacted versions should
13  be destroyed.  And that's what we're asking.
14          THE COURT:  Counsel for the
15  plaintiff, I guess let me ask you this.  When it
16  comes to attorney work product on these non code
17  technical documents that would otherwise fall
18  within the definition of source code and be
19  required to come with all of the bells and
20  whistles associated therewith, is it your
21  intention to ship them away to one of the
22  storage warehouse facilities where lawyers send
23  their papers that they're no longer working on
24  or would you keep them in accordance with the

60

1  And if you have any additional questions, I'm
2  happy to answer them.
3          THE COURT:  Well, I guess I just
4  want to make sure I'm tracking.  Are you saying
5  that AD would treat -- you would treat expert
6  reports, deposition transcripts, attorney work
7  product, whatever it may be, that either
8  contains source code or these non code technical
9  documents, you would treat them as source code
10  in accordance with the terms of the protective
11  order in perpetuity, for however long you wanted
12  to keep those copies?
13          MR. HOLLEY:  Correct, until the
14  copies were destroyed, they would be protected
15  under the protective order of this Court.
16          MS. ONDRICK:  Well, Your Honor,
17  this is Christina Ondrick for AD.  I think this
18  hits -- your question hits the unworkable
19  proposal of a lot of this.  Meaning under
20  Tesla's definition and the vast variety of
21  things that can constitute source code, any
22  excerpts all of a sudden now can't be
23  maintained, right?  Or, there are, you can't
24  keep the deposition transcript in a paper file

61

1  in the source code room.  Right?  Like that's
2  not how these cases are run, that's not how
3  these things are done.  What they're asking for
4  when you take it to an illogical conclusion,
5  it's not only just unworkable, it's illogical as
6  to how any case is done and those become the
7  general issues.
8          THE COURT:  Mr. Desai, do you care
9  to respond to that point.
10         MR. DESAI:  I don't think this
11  dispute here has to do with the definition of
12  source code.  So whatever the definition of
13  source code ultimately is and we've already
14  debated that, if they have reports, et cetera,
15  that contain the source code, right, our
16  position is those should be destroyed.  There's
17  no reason for them to be kept.  Or if they would
18  like to keep those copies of things that
19  actually contain the source code, they can be
20  redacted and kept.  But I don't see how that
21  would apply to, for example, a deposition
22  transcript, because deposition transcripts are a
23  person speaking and answering questions and
24  they're not going to have source code in them.

62

1  So I don't think this is as complicated as
2  counsel was making it seem.  It's simply there's
3  going to be material in this case that is going
4  to be designated as source code and everyone
5  will know what that material is because it will
6  be designated that way and then at the end of
7  this case, there are going to be materials that
8  include copies potentially, potentially of that
9  source code and if that material wants to be
10  archived, our proposal is that it should either
11  be redacted or that material should be
12  destroyed.  And there's no reason for it to be
13  kept in perpetuity.
14         THE COURT:  Look, I don't know
15  what their policy is and why and how they want
16  to enforce it and I don't intend to get into
17  that, but if AD is saying I want to keep
18  attorney work product and attorney work product
19  includes that non code technical document that a
20  lawyer marked up and brought to the deposition
21  and used that to question Tesla's expert and
22  they want to retain that as work product, if
23  they abide by the protections of the protective
24  order, is that not sufficient?  It doesn't need

63

1  to be destroyed in that right, if they are
2  abiding by the restrictions in the protective
3  order?
4          MR. DESAI:  Agree with that, if
5  they want to abide by the restrictions of the
6  protective order forever.  I guess that's fine.
7  Ultimately our position was what was the need
8  for that, but I understand your point, Your
9  Honor.
10         THE COURT:  Okay.  Very good.
11  Here's what I propose we do.  Folks on the line,
12  let's take say a 20-minute break, but let's just
13  make it easy.  Can folks get back on the line
14  and the court reporter get back on the line at
15  11:45 and we'll go through ruling at that point.
16  Does that make sense for everyone?
17         (Short recess.)
18         THE COURT:  Okay.  I have very
19  carefully considered all of the parties'
20  submissions and the arguments today.  I want to
21  thank counsel for their careful attention, their
22  willingness to try and really engage with this
23  subject matter and help me understand each
24  party's position on the various disputes.  I

64

1  found the argument to be very, very helpful
2  today, so I thank each of you for that.  But I
3  think I am ready to give you my ruling, so we'll
4  go through and certainly if there are questions,
5  I want you to feel free to ask.
6          So dispute number one, that is the
7  definition of source code as set forth in
8  paragraph 2 C of the protective order.  As I
9  said, I have carefully considered the
10  submissions and the argument and the record
11  before me shows that Tesla treats the AP group
12  technology as its crown jewels and has put in
13  place additional security at Tesla to protect
14  it.  For example, I note that employees outside
15  of the AP group where the technology resides do
16  not have access to it and even employees within
17  the AP group are not allowed to print it.  I
18  further note the details of the employees of the
19  group itself are kept different and separate and
20  are less available in terms of information to
21  other Tesla employees.  The company also, you
22  know, declares that it has developed additional
23  special security steps including a special
24  software platform just to protect the

65

1  technology.  I certainly have also considered
2  AD's point about the theft case and note that
3  although there are some helpful things to take
4  from that, one thing I take is that this was a
5  case of employee theft and that Tesla responded
6  I think appropriately and treated it as theft.
7  So under these circumstances and on these facts
8  as supported by the declaration from this
9  company, from Tesla, that is, I find that good
10  cause exists to provide for source code
11  protection to extend not just to the code but to
12  the technical documents with the formulas,
13  engineering specs and schematics that define or
14  otherwise describe in detail the algorithms or
15  the structure of software hardware design.
16          During the call today I note that
17  Tesla reaffirmed that it would carefully review
18  these documents for designation and that there
19  would be a lot of technical documents that do
20  not fall within this definition and thus would
21  not be produced with this source code
22  designation.  I trust that AD will hold Tesla to
23  that representation.  I also note that
24  plaintiff's proposed definition would leave

66

1  those technical documents that describe the code
2  unprotected and thus I find that plaintiff's
3  definition strikes me as too narrow given the
4  facts of this case and on the evidence we have
5  about the sensitivity of this technology.
6  Plaintiff expressed that it was worried that
7  this definition, which is broad, is too broad
8  and specifically plaintiff's concern is that
9  nearly every technical document would fall
10  within this definition and plaintiff would
11  therefore be hampered in its prosecution of the
12  case.  Tesla responded in the hearing and in
13  this letter and confirmed today that the goal is
14  not to protect every technical document but just
15  those documents that describe the code.  This
16  does not seem to encompass every technical
17  document, rather it should be and I accept
18  Tesla's representation that it will diligently
19  mark those documents only those that detail the
20  code.
21          I also note that AD expressed
22  concern about the effects of Tesla's proposed
23  definition of source code on depositions.  And
24  in its letter and today AD confirmed that it

67

1  would not travel with source code and by that I
2  mean the technical computer code, but that for
3  the reasons detailed during the hearing, it may
4  wish to travel with those non code technical
5  documents that would fall within Tesla's
6  proposed definition.  This concern is reasonable
7  to me, but I think it's one that can be
8  alleviated.  During the hearing I asked Tesla's
9  counsel whether it would agree that AD could
10  travel with and to deposition with those non
11  code technical documents.  I noted that even
12  Tesla seemed to agree on some level that those
13  documents were a bit different than technical
14  source computer code because Tesla had agreed or
15  at least offered to agree to allow for the
16  additional printing of such non code documents
17  beyond the source code page limit.  Tesla of
18  course did not bind itself but agreed that a
19  compromise like this could work and counsel for
20  AD I believe also indicated that this might
21  alleviate some of its concern regarding Tesla's
22  proposed definition.
23          So accordingly here's how I think
24  we ought to proceed.  With respect to dispute

68

1  number one, the definition of source code, the
2  Court adopts Tesla's definition with the proviso
3  that the parties are directed to meet and confer
4  to come up with language that will address those
5  non code technical documents at deposition and
6  in travel and certainly, you know, the parties
7  are in a better position to do this than the
8  Court, but it seems to me this can be
9  accomplished either with an addendum to the
10  definition of source code or by an addendum to
11  the section of the protective order dealing with
12  the use of documents at deposition and
13  specifically carving out those non code
14  technical documents allowing for AD to travel
15  with those documents.
16          Moving on to the dispute number
17  two, that is the location of the source code
18  review.  As with the first dispute I heard and
19  appreciated and I believe understood your
20  arguments on the location of source code review.
21  I understand Tesla's argument regarding its
22  preference that the review take place in the Bay
23  Area and specifically at a Tesla facility.  I
24  further understand AD's preference that the

69

1    source code review take place closer to its
2    offices of its outside counsel in New York or
3    D.C. and I think it's -- note that it seems
4    common in protective orders and this
5    jurisdiction at least to allow the review to
6    take place at the office of the producing
7    party's outside counsel.  In this case, given
8    the argument that I heard, I'm not convinced
9    that review should take place at Tesla's
10   business office and I understand AD's concerns
11   with doing so and essentially engaging in
12   extended litigation strategy at the home field
13   of the opposing team.  I'm not convinced that AD
14   should get to pick the location most convenient
15   to it especially in light of the special
16   protections that Tesla has in place.
17           So here's what I think we should
18   do.  For this dispute I think the provision
19   should provide that review should take place at
20   an office of the outside counsel for the
21   producing party or otherwise as agreed to by the
22   parties.  In making this ruling I remind the
23   parties that they are of course encouraged to
24   work together on this and that the review, as

70

1    discussed during the hearing today, might be
2    able to take place in Texas, which could be
3    slightly less burdensome for all rather than
4    exclusively in California.
5            The next dispute I think was
6    number three and that was on the limits of
7    printed source code.  I believe you have my
8    ruling on this issue for the reasons that we've
9    previously discussed and having heard the
10   parties' arguments, the limits are 500/15 with
11   the understanding that Tesla has offered to
12   exclude from that number the non code technical
13   documents.  And I'm sure the parties can work
14   out the best procedure for how to do that on a
15   mechanical level.
16           The next dispute is the use of
17   source code at depositions.  This of course
18   relates to traveling with computer source code.
19   And for the reasons we've discussed today, the
20   receiving party will not be able and will not be
21   permitted to travel with printed computer source
22   code.  It will, however, be permitted to travel
23   with printed copies of the non technical code
24   that otherwise fall within that definition of

71

1    source code that's been advanced by Tesla.
2            As to the source code, that
3    computer code itself, Tesla has offered to make
4    a computer available at depositions.  It seems
5    to me that another options to provide two copies
6    of the source code, that is the computer code,
7    at deposition and for Tesla to do that since
8    these depositions are taking place presumably in
9    the Bay Area and since Tesla was already
10   offering to bring printed code to the deposition
11   does not seem burdensome or to place the code at
12   any risk to ask Tesla to bring essentially the
13   universe of those 500 pages, two copies of that.
14   I think the Court is not in a position to choose
15   between a source code computer or two copies of
16   the 500 pages of source code and so I direct the
17   parties to either choose between those two among
18   yourselves or to write into the protective that
19   the receiving party may elect one versus the
20   other on some reasonable number of day's notice
21   in advance of the deposition.
22           As to the retention of exhibits,
23   source code exhibits, I think the receiving
24   parties may retain the non technical source code

72

1    exhibits, that is that it traveled to the
2    deposition with.  Source code documents, as in
3    the computer code that are used as exhibits,
4    should be retained by the producing party for
5    the same reason that the Court has previously
6    discussed in not allowing the receiving party to
7    travel with such documents.  Now, to the extent
8    that there are altered documents, it seems to me
9    that if they were printed copies of computer
10   code that get altered by the deponent, that, I
11   hope and trust would be probably a voluminous
12   occurrence, but in any event it seems to me the
13   parties can work out how to ensure that each
14   party, that is each of Tesla and AD retain a
15   copy of that exhibit and Tesla makes
16   arrangements to allow AD to travel with that
17   piece, depending on how large of a document it
18   is, provide that exhibit marked up to AD through
19   some other source.  And I leave that to the
20   parties to work out, but it does seem to be
21   important to note the difference between altered
22   computer code, printed exhibits and non altered.
23           Dispute number five, I think we
24   covered this during the first hearing, the

73

1  parties will work this out.  I think you're
2  close and I have all the confidence in the world
3  that this is an easy one.
4           And essentially with number six, I
5  find the same.  I think there's actually no
6  dispute here as AD has agreed to keep the
7  protected material as protected no matter what.
8  So in light of that, to the extent AD wishes to
9  retain protected material or work product that
10  contains protected materials it has agreed to be
11  so bound by the restrictions of the protective
12  order and for those reasons I adopt AD's
13  proposal with respect to that dispute.  I just
14  went through a number of things there.
15          Are there any questions from the
16  parties about my ruling?
17          MR. DESAI:  No questions from
18  Tesla, Your Honor.
19          THE COURT:  Okay.  And anything
20  from AD?
21          MR. HOLLEY:  No questions, Your
22  Honor.
23          THE COURT:  Okay.  Thanks very
24  much for your time today.  And again, all of

Hawkins Reporting Service
855 Arthursville Road   Hartly, Delaware  19953
(302) 658-6697  FAX (302) 658-8418

74

1  your hard work and your good arguments today and
2  your submissions to the Court, I found them
3  very, very helpful.  The Court will be
4  adjourned.  Thank you.
5           (End at 12 o'clock p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
855 Arthursville Road   Hartly, Delaware  19953
(302) 658-6697  FAX (302) 658-8418

75

1  State of Delaware)
                )
2  New Castle County)

3
4
5           CERTIFICATE OF REPORTER
6
7      I, Stacy M. Ingram, Certified Court Reporter
8  and Notary Public, do hereby certify that the
9  foregoing record, Pages 1 to 75 inclusive, is a true
10  and accurate transcript of my stenographic notes
11  taken on May 31, 2023, in the above-captioned matter.
12
13      IN WITNESS WHEREOF, I have hereunto set my
14  hand and seal this 31st day of May 2023, at
15  Wilmington.
16
17
18      /s/ Stacy M. Ingram
19      Stacy M. Ingram, CCR
20
21
22
23
24

Hawkins Reporting Service
855 Arthursville Road   Hartly, Delaware  19953
(302) 658-6697  FAX (302) 658-8418

## /

/s [1] - 75:18

## 1

1 [1] - 75:9
1,500 [1] - 8:18
10 [2] - 46:11, 47:23
10:00 [1] - 1:10
11 [9] - 20:11, 27:12, 32:18, 32:20, 37:21, 42:4, 49:4, 51:6
11:45 [1] - 63:15
12 [6] - 20:10, 42:4, 49:4, 51:6, 51:7, 74:5
13 [3] - 20:9, 49:15, 51:23
14 [1] - 25:14
15 [1] - 38:2
16 [2] - 5:15, 6:14
18 [2] - 17:9, 55:8

## 2

2 [1] - 64:8
2,500 [1] - 8:18
2,500/50 [3] - 38:2, 38:4, 38:9
20 [2] - 33:1, 46:14
20-minute [1] - 63:12
200 [6] - 8:13, 8:20, 8:23, 37:24, 38:22, 39:4
200/5 [1] - 38:8
2018 [1] - 20:14
2023 [3] - 1:10, 75:11, 75:14
22-1466 [1] - 3:6
22-1466-MN-LDH [1] - 1:5
2C [1] - 4:19

## 3

3 [1] - 32:20
30 [1] - 33:1
30(b)(6 [1] - 8:2
300,000 [1] - 20:17
31 [2] - 1:10, 75:11
31st [1] - 75:14

## 4

4 [1] - 5:7
400 [1] - 41:5

## 5

5 [3] - 5:11, 32:18, 49:12
50 [3] - 17:13, 17:15, 22:9
500 [6] - 8:16, 38:1, 39:5, 40:20, 71:13, 71:16
500-page [1] - 41:4
500/15 [4] - 39:11, 39:18, 40:7, 70:10

## 6

6 [1] - 55:7

## 7

7 [1] - 37:21
75 [1] - 75:9

## 8

844 [1] - 1:11

## 9

9 [1] - 32:18

## A

a.m [1] - 1:10
abide [2] - 62:23, 63:5
abiding [1] - 63:2
ability [4] - 7:6, 11:23, 16:16, 18:7
able [20] - 20:14, 21:2, 21:5, 21:22, 23:3, 23:15, 31:23, 34:11, 39:22, 41:16, 44:4, 45:18, 47:3, 48:1, 48:24, 51:11, 54:9, 57:3, 70:2, 70:20
above-captioned [1] - 75:11
accept [1] - 66:17
acceptable [5] - 14:12, 16:6, 16:8,

16:10, 36:17
accepted [1] - 39:6
access [6] - 11:23, 13:3, 13:19, 21:2, 30:5, 64:16
accessed [1] - 11:18
accessible [3] - 11:16, 12:12, 14:14
accessing [2] - 12:7, 13:11
accommodate [2] - 37:7, 37:16
accompany [1] - 6:23
accomplished [1] - 68:9
accordance [4] - 57:22, 58:24, 59:3, 60:10
accordingly [2] - 27:9, 67:23
account [1] - 20:16
accurate [1] - 75:10
accused [1] - 38:24
acrimony [1] - 40:21
action [1] - 3:5
actual [3] - 5:1, 10:24, 47:15
AD [38] - 3:5, 6:19, 9:18, 14:18, 15:7, 15:15, 15:17, 22:17, 25:3, 25:9, 25:11, 28:7, 31:9, 41:4, 43:10, 44:7, 50:7, 50:23, 55:18, 55:19, 56:6, 59:23, 60:5, 60:17, 62:17, 65:22, 66:21, 66:24, 67:9, 67:20, 68:14, 69:13, 72:14, 72:16, 72:18, 73:6, 73:8, 73:20
AD's [13] - 9:12, 31:15, 38:20, 43:11, 44:3, 45:4, 45:5, 53:7, 56:11, 65:2, 68:24, 69:10, 73:12
add [6] - 25:5, 41:9, 41:24, 49:13, 50:16, 59:8
addendum [2] - 68:9, 68:10
addition [2] - 26:13, 33:7
additional [7] - 50:16, 51:24, 52:16, 60:1, 64:13, 64:22, 67:16
address [2] - 8:22, 68:4
adequate [1] - 7:8
adequately [3] -

16:17, 48:24, 51:23
adjourned [1] - 74:4
admitted [1] - 50:9
adopt [3] - 11:4, 15:20, 73:12
adopted [1] - 6:7
adopts [1] - 68:2
advance [7] - 7:19, 26:16, 46:11, 47:19, 47:24, 71:21
advanced [1] - 71:1
agent [4] - 26:4, 26:10, 31:16, 31:22
aggregate [2] - 8:13, 38:1
ago [1] - 32:13
agree [11] - 13:23, 14:18, 15:13, 22:13, 29:10, 30:14, 39:23, 63:4, 67:9, 67:12, 67:15
agreeable [1] - 26:10
agreed [10] - 14:17, 32:13, 35:24, 49:24, 50:8, 67:14, 67:18, 69:21, 73:6, 73:10
agreeing [2] - 15:15, 36:3
agreement [3] - 20:19, 28:17, 28:19
agreements [1] - 41:2
agrees [1] - 14:3
ahead [8] - 3:22, 4:14, 4:20, 21:14, 21:16, 27:17, 49:16, 55:10
aid [1] - 15:11
Albright [1] - 59:6
algorithms [4] - 5:3, 5:20, 9:11, 65:14
alleviate [6] - 22:18, 36:13, 36:24, 47:7, 50:22, 67:21
alleviated [1] - 67:8
allow [11] - 10:13, 16:15, 35:24, 36:3, 46:19, 47:1, 49:24, 59:20, 67:15, 69:5, 72:16
allowed [8] - 20:2, 34:9, 34:10, 34:11, 35:7, 44:2, 46:3, 64:17
allowing [4] - 14:11, 39:14, 68:14, 72:6
alluded [2] - 32:21, 47:17
altered [4] - 72:8, 72:10, 72:21, 72:22

alternative [2] - 7:8, 32:2
alternatively [1] - 31:5
Amazon [3] - 5:16, 6:1, 6:8
ambiguity [3] - 28:14, 30:4, 30:9
amount [1] - 31:24
analysis [3] - 34:12, 48:21, 54:14
Anish [3] - 4:10, 36:16, 41:23
ANISH [1] - 2:5
annotate [1] - 15:9
answer [3] - 18:21, 18:24, 60:2
answering [1] - 61:23
anticipating [2] - 27:2, 27:5
anyway [2] - 8:1, 8:3
AP [12] - 11:13, 11:22, 11:24, 12:5, 12:10, 12:11, 12:16, 19:18, 34:1, 64:11, 64:15, 64:17
apologize [2] - 51:5, 57:11
apparent [1] - 39:16
APPEARANCES [2] - 1:17, 2:1
appendix [1] - 52:9
Apple [1] - 47:22
applicable [1] - 5:23
application [1] - 13:11
applies [1] - 10:23
apply [4] - 4:24, 13:4, 39:24, 61:21
appreciate [6] - 9:1, 9:3, 11:10, 16:11, 16:19, 43:7
appreciated [1] - 68:19
appropriate [8] - 8:23, 10:11, 10:13, 10:17, 11:3, 14:6, 23:20, 25:1
appropriately [3] - 10:8, 11:8, 65:6
April [1] - 5:11
archival [5] - 55:7, 57:18, 58:3, 59:17, 59:21
archive [2] - 55:18, 56:7
archived [2] - 56:2, 62:10
archives [1] - 58:10
archiving [2] - 55:21,

56:3
**area** [1] - 34:13
**Area** [10] - 11:17, 28:5, 28:13, 29:21, 30:6, 31:1, 31:3, 31:6, 68:23, 71:9
**arguably** [1] - 36:9
**arguing** [2] - 3:23, 4:2
**argument** [10] - 4:12, 5:13, 38:4, 39:10, 43:10, 53:12, 64:1, 64:10, 68:21, 69:8
**arguments** [5] - 50:17, 63:20, 68:20, 70:10, 74:1
**armed** [1] - 39:20
**arms** [1] - 19:9
**arrangements** [1] - 72:16
**ARSHT** [1] - 2:2
**artificially** [1] - 38:21
**aspersions** [1] - 43:9
**associated** [2] - 9:8, 58:20
**assume** [1] - 57:14
**attention** [1] - 63:21
**attorney** [7] - 56:16, 56:23, 58:6, 58:16, 60:6, 62:18
**attorney's** [3] - 17:7, 17:14, 21:11
**attorneys** [2] - 42:14, 56:18
**Austin** [2] - 37:8, 37:14
**Autonomous** [6] - 8:14, 17:3, 18:8, 25:7, 25:23, 51:11
**AUTONOMOUS** [1] - 1:3
**Autonomous'** [3] - 19:8, 21:19, 45:12
**available** [10] - 7:9, 7:13, 7:16, 22:21, 44:15, 53:20, 56:2, 57:9, 64:20, 71:4
**avoid** [7] - 29:5, 42:20, 43:1, 43:4, 43:17, 44:12, 49:20
**awful** [1] - 18:1

### B

**balance** [1] - 17:11
**basis** [1] - 41:3
**bates** [3] - 53:22, 53:23, 54:1
**Bay** [10] - 11:17, 28:5,

28:13, 29:21, 30:6, 31:1, 31:2, 31:6, 68:22, 71:9
**bear** [3] - 20:10, 38:15, 39:3
**become** [1] - 61:6
**becomes** [1] - 39:16
**BEFORE** [1] - 1:14
**begin** [1] - 54:8
**beginning** [1] - 46:6
**behalf** [9] - 3:12, 3:16, 3:23, 4:3, 4:6, 4:10, 16:21, 17:2, 40:5
**behind** [3] - 22:12, 43:14, 45:3
**believes** [1] - 49:5
**bells** [1] - 58:19
**best** [2] - 6:1, 70:14
**better** [1] - 68:7
**between** [9] - 3:3, 4:16, 15:5, 17:18, 35:19, 41:13, 71:15, 71:17, 72:21
**beyond** [2] - 39:2, 67:17
**big** [1] - 35:14
**bind** [1] - 67:18
**binder** [1] - 19:3
**bit** [9] - 11:20, 24:2, 28:7, 30:14, 38:20, 39:20, 42:8, 52:17, 67:13
**Blair** [3] - 3:17, 4:2, 37:6
**BLAIR** [1] - 1:22
**body** [1] - 50:14
**bold** [1] - 54:16
**bound** [1] - 73:11
**break** [1] - 63:12
**Brian** [1] - 4:9
**BRIAN** [1] - 2:3
**briefing** [1] - 17:10
**briefly** [3] - 51:8, 53:6, 55:8
**bring** [8] - 9:2, 33:15, 45:9, 47:4, 47:14, 50:7, 71:10, 71:12
**broad** [3] - 17:24, 66:7
**brought** [3] - 34:24, 47:21, 62:20
**bulk** [2] - 42:14, 44:2
**burden** [9] - 8:14, 9:22, 25:9, 25:10, 26:12, 30:21, 33:4, 36:24, 45:13
**burdened** [1] - 38:6
**burdens** [1] - 50:7
**burdensome** [5] -

24:2, 26:19, 51:15, 70:3, 71:11
**buried** [1] - 19:10
**business** [3] - 28:5, 30:16, 69:10
**BY** [9] - 1:18, 1:19, 1:21, 1:22, 1:22, 1:23, 2:3, 2:5, 2:6

### C

**C.A** [1] - 1:5
**calendar** [1] - 41:18
**California** [12] - 5:6, 6:7, 6:13, 13:9, 13:17, 22:1, 25:14, 25:24, 33:6, 35:17, 36:10, 70:4
**cannot** [1] - 15:7
**captioned** [1] - 75:11
**capture** [1] - 9:14
**care** [2] - 42:23, 61:8
**careful** [1] - 63:21
**carefully** [4] - 9:23, 63:19, 64:9, 65:17
**carry** [1] - 15:10
**carving** [2] - 46:23, 68:13
**case** [35] - 5:10, 5:16, 5:22, 5:24, 6:13, 12:17, 17:10, 20:12, 24:17, 24:23, 25:9, 32:12, 32:24, 34:3, 34:6, 35:4, 35:15, 36:2, 38:13, 45:13, 46:2, 46:3, 47:20, 47:21, 55:22, 57:5, 59:4, 61:6, 62:3, 62:7, 65:2, 65:5, 66:4, 66:12, 69:7
**cases** [2] - 7:22, 61:2
**cast** [1] - 43:9
**Castle** [1] - 75:2
**catch** [1] - 24:22
**category** [6] - 10:1, 10:3, 22:10, 23:24, 24:15, 57:21
**caught** [1] - 24:18
**caution** [1] - 6:4
**CCR** [1] - 75:19
**certain** [2] - 9:6, 48:22
**certainly** [21] - 6:18, 8:8, 12:9, 14:8, 14:16, 15:1, 21:5, 21:7, 26:6, 29:14, 29:21, 30:13, 35:19, 37:7, 37:16, 41:14, 48:7, 53:17, 64:4,

65:1, 68:6
**CERTIFICATE** [1] - 75:5
**certification** [1] - 41:8
**Certified** [1] - 75:7
**certify** [1] - 75:8
**cetera** [2] - 16:3, 61:14
**challenge** [1] - 10:16
**chance** [1] - 16:22
**characterize** [1] - 54:17
**choose** [2] - 71:14, 71:17
**choosing** [2] - 28:17, 28:22
**chosen** [1] - 29:13
**Chou** [1] - 20:11
**CHRISTINA** [1] - 1:22
**Christina** [2] - 3:17, 60:17
**circumstances** [2] - 39:9, 65:7
**citation** [1] - 6:12
**citations** [1] - 54:14
**cite** [1] - 54:1
**cited** [3] - 5:5, 5:16, 39:10
**civil** [1] - 3:5
**clarification** [4] - 28:19, 40:7, 40:24, 59:8
**clear** [4] - 13:6, 18:2, 18:24, 24:17
**client** [4] - 16:8, 31:7, 36:17, 44:1
**clients** [1] - 33:13
**close** [3] - 50:11, 56:21, 73:2
**closed** [1] - 55:22
**closely** [1] - 20:22
**closer** [3] - 26:10, 36:10, 69:1
**cloud** [1] - 24:20
**coast** [2] - 20:2, 26:11
**code** [214] - 4:18, 4:23, 5:1, 5:18, 6:3, 6:20, 6:21, 6:23, 7:9, 7:19, 8:4, 8:6, 8:11, 9:5, 9:6, 9:7, 9:8, 9:9, 10:24, 11:15, 13:7, 13:23, 14:1, 14:3, 14:4, 14:11, 14:19, 15:6, 15:7, 15:13, 15:14, 15:16, 15:17, 15:21, 15:23, 17:13, 17:16, 17:17, 17:19, 17:23,

18:3, 18:4, 18:9, 18:20, 19:20, 19:22, 20:1, 20:8, 20:13, 20:15, 20:21, 21:2, 21:8, 22:11, 22:15, 22:22, 23:22, 24:12, 24:15, 24:24, 25:19, 26:5, 26:9, 27:12, 27:24, 28:4, 28:12, 29:12, 29:16, 30:6, 30:12, 31:3, 31:10, 32:15, 32:17, 32:19, 32:22, 33:7, 33:23, 34:1, 34:7, 34:9, 34:21, 34:23, 34:24, 35:1, 35:5, 35:12, 35:16, 35:23, 36:4, 37:10, 37:11, 37:12, 37:13, 37:20, 38:7, 38:10, 39:3, 39:8, 39:12, 39:17, 40:9, 40:10, 40:12, 42:3, 42:7, 42:17, 43:11, 43:12, 44:15, 44:18, 46:24, 47:8, 47:11, 47:12, 47:15, 48:2, 48:3, 48:11, 49:14, 49:24, 50:3, 50:9, 50:14, 50:24, 51:10, 51:12, 52:21, 53:9, 53:10, 53:11, 53:21, 54:20, 54:21, 56:3, 56:7, 56:9, 56:13, 56:15, 56:17, 57:21, 57:24, 58:8, 58:9, 58:16, 58:18, 59:4, 59:10, 59:16, 59:19, 60:8, 60:9, 60:21, 61:1, 61:12, 61:13, 61:15, 61:19, 61:24, 62:4, 62:9, 62:19, 64:7, 65:10, 65:11, 65:21, 66:1, 66:15, 66:20, 66:23, 67:1, 67:2, 67:4, 67:11, 67:14, 67:16, 67:17, 68:1, 68:5, 68:10, 68:13, 68:17, 68:20, 69:1, 70:7, 70:12, 70:17, 70:18, 70:22, 70:23, 71:1, 71:2, 71:3, 71:6, 71:10, 71:11, 71:15, 71:16, 71:23, 71:24, 72:2, 72:3, 72:10, 72:22
**codes** [1] - 39:4
**comments** [1] - 9:8
**common** [2] - 18:9, 69:4

**company** [4] - 20:14,
47:21, 64:21, 65:9
**comparison** [1] - 25:1
**complaint** [1] - 45:18
**complete** [1] - 20:15
**completed** [1] - 38:18
**complexities** [1] -
38:13
**complexity** [1] - 38:24
**complicated** [1] - 62:1
**compromise** [10] -
8:18, 14:8, 14:16,
16:10, 22:22, 36:18,
47:6, 50:18, 51:20,
67:19
**compromises** [3] -
42:16, 43:3, 43:6
**computer** [25] - 7:9,
9:8, 9:9, 22:22,
23:12, 33:15, 34:21,
34:24, 35:1, 42:17,
44:15, 44:18, 48:4,
53:21, 67:2, 67:14,
70:18, 70:21, 71:3,
71:4, 71:6, 71:15,
72:3, 72:9, 72:22
**computers** [3] - 26:5,
26:9, 33:11
**concern** [20] - 7:14,
7:17, 7:21, 8:5,
9:13, 9:17, 14:24,
22:18, 23:14, 37:9,
42:22, 47:7, 47:16,
54:6, 56:17, 66:8,
66:22, 67:6, 67:21
**concerned** [1] - 52:12
**concerns** [5] - 18:5,
30:18, 50:23, 51:2,
69:10
**concluded** [1] - 27:24
**conclusion** [1] - 61:4
**conduct** [3] - 22:19,
39:14, 45:19
**conducting** [1] -
36:11
**confer** [7] - 13:22,
18:14, 18:23, 39:19,
41:14, 52:20, 68:3
**confidence** [1] - 73:2
**confident** [1] - 52:24
**confidential** [5] -
17:5, 21:9, 38:6,
44:24, 51:1
**confidentiality** [1] -
19:20
**confirm** [1] - 49:22
**confirmed** [3] - 24:10,
66:13, 66:24
**confusing** [1] - 52:17

**conjunction** [1] - 42:6
**consecutive** [2] -
37:23, 38:2
**considered** [5] -
10:22, 39:12, 63:19,
64:9, 65:1
**consistent** [1] - 59:12
**constitute** [1] - 60:21
**constructed** [1] -
12:15
**consultant** [1] - 58:6
**contain** [6] - 7:1,
53:10, 56:13, 56:15,
61:15, 61:19
**contained** [1] - 28:3
**contains** [4] - 53:8,
58:8, 60:8, 73:10
**contemplate** [1] -
45:4
**contends** [1] - 32:16
**contentions** [1] - 7:23
**CONTINUED** [1] - 2:1
**continuous** [2] -
17:13, 17:15
**controls** [1] - 21:13
**controversial** [2] -
46:17
**convenient** [1] - 69:14
**convince** [1] - 31:7
**convinced** [2] - 69:8,
69:13
**copies** [29] - 7:7, 7:11,
16:4, 18:6, 19:11,
20:15, 23:6, 26:20,
29:8, 40:12, 44:7,
50:9, 50:24, 53:19,
54:10, 55:7, 55:14,
56:3, 57:18, 58:3,
60:12, 60:14, 61:18,
62:8, 70:23, 71:5,
71:13, 71:15, 72:9
**copy** [3] - 54:2, 59:17,
72:15
**correct** [4] - 13:15,
28:15, 49:15, 60:13
**corrected** [1] - 30:8
**correctly** [3] - 9:13,
17:21, 42:3
**cost** [1] - 32:1
**Counsel** [2] - 1:24,
2:7
**counsel** [38] - 3:1,
6:19, 13:9, 17:21,
18:15, 22:17, 25:3,
26:11, 29:17, 29:20,
29:22, 29:23, 30:3,
30:19, 31:21, 35:12,
35:16, 36:8, 37:3,

41:2, 43:11, 43:16,
44:3, 44:6, 46:3,
47:2, 49:16, 50:20,
58:14, 62:2, 63:21,
67:9, 67:19, 69:2,
69:7, 69:20
**counsel's** [1] - 29:3
**count** [2] - 13:23, 16:1
**counting** [1] - 14:12
**countries** [1] - 44:24
**counts** [1] - 40:20
**County** [1] - 75:2
**couple** [3] - 16:24,
20:7, 42:8
**course** [6] - 16:8,
17:5, 22:20, 67:18,
69:23, 70:17
**COURT** [59] - 1:1, 3:1,
3:8, 3:10, 3:20, 4:4,
4:13, 6:9, 8:24,
11:9, 13:6, 13:21,
14:17, 14:24, 16:5,
16:11, 19:15, 21:16,
22:4, 25:3, 26:24,
27:21, 29:14, 30:13,
31:14, 32:3, 32:8,
33:20, 34:16, 34:22,
35:18, 36:23, 37:18,
40:14, 41:11, 42:1,
43:7, 44:5, 44:19,
46:21, 48:5, 49:2,
49:8, 50:4, 51:17,
52:14, 54:16, 55:4,
56:4, 57:11, 57:20,
58:14, 60:3, 61:8,
62:14, 63:10, 63:18,
73:19, 73:23
**court** [2] - 3:6, 63:14
**Court** [13] - 1:14, 5:23,
6:6, 20:4, 27:13,
60:15, 68:2, 68:8,
71:14, 72:5, 74:2,
74:3, 75:7
**Court's** [1] - 21:10
**cover** [1] - 12:10
**covered** [4] - 11:2,
12:8, 32:7, 72:24
**covering** [1] - 3:9
**created** [1] - 27:16
**cross** [2] - 45:19, 58:5
**cross-examination**
[1] - 45:19
**crown** [1] - 64:12
**curious** [1] - 36:5
**current** [1] - 53:12
**cut** [2] - 10:12, 54:2

## D

**D.C** [12] - 11:19, 12:3,
12:24, 13:17, 13:18,
21:3, 28:5, 29:4,
29:9, 31:11, 33:9,
69:3
**Dale** [1] - 3:9
**Dallas** [3] - 36:19,
37:8, 37:14
**data** [1] - 33:14
**day's** [1] - 71:20
**days** [3] - 25:15,
46:11, 47:23
**deal** [1] - 48:17
**dealing** [2] - 6:5,
68:11
**deals** [1] - 54:19
**dealt** [1] - 11:6
**debated** [1] - 61:14
**decide** [1] - 23:8
**declaration** [5] -
10:21, 11:2, 12:9,
65:8
**declarations** [5] -
11:11, 15:3, 20:22,
28:24, 29:7
**declares** [1] - 64:22
**default** [3] - 8:10,
26:3, 31:17
**defendant** [3] - 4:6,
12:23, 13:5
**Defendant** [2] - 1:8,
2:7
**defendant's** [1] -
32:23
**defended** [1] - 47:21
**define** [4] - 5:2, 5:19,
9:10, 65:13
**defined** [5] - 5:18,
6:23, 13:8, 40:13,
58:9
**definition** [49] - 4:17,
4:23, 5:5, 5:8, 5:12,
5:17, 6:7, 6:20,
6:21, 9:5, 9:14,
9:16, 10:6, 10:13,
10:17, 11:4, 11:15,
13:8, 13:14, 15:20,
17:18, 17:20, 17:24,
18:2, 19:22, 22:13,
37:10, 39:3, 39:8,
42:6, 47:8, 53:12,
58:18, 60:20, 61:11,
61:12, 64:7, 65:20,
65:24, 66:3, 66:7,
66:10, 66:23, 67:6,
67:22, 68:1, 68:2,

68:10, 70:24
**DELAWARE** [1] - 1:1
**Delaware** [8] - 1:12,
3:12, 4:7, 5:10,
7:22, 8:10, 26:3,
75:1
**delete** [1] - 41:7
**delineation** [1] - 17:18
**demonstrate** [1] -
8:21
**deponent** [2] - 42:21,
72:10
**depose** [5] - 45:4,
45:8, 47:5, 48:9,
49:1
**deposed** [1] - 44:11
**deposition** [32] - 7:10,
7:15, 8:6, 15:10,
15:11, 15:12, 16:17,
42:19, 44:6, 44:8,
46:14, 46:24, 47:4,
47:5, 47:24, 51:7,
55:24, 56:12, 56:19,
59:14, 60:6, 60:24,
61:21, 61:22, 62:20,
67:10, 68:5, 68:12,
71:7, 71:10, 71:21,
72:2
**depositions** [25] - 7:3,
7:8, 7:14, 7:18,
16:3, 26:17, 26:21,
42:4, 42:18, 43:3,
44:16, 44:17, 45:11,
45:12, 46:10, 47:9,
47:15, 48:7, 48:12,
59:11, 59:13, 66:23,
70:17, 71:4, 71:8
**DESAI** [38] - 2:5, 4:21,
7:4, 9:19, 11:21,
13:15, 14:7, 14:21,
15:19, 16:7, 22:24,
27:19, 28:10, 30:1,
30:23, 31:18, 32:6,
34:5, 34:20, 35:3,
36:15, 41:22, 42:12,
43:19, 44:9, 48:14,
49:6, 49:17, 52:2,
53:15, 55:2, 55:11,
56:22, 57:17, 58:1,
61:10, 63:4, 73:17
**Desai** [32] - 4:11, 4:12,
4:20, 16:19, 16:23,
19:14, 20:24, 22:5,
30:14, 32:5, 32:11,
33:10, 33:20, 35:22,
36:16, 40:16, 41:23,
44:20, 45:17, 46:22,
47:17, 48:5, 49:16,
50:7, 51:19, 53:5,

54:18, 55:10, 56:15, 57:12, 59:9, 61:8
**describe** [6] - 5:3, 5:20, 9:11, 65:14, 66:1, 66:15
**described** [1] - 32:19
**describing** [3] - 9:6, 22:11, 22:15
**descriptions** [1] - 54:5
**desia** [1] - 43:8
**design** [2] - 5:21, 65:15
**designate** [2] - 10:5, 11:8
**designated** [3] - 10:10, 62:4, 62:6
**designating** [4] - 10:18, 11:6, 13:13, 21:8
**designation** [3] - 10:16, 65:18, 65:22
**designations** [1] - 17:7
**designed** [1] - 33:3
**destroyed** [7] - 56:11, 57:6, 58:13, 60:14, 61:16, 62:12, 63:1
**detail** [6] - 5:3, 5:20, 9:11, 59:16, 65:14, 66:19
**detailed** [1] - 67:3
**details** [2] - 40:19, 64:18
**determine** [1] - 6:2
**developed** [1] - 64:22
**DEVICES** [1] - 1:3
**Devices** [2] - 17:3, 25:7
**Devices'** [1] - 18:8
**DiBenedetto** [2] - 1:19, 3:19
**difference** [3] - 35:14, 35:19, 72:21
**different** [9] - 10:19, 14:4, 25:19, 31:9, 31:12, 35:9, 36:2, 64:19, 67:13
**difficult** [4] - 19:8, 33:5, 33:11, 39:4
**digital** [1] - 29:8
**digitize** [1] - 50:2
**digitized** [3] - 14:13, 14:20, 52:22
**digitizing** [5] - 49:14, 49:21, 49:23, 52:11, 52:12
**diligently** [1] - 66:18

**direct** [1] - 71:16
**directed** [1] - 68:3
**directories** [1] - 20:17
**disagreement** [1] - 10:8
**disclosing** [1] - 7:15
**disclosure** [5] - 20:18, 43:5, 43:13, 43:15, 43:18
**disclosures** [1] - 38:17
**discovery** [4] - 18:10, 38:15, 38:19, 39:15
**discuss** [6] - 10:10, 36:10, 41:19, 42:21, 46:12, 59:15
**discussed** [6] - 41:12, 50:19, 70:1, 70:9, 70:19, 72:6
**discussion** [2] - 25:2, 36:13
**disposed** [1] - 57:2
**dispute** [31] - 4:16, 4:22, 11:5, 25:4, 28:3, 28:8, 36:13, 37:21, 41:16, 42:2, 42:11, 47:13, 49:5, 49:9, 49:12, 50:12, 51:21, 55:6, 56:6, 58:2, 61:11, 64:6, 67:24, 68:16, 68:18, 69:18, 70:5, 70:16, 72:23, 73:6, 73:13
**disputed** [1] - 5:14
**disputes** [6] - 3:4, 17:4, 27:4, 27:14, 49:11, 63:24
**distinction** [1] - 58:5
**distinguish** [1] - 11:1
**DISTRICT** [2] - 1:1, 1:1
**District** [4] - 1:14, 5:6, 6:6, 6:12
**doable** [1] - 53:18
**docket** [1] - 38:14
**document** [23] - 9:16, 9:20, 9:23, 10:9, 13:13, 17:16, 17:17, 17:19, 18:12, 22:8, 22:16, 22:20, 24:13, 25:13, 26:1, 46:14, 46:18, 62:19, 66:9, 66:14, 66:17, 72:17
**documents** [102] - 5:2, 9:6, 9:15, 10:3, 10:9, 10:14, 11:1, 11:14, 11:23, 13:20, 13:24, 14:4, 15:6, 15:8, 15:14, 15:18,

15:22, 15:24, 17:4, 17:6, 17:12, 17:22, 18:7, 18:9, 18:13, 18:18, 18:19, 18:21, 19:2, 19:6, 19:10, 19:21, 21:6, 21:9, 21:20, 22:3, 23:3, 23:8, 23:16, 23:24, 24:9, 24:11, 25:11, 25:16, 25:19, 25:21, 26:14, 26:15, 37:13, 39:2, 40:9, 40:13, 42:15, 42:21, 43:4, 43:21, 44:3, 44:13, 44:23, 45:1, 45:2, 45:8, 45:14, 45:24, 46:4, 46:9, 46:12, 46:24, 47:12, 47:17, 47:23, 48:2, 48:11, 48:23, 51:1, 51:7, 52:11, 53:10, 55:17, 56:18, 58:17, 59:22, 60:9, 65:12, 65:18, 65:19, 66:1, 66:15, 66:19, 67:5, 67:11, 67:13, 67:16, 68:5, 68:12, 68:14, 68:15, 70:13, 72:2, 72:7, 72:8
**done** [9] - 8:15, 12:21, 22:2, 27:20, 29:3, 35:20, 43:3, 61:3, 61:6
**doubt** [1] - 15:2
**downloaded** [1] - 33:24
**draft** [4] - 26:22, 53:16, 53:18, 54:12
**drive** [1] - 13:12
**driving** [1] - 22:12
**drop** [1] - 19:5
**during** [9] - 15:12, 18:14, 18:22, 50:19, 65:16, 67:3, 67:8, 70:1, 72:24

# E

**early** [2] - 38:15, 38:19
**east** [2] - 20:2, 26:11
**easy** [2] - 63:13, 73:3
**effectively** [2] - 25:20, 26:17
**effects** [1] - 66:22
**efforts** [1] - 50:6
**EGAN** [2] - 2:3, 4:8
**Egan** [1] - 4:9

**either** [11] - 25:13, 40:4, 43:9, 43:21, 49:2, 56:10, 58:9, 60:7, 62:10, 68:9, 71:17
**elect** [1] - 71:19
**electronic** [7] - 16:4, 18:10, 21:22, 22:19, 23:3, 49:18, 54:10
**electronically** [2] - 22:17, 49:14
**elements** [1] - 6:2
**eliminate** [1] - 7:10
**elsewhere** [1] - 28:18
**EMILY** [1] - 1:19
**Emily** [1] - 3:19
**employee** [4] - 20:14, 32:12, 32:16, 65:5
**employees** [10] - 20:12, 20:20, 21:5, 45:12, 47:5, 48:7, 64:14, 64:16, 64:18, 64:21
**enabled** [1] - 24:22
**encompass** [1] - 66:16
**encouraged** [1] - 69:23
**encrypt** [1] - 33:15
**encryption** [1] - 33:12
**end** [1] - 62:6
**End** [1] - 74:5
**enforce** [1] - 62:16
**engage** [1] - 63:22
**engaging** [1] - 69:11
**engineer** [2] - 24:18, 24:24
**engineering** [2] - 9:10, 65:13
**engineers** [2] - 21:2, 21:21
**ensure** [2] - 45:15, 72:13
**entire** [1] - 33:23
**entirely** [2] - 31:9, 31:12
**envision** [1] - 40:15
**envisions** [1] - 51:13
**equally** [1] - 13:4
**err** [1] - 6:4
**escrow** [6] - 26:4, 26:10, 31:15, 31:22, 35:10, 35:13
**escrow's** [1] - 35:4
**especially** [1] - 69:15
**ESQ** [9] - 1:18, 1:19, 1:21, 1:22, 1:22, 1:23, 2:3, 2:5, 2:6

**essentially** [6] - 4:17, 5:8, 33:24, 69:11, 71:12, 73:4
**estimation** [1] - 6:18
**et** [2] - 16:3, 61:14
**event** [1] - 72:12
**evidence** [2] - 45:16, 66:4
**exactly** [5] - 12:8, 15:22, 23:5, 23:13, 55:2
**examination** [2] - 45:19, 45:21
**example** [15] - 5:14, 7:3, 8:2, 22:7, 25:12, 29:6, 36:3, 41:4, 43:14, 45:7, 45:20, 53:24, 59:14, 61:21, 64:14
**examples** [1] - 7:5
**exceeds** [1] - 39:18
**exception** [1] - 15:24
**excerpts** [3] - 49:24, 59:10, 60:22
**exchanged** [1] - 38:16
**exclude** [1] - 70:12
**exclusively** [1] - 70:4
**exercise** [1] - 25:15
**exhibit** [14] - 5:7, 5:11, 5:15, 6:14, 17:9, 20:9, 20:10, 32:17, 32:20, 50:21, 51:6, 72:15, 72:18
**exhibits** [13] - 49:18, 49:21, 50:3, 50:16, 51:1, 52:23, 54:3, 56:14, 71:22, 71:23, 72:1, 72:3, 72:22
**existing** [1] - 51:22
**exists** [1] - 65:10
**expect** [2] - 40:18, 53:8
**expensive** [3] - 21:23, 26:6, 33:5
**experience** [1] - 29:11
**expert** [18] - 25:22, 26:16, 34:8, 35:6, 38:11, 48:20, 49:1, 51:9, 51:11, 53:7, 53:24, 54:5, 54:22, 56:14, 58:7, 60:5, 62:21
**experts** [15] - 15:9, 18:8, 19:9, 21:20, 25:12, 26:22, 34:10, 35:11, 45:5, 45:6, 45:8, 48:15, 49:1, 54:21
**explain** [1] - 54:1

explanation [1] - 54:13
explanations [1] - 54:4
exposes [1] - 51:14
expressed [3] - 9:17, 66:6, 66:21
extend [1] - 65:11
extended [1] - 69:12
extent [8] - 26:8, 43:1, 48:9, 48:21, 52:5, 54:4, 72:7, 73:8
extra [1] - 30:20
extremely [4] - 19:8, 21:18, 21:23, 26:19, 42:24, 45:24, 51:14
eyes [3] - 17:7, 17:14, 21:11

## F

faced [1] - 54:22
facilities [7] - 12:2, 12:3, 30:3, 31:20, 45:6, 48:8, 58:22
facility [9] - 12:21, 13:10, 20:3, 28:13, 29:1, 31:4, 35:23, 44:12, 68:23
fact [9] - 8:1, 8:10, 8:16, 9:21, 12:15, 24:21, 34:17, 39:1, 46:17
facts [2] - 65:7, 66:4
fair [3] - 17:17, 35:18, 41:18
fairly [1] - 5:23
faith [1] - 39:20
fall [8] - 11:14, 19:22, 24:14, 58:17, 65:20, 66:9, 67:5, 70:24
Fallon [1] - 17:11
falls [3] - 9:16, 22:10, 22:14
fantastic [1] - 3:20
far [6] - 11:13, 35:15, 38:4, 40:17, 41:11, 57:1
feelings [1] - 49:11
fell [1] - 57:21
felt [1] - 37:14
field [1] - 69:12
figure [3] - 23:21, 24:5, 31:22
file [2] - 59:15, 60:24
filed [1] - 24:23
files [6] - 5:1, 10:24, 14:11, 14:19, 15:23,

20:17
filing [2] - 49:14, 49:18
filings [1] - 20:7
final [1] - 57:9
fine [2] - 52:10, 63:6
first [14] - 3:13, 4:7, 4:15, 4:19, 10:12, 16:21, 17:3, 27:12, 42:10, 51:19, 54:7, 55:19, 68:18, 72:24
FISHBACK [1] - 1:23
Fishback [1] - 3:18
fit [1] - 10:3
fits [3] - 9:24, 13:13, 17:23
five [2] - 37:23, 72:23
flag [1] - 27:3
flagged [1] - 44:7
flexibility [1] - 46:20
floated [1] - 41:12
fly [4] - 20:3, 21:24, 25:13, 33:6
flying [2] - 13:9, 25:17
focusing [1] - 9:3
folks [8] - 12:2, 12:6, 46:8, 48:10, 52:19, 53:1, 63:11, 63:13
follow [4] - 6:17, 6:22, 16:24, 19:16
follow-on [2] - 6:17, 6:22
following [1] - 42:2
FOR [1] - 1:1
force [2] - 22:12, 45:5
forecasted [1] - 27:11
foregoing [2] - 52:18, 75:9
foreshadow [1] - 49:10
foreshadowed [1] - 44:7
forever [1] - 63:6
form [3] - 21:22, 23:3, 23:18
format [2] - 19:7, 21:20
formulas [2] - 9:9, 65:12
forth [2] - 50:20, 64:7
forward [1] - 40:22
founded [1] - 30:18
four [1] - 19:3
frankly [1] - 8:4
Fraunhofer [1] - 17:10
free [1] - 64:5
full [2] - 22:20, 32:19
fully [1] - 40:18

## G

general [1] - 61:7
generically [1] - 16:23
George [1] - 3:18
GEORGE [1] - 1:23
giant [1] - 59:5
given [11] - 13:2, 34:18, 38:10, 38:13, 38:24, 40:2, 43:5, 43:13, 51:22, 66:3, 69:7
goal [1] - 66:13
Google [1] - 47:22
Gotshal [1] - 4:11
GOTSHAL [1] - 2:5
granted [1] - 13:19
great [1] - 38:5
greater [1] - 37:15
group [13] - 11:13, 11:22, 11:24, 12:5, 12:10, 12:11, 12:13, 19:18, 34:1, 64:11, 64:15, 64:17, 64:19
group's [1] - 12:16
guess [9] - 7:14, 19:16, 28:8, 42:7, 49:9, 51:17, 58:15, 60:3, 63:6
gun [1] - 59:5
guys [1] - 56:20

## H

hampered [1] - 66:11
hand [1] - 75:14
handle [1] - 37:6
happy [3] - 33:9, 40:4, 60:2
hard [3] - 13:12, 24:5, 74:1
hardware [4] - 5:4, 5:21, 9:12, 65:15
HATCHER [1] - 1:14
Hatcher [1] - 3:2
headquartered [1] - 36:7
hear [9] - 4:19, 6:18, 28:8, 29:18, 40:4, 42:7, 42:10, 51:19, 55:8
heard [7] - 16:18, 17:21, 28:7, 59:24, 68:18, 69:8, 70:9
hearing [6] - 57:8, 66:12, 67:3, 67:8, 70:1, 72:24

heightened [3] - 4:24, 10:14, 10:23
help [3] - 26:22, 56:5, 63:23
helpful [6] - 11:11, 19:15, 46:16, 64:1, 65:3, 74:3
hereby [1] - 75:8
hereunto [1] - 75:13
highest [1] - 19:19
highly [11] - 6:5, 10:7, 17:5, 18:10, 21:9, 25:23, 42:15, 42:24, 43:22, 44:24, 51:1
history [1] - 9:9
hits [2] - 60:18
hold [2] - 26:4, 65:22
Holey's [1] - 33:22
HOLLEY [17] - 1:21, 17:1, 20:6, 21:17, 25:6, 32:10, 37:5, 40:5, 40:23, 41:21, 44:21, 47:10, 49:7, 50:5, 59:2, 60:13, 73:21
Holley [16] - 3:17, 4:2, 4:5, 16:20, 17:2, 22:6, 25:6, 27:11, 32:9, 36:23, 40:5, 44:19, 46:21, 48:6, 50:4, 51:21
Holley's [2] - 53:6, 53:12
home [1] - 69:12
honest [2] - 12:1, 12:4
honestly [1] - 17:24
Honor [42] - 3:8, 3:15, 4:1, 4:9, 4:21, 11:21, 12:1, 12:4, 12:23, 13:16, 14:7, 17:2, 17:3, 18:15, 20:6, 25:8, 26:7, 26:8, 27:20, 28:10, 30:1, 32:11, 32:21, 36:15, 37:5, 40:6, 41:22, 42:13, 43:19, 44:22, 47:10, 48:15, 49:6, 49:7, 49:17, 50:5, 51:5, 55:3, 60:16, 63:9, 73:18, 73:22
honor [2] - 40:18, 46:5
HONORABLE [1] - 1:14
honored [2] - 57:14, 57:15
hope [2] - 51:20, 72:11

hopes [1] - 27:14
house [1] - 30:3
Houston [1] - 36:19
hundred [2] - 41:6, 41:8
hundreds [2] - 19:5, 24:7

## I

Ian [2] - 4:11, 13:16
IAN [1] - 2:6
iCloud [1] - 20:16
idea [2] - 31:8, 54:9
identifiable [1] - 53:21
identified [2] - 23:22, 53:23
identifier [3] - 53:22, 53:23
identify [1] - 7:23
identifying [1] - 25:22
illogical [2] - 61:4, 61:5
images [1] - 50:8
implied [1] - 43:9
important [8] - 5:22, 14:10, 16:15, 19:10, 23:9, 24:18, 25:8, 72:21
imposed [1] - 44:1
IN [2] - 1:1, 75:13
in-house [1] - 30:3
inability [1] - 22:19
inadvertent [5] - 43:5, 43:13, 43:15, 43:18, 45:2
INC [1] - 1:7
inch [1] - 19:3
inclined [1] - 26:8
include [7] - 39:2, 40:9, 42:19, 52:6, 53:18, 56:17, 62:8
included [2] - 46:7, 52:23
includes [1] - 62:19
including [6] - 5:18, 11:10, 15:6, 34:1, 52:21, 64:23
inclusive [2] - 42:19, 75:9
inconsiste nt [1] - 59:24
increase [2] - 32:1, 33:4
increased [1] - 8:17
indicate [1] - 49:10
indicated [1] - 67:20
indicates [1] - 38:10

individuals [2] -
12:13, 44:10
indoor [1] - 9:8
indulge [1] - 51:4
information [4] -
12:11, 37:16, 39:21,
64:20
infringement [1] -
7:24
infringing [1] - 39:1
Ingram [5] - 3:9, 3:11,
75:7, 75:18, 75:19
initials [1] - 38:15
initiated [1] - 38:18
instance [1] - 33:14
instead [1] - 30:19
insufficient [1] -
57:12
insuring [1] - 56:9
intend [3] - 9:20, 11:7,
62:16
intended [2] - 12:18,
49:22
intending [1] - 52:3
intent [1] - 9:4
intention [5] - 28:11,
30:2, 30:7, 47:14,
58:21
intentions [1] - 50:23
internal [2] - 21:13,
33:14
interrupt [1] - 6:10
interrupted [1] - 32:3
intimate [1] - 59:16
involve [4] - 35:9,
35:10, 35:11, 35:13
involved [1] - 26:12
issue [12] - 10:19,
31:13, 40:21, 48:4,
48:16, 50:6, 55:12,
55:14, 56:20, 58:3,
58:7, 70:8
issues [2] - 12:19,
61:7
itself [4] - 12:10,
64:19, 67:18, 71:3

**J**

Jacobs [5] - 3:17, 4:2,
4:5, 37:6, 37:19
JACOBS [2] - 1:22,
4:1
jewels [1] - 64:12
job [2] - 10:4, 11:7
John [5] - 3:17, 4:2,
17:2, 25:6, 40:5
JOHN [1] - 1:21

joined [1] - 20:14
joining [2] - 3:11, 4:10
Judge [3] - 1:14,
17:11, 59:5
jump [1] - 4:15
jurisdiction [2] - 39:7,
69:5
justifies [1] - 30:20

**K**

Karen [1] - 3:15
KAREN [1] - 1:18
keep [10] - 57:18,
57:22, 58:24, 59:2,
59:17, 60:12, 60:24,
61:18, 62:17, 73:6
Keller [3] - 3:15, 3:20
KELLER [3] - 1:18,
1:18, 3:14
kept [8] - 57:5, 57:24,
58:10, 59:4, 61:17,
61:20, 62:13, 64:19
key [12] - 8:19, 15:4,
22:11, 22:14, 28:1,
28:6, 38:11, 38:21,
46:11, 46:23, 51:14,
54:17
kind [12] - 8:19, 15:4,
22:11, 22:14, 28:1,
28:6, 38:11, 38:21,
46:11, 46:23, 51:14,
54:17
King [1] - 1:11

**L**

language [5] - 28:14,
49:13, 52:1, 52:16,
68:4
large [4] - 9:14, 38:20,
47:21, 72:17
largely [4] - 40:1,
42:6, 45:11
larger [2] - 7:13, 7:16
last [12] - 13:17,
24:16, 26:13, 40:23,
45:10, 46:5, 49:4,
49:9, 49:11, 55:6,
56:22
latitude [1] - 20:20
Laura [1] - 3:2
LAURA [1] - 1:14
lawyer [2] - 20:4,
62:20
lawyers [13] - 3:13,
4:7, 12:23, 15:9,
18:8, 19:8, 21:19,
21:21, 21:24, 25:11,
42:23, 46:6, 58:22
layers [2] - 23:21,

30:24
lead [1] - 20:23
leading [1] - 4:12
least [6] - 10:12,
31:19, 35:21, 41:19,
61:19, 69:5
leave [2] - 65:24,
72:19
leeway [2] - 18:1, 18:6
left [3] - 32:11, 43:13,
45:2
legitimate [1] - 7:21
lengthy [3] - 22:8,
25:14, 50:19
less [4] - 17:13, 41:1,
64:20, 70:3
lesser [2] - 14:5, 20:5
letter [6] - 17:9, 27:15,
27:22, 27:24, 66:13,
66:24
letters [2] - 9:4, 15:17
level [6] - 14:3, 19:19,
19:23, 30:21, 67:12,
70:15
light [5] - 38:6, 39:10,
52:18, 69:15, 73:8
likely [3] - 43:15,
43:17, 44:11
limit [8] - 7:6, 8:8,
14:1, 16:1, 40:20,
41:4, 52:4, 67:17
limitation [2] - 37:23,
40:7
limitations [2] - 50:15,
54:23
limited [3] - 11:22,
11:24, 38:22
limits [6] - 8:9, 37:20,
51:3, 52:8, 70:6,
70:10
line [6] - 3:7, 3:11,
4:6, 63:11, 63:13,
63:14
lines [4] - 17:13,
17:15, 22:9, 58:6
list [1] - 7:13
literally [1] - 30:22
litigation [4] - 6:1,
20:5, 54:18, 69:12
lives [1] - 13:17
LLC [1] - 1:4
LLP [3] - 1:18, 2:2, 2:5
located [1] - 12:5
location [20] - 11:17,
12:20, 23:4, 23:12,
27:11, 27:23, 28:16,
28:24, 29:13, 29:17,
30:10, 30:17, 31:1,

35:2, 36:4, 37:3,
44:10, 68:17, 68:20,
69:14
locations [1] - 36:9
look [8] - 10:6, 10:7,
16:11, 19:16, 33:7,
46:13, 54:18, 62:14
looked [1] - 45:23
looking [1] - 23:8
looks [1] - 27:21
loosening [1] - 48:19
lower [1] - 38:22

**M**

Magistrate [1] - 17:11
main [1] - 37:9
maintain [1] - 55:13
maintained [1] - 60:23
major [1] - 42:12
MANGES [1] - 2:5
map [4] - 7:15, 45:24,
46:10, 47:4
maps [1] - 47:23
mark [6] - 9:20, 10:7,
15:8, 46:8, 47:3,
66:19
marked [5] - 17:14,
24:12, 56:18, 62:20,
72:18
marking [1] - 13:7
material [12] - 57:2,
57:6, 57:19, 58:8,
58:11, 62:3, 62:5,
62:9, 62:11, 63:7,
73:9
materials [12] - 6:5,
12:16, 13:2, 13:22,
17:15, 42:24, 43:22,
53:20, 55:22, 57:7,
62:7, 73:10
matter [5] - 53:16,
54:12, 63:23, 73:7,
75:11
McKook [1] - 36:21
McKool [2] - 1:21,
3:18
mean [16] - 12:20,
29:4, 29:22, 30:13,
30:15, 34:1, 34:18,
36:19, 37:1, 43:22,
49:10, 54:6, 55:23,
56:23, 57:2, 67:2
meaning [2] - 12:11,
60:19
means [5] - 9:8, 15:7,
29:20, 29:24, 47:11
mechanical [1] -

70:15
mechanisms [2] -
28:23, 30:11
meet [8] - 13:22,
18:14, 18:23, 38:5,
39:19, 41:13, 52:20,
68:3
meets [1] - 6:24
mentioned [1] - 32:12
mere [1] - 34:17
might [5] - 14:5, 22:7,
56:17, 67:20, 70:1
minimum [1] - 39:3
minutes [1] - 46:14
misappropriated [1] -
32:16
misappropriating [1]
- 20:13
mistaken [1] - 6:15
model [2] - 5:6, 6:7
modern [1] - 33:12
modify [1] - 39:24
moment [4] - 12:5,
26:3, 32:13, 51:5
monitored [1] - 20:22
Moore [3] - 4:11,
13:16, 20:1
MOORE [1] - 2:6
morning [5] - 3:1,
3:10, 3:14, 4:8, 4:13
MORRIS [1] - 2:2
Morris [1] - 4:9
most [4] - 10:22, 24:9,
57:7, 69:14
motion [1] - 56:12
motions [1] - 55:24
move [10] - 19:13,
20:16, 20:21, 25:4,
26:9, 27:10, 34:16,
37:19, 49:4, 55:6
moving [2] - 8:19,
68:16
MR [55] - 4:1, 4:8,
4:21, 7:4, 9:19,
11:21, 13:15, 14:7,
14:21, 15:19, 16:7,
17:1, 20:6, 21:17,
22:24, 25:6, 27:19,
28:10, 30:1, 30:23,
31:18, 32:6, 32:10,
34:5, 34:20, 35:3,
36:15, 37:5, 40:5,
40:23, 41:21, 41:22,
42:12, 43:19, 44:9,
44:21, 47:10, 48:14,
49:6, 49:7, 49:17,
50:5, 52:2, 53:15,
55:2, 55:11, 56:22,
57:17, 58:1, 59:2,

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697   FAX (302) 658-8418

60:13, 61:10, 63:4,
73:17, 73:21
**MS** [2] - 3:14, 60:16
**mutually** [1] - 26:10

## N

**narrow** [1] - 66:3
**narrower** [1] - 39:7
**Natu** [1] - 20:11
**nature** [6] - 14:15,
21:7, 38:7, 39:22,
51:15, 52:9
**nearly** [2] - 53:2, 66:9
**necessarily** [1] -
45:22
**necessary** [4] - 38:8,
38:12, 39:17, 52:1
**need** [20] - 7:11, 8:21,
25:24, 31:3, 31:23,
42:16, 44:13, 45:14,
45:16, 46:17, 48:10,
50:2, 54:2, 54:23,
55:13, 55:21, 56:3,
57:4, 62:24, 63:7
**needed** [1] - 38:10
**needs** [6] - 8:3, 8:15,
22:1, 28:23, 30:11,
39:21
**negate** [1] - 42:16
**negotiations** [1] -
8:17
**nervous** [1] - 35:22
**Netgear** [2] - 5:10,
6:13
**Networks** [1] - 5:9
**neutral** [11] - 32:15,
34:2, 34:8, 34:12,
34:18, 34:19, 34:22,
35:1, 35:6, 35:8
**never** [10] - 18:21,
18:24, 28:18, 30:5,
30:15, 30:22, 32:22,
33:1, 45:1, 47:20
**New** [11] - 11:18, 12:2,
12:24, 21:3, 28:5,
29:3, 29:9, 31:12,
33:10, 69:2, 75:2
**new** [1] - 33:3
**next** [4] - 25:4, 42:2,
70:5, 70:16
**nice** [1] - 18:16
**NICHOLS** [1] - 2:2
**Nichols** [1] - 4:9
**non** [28] - 13:23, 14:3,
14:10, 14:19, 15:6,
15:13, 15:17, 18:9,
18:20, 19:20, 20:18,

25:19, 40:9, 40:12,
46:24, 56:17, 58:16,
60:8, 62:19, 67:4,
67:10, 67:16, 68:5,
68:13, 70:12, 70:23,
71:24, 72:22
**non-code** [2] - 13:23,
14:3
**non-disclosure** [1] -
20:18
**Northern** [3] - 5:6,
6:6, 6:12
**Notary** [1] - 75:8
**note** [9] - 51:8, 64:14,
64:18, 65:2, 65:16,
65:23, 66:21, 69:3,
72:21
**noted** [1] - 67:11
**notes** [2] - 37:24,
75:10
**notice** [4] - 7:19,
25:14, 33:6, 71:20
**noting** [1] - 5:23
**notion** [1] - 22:6
**number** [13] - 3:4, 3:5,
18:18, 22:2, 38:12,
39:6, 49:12, 55:7,
64:6, 68:1, 68:16,
70:6, 70:12, 71:20,
72:23, 73:4, 73:14
**numbers** [2] - 54:1,
54:24
**numerous** [1] - 44:24

## O

**o'clock** [1] - 74:5
**obstructive** [1] - 53:4
**obviously** [6] - 35:9,
35:14, 36:20, 42:23,
54:7, 56:1
**occur** [2] - 25:17,
43:16
**occurrence** [1] -
72:12
**OF** [2] - 1:1, 75:5
**offer** [2] - 14:16, 40:15
**offered** [7] - 8:18,
42:15, 42:17, 59:20,
67:15, 70:11, 71:3
**offering** [4] - 8:13,
8:16, 14:8, 71:10
**office** [22] - 3:19,
26:18, 29:2, 29:3,
29:19, 29:21, 29:22,
30:6, 30:8, 31:5,
31:6, 32:23, 33:9,
33:10, 33:16, 34:23,

36:18, 59:3, 59:6,
69:6, 69:10, 69:20
**offices** [2] - 29:23,
33:8, 37:8, 69:2
**often** [5] - 27:13, 39:6,
41:2, 46:13, 50:14
**old** [1] - 23:23
**once** [5] - 23:6, 27:6,
35:20, 36:1, 57:5
**Ondrick** [2] - 3:17,
60:17
**ONDRICK** [2] - 1:22,
60:16
**one** [37] - 5:15, 12:19,
13:10, 17:4, 18:6,
19:4, 19:16, 20:12,
22:23, 24:3, 24:16,
25:18, 26:13, 27:1,
27:16, 30:24, 33:3,
34:20, 35:21, 37:6,
38:23, 40:23, 43:16,
46:5, 50:11, 51:5,
52:19, 55:15, 58:21,
59:8, 64:6, 65:4,
67:7, 68:1, 71:19,
73:3
**onerous** [4] - 18:11,
23:1, 34:14, 51:15
**ones** [2] - 23:9, 23:22
**opening** [1] - 27:22
**opined** [1] - 38:11
**opportunity** [2] -
39:14, 40:2
**opposing** [2] - 41:2,
69:13
**option** [3] - 25:13,
31:19, 36:11
**options** [1] - 71:5
**order** [26] - 3:5, 4:18,
5:7, 5:9, 5:14,
12:18, 14:22, 21:11,
28:2, 38:17, 39:13,
40:1, 43:23, 45:15,
53:13, 56:8, 57:13,
59:1, 60:11, 60:15,
62:24, 63:3, 63:6,
64:8, 68:11, 73:12
**order's** [1] - 57:23
**ordered** [1] - 59:6
**orders** [6] - 6:15,
6:16, 7:1, 7:5,
29:15, 69:4
**originally** [1] - 38:1
**otherwise** [7] - 5:3,
5:19, 9:11, 58:17,
65:14, 69:21, 70:24
**ought** [2] - 38:23,
67:24
**outlined** [2] - 28:24,

29:6
**outlines** [1] - 26:22
**outside** [17] - 11:17,
13:8, 29:3, 29:16,
29:23, 30:2, 31:21,
34:10, 35:11, 35:12,
35:23, 36:8, 37:3,
64:14, 69:2, 69:7,
69:20
**overly** [1] - 16:16
**overseas** [1] - 44:23
**overstated** [1] - 23:15
**own** [2] - 8:6, 44:1

## P

**p.m** [1] - 74:5
**page** [14] - 8:8, 8:9,
13:24, 27:23, 32:18,
50:15, 51:2, 51:24,
52:3, 52:4, 52:8,
52:13, 53:2, 67:17
**Pages** [1] - 75:9
**pages** [15] - 8:13,
8:16, 8:20, 19:6,
24:7, 37:24, 38:22,
39:4, 41:1, 41:3,
41:5, 41:6, 41:9,
71:13, 71:16
**paper** [7] - 7:6, 7:11,
19:7, 21:20, 23:6,
26:20, 60:24
**papers** [7] - 38:3,
39:11, 50:10, 52:7,
56:12, 57:7, 58:23
**paragraph** [12] - 4:19,
27:12, 32:18, 32:20,
37:21, 42:4, 49:4,
49:15, 51:6, 51:22,
55:8, 64:8
**paragraphs** [1] -
52:18
**Parity** [1] - 5:9
**part** [2] - 38:9, 56:23
**particularized** [1] -
39:22
**parties** [31] - 3:3,
4:16, 6:24, 7:22,
19:24, 27:3, 27:14,
34:11, 35:7, 36:8,
36:10, 39:10, 39:19,
39:23, 40:19, 41:13,
47:13, 50:8, 51:23,
55:9, 68:3, 68:6,
69:22, 69:23, 70:13,
71:17, 71:24, 72:13,
72:20, 73:1, 73:16
**parties'** [4] - 54:21,

55:5, 63:19, 70:10
**partners** [2] - 32:24,
46:7
**party** [18] - 29:13,
30:19, 31:21, 31:22,
32:14, 34:2, 35:4,
35:10, 35:13, 40:4,
49:3, 53:3, 69:21,
70:20, 71:19, 72:4,
72:6, 72:14
**party's** [5] - 29:16,
29:23, 30:19, 63:24,
69:7
**past** [3] - 19:4, 40:24,
59:13
**paste** [1] - 54:2
**path** [2] - 10:11, 11:3
**paths** [1] - 59:15
**peak** [1] - 38:16
**people** [2] - 11:23,
33:15
**perceived** [1] - 38:24
**perhaps** [7] - 21:4,
28:14, 43:23, 50:18,
51:21, 52:19, 52:20
**period** [1] - 25:14
**permitted** [4] - 16:2,
16:4, 70:21, 70:22
**perpetuity** [2] - 60:11,
62:13
**person** [1] - 61:23
**personal** [1] - 20:16
**perspective** [1] - 9:17
**phrase** [1] - 18:13
**pick** [2] - 32:10, 69:14
**piece** [1] - 72:17
**place** [19] - 28:21,
37:1, 44:8, 44:12,
44:17, 48:8, 53:17,
54:19, 64:13, 68:22,
69:1, 69:6, 69:9,
69:16, 69:19, 70:2,
71:8, 71:11
**plain** [1] - 23:23
**plaintiff** [23] - 3:16,
3:24, 4:3, 5:16,
13:5, 16:15, 16:21,
17:2, 38:1, 38:5,
38:9, 39:14, 39:18,
39:20, 39:23, 40:6,
47:2, 48:20, 50:2,
55:13, 58:15, 66:6,
66:10
**Plaintiff** [2] - 1:5, 1:24
**plaintiff's** [4] - 48:10,
65:24, 66:2, 66:8
**plaintiffs** [2] - 3:12,
5:13
**plan** [1] - 27:8

**planning** [1] - 24:14
**platform** [1] - 64:24
**plausible** [1] - 57:3
**pleading** [1] - 55:24
**pleadings** [12] - 25:22, 50:1, 50:10, 50:14, 50:22, 52:7, 52:23, 56:11, 57:7, 58:4, 59:10, 59:12
**PO** [1] - 6:7
**point** [36] - 5:24, 6:11, 11:12, 12:7, 14:12, 24:3, 24:16, 24:21, 25:1, 26:2, 30:9, 33:21, 33:22, 34:17, 40:6, 40:23, 41:14, 41:15, 41:18, 42:13, 45:10, 46:5, 48:6, 48:13, 49:19, 52:4, 52:10, 52:15, 53:7, 55:9, 56:14, 59:8, 61:9, 63:8, 63:15, 65:2
**pointed** [1] - 6:6
**pointing** [1] - 6:14
**points** [5] - 19:14, 31:16, 34:3, 35:22, 51:18
**police** [2] - 56:24, 57:4
**policies** [3] - 20:18, 24:20, 24:22
**policy** [1] - 62:15
**poor** [1] - 20:1
**portion** [3] - 22:9, 22:14, 22:15
**portions** [5] - 7:24, 34:6, 53:9, 54:3, 59:21
**position** [9] - 28:20, 37:4, 38:4, 41:20, 61:16, 63:7, 63:24, 68:7, 71:14
**positions** [1] - 55:5
**possibility** [1] - 46:22
**possible** [2] - 21:1, 50:10
**possibly** [1] - 20:21
**posture** [1] - 28:7
**potential** [1] - 10:15
**potentially** [3] - 48:10, 62:8
**practical** [1] - 16:13
**practice** [2] - 17:6, 33:2
**precedent** [1] - 5:5
**preference** [4] - 31:2, 31:19, 68:22, 68:24

**prejudicial** [4] - 18:11, 21:19, 25:23, 46:1
**preparation** [1] - 15:10
**prepare** [1] - 16:17
**prepared** [4] - 8:3, 45:22, 59:12
**preparing** [4] - 13:7, 26:16, 26:21
**presence** [2] - 36:20, 36:22
**present** [1] - 54:15
**presented** [1] - 44:18
**presenting** [1] - 16:21
**presents** [1] - 29:4
**presumably** [1] - 71:8
**presume** [1] - 33:24, 45:7
**pretty** [5] - 23:1, 30:18, 38:14, 38:19, 50:11
**previously** [4] - 35:24, 40:11, 70:9, 72:5
**primarily** [1] - 12:24
**primary** [4] - 4:22, 7:17, 42:22, 49:19
**print** [5] - 14:11, 23:9, 23:10, 35:6, 64:17
**printed** [12] - 8:11, 14:1, 16:1, 18:6, 19:11, 39:17, 70:7, 70:21, 70:23, 71:10, 72:9, 72:22
**printing** [7] - 8:9, 22:21, 34:13, 35:11, 37:20, 37:23, 67:16
**printouts** [1] - 14:23, 42:14, 42:20, 43:21, 44:3, 47:14, 48:22, 53:22, 54:8
**prints** [1] - 41:5
**problem** [2] - 54:15, 57:17
**procedural** [1] - 28:6
**procedure** [1] - 70:14
**proceed** [2] - 51:18, 67:24
**process** [5] - 10:1, 10:15, 18:15, 18:23, 25:17
**produce** [5] - 23:17, 28:12, 28:16, 28:21, 29:9
**produced** [7] - 22:17, 29:12, 29:16, 30:16, 32:22, 53:20, 65:21
**producing** [9] - 9:24, 10:2, 24:10, 24:14,

29:13, 29:16, 69:6, 69:21, 72:4
**product** [12] - 56:16, 56:23, 57:9, 58:6, 58:7, 58:16, 59:7, 60:7, 62:18, 62:22, 73:9
**production** [1] - 54:24
**productions** [1] - 56:10
**progressed** [1] - 8:17
**proper** [3] - 40:10, 45:19, 48:3
**proposal** [15] - 9:21, 29:8, 34:15, 41:12, 45:3, 46:10, 46:19, 49:13, 51:16, 55:15, 56:11, 58:4, 60:19, 62:10, 73:13
**propose** [4] - 19:21, 44:14, 46:1, 63:11
**proposed** [17] - 3:4, 6:8, 7:7, 7:12, 11:15, 13:8, 13:24, 17:20, 31:4, 38:1, 39:8, 43:2, 52:17, 65:24, 66:22, 67:6, 67:22
**proposes** [3] - 9:7, 13:14, 38:2
**proposing** [6] - 19:1, 19:5, 31:10, 34:14, 35:15, 44:2
**prosecution** [1] - 66:11
**protect** [5] - 9:5, 43:4, 64:13, 64:24, 66:14
**protected** [7] - 17:7, 57:1, 60:14, 73:7, 73:9, 73:10
**protecting** [1] - 12:16
**protection** [8] - 4:24, 10:14, 19:19, 20:5, 21:13, 37:15, 57:16, 65:11
**protections** [13] - 12:22, 14:5, 14:9, 15:2, 15:21, 29:6, 31:23, 39:13, 49:20, 51:22, 53:17, 62:23, 69:16
**protective** [32] - 4:3, 4:18, 5:7, 5:9, 5:14, 6:15, 6:16, 7:1, 7:5, 12:17, 14:22, 21:11, 28:2, 29:15, 39:13, 40:1, 43:23, 53:13, 56:8, 57:13, 57:23, 59:1, 60:10, 60:15,

62:23, 63:2, 63:6, 64:8, 68:11, 69:4, 71:18, 73:11
**protects** [2] - 16:14, 39:11
**prove** [2] - 25:9, 45:13
**provide** [21] - 12:18, 12:22, 19:1, 21:12, 21:14, 28:22, 29:5, 30:10, 31:23, 32:14, 33:5, 41:7, 50:13, 50:24, 54:13, 54:14, 65:10, 69:19, 71:5, 72:18
**provided** [6] - 13:22, 34:2, 34:7, 34:17, 35:5, 37:15
**provision** [2] - 49:22, 69:18
**provisions** [4] - 7:2, 53:13, 56:8, 59:1
**proviso** [1] - 68:2
**public** [1] - 20:7
**Public** [1] - 75:8
**pull** [1] - 46:18
**purpose** [3] - 22:12, 49:20, 54:11
**purposes** [2] - 35:5, 46:23
**put** [10] - 7:22, 9:22, 14:14, 19:2, 50:21, 52:8, 54:9, 59:6, 59:7, 64:12
**putting** [1] - 16:12

## Q

**qualified** [1] - 6:1
**questions** [12] - 16:24, 19:12, 34:12, 35:8, 42:8, 48:2, 60:1, 61:23, 64:4, 73:15, 73:17, 73:21
**quite** [2] - 30:22, 32:23
**quote** [4] - 9:5, 14:10, 32:15, 32:18
**quotes** [1] - 5:22

## R

**raise** [1] - 41:19
**raised** [5] - 22:6, 35:20, 45:18, 46:6, 48:6
**rather** [2] - 66:17, 70:3
**reached** [1] - 47:6

**reaction** [1] - 36:6
**read** [2] - 18:12, 29:21
**ready** [1] - 64:3
**reaffirmed** [1] - 65:17
**real** [2] - 6:19, 56:20
**realizes** [1] - 41:5
**really** [17] - 7:21, 8:12, 8:13, 8:15, 24:17, 25:1, 45:20, 46:15, 47:13, 50:1, 51:21, 52:1, 52:4, 54:12, 55:12, 55:21, 63:22
**realm** [1] - 24:7
**reason** [10] - 6:4, 21:10, 33:18, 40:10, 44:14, 50:1, 55:13, 61:17, 62:12, 72:5
**reasonable** [5] - 40:17, 43:2, 55:17, 67:6, 71:20
**reasonably** [1] - 39:17
**reasons** [4] - 67:3, 70:8, 70:19, 73:12
**receiving** [4] - 70:20, 71:19, 71:23, 72:6
**receptive** [1] - 31:8
**recess** [2] - 27:6, 63:17
**record** [2] - 64:10, 75:9
**redact** [5] - 23:1, 24:1, 55:16, 55:17, 56:24
**redacted** [6] - 22:16, 23:18, 58:11, 58:12, 61:20, 62:11
**redacting** [1] - 55:20
**refer** [3] - 53:10, 53:24, 54:23
**reference** [1] - 48:15
**regard** [1] - 37:9
**regarding** [4] - 3:3, 49:13, 67:21, 68:21
**regular** [1] - 19:24
**relate** [1] - 6:3
**related** [1] - 19:18
**relates** [2] - 47:8, 70:18
**relevant** [1] - 7:23
**remainder** [1] - 27:4
**remains** [1] - 37:9
**remind** [1] - 69:22
**remote** [1] - 13:11
**remotely** [3] - 13:3, 13:20, 14:14
**report** [8] - 53:7, 53:16, 53:18, 53:24, 54:4, 54:5, 54:10, 54:13

27 of 30 sheets

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697    FAX (302) 658-8418

Page 8 to 8 of 11

06/05/2023 01:55:23 AM

**Reporter** [1] - 75:7
**reporter** [2] - 3:6, 63:14
**REPORTER** [2] - 3:8, 75:5
**reports** [14] - 25:22, 26:16, 26:21, 26:23, 48:20, 49:1, 51:9, 51:12, 54:22, 56:14, 59:11, 59:13, 60:6, 61:14
**representation** [2] - 65:23, 66:18
**reproduced** [1] - 28:18
**request** [3] - 38:7, 38:20, 38:22
**requesting** [1] - 42:19
**require** [3] - 20:4, 26:6, 57:13
**required** [2] - 38:17, 58:19
**requirement** [1] - 30:16
**requirements** [1] - 57:23
**resides** [1] - 64:15
**resolve** [1] - 27:14
**respect** [4] - 7:2, 25:10, 67:24, 73:13
**respond** [7] - 16:22, 33:21, 34:3, 40:3, 53:6, 61:9
**responded** [2] - 65:5, 66:12
**responding** [1] - 25:20
**response** [7] - 31:15, 32:9, 40:3, 44:20, 48:12, 51:19, 53:11
**responsibility** [1] - 33:17
**responsible** [1] - 43:17
**restricted** [1] - 16:16
**restriction** [6] - 8:7, 8:8, 14:23, 30:21, 43:24
**restrictions** [9] - 6:17, 6:22, 8:9, 9:2, 13:4, 48:19, 63:2, 63:5, 73:11
**restrictive** [1] - 7:2
**result** [1] - 21:14
**retain** [4] - 62:22, 71:24, 72:14, 73:9
**retained** [1] - 72:4
**retention** [1] - 71:22

**returned** [1] - 56:10
**reveal** [2] - 45:2, 47:18
**revealing** [1] - 42:20
**review** [34] - 9:23, 12:20, 13:1, 13:3, 13:20, 17:22, 19:7, 20:2, 21:20, 21:22, 22:21, 23:3, 23:11, 23:21, 25:18, 27:12, 28:2, 28:4, 35:6, 35:16, 36:11, 36:24, 37:7, 37:12, 47:3, 65:17, 68:18, 68:20, 68:22, 69:1, 69:5, 69:9, 69:19, 69:24
**reviewing** [1] - 35:12
**risk** [2] - 42:16, 71:12
**risks** [1] - 29:4
**risky** [1] - 43:12
**road** [6] - 6:24, 7:15, 45:23, 46:9, 47:3, 47:23
**rolling** [1] - 41:3
**room** [2] - 50:18, 61:1
**rub** [1] - 6:19
**rubber** [1] - 6:24
**ruling** [8] - 27:8, 37:2, 40:2, 63:15, 64:3, 69:22, 70:8, 73:16
**run** [1] - 61:2

## S

**safe** [2] - 59:5, 59:7
**saw** [2] - 10:21, 13:21
**scheduling** [1] - 38:17
**schematics** [3] - 5:19, 9:10, 65:13
**scope** [1] - 37:10
**seal** [1] - 75:14
**search** [8] - 18:9, 21:5, 22:1, 23:4, 23:15, 23:17, 25:12, 26:1
**searches** [1] - 22:20
**searching** [5] - 22:18, 23:7, 25:16, 26:14, 26:15
**second** [3] - 20:10, 34:20, 49:9
**section** [1] - 68:11
**secure** [1] - 33:17
**security** [9] - 10:23, 12:18, 19:23, 24:21, 28:23, 30:11, 59:19, 64:13, 64:23
**see** [23] - 6:16, 7:21,

8:4, 9:24, 14:22, 16:23, 17:23, 18:12, 21:10, 25:5, 32:2, 33:18, 34:9, 36:17, 38:14, 41:11, 41:19, 50:12, 55:12, 55:21, 56:2, 56:11, 61:20
**seek** [1] - 39:2
**seem** [7] - 6:17, 57:3, 57:4, 62:2, 66:16, 71:11, 72:20
**select** [1] - 12:13
**send** [1] - 58:22
**sense** [2] - 22:23, 63:16
**sensitive** [3] - 10:7, 15:1, 42:15, 42:24, 43:22
**sensitivity** [1] - 66:5
**separate** [1] - 64:19
**serially** [1] - 18:22
**server** [1] - 13:12
**servers** [4] - 11:16, 14:15, 21:3, 21:6
**serving** [1] - 48:20
**session** [1] - 16:18
**set** [5] - 7:16, 10:9, 47:3, 64:7, 75:13
**setup** [1] - 35:9
**shall** [1] - 52:21
**Shaw** [1] - 3:15
**SHAW** [1] - 1:18
**ship** [1] - 58:21
**shipped** [2] - 13:12, 31:11
**short** [3] - 27:6, 40:3, 52:20
**Short** [1] - 63:17
**shorter** [1] - 41:1
**show** [6] - 8:14, 20:19, 38:6, 44:6, 45:14, 46:18
**showing** [1] - 19:17
**shows** [1] - 64:11
**side** [1] - 6:4
**sift** [2] - 23:6, 26:20
**significant** [4] - 18:5, 26:15, 31:24, 36:22
**siloed** [2] - 12:10, 12:13
**similar** [2] - 5:12, 5:17
**similarly** [1] - 7:2
**simply** [3] - 29:10, 45:23, 62:2
**sincerity** [1] - 40:16
**single** [1] - 24:13
**Sirius** [1] - 17:10
**situation** [3] - 12:14,

48:23, 55:19
**six** [1] - 73:4
**slightly** [1] - 70:3
**small** [3] - 19:1, 22:14, 25:21
**Smith** [2] - 3:18, 36:21
**SMITH** [1] - 1:21
**snippets** [6] - 50:13, 50:21, 52:6, 52:12, 52:22, 54:24
**software** [7] - 5:4, 5:21, 9:12, 12:15, 19:18, 64:24, 65:15
**solution** [1] - 16:13
**sometimes** [1] - 39:7
**somewhat** [2] - 36:9, 38:20
**somewhere** [1] - 34:24
**sooner** [1] - 41:18
**sorry** [4] - 6:10, 14:18, 21:15, 27:19
**sort** [4] - 24:4, 43:14, 47:1, 47:6
**sounded** [1] - 51:20
**sounds** [1] - 53:1
**source** [15] - 4:18, 4:23, 5:1, 5:18, 6:3, 6:20, 6:23, 7:9, 7:19, 8:4, 8:6, 8:10, 9:5, 9:7, 10:24, 11:15, 13:7, 14:1, 14:4, 14:10, 14:19, 15:6, 15:7, 15:14, 15:16, 15:17, 15:21, 15:23, 17:16, 17:19, 17:23, 18:3, 18:4, 18:20, 19:22, 19:24, 20:8, 20:13, 20:15, 21:8, 22:22, 23:22, 24:12, 24:15, 25:19, 26:5, 26:9, 27:11, 27:23, 28:4, 28:12, 29:12, 29:15, 30:5, 30:12, 31:10, 32:15, 32:19, 32:22, 33:23, 34:1, 34:21, 34:23, 35:1, 35:5, 37:10, 37:11, 37:12, 37:13, 37:20, 38:7, 39:3, 39:8, 39:12, 40:9, 40:10, 40:12, 42:3, 42:7, 42:17, 43:11, 43:12, 44:15, 44:18, 47:8, 47:11, 47:15, 48:2, 48:3, 48:11, 49:14, 49:24, 50:3, 50:9, 50:13, 50:24, 51:10, 51:12, 52:21,

53:9, 53:10, 53:11, 53:21, 54:20, 54:21, 56:3, 56:7, 56:9, 56:13, 56:15, 57:21, 57:24, 58:8, 58:9, 58:18, 59:3, 59:10, 59:15, 60:8, 60:9, 60:21, 61:1, 61:12, 61:13, 61:15, 61:19, 61:24, 62:4, 62:9, 64:7, 65:10, 65:21, 66:23, 67:1, 67:14, 67:17, 68:1, 68:10, 68:17, 68:20, 69:1, 70:7, 70:17, 70:18, 70:21, 71:1, 71:2, 71:6, 71:15, 71:16, 71:23, 71:24, 72:2, 72:19
**space** [1] - 50:17
**speaking** [3] - 8:4, 19:4, 61:23
**special** [3] - 64:23, 69:15
**specialized** [2] - 12:15, 38:10
**specific** [1] - 42:20
**specifically** [3] - 66:8, 68:13, 68:23
**specifications** [1] - 5:19
**specs** [2] - 9:10, 65:13
**spend** [1] - 23:7
**spent** [1] - 26:15
**spot** [1] - 16:12
**squeeze** [2] - 52:3, 52:7
**squeezed** [1] - 51:3
**stab** [1] - 55:20
**Stacy** [4] - 3:9, 75:7, 75:18, 75:19
**stage** [1] - 38:19
**standard** [2] - 26:4, 31:17
**start** [2] - 4:15, 8:23
**started** [1] - 8:16
**starting** [3] - 3:12, 4:7, 8:12
**starts** [1] - 46:15
**State** [1] - 75:1
**state** [1] - 43:23
**STATES** [1] - 1:1
**States** [1] - 1:14
**stealing** [2] - 24:19, 24:24
**stenographic** [1] - 75:10

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697    FAX (302) 658-8418

06/05/2023 01:55:23 AM

Page 9 to 9 of 11

28 of 30 sheets

**step** [2] - 9:1, 23:2
**steps** [1] - 64:23
**still** [3] - 26:6, 52:1
**stipulated** [1] - 5:9
**stop** [1] - 42:9
**storage** [1] - 58:22
**stored** [1] - 11:16
**story** [1] - 59:24
**strategy** [1] - 69:12
**Street** [1] - 1:11
**strict** [1] - 54:20
**strike** [1] - 59:21
**strikes** [1] - 66:3
**struck** [1] - 17:11
**structure** [4] - 5:4,
5:20, 9:12, 65:15
**stuff** [1] - 24:19
**subject** [1] - 63:23
**submissions** [3] -
63:20, 64:10, 74:2
**submitted** [3] - 15:4,
27:15, 27:22
**subsequent** [1] - 28:1
**subset** [3] - 11:24,
19:1, 25:21
**sudden** [1] - 60:22
**sued** [1] - 20:12
**sufficient** [3] - 38:8,
39:5, 62:24
**suggest** [2] - 14:2,
37:2
**suggested** [5] - 15:5,
21:1, 32:13, 40:11,
59:9
**suggestion** [3] -
13:21, 31:15, 33:23
**suggests** [1] - 37:22
**supported** [1] - 65:8
**suppose** [2] - 31:7,
56:16
**surprised** [1] - 29:18
**surprises** [2] - 8:1,
45:20
**surprising** [1] - 8:5
**suspect** [1] - 42:9

**T**

**tandem** [1] - 39:12
**target** [1] - 8:19
**team** [1] - 69:13
**technical** [62] - 5:2,
6:5, 9:15, 9:20,
10:2, 11:14, 13:24,
14:4, 15:6, 15:8,
15:14, 17:4, 17:6,
17:12, 17:16, 17:22,
18:7, 19:2, 19:21,

21:9, 22:2, 22:8,
22:16, 23:23, 24:8,
24:11, 24:13, 37:12,
44:22, 45:1, 45:8,
46:4, 46:9, 46:24,
47:12, 47:16, 47:23,
48:1, 48:11, 51:7,
53:9, 54:20, 54:21,
56:18, 58:17, 60:8,
62:19, 65:12, 65:19,
66:1, 66:9, 66:14,
66:16, 67:2, 67:4,
67:11, 67:13, 68:5,
68:14, 70:12, 70:23,
71:24
**technically** [2] - 8:12,
29:11
**techniques** [1] - 33:12
**technology** [9] -
10:21, 10:23, 11:13,
19:18, 39:1, 64:12,
64:15, 65:1, 66:5
**Telebuyer** [1] - 5:16
**teleconference** [1] -
3:3
**tension** [1] - 15:5
**terms** [6] - 10:20,
39:17, 56:21, 57:13,
60:10, 64:20
**TESLA** [1] - 1:7
**Tesla** [105] - 3:5, 4:10,
4:19, 9:3, 9:22,
10:23, 11:12, 11:17,
11:18, 12:12, 12:21,
13:10, 13:14, 13:23,
14:2, 14:17, 14:18,
15:13, 16:6, 16:14,
18:1, 18:2, 18:15,
18:21, 18:24, 19:5,
19:17, 19:20, 20:3,
20:8, 20:9, 20:11,
20:12, 21:7, 21:21,
22:11, 22:13, 25:9,
25:16, 25:20, 26:17,
27:21, 28:4, 28:9,
28:16, 29:10, 29:20,
29:21, 30:9, 32:13,
33:18, 34:24, 35:22,
36:3, 36:6, 36:19,
37:22, 37:24, 39:2,
40:11, 40:15, 40:18,
41:8, 41:19, 42:10,
42:13, 43:16, 44:10,
44:12, 45:5, 45:7,
47:5, 48:7, 48:8,
48:9, 48:16, 49:16,
50:13, 51:13, 52:17,
55:15, 57:15, 59:18,
64:11, 64:13, 64:21,

65:5, 65:9, 65:17,
65:22, 66:12, 67:12,
67:14, 67:17, 68:23,
69:16, 70:11, 71:1,
71:3, 71:7, 71:9,
71:12, 72:14, 72:15,
73:18
**Tesla's** [60] - 5:5,
6:11, 10:22, 13:8,
13:20, 15:2, 17:20,
17:23, 20:4, 20:13,
20:15, 20:18, 20:20,
21:1, 21:4, 21:13,
21:21, 21:24, 24:20,
28:11, 28:20, 29:1,
29:19, 30:2, 30:3,
30:7, 31:1, 31:4,
31:14, 31:20, 33:8,
33:23, 34:23, 38:3,
38:21, 39:11, 44:5,
45:3, 45:6, 45:12,
46:10, 46:19, 49:12,
50:6, 50:20, 51:15,
53:9, 53:11, 56:17,
60:20, 62:21, 66:18,
66:22, 67:5, 67:8,
67:21, 68:2, 68:21,
69:9
**testify** [1] - 8:3
**Texas** [12] - 11:19,
12:3, 21:4, 36:7,
36:9, 36:11, 36:20,
36:22, 37:1, 37:4,
70:2
**THE** [60] - 1:1, 1:1,
1:14, 3:1, 3:10,
3:20, 4:4, 4:13, 6:9,
8:24, 11:9, 13:6,
13:21, 14:17, 14:24,
16:5, 16:11, 19:15,
21:16, 22:4, 25:3,
26:24, 27:21, 29:14,
30:13, 31:14, 32:3,
32:8, 33:20, 34:16,
34:22, 35:18, 36:23,
37:18, 40:14, 41:11,
42:1, 43:7, 44:5,
44:19, 46:21, 48:5,
49:2, 49:8, 50:4,
51:17, 52:14, 54:16,
55:4, 56:4, 57:11,
57:20, 58:14, 60:3,
61:8, 62:14, 63:10,
63:18, 73:19, 73:23
**theft** [8] - 24:17,
32:12, 34:6, 35:4,
36:2, 65:2, 65:5,
65:6
**therefore** [1] - 66:11

therewith [1] - 58:20
**third** [9] - 31:21,
31:22, 32:14, 34:2,
35:1, 35:4, 35:10,
35:13, 36:4
**thousands** [3] - 19:6,
24:7, 24:8
**three** [2] - 23:20, 70:6
**throughout** [1] -
12:12
**tie** [1] - 21:18
**today** [15] - 3:16, 3:24,
4:10, 36:14, 59:18,
59:24, 63:20, 64:2,
65:16, 66:13, 66:24,
70:1, 70:19, 73:24,
74:1
**together** [3] - 18:16,
18:17, 69:24
**tool** [1] - 15:11
**towards** [1] - 40:20
**tracking** [1] - 60:4
**traditional** [2] - 29:23,
37:11
**traditionally** [1] -
19:24
**train** [1] - 43:14
**transcript** [3] - 60:24,
61:22, 75:10
**transcripts** [3] -
56:12, 60:6, 61:22
**transporting** [1] -
29:7
**travel** [28] - 7:6, 7:11,
14:19, 15:15, 15:18,
16:2, 25:24, 26:7,
26:12, 31:10, 33:8,
33:9, 34:15, 36:4,
44:2, 46:3, 48:1,
48:22, 51:11, 67:1,
67:4, 67:10, 68:6,
68:14, 70:21, 70:22,
72:7, 72:16
**traveled** [6] - 31:3,
31:11, 43:2, 44:22,
44:23, 72:1
**traveling** [10] - 7:3,
14:23, 33:11, 35:23,
42:14, 42:23, 43:12,
43:20, 44:13, 70:18
**treat** [8] - 19:17, 20:8,
46:2, 51:9, 59:19,
60:5, 60:9
**treated** [1] - 65:6
**treating** [1] - 11:13
**treats** [2] - 19:23,
64:11
**trial** [2] - 55:24, 56:13
**trials** [1] - 57:8

**true** [1] - 75:9
**trust** [2] - 65:22, 72:11
**try** [2] - 24:5, 63:22
**trying** [4] - 16:13,
29:5, 32:4, 53:3
**TUNNELL** [1] - 2:2
**two** [10] - 30:24, 34:3,
44:21, 49:11, 51:18,
68:17, 71:5, 71:13,
71:15, 71:17
**type** [1] - 47:16
**types** [1] - 15:24
**typically** [2] - 29:12,
59:2

**U**

**ultimately** [9] - 4:23,
7:17, 8:19, 23:10,
28:20, 30:9, 55:16,
61:13, 63:7
**unable** [1] - 48:22
**unavailable** [1] -
47:18
**unbounded** [2] - 22:2,
24:4
**under** [6] - 10:2, 10:3,
39:9, 60:15, 60:19,
65:7
**understood** [4] -
15:16, 26:24, 35:21,
68:19
**UNITED** [1] - 1:1
**United** [1] - 1:14
**universe** [2] - 9:14,
71:13
**unlimited** [1] - 40:12
**unprotected** [1] - 66:2
**unredacted** [1] -
58:12
**unusual** [1] - 30:15
**unworkable** [3] -
53:14, 60:18, 61:5
**up** [11] - 9:2, 15:8,
21:18, 32:10, 44:6,
46:9, 47:3, 56:19,
62:20, 68:4, 72:18
**updated** [1] - 28:2
**usual** [1] - 17:5
**utmost** [1] - 59:19

**V**

**valid** [1] - 45:20
**valuable** [1] - 10:22
**variety** [1] - 60:20
**various** [2] - 38:13,

63:24
**vast** [1] - 60:20
**versions** [1] - 58:12
**versus** [7] - 3:5, 5:10, 5:16, 17:10, 20:11, 36:2, 71:19
**viable** [1] - 32:2
**view** [2] - 29:19, 50:6
**violate** [1] - 54:11
**violated** [1] - 20:18
**violating** [1] - 24:20
**vision** [1] - 9:9
**volume** [2] - 24:4, 24:6
**voluminous** [1] - 72:11
**voluntarily** [1] - 36:3

## W

**wants** [4] - 28:4, 50:13, 56:6, 62:9
**warehouse** [1] - 58:22
**warrant** [1] - 48:18
**wary** [2] - 38:19, 38:21
**Washington** [2] - 29:9, 31:11
**Wednesday** [1] - 1:10
**week** [1] - 13:17
**Weil** [2] - 4:11, 30:6
**WEIL** [1] - 2:5
**Weil's** [3] - 29:2, 31:5, 33:9
**weird** [1] - 28:6
**welcome** [2] - 3:21, 4:14
**whereby** [1] - 10:15
**WHEREOF** [1] - 75:13
**whistles** [1] - 58:20
**whole** [3] - 25:15, 49:19, 54:11
**wholesale** [3] - 50:24, 52:22, 53:19
**widely** [1] - 12:12
**willing** [2] - 14:16, 37:7
**willingness** [1] - 63:22
**Wilmington** [2] - 1:12, 75:15
**wish** [1] - 67:4
**wishes** [2] - 48:9, 73:8
**WITNESS** [1] - 75:13
**witness** [2] - 8:2
**witnesses** [3] - 7:20, 45:14, 45:21
**wondered** [1] - 15:12

**word** [3] - 18:13, 22:1, 52:21
**workable** [2] - 22:23, 46:13
**works** [2] - 13:18, 45:21
**world** [1] - 73:2
**worried** [1] - 66:6
**worthy** [1] - 36:12
**write** [1] - 71:18
**writes** [1] - 9:3
**writing** [1] - 18:23
**written** [1] - 58:4

## Y

**year** [1] - 5:11
**years** [2] - 33:1, 44:23
**York** [10] - 11:18, 12:2, 12:24, 21:3, 28:6, 29:3, 29:9, 31:12, 33:10, 69:2
**yourselves** [1] - 71:18

## Z

**zero** [1] - 8:12

Hawkins Reporting Service
855 Arthursville Road    Hartly, Delaware   19953
(302) 658-6697   FAX (302) 658-8418
Page 11 to 11 of 11

06/05/2023 01:55:23 AM

30 of 30 sheets

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AUTONOMOUS DEVICES LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. 22-1466-MN |
| | ) |
| TESLA, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**[PROPOSED] PROTECTIVE ORDER GOVERNING THE DESIGNATION AND
HANDLING OF CONFIDENTIAL MATERIALS**

Plaintiff Autonomous Devices LLC ("Plaintiff") and Defendant Tesla, Inc. ("Defendant")
anticipate that documents, testimony, or information containing or reflecting confidential,
proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or
produced during the course of discovery, initial disclosures, and supplemental disclosures in this
case and request that the Court enter this Order setting forth the conditions for treating, obtaining,
and using such information.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court finds good cause
for the following Agreed Protective Order Regarding the Disclosure and Use of Discovery
Materials ("Order" or "Protective Order").

1.     **PURPOSES AND LIMITATIONS**

(a)     Protected Material designated under the terms of this Protective Order shall
be used by a Receiving Party solely for this case, and shall not be used directly or indirectly for
any other purpose whatsoever.

(b)     The Parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery, or in the course of making initial or supplemental disclosures under Rule 26(a). Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth below. If it comes to a Producing Party's attention that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

(c)     <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS," or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this order shall promptly notify that party of the motion so that the party has a reasonable opportunity to appear and be heard on whether that information should be disclosed prior to disclosure.

2.     **<u>DEFINITIONS</u>**

(a)     "CONFIDENTIAL" means information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

(b)     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" means sensitive "CONFIDENTIAL" information (regardless of how it is generated, stored or maintained) or tangible things, disclosure of which to another would create a substantial risk of serious harm

that could not be avoided by less restrictive means. The Parties agree that the following information, if non-public, shall be presumed to at least merit the "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designation: trade secrets, pricing information, financial data, sales information, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, employee information, and other non-public information of similar competitive and business sensitivity.

(c)     "HIGHLY CONFIDENTIAL – SOURCE CODE" means "Source Code," which is computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs. "Source Code" shall be designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" in all permitted forms, printed, written or otherwise.

(d)     "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS" means "Source Code Related Technical Documents," which are documents that fall within the definition of "Source Code" but do not contain "computer code, associated comments, and/or revision histories for computer code" (i.e., "formulas, engineering specifications, or schematics that that define or otherwise describe in detail the algorithms or structure of software or hardware designs"). "Source Code Related Technical Documents" shall be designated as "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS" in all permitted forms, printed, written or otherwise.

(e)     "Discovery Material" means all items or information, including from any non-party, regardless of the medium or manner generated, stored, or maintained (including, among

other things, testimony, transcripts, or tangible things) that are produced, disclosed, or generated in connection with discovery or Rule 26(a) disclosures in this case.

(f)     "Expert" means a person with specialized knowledge or experience in a matter pertinent to the respective litigations who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in the above-captioned action, (2) is not a current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

(g)     "Outside Counsel" means (i) attorneys who are not employees of a Party to the above-captioned action but are retained to represent or advise a Party to that action and have appeared on the pleadings as counsel for a Party and (ii) partners, associates, and staff of such counsel to whom it is reasonably necessary to disclose the information for this litigation.

(h)     "Patents-in-suit" means U.S. Patent Nos. 10,102,449; 11,055,583; 10,452,974; 11,238,344; 10,607,134; and 11,113,585, and any other patent asserted in this action.

(i)     "Party" means any party to this case, including all of its officers, directors, employees, consultants, retained Experts, and Outside Counsel and their support staffs.

(j)     "Producing Party" means any Party or non-party that discloses or produces any Discovery Material in this case.

(k)     "Protected Material" means any Discovery Material that is designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS," or "HIGHLY CONFIDENTIAL – SOURCE CODE," as provided for in this Order. Protected Material shall not include: (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

(l)     "Receiving Party" means any Party who receives Discovery Material from a Producing Party.

3.     **COMPUTATION OF TIME**

The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

4.     **SCOPE**

(a)     The protections conferred by this Order cover not only Discovery Material governed by this Order as addressed herein, but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or their counsel in court or in other settings that might reveal Protected Material.

(b)     Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose, and nothing in this Order shall preclude any Producing Party from showing its Protected Material to an individual who prepared the Protected Material.

(c)     Nothing in this Order shall be construed to prejudice any Party's right to use any Protected Material in court or in any court filing with the consent of the Producing Party or by order of the Court.

(d)     This Order is without prejudice to the right of any Party to seek further or additional protection of any Discovery Material or to modify this Order in any way, including, without limitation, an order that certain matter not be produced at all.

(e)     The protections conferred by this Order do not cover the following information: (a) any information that the Receiving Party can show is in the public domain at the

time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information that the Receiving Party can clearly show was known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Party that designated the Discovery Material.

5.     **DURATION**

Even after the termination of this case, the confidentiality obligations imposed by this Order shall remain in effect until a Producing Party agrees otherwise in writing or a court order otherwise directs.

6.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

(a)     Basic Principles. All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function. Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

(b)     Patent Prosecution Bar. Absent the written consent of the Producing Party, any person on behalf of the Plaintiff who personally reviews any technical CONFIDENTIAL, HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY, HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS, or HIGHLY CONFIDENTIAL – SOURCE CODE are prohibited from participating in an administrative proceeding for the examination and reexamination of a patent or patent application insofar as the participation involves input into the

drafting, revising or amending of a patent claim relating to the functionality, operation, and design of autonomous systems, machine learning, or artificial intelligence (generally or as described in any patent in suit), if such administrative proceeding (e.g., patent application filing) was commenced less than two years following the final termination of this action (including any appeals). This prosecution bar does not prevent an individual from participating in a reexamination, *inter partes* review, or other post-grant review proceedings involving the patents-at-issue or patents related thereto, except that the individual is prohibited from participating in, or otherwise providing input into, the drafting of any claim or amendment to any claim.

(c)     Secure Storage, No Export. Protected Material must be stored and maintained by a Receiving Party in locked and hardened containers (e.g. a safe or lockbox) at a location in the United States. Access to such locked and hardened containers shall be strictly limited to the persons authorized under this Order. To ensure compliance with applicable United States Export Administration Regulations, Protected Material may not be exported outside the United States or released to any foreign national (even if within the United States).

(d)     Legal Advice Based on Protected Material. Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself or the substance thereof except as provided in this Order.

(e)     Limitations. Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protected Material. Nothing in this Order shall restrict in any way the use or disclosure of Discovery Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of the Producing Party; (iii) previously produced, disclosed

and/or provided by the Producing Party to the Receiving Party or a non-party without an obligation of confidentiality and not by inadvertence or mistake; (iv) with the consent of the Producing Party; or (v) pursuant to order of the Court.

7.    **DESIGNATING PROTECTED MATERIAL**

(a)    <u>Available Designations</u>. Any Producing Party may designate Discovery Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein: "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

(b)    <u>Written Discovery and Documents and Tangible Things</u>. Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Procedure 34), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 7(a) may be so designated by placing the appropriate designation on every page of the written material prior to production. For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained. In the event that original paper documents are produced for inspection, the original documents shall be presumed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" during the inspection and re-designated, as appropriate during the copying process.

(c)    <u>Native Files</u>. Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending to the file names or designators information indicating whether the file contains "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY,"

"HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS," or "HIGHLY CONFIDENTIAL – SOURCE CODE," material, or shall use any other reasonable method for so designating Protected Materials produced in electronic format. When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an Expert or consultant pre-approved pursuant to paragraph 12, the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file.

      (d)    <u>Depositions and Testimony</u>. Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony is designated within thirty (30) days of receipt of the transcript of the testimony. If no indication on the record is made, all information disclosed during a deposition shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" until the time within which it may be appropriately designated as provided for herein has passed. Any Party that wishes to disclose the transcript, or information contained therein, may provide written notice of its intent to treat the transcript as non-confidential, after which time, any Party that wants to maintain any portion of the transcript as confidential must designate the confidential portions within fourteen (14) days, or else the transcript may be treated as non-confidential. Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material. In such cases the court reporter shall be informed of this Protective Order and shall be required to execute an agreement to be bound by this Protective Order in the form of Exhibit A hereto, and

shall operate in a manner consistent with this Protective Order. In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties." Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Before publication of any material subject to this Protective Order to any non-Tesla witness, counsel shall determine whether such witness is authorized to view such material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

8.   **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL"**

(a)   A Producing Party may designate Discovery Material as "CONFIDENTIAL" if the Producing Party reasonably believes it contains or reflects "CONFIDENTIAL" information.

(b)   Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL" may be disclosed only to the following:

(i)   The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)      Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; (c) such Expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party such Expert or consultant accesses the materials in the United States only, and does not transport them to or access them from any foreign jurisdiction; and (d) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below; Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iii)     The Court, jury, and court personnel;

(iv)     Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(v)      Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material, not to use the Protected Material in any way other than as a mock juror, and to keep any information concerning Protected Material confidential;

(vi)     Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

(vii)    Any other person with the prior written consent of the Producing Party.

9.    **<u>DISCOVERY MATERIAL DESIGNATED AS "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"</u>**

(a)    A Producing Party may designate Discovery Material as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" if the Producing Party reasonably believes it contains or reflects "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

(b)    Unless otherwise ordered by the Court, Discovery Material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be disclosed only to:

(i)    The Receiving Party's Outside Counsel, provided that such Outside Counsel is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party, and such Outside Counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)    Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director, or employee of a Party or of a competitor of a Party; (c) such Expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party; (d) such Expert or consultant accesses the materials in the United States only, and does not transport them to or access them from any foreign jurisdiction; and (e) no

unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

        (iii)    Court reporters, stenographers and videographers retained to record testimony taken in this action;

        (iv)    The Court, jury, and court personnel;

        (v)    Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

        (vi)    Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

        (vii)    Any other person with the prior written consent of the Producing Party.

        (c)    In addition, a Party may disclose arguments and materials derived from Discovery Material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential. A Party may not disclose to mock jurors any original, as-produced materials or information (including, for example, documents, deposition testimony, or interrogatory responses) produced by another Party designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

        10.    **<u>DISCOVERY MATERIAL DESIGNATED AS "HIGHLY CONFIDENTIAL SOURCE CODE TECHNICAL DOCUMENTS" OR "HIGHLY CONFIDENTIAL – SOURCE CODE"</u>**

        (a)    To the extent production of Source Code becomes necessary to the prosecution or defense of the case, a Producing Party may designate Source Code as "HIGHLY

CONFIDENTIAL SOURCE CODE TECHNICAL DOCUMENTS" or "HIGHLY CONFIDENTIAL – SOURCE CODE."

      (b)    Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

      (c)    Unless otherwise ordered by the Court, Discovery Material designated as "HIGHLY CONFIDENTIAL SOURCE CODE TECHNICAL DOCUMENTS" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to the provisions set forth in Paragraph 11 below, and may be disclosed, subject to Paragraph 11 below, solely to:

      (i)    The Receiving Party's Outside Counsel, provided that such Outside Counsel is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party, and such Outside Counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

      (ii)    Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; (c) such Expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of

a Party; and (d) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

        (iii)    Court reporters, stenographers and videographers retained to record testimony taken in this action;

        (iv)    The Court, jury, and court personnel;

        (v)    Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

        (vi)    Any other person with the prior written consent of the Producing Party.

11.    **<u>DISCLOSURE AND REVIEW OF SOURCE CODE</u>**

[**DISPUTED PROVISION #1: PLAINTIFF'S PROPOSAL #1**: Any Source Code that is produced in discovery shall be made available for inspection, in electronic (e.g., native) format. The Producing Party shall produce Source Code for inspection in electronic (e.g., native) format at the office of its Outside Counsel in Austin, Texas or at another location agreed on by the parties, such as Dallas, Texas, Washington D.C. or New York City where Outside Counsel for each party has offices. **PLAINTIFF'S PROPOSAL #2:** Any Source Code that is produced in discovery shall be made available for inspection, in electronic (e.g., native) format. The Source Code Computer shall be located with an independent escrow agent, with the costs of such to be shared by the parties. If the parties cannot agree on such an agent, each party shall submit to the court the name and qualifications of their proposed agents for the court to choose. **DEFENDANTS PROPOSAL:** Any Source Code that is produced in discovery shall be made available for inspection, in computer searchable format. The Producing Party shall produce Source Code for

inspection in computer searchable format at the office of its Outside Counsel in Silicon Valley, California.].

(a)     Any single reviewing session (conducted during one business day or during consecutive business days of review) shall be conducted during regular business hours (8:00 A.M. to 6:00 P.M. local time) on four (4) business days' written (including email) notice, although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times and on shorter notice.

(b)     Prior to the first inspection of Source Code, the Receiving Party shall provide fourteen (14) days' notice for its Source Code inspection request.

(c)     Source Code that is designated "HIGHLY CONFIDENTIAL SOURCE CODE TECHNICAL DOCUMENTS" or "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the Producing Party:

i.     All Source Code shall be made available by the Producing Party to the Receiving Party's outside counsel and/or Experts in a secure room ("Source Code Review Room") on at least two (2) secured computers without Internet access or network access to other computers, and on which all access ports have been disabled, as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source Code outside or away from the computer on which the Source Code is provided for inspection (the "Source Code Computer"). **[DISPUTED PROVISION   #2: Plaintiff's Proposal**: The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools

==exist and are presently used in the ordinary course of the Producing Party's== ==business. **Defendant's Proposal:** The Producing Party shall install tools that are== ==sufficient for viewing and searching the code produced, on the platform produced,== ==if such tools exist.]== The Receiving Party's Outside Counsel and/or Experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computers, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein. The Receiving Party must provide the Producing Party with the software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer. The Receiving Party shall not copy, remove, or otherwise transfer any portion of the Source Code onto any recordable media or recordable device absent prior agreement of the Producing Party.

ii.      No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind shall be permitted into the Source Code Review Room. Upon request, the Producing Party shall provide personnel to keep such devices (include cellular telephones) secure while a member of the Receiving Party is in the Source Code Review Room, and shall promptly notify the member if any calls or notifications are received.

[PROPOSED] PROTECTIVE ORDER – PAGE 17

iii.        [DISPUTED PROVISION #3:  Plaintiff's Proposal:  The Source Code shall be produced as it is kept in the normal course of business, or as it would be collected in the normal course of business.  Defendant's Proposal: The Source Code shall be produced in computer searchable format.] The Receiving Party's outside counsel and/or Experts shall be entitled to take handwritten notes relating to the Source Code. Such notes shall be labeled "HIGHLY CONFIDENTIAL – SOURCE CODE."  The Receiving Party shall be under no obligation to produce handwritten notes.  No copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided in this Protective Order.  The Receiving Party's outside counsel and/or Experts shall also be entitled to take notes relating to the Source Code, but may not copy the Source Code into the notes. No other computer is permitted in the Source Code Review Room. Further, no other written or electronic record of the Source Code is permitted except as otherwise provided in this Protective Order.

iv.        The Source Code provider shall provide a manifest of the contents of the computer to include a list of Source Code files available for review. This manifest, which will be supplied in both printed and electronic form, will list the name, location, and MD5 checksum of every Source Code file on the Source Code Computer.

v.        [DISPUTED Provision #4:  Plaintiff's Proposal:  The Source Code Computer shall include software utilities which will allow counsel and experts to view and search the Source Code. At a minimum, these utilities must provide the ability to (a) view, search, and line-number any source file, and (b)

search for a given pattern of text through a number of files, (c) compare two files and display their differences, and (d) compute the MD5 checksum of a file. **Defendant's Proposal**: N/A.]

      vi.      The Producing Party may visually monitor the activities of the Receiving Party's representatives during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code and no information concerning the Source Code are being created or transmitted in any way.

      vii.      The Receiving Party may request copies of reasonable portions of the Source Code identified in a reasonable manner. The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere. In the event that the Receiving Party requests more than 15 consecutive pages, or an aggregate of more than 500 pages, of print outs of Source Code,[1] the parties shall have a meet and confer in good faith. A text editor will be provided on the Source Code Computer so that the files to be printed may be saved directly to the Source Code Computer. If the Producing Party objects that identified files are not reasonably necessary, the Producing Party shall make such objection

---

[1] Notwithstanding this provision, printouts of Source Code Related Technical Documents shall not count towards the Receiving Party's aggregate or consecutive page limits. Defendant will promptly provide Plaintiff with printed copies of each Source Code Related Document each time such a document is produced.

[PROPOSED] PROTECTIVE ORDER – PAGE 19

known to the Receiving Party within three (3) business days of the identification of any files by the Receiving party. If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Producing Party shall be entitled to seek a judicial resolution of whether or not the identified Source Code in question is reasonably necessary to any case preparation activity. At the request of the Receiving Party, in the absence of any objection the Producing Party shall provide within five (5) days of such request, paper copies of the Source Code identified at the time of inspection by the Receiving Party. The Producing Party shall print, label such Source Code with the Source Code's complete path name, and append production numbers and the designation "HIGHLY CONFIDENTIAL – SOURCE CODE." **[DISPUTED PROVISION  #5: Plaintiff's Proposal**: The paper copies must be kept in a secured, locked and hardened containers (e.g. a safe or lockbox) at the offices of the Receiving Party's Outside Counsel or the Receiving Party's Experts at all times. The Receiving Party may make no more than five (5) additional paper copies of any portions of the Source Code files, not including copies attached to court filings or trial and hearing demonstrative exhibits. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), or (2) necessary for deposition.  **Defendant's Proposal**:  The paper copies must be kept in a secured, locked and hardened containers (e.g. a safe or lockbox) location at the offices of the Receiving Party's Outside Counsel at all times. The Receiving Party shall not make copies of any portions of the Source Code files, not including copies attached to court filings or

<mark>trial and hearing demonstrative exhibits. The Parties anticipate that the Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings, or other papers (including a testifying expert's expert report), or (2) necessary for deposition.]</mark> The Receiving Party shall request printing of only such portions as are relevant to the claims and defenses in the case and are reasonably necessary for such purpose. Such printouts are to be of minimum 10-point, fixed-width font, and shall not exceed sixty-five (65) lines of text per page. The Producing Party may challenge the amount of Source Code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth herein whereby the Producing Party is the "Challenging Party," and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

viii.     The Receiving Party's Outside Counsel shall maintain a log of all paper copies of the Source Code. The log shall include the number of paper copies, names of the recipients of paper copies, and locations where the paper copies are stored. Upon one (1) day's advance notice to the Receiving Party by the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party.

<mark>[DISPUTED PROVISION #6: Plaintiff's Proposal: N/A. Defendant's Proposal: All copies of Source Code shall be printed with an "anti-copying" watermark that reveals whether such printouts have been photocopied.]</mark>

ix.     The Receiving Party's Outside Counsel and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source

Code at their offices in locked and hardened containers (e.g. a safe or lockbox) that prevents duplication of or unauthorized access to the Source Code.

  x.  Except as provided in this Protective Order, no electronic copies of the Source Code shall be made.

  xi.  Unless otherwise agreed in advance by the parties in writing, the Receiving Party's Outside Counsel and/or Experts shall remove all notes, documents, and all other materials from the Source Code Review Room that may contain work product and/or attorney-client privileged information at the end of each day. Materials inadvertently left in the Source Code Review Room do not operate as a waiver of the attorney work product doctrine or any other applicable privilege and shall be returned to the owner promptly. The Producing Party shall not be responsible for any items left in the Source Code Review Room. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

  xii.  For depositions, the Receiving Party shall not bring copies of any documents designated HIGHLY CONFIDENTIAL – SOURCE CODE.

  xiii.  For depositions, if a Source Code document has been marked up or altered in any way by the deponent, the Producing Party shall copy the exhibit in

its marked form and provide one copy to outside counsel for the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. All paper copies of Source Code brought to the deposition shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.

xiv.     Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party and any persons receiving Source Code from Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party and any persons receiving Source Code from Receiving Party may not scan the Source Code to a PDF or photograph the code). A party may make and use snippets and images of the Source Code if necessary for court filings, expert reports, discovery responses and other similar documents and exhibits thereto. All such documents shall be clearly marked "HIGHLY CONFIDENTIAL – SOURCE CODE" and, if filed, shall be filed under seal. Unless agreed by the parties, images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead). Unless agreed by the parties, images or copies of Source Code shall be omitted from pleadings, exhibits, and other papers whenever possible and reasonably minimized when not.

xv.     All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law

firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code Computer. All persons viewing Source Code Computer shall sign on each day they view Source Code Computer a log that will include the names of persons who enter the locked room to view the Source Code Computer and when they enter and depart. The Producing Party shall be entitled to a copy of the log upon one (1) day's advance notice to the Receiving Party.

xvi.       At least three (3) days before the date of a deposition, a Receiving Party may request that the witness have access to a Source Code Computer. The Producing Party shall provide a Source Code Computer that the witness can access and an external monitor that allows the questioning attorney to see the files being discussed during the deposition on the condition that the deposition take place at a location of the Producing Party's choosing. The deposition record will identify the file names and file paths being discussed.

**NOTICE OF DISCLOSURE**

(d)       Prior to disclosing any Protected Material to any person described in Paragraphs 8(b)(ii), 9(b)(ii), or 10(c)(ii) (referenced below as "Person"), the Party seeking to disclose such information shall provide the Producing Party with written notice that includes:

(i) the name of the Person;

(ii) an up-to-date curriculum vitae of the Person;

(iii) the present employer and title of the Person;

(iv) an identification of all of the Person's past and current employment and consulting relationships, including direct relationships and relationships through entities

owned or controlled by the Person, including but not limited to an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of autonomous systems, machine learning, or artificial intelligence, or relating to the acquisition of intellectual property assets relating to autonomous systems, machine learning, or artificial intelligence;

(v) an identification of all pending patent applications on which the Person is named as an inventor, in which the Person has any ownership interest, or as to which the Person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

(vi) a list of the cases in which the Person has testified at deposition or trial within the last five (5) years.

Further, the Party seeking to disclose Protected Material shall provide such other information regarding the Person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside Expert or consultant. During the pendency of and for a period of one (1) year after the final resolution of this action, including all appeals, the Party retaining any expert given access to Protected Material shall immediately provide written notice of any change with respect to the Person's involvement in the design, development, operation or patenting of autonomous systems, machine learning, or artificial intelligence, or the acquisition of intellectual property assets relating to autonomous systems, machine learning, or artificial intelligence.

(e)     Within seven (7) days of receipt of the disclosure of the Person, the Producing Party or Parties may object in writing to the Person for good cause. In the absence of an objection at the end of the seven (7) day period, the Person shall be deemed approved under this Protective Order. There shall be no disclosure of Protected Material to the Person prior to expiration of this seven (7) day period. If the Producing Party objects to disclosure to the Person within such seven (7) day period, the Parties shall meet and confer via telephone or in person within seven (7) days following the objection and attempt in good faith to resolve the dispute on an informal basis. If the dispute is not resolved, the Party objecting to the disclosure will have seven (7) days from the date of the meet and confer to seek relief from the Court. If relief is not sought from the Court within that time, the objection shall be deemed withdrawn. If relief is sought, designated materials shall not be disclosed to the Person in question until the Court resolves the objection.

(f)     For purposes of this section, "good cause" shall include an objectively reasonable concern that the Person will, advertently or inadvertently, use or disclose Discovery Materials in a way or ways that are inconsistent with the provisions contained in this Order.

(g)     Prior to receiving any Protected Material under this Order, the Person must execute a copy of the "Agreement to Be Bound by Protective Order" (Exhibit A hereto) and serve it on all Parties.

(h)     An initial failure to object to a Person under this Paragraph 12 shall not preclude the non-objecting Party from later objecting to continued access by that Person for good cause. If an objection is made, the Parties shall meet and confer via telephone or in person within seven (7) days following the objection and attempt in good faith to resolve the dispute informally. If the dispute is not resolved, the Party objecting to the disclosure will have seven (7) days from

the date of the meet and confer to seek relief from the Court. The designated Person may continue to have access to information that was provided to such Person prior to the date of the objection. If a later objection is made, no further Protected Material shall be disclosed to the Person until the Court resolves the matter or the Producing Party withdraws its objection. Notwithstanding the foregoing, if the Producing Party fails to move for a protective order within seven (7) business days after the meet and confer, further Protected Material may thereafter be provided to the Person.

12.   **CHALLENGING DESIGNATIONS OF PROTECTED MATERIAL**

(a)   A Party shall not be obligated to challenge the propriety of any designation of Discovery Material under this Order at the time the designation is made, and a failure to do so shall not preclude a subsequent challenge thereto.

(b)   Any challenge to a designation of Discovery Material under this Order shall be written, shall be served on outside counsel for the Producing Party, shall particularly identify the documents or information that the Receiving Party contends should be differently designated, and shall state the grounds for the objection. Thereafter, further protection of such material shall be resolved in accordance with the following procedures:

(i)   The objecting Party shall have the burden of conferring either in person, in writing, or by telephone with the Producing Party claiming protection (as well as any other interested party) in a good faith effort to resolve the dispute. The Producing Party shall have the burden of justifying the disputed designation;

(ii)   Failing agreement, the Receiving Party may bring a motion to the Court for a ruling that the Discovery Material in question is not entitled to the status and protection of the Producing Party's designation. The Parties' entry into this Order shall not preclude or prejudice either Party from arguing for or against any designation, establish any presumption that

a particular designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information;

(iii)    Notwithstanding any challenge to a designation, the Discovery Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Party who designated the Discovery Material in question withdraws such designation in writing; or (b) the Court rules that the Discovery Material in question is not entitled to the designation.

13.    **SUBPOENAS OR COURT ORDERS**

(a)    If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Discovery Material and to its counsel and shall provide each such Party with an opportunity to move for a protective order regarding the production of Protected Materials implicated by the subpoena.

14.    **FILING PROTECTED MATERIAL**

(a)    Absent written permission from the Producing Party or a court Order secured after appropriate notice to all interested persons, a Receiving Party may not file or disclose in the public record any Protected Material.

(b)    Any Party is authorized under Del. L.R. 5.1.3 to file under seal with the Court any brief, document or materials that are designated as Protected Material under this Order. However, nothing in this section shall in any way limit or detract from this Order's requirements as to Source Code.

15.    **INADVERTENT DISCLOSURE OF PRIVILEGED MATERIAL**

(a)     The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b)     Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c)     Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

16.    **INADVERTENT FAILURE TO DESIGNATE PROPERLY**

(a)     The inadvertent failure by a Producing Party to designate Discovery Material as Protected Material with one of the designations provided for under this Order shall not waive any such designation provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties. Upon receiving the Protected Material with the

correct confidentiality designation, the Receiving Parties shall return or securely destroy, at the Producing Party's option, all Discovery Material that was not designated properly.

(b)     A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in Paragraph 16(c) below) at the appropriately designated level pursuant to the terms of this Order.

(c)     Notwithstanding the above, a subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," "HIGHLY CONFIDENTIAL – SOURCE CODE TECHNICAL DOCUMENTS," or "HIGHLY CONFIDENTIAL –SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL — SOURCE CODE" materials while the materials were not so-marked from engaging in the activities set forth in Paragraph 6(b).

17.     **INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER**

(a)     In the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and/or each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and

circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made

(b)    Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive the right to hold the disclosed document or information as Protected.

(c)    The Receiving Party shall promptly notify the Producing Party within 5 days if it becomes aware of any unauthorized access of the Receiving Party or any unauthorized access of a Party having access to the Producing party's materials.

18.    **FINAL DISPOSITION**

(a)    Not later than ninety (90) days after the Final Disposition of this case, each Party shall return all Discovery Material of a Producing Party to the respective outside counsel of the Producing Party or destroy such Material. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

(b)    All Parties that have received any such Discovery Material shall certify in writing that all such materials have been returned to the respective outside counsel of the Producing Party or destroyed. Notwithstanding the provisions for return of Discovery Material, outside counsel may retain one set of pleadings, correspondence and attorney and consultant work product (but not document productions) for archival purposes, but must return any pleadings, correspondence, and consultant work product that contain Source Code.

Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant

and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order.

19.     **DISCOVERY FROM EXPERTS OR CONSULTANTS**

(a)     Absent good cause, drafts of reports of testifying Experts, and reports and other written materials, including drafts, of consulting Experts, shall not be discoverable.

(b)     Reports and materials exempt from discovery under the foregoing Paragraph shall be treated as attorney work product for the purposes of this case and Protective Order.

(c)     Testifying Experts shall not be subject to discovery with respect to any draft of his or her report(s) in this case. Draft reports, notes, or outlines for draft reports developed and drafted by the testifying Expert and/or his or her staff are also exempt from discovery.

(d)     Discovery of materials provided to testifying experts shall be limited to those materials, facts, consulting expert opinions, and other matters reviewed (regardless of whether such information was relied upon) or relied upon by the testifying expert in forming his or her final report, trial, or deposition testimony or any opinion in this case. For clarity, this provision is not intended to abrogate the protections for draft reports or disclosures under Fed. R. Civ. P. 26. No discovery can be taken from any non-testifying Expert except to the extent that such non-testifying Expert has provided information, opinions, or other materials to a testifying Expert relied upon by that testifying Expert in forming his or her final report(s), trial, and/or deposition testimony or any opinion in this case.

(e)     No conversations or communications between counsel and any testifying or consulting Expert will be subject to discovery unless the conversations or communications are

relied upon by such Experts in formulating opinions that are presented in reports or trial or deposition testimony in this case.

(f)     Materials, communications, and other information exempt from discovery under the foregoing Paragraphs 20(a)–(c) shall be treated as attorney-work product for the purposes of this litigation and Order.

(g)     Nothing in Protective Order, including Paragraphs 20(a)–(c), shall alter or change in any way the requirements in Paragraph 11 regarding Source Code, and Paragraph 11 shall control in the event of any conflict.

20.    **MISCELLANEOUS**

(a)     <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future. The Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

(b)     <u>Termination of Matter and Retention of Jurisdiction</u>. The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Determination of the above-captioned matter. The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

(c)     <u>Successors</u>. This Order shall be binding upon the Parties hereto, their attorneys, and their successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, retained consultants and Experts, and any persons or organizations over which they have direct control.

(d)     <u>Right to Assert Other Objections</u>. No Party waives any right it otherwise would have to object to disclosing or producing any information or item. Similarly, no Party

waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order. This Order shall not constitute a waiver of the right of any Party to claim in this action or otherwise that any Discovery Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding.

(e)   <u>Burdens of Proof</u>. Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Discovery Material is confidential, which level of confidentiality is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

(f)   <u>Modification by Court</u>. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice. The United States District Court for the District of Delaware is responsible for the interpretation and enforcement of this Order. All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of Delaware.

(g)   <u>Discovery Rules Remain Unchanged</u>. Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders. Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders.

**SO ORDERED.**

## EXHIBIT A

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Autonomous Devices LLC v. Tesla, Inc.*, United States District Court, District of Delaware, Civil Action No. 22-1466-MN. Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order. **[DISPUTED PROVISION #7:  Plaintiff's Proposal:** N/A.  **Defendant's Proposal:** I understand and acknowledge that the protective order materials I am accessing in this case represent highly valuable technology, including software, trade secrets, copyrighted material, patented material, and compilations of material not available in the public domain. I understand that any use, disclosure, or publication of this protective order material may expose me and my company to significant liability to the disclosing party, including money damages and possible criminal sanctions.]

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address: _____

Dated: _____

_____
[Signature]

# Exhibit D

Fred Norton (SBN 224725)
Bree Hann (SBN 215695)
Matt Turetzky (SBN 280997)
THE NORTON LAW FIRM PC
299 Third Street, Ste 106
Oakland, California 94607
Telephone: (510) 906-4900
Fax: (510) 906-4910
fnorton@nortonlaw.com
bhann@nortonlaw.com
mturetzky@nortonlaw.com

Attorneys for TESLA, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESLA, INC., a Delaware corporation, | **CASE NO.** |
| Plaintiff, | **COMPLAINT** |
| v. | |
| GUANGZHI CAO, an individual, | **JURY TRIAL DEMANDED** |
| Defendant. | |

COMPLAINT

**SUMMARY OF THE ACTION**

1.      Tesla, Inc. ("Tesla") leads the world in the design and production of all-electric vehicles, as well as clean energy generation and storage products.  Defendant Guangzhi Cao was a member of Tesla's Autopilot team, an elite group of engineers developing Tesla's industry-leading Autopilot features, including its full self-driving technology – a crown jewel of Tesla's intellectual property portfolio.  As part of the Autopilot team, Cao had access to crucially important, and highly confidential, Tesla trade secrets, including source code.

2.      On January 3, 2019, Cao abruptly announced that he was quitting his job at Tesla, effective the very next day.  Although he did not tell anyone at the time, Cao had accepted a job doing the same work for Xiaopeng Motors Technology Company Ltd. ("XMotors"), a Tesla imitator also pursuing self-driving and electric vehicle technology.

3.      As Tesla has now learned, Cao began searching for a new job by November 2018.  Long before he left, Cao began uploading complete copies of Tesla's Autopilot-related source code to his personal iCloud account – more than 300,000 files and directories, in violation of Tesla's policies and its agreements with Cao.  Then, as he was looking to leave Tesla, Cao created .zip files of Tesla's complete Autopilot-related source code repositories, making them smaller and easier to move.

4.      Unbeknownst to Tesla, Cao had at least a verbal offer from XMotors by November 26, 2018.  Cao then traveled to China (the home of XMotors) between December 5 and 9, without telling his manager where he was going or why.  He received a written employment offer from XMotors on December 12.

5.      Tesla does not know when Cao accepted his job offer.  However, as Tesla now knows, Cao deleted over 120,000 files in the month of December and disconnected his iCloud account from his Tesla-issued computer on December 26.  Between December 27 and January 1, Cao repeatedly logged into Tesla's secure networks, and he cleared his browser history by January 4, his last day at Tesla.

6.      When he left, Cao did not return Tesla's highly confidential information, nor disclose that he had made copies. Tesla thus believes that Cao still has, can access at will, and may be using

1

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AUTONOMOUS DEVICES LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-1466-MN |
| | ) | |
| TESLA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOHN HOLLEY**
**<u>REGARDING THE ONGOING PROTECTIVE ORDER DISPUTE</u>**

I, John S. Holley, declare and state as follows:

1.      I am a principal in the law firm of McKool Smith, P.C. and am counsel of record for Plaintiff Autonomous Devices LLC ("AD") in the above-captioned matter. After earning a degree in electrical engineering, I developed source code for a safety-critical fuel control system used on a military fighter jet called the F-35—commonly known as the Joint Strike Fighter (JSF). Given my engineering background, I regularly manage the technical aspects of my client's cases and am generally familiar with source code. I submit this declaration in support of AD's letter regarding the ongoing protective order dispute. The following statement is based on my personal knowledge.

2.      On July 10, 2023, I traveled from my home in Arlington, Virginia to Weil Gotshal's Silicon Valley office to review Tesla's source code computer. The total travel time door-to-door was approximately nine hours and thirty minutes. The combined cost for my off-peak economy-class airfare, rental car and hotel room was $2,469.12. This excludes ancillary expenses, such as gas, meals, parking, or Wi-Fi.

3.      When I arrived at Tesla's source code computer, I observed three folders: (1) C:\AP\Source Code, (2) C:\AP\Autopilot, and (3) C:\AP\Simulator.

4.      The first folder contained forty-seven PDF documents that appear to have been printed from a system called "Confluence." Confluence appears to be a *web-based* corporate wiki. *See, e.g.*, https://www.atlassian.com/software/confluence. I attempted to confirm my understanding that Confluence is a web-based corporate wiki with Tesla's counsel on July 26, 2023, July 28, 2023, and August 2, 2023. Tesla's counsel has not responded to my question. *See also* Ex. B (Tr.) at 11:9-12:7 (this Court's question and Mr. Desai's answer about whether these Confluence documents can be accessed outside the bay area). Tesla also appears to be presenting

1

███████████████████████████████████████████

certain of these documents on recorded Zoom meetings.  For example, in one document titled,

"████████████████████," Tesla wrote "[t]his page was presented and recorded with

Zoom: ████████████████████████████████ TESLA-SCT-0000515.

5.       Each Confluence document on Tesla's source code computer also had the following

statement in a red box at the top of the first page: "New Tesla team members no longer

automatically get Confluence access per InfoSec. They can file an access request at

https://itdos.tesla.com." An example of that statement is reproduced below:



Notably, as shown in the snippet above, Tesla chose to produce "old version[s]" of documents

without the corresponding current version.

6.       Many of the Confluence documents also had no source code. Others had source

code for elementary functions, such as coloring lines or making them dashed, dotted, or solid. *See,*

*e.g.*, https://www.youtube.com/live/j0z4FweCy4M?feature=share&t=5455.



I observed at least one document with over one hundred consecutive lines of code and comments.

7.      Every hyperlink in the Confluence documents was disabled. For example, one document referenced a "███████████████" hyperlink, but Tesla disabled that link. Tesla did produce four "████████████████" documents, but they were from 2015 and 2016. Four other documents referred to the ███████████████ of a codenamed project, and those documents were dated 2016 and 2019. There was no way to determine which "██████████████████" document was being referred to in the hyperlink or if Tesla disclosed the current ████████ ████████ referenced by the link. I attempted to review the Confluence documents' metadata, but there was no metadata other than the documents were "created" on July 5, 2023.

8.      Tesla's PDF conversion of the Confluence documents also made efficient searching impossible. I utilized the advanced search functionality in Adobe Reader to search all forty-seven files in the C:\AP\Source Code folder. Adobe Reader returned the following error: "Search has skipped 46 files because either these files are corrupt or you don't have permission to open them." I was able to open each of the Confluence files individually for search purposes. There were no

options for sophisticated searching such as wild cards, exclusions, reverse exclusions, exactly or nearby operators found in traditional e-discovery platforms.  Therefore, I attempted to add the Confluence PDFs to the search tools AD's source code review experts recommended. The screen showed a corrupt file, e.g., kanji, empty boxes, numbers, etc.

9.      The second folder contained fifteen PDFs, e.g., Code Part 1, Code Part 2, ..., Code Part 15. These PDFs concatenated hundreds of actual source code files, e.g., .cpp or .h files, into a single PDF. The various "Code Part" PDFs contained the following number of converted code files: 311, 312, 465, 319, 697, 675, 285, 498, 367, 420, 311, 773, 433, 487, and 345. Every line of these documents was converted to black text, so visually identifying comments by the text's color was impossible.

10.     I attempted to load the PDF source code into the following conventional code review and software development platforms: Visual Studio, Eclipse, and Notepad ++.

a.   Visual Studio gave the following error, "This document' format is either unsupported or contains binary characters, opening with a different application." The different application was Adobe Reader. During a break, I spoke with Dr. Rubin's code review assistant. He confirmed that Adobe Reader is not a source code review tool.

b.   Eclipse warned that it "cannot create the in-place editor. Reason: This is probably because there is no OLE editor registered against the type of file you are trying to open." Like Visual Studio, Eclipse opened the files in Adobe Reader.

c.   When I placed the PDF files into Notepad ++, the files became corrupt, like the Confluence PDFs became corrupt.

11.   I experienced identical issues when I attempted to review the single PDF file that Tesla created by concatenating and converting 836 source code files in the c:\AP\Simulator folder. The total number of converted source code files in C:\AP\Simulator and C:\AP\Autopilot was 7,534.

12.   In my experience reviewing source code as a lawyer, defendants produce their entire source code base for each accused product. And, if necessary, plaintiffs do the same. In another litigation, Tesla represented that in late 2018 its Autopilot source code consisted of over 300,000 files and directories. *See, e.g.*, Ex. D (complaint in *Tesla, Inc. v. Guangshi Cao* (5:19-cv-01463-SVK)) at ¶¶2-3. Assuming that Tesla has not generated any files since that representation, Tesla's production represents 2% of the relevant source code. While there is no similar metric for the accused simulator, Tesla's public representation that it is the fifth most powerful computer in the world suggests that more than 836 relevant files exist.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7th day of August 2023, in Washington, D.C.

Dated: August 8, 2023                      Respectfully submitted,

                                           */s/ John S. Holley*
                                           John S. Holley

# Exhibit F



Harbor Labs, LLC
Baltimore, MD
1-855-CYBR-SCI
**HarborLabs.com**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AUTONOMOUS DEVICES LLC,<br><br>            Plaintiff,<br><br>  v.<br><br>TESLA, INC.,<br><br>            Defendant. | C.A. No. 22-1466-MN<br><br>**DECLARATION OF DR. AVIEL D. RUBIN IN SUPPORT OF LETTER TO THE HONORABLE LAURA D. HATCHER**<br><br>**REGARDING THE ONGOING PROTECTIVE ORDER DISPUTE** |

1.      My name is Dr. Aviel D. Rubin. I have been retained as an expert on behalf of Plaintiff Autonomous Devices, LLC ("Autonomous") in the above-captioned litigation. I have been asked to submit this declaration in support of Autonomous's Motion to Compel the Production of Source Code from Defendant Tesla.

## I.      Summary of Qualifications

2.      I am a Computer Scientist with almost a decade of industry experience followed by over 20 years in academia. After receiving my Ph.D. in Computer Science from the University of Michigan in 1994, I worked as a researcher at Bellcore and then at AT&T Labs. In 2003, I joined the Computer Science faculty at Johns Hopkins University and was promoted to Full Professor with Tenure in 2004. During my over 20 years at Johns Hopkins, I was Technical Director of the JHU Information Security Institute, along with my regular faculty position. In 2023, I retired from Johns Hopkins and joined Harbor Labs, a company I founded in 2011, as Chief Scientist. I am a frequent keynote speaker at industry and academic conferences and delivered widely viewed TED talks in 2011 and 2015. I have testified about information and network security before Congress on multiple occasions and frequently testify as an expert witness in Federal court. My awards include Fulbright Scholar, Baltimorean of the Year, and the EFF Pioneer Award.

3.      I have reviewed source code written in languages including ARM Assembly, X86 Assembly, MIPS Assembly, C, C++ (including Visual C++), C#, Objective C, Java, Python, Perl, JavaScript, Swift, Kotlin, Ruby, COBOL and others.  As part of this work, I have reviewed software systems of varying sizes, often totaling in the millions or billions of lines of code. I have reviewed products in the security space, television-based set top boxes, network appliances, numerous web-based enterprise systems, email management systems, telephony products,

embedded system bootloaders, social network platforms, and countless other products. I have conducted and/or supervised source code reviews in more than 60 cases.

## II.    Relevance of and Need for Source Code for the Accused Cisco Products

4.    Source code is necessary to determine how the accused Tesla products work. That is because the ultimate source of truth for how a product works is in its implementation. While resources such as user guides, design documentation, and marketing documents are useful in understanding how a product is *likely* to work, such materials are not always comprehensive or accurate. Indeed, in my experience, these types of documentation can be incomplete, aspirational, outdated, and oversimplified. This is particularly true in cases where, as here, the documents describe the design, implementation, or structure of system subcomponents, protocol messages, or internal processes.

5.    Because technical documentation for software-related products is not always complete or accurate, it is necessary to review the source code of those products to understand how they operate. Given that source code is—by definition—the implementation of a product's functionality, it is impossible for source code to be inaccurate.

6.    Source code is generally written in a human readable programming language such as C, C++, Rust, Java, Go, or one or more of thousands of similar such languages. Source code is typically written by humans and divided into many different interrelated text files. Because of the interrelated nature of these files, it is necessary to cross-reference source code between files as part of the creation and review of the code. For these reasons, source code is typically written using a type of program called an integrated development environment (IDE) and/or a programmer's text editor (collectively, source code editors). Similarly, in order to organize code appropriately, programming languages provide facilities for code to be stored in separate modules composed of nested files and folders. Source code is stored in this manner in the typical course of business.

The source code is also reviewed and edited using code editors and search tools in the typical course of business.

7.      I understand that rather than produce the source code in the manner in which it is stored in the typical course of business and to provide typical and appropriate source code review tools to make source code review efficient, Tesla has instead elected to concatenate all of its source code files into fifteen separate PDF files consisting of thousands of pages each.  In order to do this, Tesla would have had to have manually taken all of its source code files out of the directory structure in which it was held and organized and then concatenated it into these enormous PDF files.  Files produced in this way cannot reasonably be cross-referenced or searched in an efficient fashion as PDF readers are not designed for these purposes and consist of rudimentary search features that do not work efficiently for reviewing source code.  In my opinion, there is no logical reason why Tesla would have produced its code in this way except to frustrate the source code review process and to make source code review nearly impossible.  In the more than 60 cases for which I have reviewed source code, I cannot think of a single instance in which source code has been produced in this fashion.[1]  It is my opinion that Tesla needs to produce its source code in the manner in which it stores the code in the ordinary course of business, and that Tesla needs to provide access to standard source code review tools agreed upon by the parties, in order to allow for the source code to be reasonably be reviewed.

---

[1] I have been informed that Tesla's lawyers are asserting that providing the code in Portable Document Format (PDF) results in more security than native C++ format.  This is not correct.  A PDF file is not inherently more secure than C++ files, and no company that I am aware of stores their code in PDF format.  Security is provided by security measures, such as an encrypted laptop without internet connectivity—not the format of the files.

8.      Producing source code in PDF files result in loss of information and accessibility. In combination with Tesla's selective source code production[2] and loss of original file structure, the source code they produced would hardly be complete or navigable.

9.      Source code relies heavily on its original formatting, such as indentation, which is key to understanding its structure and functionality. For some programming languages, changing formatting can even change the actual meaning of the code. Syntax is crucial in code development and comprehension, for both code developers and reviewers. When code is produced in PDF format, original formatting and syntax will likely be lost or altered, possibly leading to an altered presentation of code functionality.

10.      In addition, when source code is in its original format, source code editors can distinguish different parts of the code (e.g., utilize syntax highlighting on different code components, identify classes and functions, etc.). Syntax highlighting in source code editors is common and crucial for both code developers and reviewers. When code is produced in PDF format, PDF viewers generates no syntax highlighting of the code, making it physically difficult to differentiate between keywords in the code when staring at a screen for long periods of time. This limits the reviewer's capability for comprehending source code.

11.      Source code editors also have enhanced, code-specific interactive functionalities, such as definition lookup, search within specific files or directories, filters for search results, code folding, or interactive code execution. Using source code editors to interact with code in its original format is crucial for both code developers and reviewers in developing and understanding source code. When code is produced in PDF format the source code cannot be reviewed using source code

---

[2] I have been informed that Tesla produced 7,534 files, and that Tesla publically stated that over 300,000 files and directed existed in 2019.

editors. PDF viewers usually provide extremely limited and unreliable search and interactivity, which makes it challenging to navigate through the code, or validate its behavior.

12.     I understand that Tesla has loaded external tools to interpret the source code, such as external search applications, folder comparison applications, static code analysis and linking tools, etc. onto the source code computer.  These tools work on code in their original formatting and file structure, but not on PDFs with different source code combined into the same file.  Thus, Tesla has loaded source code review tools onto its source code computer that cannot be used to review the source code at all.

13.     Furthermore, the sheer volume of the code represented in 16 large PDF files, with thousands of pages of unstructured, non-interactive text, would make the review process extremely time-consuming and inefficient. Having source code in PDF format also obscures the information that would be cited future reports, including but not limited to folder name, file path, and line numbers.

14.     To summarize, Tesla has attempted the digital equivalent of printing all of its source code files out end-to-end on thousands of sheets of paper in order to frustrate the code review process.  If Tesla succeeds, I fear that they will have made effective source code review nearly impossible.

15.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 8th day of August, 2023, in Annapolis, Maryland.


_____
Dr. Aviel D. Rubin, Ph.D.

5

# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AUTONOMOUS DEVICES LLC,               )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )      C.A. No. 22-1466-MN
                                       )
TESLA, INC.,                           )
                                       )
                    Defendant.         )
                                       )

**[PROPOSED] PROTECTIVE ORDER GOVERNING THE DESIGNATION AND**
**HANDLING OF CONFIDENTIAL MATERIALS**

Plaintiff Autonomous Devices LLC ("Plaintiff") and Defendant Tesla, Inc. ("Defendant")

anticipate that documents, testimony, or information containing or reflecting confidential,

proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or

produced during the course of discovery, initial disclosures, and supplemental disclosures in this

case and request that the Court enter this Order setting forth the conditions for treating, obtaining,

and using such information.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, the Court finds good cause

for the following Agreed Protective Order Regarding the Disclosure and Use of Discovery

Materials ("Order" or "Protective Order").

    1.     **PURPOSES AND LIMITATIONS**

        (a)    Protected Material designated under the terms of this Protective Order shall

be used by a Receiving Party solely for this case, and shall not be used directly or indirectly for

any other purpose whatsoever.

(b)     The Parties acknowledge that this Order does not confer blanket protections on all disclosures during discovery, or in the course of making initial or supplemental disclosures under Rule 26(a). Designations under this Order shall be made with care and shall not be made absent a good faith belief that the designated material satisfies the criteria set forth below. If it comes to a Producing Party's attention that designated material does not qualify for protection at all, or does not qualify for the level of protection initially asserted, the Producing Party must promptly notify all other Parties that it is withdrawing or changing the designation.

(c)     <u>Other Proceedings</u>. By entering this order and limiting the disclosure of information in this case, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this order who becomes subject to a motion to disclose another party's information designated "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" pursuant to this order shall promptly notify that party of the motion so that the party has a reasonable opportunity to appear and be heard on whether that information should be disclosed prior to disclosure.

2.     **DEFINITIONS**

(a)     "CONFIDENTIAL" means information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

(b)     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" means sensitive "CONFIDENTIAL" information (regardless of how it is generated, stored or maintained) or tangible things, disclosure of which to another would create a substantial risk of serious harm that could not be avoided by less restrictive means.

(c) **[DISPUTED PROVISION-DEFENDANT'S PROPOSAL:** "Source Code" means computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs.**]**

**[PLAINTIFF'S PROPOSAL:** "HIGHLY CONFIDENTIAL – SOURCE CODE MATERIAL" means sensitive "CONFIDENTIAL" information (regardless of how it is generated, stored or maintained) or tangible things representing computer code (i.e., computer instructions and data definitions expressed in a form suitable for input to an assembler, compiler or other translator) and associated comments and revision histories, disclosure of which to another would create a substantial risk of serious harm that could not be avoided by less restrictive means.**]**

(d) "Discovery Material" means all items or information, including from any non-party, regardless of the medium or manner generated, stored, or maintained (including, among other things, testimony, transcripts, or tangible things) that are produced, disclosed, or generated in connection with discovery or Rule 26(a) disclosures in this case.

(e) "Expert" means a person with specialized knowledge or experience in a matter pertinent to the respective litigations who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in the above-captioned action, (2) is not a current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

(f) "Outside Counsel" means (i) attorneys who are not employees of a Party to the above-captioned action but are retained to represent or advise a Party to that action and have appeared on the pleadings as counsel for a Party and (ii) partners, associates, and staff of such counsel to whom it is reasonably necessary to disclose the information for this litigation.

(g)     "Patents-in-suit" means U.S. Patent Nos. 10,102,449; 11,055,583; 10,452,974; 11,238,344; 10,607,134; and 11,113,585, and any other patent asserted in this action.

(h)     "Party" means any party to this case, including all of its officers, directors, employees, consultants, retained Experts, and Outside Counsel and their support staffs.

(i)     "Producing Party" means any Party or non-party that discloses or produces any Discovery Material in this case.

(j)     "Protected Material" means any Discovery Material that is designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE," as provided for in this Order. Protected Material shall not include: (i) advertising materials that have been actually published or publicly disseminated; and (ii) materials that show on their face they have been disseminated to the public.

(k)     "Receiving Party" means any Party who receives Discovery Material from a Producing Party.

3.     **COMPUTATION OF TIME**

The computation of any period of time prescribed or allowed by this Order shall be governed by the provisions for computing time set forth in Federal Rules of Civil Procedure 6.

4.     **SCOPE**

(a)     The protections conferred by this Order cover not only Discovery Material governed by this Order as addressed herein, but also any information copied or extracted therefrom, as well as all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or their counsel in court or in other settings that might reveal Protected Material.

(b)     Nothing in this Protective Order shall prevent or restrict a Producing Party's own disclosure or use of its own Protected Material for any purpose, and nothing in this Order shall preclude any Producing Party from showing its Protected Material to an individual who prepared the Protected Material.

(c)     Nothing in this Order shall be construed to prejudice any Party's right to use any Protected Material in court or in any court filing with the consent of the Producing Party or by order of the Court.

(d)     This Order is without prejudice to the right of any Party to seek further or additional protection of any Discovery Material or to modify this Order in any way, including, without limitation, an order that certain matter not be produced at all.

(e)     The protections conferred by this Order do not cover the following information: (a) any information that the Receiving Party can show is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information that the Receiving Party can clearly show was known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Party that designated the Discovery Material.

5.     **DURATION**

Even after the termination of this case, the confidentiality obligations imposed by this Order shall remain in effect until a Producing Party agrees otherwise in writing or a court order otherwise directs.

6.     **ACCESS TO AND USE OF PROTECTED MATERIAL**

(a)     Basic Principles. All Protected Material shall be used solely for this case or any related appellate proceeding, and not for any other purpose whatsoever, including without limitation any other litigation, patent prosecution or acquisition, patent reexamination or reissue proceedings, or any business or competitive purpose or function. Protected Material shall not be distributed, disclosed or made available to anyone except as expressly provided in this Order.

(b)     Patent Prosecution Bar. Absent the written consent of the Producing Party, any person on behalf of the Plaintiff who personally reviews any technical HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY or HIGHLY CONFIDENTIAL – SOURCE CODE are prohibited from participating in an administrative proceeding for the examination and reexamination of a patent or patent application insofar as the participation involves input into the drafting, revising or amending of a patent claim relating to the functionality, operation, and design of autonomous systems, machine learning, or artificial intelligence (generally or as described in any patent in suit), if such administrative proceeding (e.g., patent application filing) was commenced less than two years following the final termination of this action (including any appeals). This prosecution bar does not prevent an individual from participating in a reexamination, *inter partes* review, or other post-grant review proceedings involving the patents-at-issue or patents related thereto, except that the individual is prohibited from participating in, or otherwise providing input into, the drafting of any claim or amendment to any claim.

(c)     Secure Storage, No Export. Protected Material must be stored and maintained by a Receiving Party at a location in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Order. To ensure compliance with applicable United States Export Administration Regulations, Protected Material may not be

exported outside the United States or released to any foreign national (even if within the United States).

(d)    Legal Advice Based on Protected Material. Nothing in this Protective Order shall be construed to prevent counsel from advising their clients with respect to this case based in whole or in part upon Protected Materials, provided counsel does not disclose the Protected Material itself except as provided in this Order.

(e)    Limitations. Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protected Material. Nothing in this Order shall restrict in any way the use or disclosure of Discovery Material by a Receiving Party: (i) that is or has become publicly known through no fault of the Receiving Party; (ii) that is lawfully acquired by or known to the Receiving Party independent of the Producing Party; (iii) previously produced, disclosed and/or provided by the Producing Party to the Receiving Party or a non-party without an obligation of confidentiality and not by inadvertence or mistake; (iv) with the consent of the Producing Party; or (v) pursuant to order of the Court.

7.    **DESIGNATING PROTECTED MATERIAL**

(a)    Available Designations. Any Producing Party may designate Discovery Material with any of the following designations, provided that it meets the requirements for such designations as provided for herein: "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

(b)    Written Discovery and Documents and Tangible Things. Written discovery, documents (which include "electronically stored information," as that phrase is used in Federal Rule of Procedure 34), and tangible things that meet the requirements for the confidentiality designations listed in Paragraph 7(a) may be so designated by placing the appropriate designation

on every page of the written material prior to production. For digital files being produced, the Producing Party may mark each viewable page or image with the appropriate designation, and mark the medium, container, and/or communication in which the digital files were contained. In the event that original documents are produced for inspection, the original documents shall be presumed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" during the inspection and re-designated, as appropriate during the copying process.

(c) <u>Native Files</u>. Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending to the file names or designators information indicating whether the file contains "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE," material, or shall use any other reasonable method for so designating Protected Materials produced in electronic format. When electronic files or documents are printed for use at deposition, in a court proceeding, or for provision in printed form to an Expert or consultant pre-approved pursuant to paragraph 12, the party printing the electronic files or documents shall affix a legend to the printed document corresponding to the designation of the Designating Party and including the production number and designation associated with the native file.

(d) <u>Depositions and Testimony</u>. Parties or testifying persons or entities may designate depositions and other testimony with the appropriate designation by indicating on the record at the time the testimony is given or by sending written notice of how portions of the transcript of the testimony is designated within thirty (30) days of receipt of the transcript of the testimony. If no indication on the record is made, all information disclosed during a deposition shall be deemed "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" until the time within

which it may be appropriately designated as provided for herein has passed. Any Party that wishes to disclose the transcript, or information contained therein, may provide written notice of its intent to treat the transcript as non-confidential, after which time, any Party that wants to maintain any portion of the transcript as confidential must designate the confidential portions within fourteen (14) days, or else the transcript may be treated as non-confidential. Any Protected Material that is used in the taking of a deposition shall remain subject to the provisions of this Protective Order, along with the transcript pages of the deposition testimony dealing with such Protected Material. In such cases the court reporter shall be informed of this Protective Order and shall be required to operate in a manner consistent with this Protective Order. In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "This videotape contains confidential testimony used in this case and is not to be viewed or the contents thereof to be displayed or revealed except pursuant to the terms of the operative Protective Order in this matter or pursuant to written stipulation of the parties." Counsel for any Producing Party shall have the right to exclude from oral depositions, other than the deponent, deponent's counsel, the reporter and videographer (if any), any person who is not authorized by this Protective Order to receive or access Protected Material based on the designation of such Protected Material. Such right of exclusion shall be applicable only during periods of examination or testimony regarding such Protected Material.

8. **DISCOVERY MATERIAL DESIGNATED AS "CONFIDENTIAL"**

(a) A Producing Party may designate Discovery Material as "CONFIDENTIAL" if it contains or reflects confidential, proprietary, and/or commercially sensitive information.

(b)     Unless otherwise ordered by the Court, Discovery Material designated as "CONFIDENTIAL" may be disclosed only to the following:

(i)     The Receiving Party's Outside Counsel, such counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)     Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; (c) such Expert or consultant accesses the materials in the United States only, and does not transport them to or access them from any foreign jurisdiction; and (d) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below; Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iii)     The Court, jury, and court personnel;

(iv)     Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(v)     Mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material, not to use the Protected Material in any way other than as a mock juror, and to keep any information concerning Protected Material confidential;

(vi)     Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

(vii)     Any other person with the prior written consent of the Producing Party.

9.     **DISCOVERY MATERIAL DESIGNATED AS "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY"**

(a)     A Producing Party may designate Discovery Material as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" if it contains or reflects information that is extremely confidential and/or sensitive in nature and the Producing Party reasonably believes that the disclosure of such Discovery Material is likely to cause economic harm or significant competitive disadvantage to the Producing Party. The Parties agree that the following information, if non-public, shall be presumed to at least merit the "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" designation: trade secrets, pricing information, financial data, sales information, sales or marketing forecasts or plans, business plans, sales or marketing strategy, product development information, engineering documents, testing documents, employee information, and other non-public information of similar competitive and business sensitivity.

(b)     Unless otherwise ordered by the Court, Discovery Material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be disclosed only to:

(i)     The Receiving Party's Outside Counsel, provided that such Outside Counsel is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party, and such Outside Counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)    Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director, or employee of a Party or of a competitor of a Party; (c) such Expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party; (d) such Expert or consultant accesses the materials in the United States only, and does not transport them to or access them from any foreign jurisdiction; and (e) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)    Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iv)    The Court, jury, and court personnel;

(v)    Graphics, translation, design, and/or trial consulting personnel, having first agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A;

(vi)    Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

(vii)    Any other person with the prior written consent of the Producing Party.

(c)     In addition, a Party may disclose arguments and materials derived from Discovery Material designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" to mock jurors who have signed an undertaking or agreement agreeing not to publicly disclose Protected Material and to keep any information concerning Protected Material confidential. A Party may not disclose to mock jurors any original, as-produced materials or information (including, for example, documents, deposition testimony, or interrogatory responses) produced by another Party designated as "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

10.     **DISCOVERY MATERIAL DESIGNATED AS "HIGHLY CONFIDENTIAL – SOURCE CODE"**

(a)     To the extent production of Source Code becomes necessary to the prosecution or defense of the case, a Producing Party may designate Source Code as "HIGHLY CONFIDENTIAL – SOURCE CODE."

(b)     Nothing in this Order shall be construed as a representation or admission that Source Code is properly discoverable in this action, or to obligate any Party to produce any Source Code.

(c)     Unless otherwise ordered by the Court, Discovery Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to the provisions set forth in Paragraph 11 below, and may be disclosed, subject to Paragraph 11 below, solely to:

(i)     The Receiving Party's Outside Counsel, provided that such Outside Counsel is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party, and such Outside Counsel's immediate paralegals and staff, and any copying or clerical litigation support services working at the direction of such counsel, paralegals, and staff;

(ii)　　Any outside Expert or consultant retained by the Receiving Party to assist in this action, provided that disclosure is only to the extent necessary to perform such work; and provided that: (a) such Expert or consultant has agreed to be bound by the provisions of the Protective Order by signing a copy of Exhibit A; (b) such Expert or consultant is not a current officer, director, or employee of a Party or of a competitor of a Party, nor anticipated at the time of retention to become an officer, director or employee of a Party or of a competitor of a Party; (c) such Expert or consultant is not involved in competitive decision-making, as defined by *U.S. Steel v. United States*, 730 F.2d 1465, 1468 n.3 (Fed. Cir. 1984), on behalf of a Party or a competitor of a Party; and (d) no unresolved objections to such disclosure exist after proper notice has been given to all Parties as set forth in Paragraph 12 below;

(iii)　　Court reporters, stenographers and videographers retained to record testimony taken in this action;

(iv)　　The Court, jury, and court personnel;

(v)　　Any mediator who is assigned to hear this matter, and his or her staff, subject to their agreement to maintain confidentiality to the same degree as required by this Protective Order; and

(vi)　　Any other person with the prior written consent of the Producing Party.

11.　　**DISCLOSURE AND REVIEW OF SOURCE CODE**

Any Source Code that is produced in discovery shall be made available for inspection, in electronic (e.g., native) format. **[DISPUTED PROVISION-DEFENDANT'S PROPOSAL:** The Producing Party shall produce Source Code for inspection in electronic (e.g., native) format.  If Tesla is the Producing Party, it shall produce Source Code at a Tesla office in the Bay Area,

California.]  [**PLAINTIFF'S PROPOSAL:** The Producing Party shall produce Source Code for inspection in electronic (e.g., native) format at the office of its counsel in Washington D.C. or New York where Outside Counsel for each party has offices.  [**PLAINTIFF'S ALTERNATIVE PROPOSAL:** The Source Code Computer shall be located with an independent escrow agent, with the costs of such to be shared by the parties. If the parties cannot agree on such an agent, each party shall submit to the court the name and qualifications of their proposed agents for the court to choose.]

(a)     Any single reviewing session (conducted during one business day or during consecutive business days of review) shall be conducted during regular business hours (8:00 A.M. to 6:00 P.M. local time) on four (4) business days' written (including email) notice, although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times and on shorter notice

(b)     Prior to the first inspection of Source Code, the Receiving Party shall provide fourteen (14) days' notice for its Source Code inspection request.

(c)     Source Code that is designated "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be produced for inspection and review subject to the following provisions, unless otherwise agreed by the Producing Party:

i.      All Source Code shall be made available by the Producing Party to the Receiving Party's outside counsel and/or Experts in a secure room on at least two (2) secured computers without Internet access or network access to other computers and on which all access ports have been disabled (except for one printer port), as necessary and appropriate to prevent and protect against any unauthorized copying, transmission, removal or other transfer of any Source Code outside or

away from the computer on which the Source Code is provided for inspection (the "Source Code Computer" in the "Source Code Review Room"). The Producing Party shall install tools that are sufficient for viewing and searching the code produced, on the platform produced, if such tools exist and are presently used in the ordinary course of the Producing Party's business. The Receiving Party's outside counsel and/or Experts may request that commercially available software tools for viewing and searching Source Code be installed on the secured computers, provided, however, that (a) the Receiving Party possesses an appropriate license to such software tools; (b) the Producing Party approves such software tools; and (c) such other software tools are reasonably necessary for the Receiving Party to perform its review of the Source Code consistent with all of the protections herein. The Receiving Party must provide the Producing Party with the software tool(s) at least fourteen (14) days in advance of the date upon which the Receiving Party wishes to have the additional software tools available for use on the Source Code Computer. The Receiving Party shall not copy, remove, or otherwise transfer any portion of the Source Code onto any recordable media or recordable device absent prior agreement of the Producing Party.

ii.      No recordable media or recordable devices, including without limitation sound recorders, computers, cellular telephones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind shall be permitted into the Source Code Review Room. Upon request, the Producing Party shall provide personnel to keep such devices (include cellular telephones) secure while a member of the Receiving

Party is in the Source Code Review Room, and shall promptly notify the member if any calls or notifications are received.

      iii.      The Source Code shall be produced as it is kept in the normal course of business, or as it would be collected in the normal course of business. The Receiving Party's outside counsel and/or Experts shall be entitled to take handwritten notes relating to the Source Code. Such notes shall be labeled "HIGHLY CONFIDENTIAL – SOURCE CODE." Such notes may include excerpts of the Source Code when reasonably necessary to guide the note taker's use of later-requested paper copies of the Source Code. Such handwritten notes shall be subject to the same limitations and protections as printed Source Code, as set forth paragraph 12, including without limitation total page limits, consecutive line number limits, copy limits, and logging requirements. The Receiving Party shall be under no obligation to produce handwritten notes but shall disclose how many pages of handwritten notes contain Source Code upon request. Otherwise, no copies of all or any portion of the Source Code may leave the room in which the Source Code is inspected except as otherwise provided in this Protective Order. The Receiving Party's outside counsel and/or Experts shall also be entitled to take notes relating to the Source Code, but may not copy the Source Code into the notes. The Producing Party shall make available software on the Source Code Computers for note-taking and shall permit printing of such notes. No other computer is permitted in the Source Code Review Room. Further, no other written or electronic record of the Source Code is permitted except as otherwise provided in this Protective Order.

iv.     The Source Code provider shall provide a manifest of the contents of the computer to include a list of Source Code files available for review. This manifest, which will be supplied in both printed and electronic form, will list the name, location, and MD5 checksum of every Source Code file on the Source Code Computer.

v.      The Source Code Computer shall include software utilities which will allow counsel and experts to view and search the Source Code. At a minimum, these utilities must provide the ability to (a) view, search, and line-number any source file, and (b) search for a given pattern of text through a number of files, (c) compare two files and display their differences, and (d) compute the MD5 checksum of a file.

vi.     The Producing Party may visually monitor the activities of the Receiving Party's representatives during any Source Code review, but only to ensure that no unauthorized electronic records of the Source Code and no information concerning the Source Code are being created or transmitted in any way.

vii.    The Receiving Party may request copies of reasonable portions of the Source Code identified in a reasonable manner. The Receiving Party shall not print Source Code in order to review blocks of Source Code elsewhere in the first instance, i.e., as an alternative to reviewing that Source Code electronically on the Source Code Computer, as the Parties acknowledge and agree that the purpose of the protections herein would be frustrated by printing portions of code for review and analysis elsewhere. In the event that the Receiving Party requests more than

**[DISPUTED PROVISION-DEFENDANT'S PROPOSAL:** 5 consecutive pages, or an aggregate of more than 200 pages**] [PLAINTIFF'S PROPOSAL:** 50 consecutive pages, or an aggregate of more than 2500 pages**]**, of print outs of Source Code, the parties shall have a meet and confer in good faith. A text editor will be provided on the Source Code Computer so that the list of files to be printed may be saved directly to the Source Code Computer. If the Producing Party objects that identified files are not reasonably necessary, the Producing Party shall make such objection known to the Receiving Party within three (3) business days of the identification of any files by the Receiving party. If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the Producing Party shall be entitled to seek a judicial resolution of whether or not the identified Source Code in question is reasonably necessary to any case preparation activity. At the request of the Receiving Party, in the absence of any objection the Producing Party shall provide within five (5) days of such request, paper copies of the Source Code identified at the time of inspection by the Receiving Party. The Producing Party shall print, label such files with the file's complete path name, and append production numbers and the designation "HIGHLY CONFIDENTIAL – SOURCE CODE." The paper copies must be kept in a secured location at the offices of the Receiving Party's Outside Counsel at all times. The Receiving Party may make no more than five (5) additional paper copies of any portions of the Source Code files, not including copies attached to court filings or trial and hearing demonstrative exhibits. The Receiving Party shall only make additional paper copies if such additional copies are (1) necessary to prepare court filings, pleadings,

or other papers (including a testifying expert's expert report), or (2) necessary for deposition. The Receiving Party shall request printing of only such portions as are relevant to the claims and defenses in the case and are reasonably necessary for such purpose. Such printouts are to be of minimum 10-point, fixed-width font, and shall not exceed sixty-five (65) lines of text per page. The Producing Party may challenge the amount of Source Code requested in hard copy form pursuant to the dispute resolution procedure and timeframes set forth herein whereby the Producing Party is the "Challenging Party," and the Receiving Party is the "Designating Party" for purposes of dispute resolution.

viii.    The Receiving Party's Outside Counsel shall maintain a log of all paper copies of the Source Code. The log shall include the number of paper copies, names of the recipients of paper copies, and locations where the paper copies are stored. Upon one (1) day's advance notice to the Receiving Party by the Producing Party, the Receiving Party shall provide a copy of this log to the Producing Party.

ix.    The Receiving Party's Outside Counsel and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices in a manner that prevents duplication of or unauthorized access to the Source Code, including, without limitation, storing the Source Code in a locked room or cabinet at all times when it is not in use.

x.    Except as provided in this Protective Order, no electronic copies of the Source Code shall be made.

xi.    Unless otherwise agreed in advance by the parties in writing, the Receiving Party's Outside Counsel and/or Experts shall remove all notes,

documents, and all other materials from the Source Code Review Room that may contain work product and/or attorney-client privileged information at the end of each day. Materials inadvertently left in the Source Code Review Room do not operate as a waiver of the attorney work product doctrine or any other applicable privilege and shall be returned to the owner promptly. The Producing Party shall not be responsible for any items left in the Source Code Review Room. Proper identification of all authorized persons shall be provided prior to any access to the secure room or the computer containing Source Code. Proper identification requires showing, at a minimum, a photo identification card sanctioned by the government of any State of the United States, by the government of the United States, or by the nation state of the authorized person's current citizenship. Access to the secure room or the Source Code Computer may be denied, at the discretion of the supplier, to any individual who fails to provide proper identification.

xii.      [**DISPUTED PROVISION-DEFENDANT'S PROPOSAL:** For depositions, the Receiving Party shall not bring copies of any printed Source Code. Rather, at least ten (10) days before the date of the deposition, the Receiving Party shall notify the Producing Party about the specific portions of Source Code it wishes to use at the deposition, and the Producing Party shall bring printed copies of those portions to the deposition for use by the Receiving Party. Copies of Source Code that are marked as deposition exhibits shall not be provided to the Court Reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. All paper copies of Source Code brought to the

deposition shall remain with the Producing Counsel's outside counsel for secure destruction in a timely manner following the deposition.**]**

**[PLAINTIFF'S PROPOSAL:** Copies of source code that are marked as deposition exhibits shall not be provided to the court reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers and the Party that brought the source code to the deposition will keep possession of the marked deposition source code exhibit. If the deposition exhibit has been marked up or altered in any way by the deponent, the Receiving Party shall store the exhibit in its marked form and provide one copy to outside counsel for the other Party**]**

xiii.        Except as provided in this sub-paragraph, absent express written permission from the Producing Party, the Receiving Party and any persons receiving Source Code from Receiving Party may not create electronic images, or any other images, or make electronic copies, of the Source Code from any paper copy of Source Code for use in any manner (including by way of example only, the Receiving Party and any persons receiving Source Code from Receiving Party may not scan the Source Code to a PDF or photograph the code). A party may make and use snippets and images of the Source Code if necessary for court filings, expert reports, discovery responses and other similar documents. All such documents shall be clearly marked "HIGHLY CONFIDENTIAL – SOURCE CODE" and, if filed, shall be filed under seal. Unless agreed by the parties, images or copies of Source Code shall not be included in correspondence between the Parties (references to production numbers shall be used instead). Unless agreed by the parties, images or

copies of Source Code shall be omitted from pleadings and other papers whenever possible and reasonably minimized when not. **[DISPUTED PROVISION-DEFENDANT'S PROPOSAL**: Source Code shall not be electronically filed as an exhibit to any pleadings or papers.**]**

xiv.  All persons who will review a Producing Party's Source Code on behalf of a Receiving Party, including members of a Receiving Party's outside law firm, shall be identified in writing to the Producing Party at least five (5) days in advance of the first time that such person reviews such Source Code Computer. All persons viewing Source Code Computer shall sign on each day they view Source Code Computer a log that will include the names of persons who enter the locked room to view the Source Code Computer and when they enter and depart. The Producing Party shall be entitled to a copy of the log upon one (1) day's advance notice to the Receiving Party.

xv.  At least three (3) days before the date of a deposition, a Receiving Party may request that the witness have access to a Source Code Computer. The Producing Party shall provide a Source Code Computer that the witness can access and an external monitor that allows the questioning attorney to see the files being discussed during the deposition on the condition that the deposition take place at a location of the Producing Party's choosing. The deposition record will identify the file names and file paths being discussed.

**NOTICE OF DISCLOSURE**

(d)      Prior to disclosing any Protected Material to any person described in Paragraphs 8(b)(ii), 9(b)(ii), or 10(c)(ii) (referenced below as "Person"), the Party seeking to disclose such information shall provide the Producing Party with written notice that includes:

(i) the name of the Person;

(ii) an up-to-date curriculum vitae of the Person;

(iii) the present employer and title of the Person;

(iv) an identification of all of the Person's past and current employment and consulting relationships, including direct relationships and relationships through entities owned or controlled by the Person, including but not limited to an identification of any individual or entity with or for whom the person is employed or to whom the person provides consulting services relating to the design, development, operation, or patenting of autonomous systems, machine learning, or artificial intelligence, or relating to the acquisition of intellectual property assets relating to autonomous systems, machine learning, or artificial intelligence;

(v) an identification of all pending patent applications on which the Person is named as an inventor, in which the Person has any ownership interest, or as to which the Person has had or anticipates in the future any involvement in advising on, consulting on, preparing, prosecuting, drafting, editing, amending, or otherwise affecting the scope of the claims; and

(vi) a list of the cases in which the Person has testified at deposition or trial within the last five (5) years.

Further, the Party seeking to disclose Protected Material shall provide such other information regarding the Person's professional activities reasonably requested by the Producing Party for it to evaluate whether good cause exists to object to the disclosure of Protected Material to the outside Expert or consultant. During the pendency of and for a period of one (1) year after the final resolution of this action, including all appeals, the Party seeking to disclose Protected Material shall immediately provide written notice of any change with respect to the Person's involvement in the design, development, operation or patenting of autonomous systems, machine learning, or artificial intelligence, or the acquisition of intellectual property assets relating to autonomous systems, machine learning, or artificial intelligence.

(e)     Within seven (7) days of receipt of the disclosure of the Person, the Producing Party or Parties may object in writing to the Person for good cause. In the absence of an objection at the end of the seven (7) day period, the Person shall be deemed approved under this Protective Order. There shall be no disclosure of Protected Material to the Person prior to expiration of this seven (7) day period. If the Producing Party objects to disclosure to the Person within such seven (7) day period, the Parties shall meet and confer via telephone or in person within seven (7) days following the objection and attempt in good faith to resolve the dispute on an informal basis. If the dispute is not resolved, the Party objecting to the disclosure will have seven (7) days from the date of the meet and confer to seek relief from the Court. If relief is not sought from the Court within that time, the objection shall be deemed withdrawn. If relief is sought, designated materials shall not be disclosed to the Person in question until the Court resolves the objection.

(f)     For purposes of this section, "good cause" shall include an objectively reasonable concern that the Person will, advertently or inadvertently, use or disclose Discovery Materials in a way or ways that are inconsistent with the provisions contained in this Order.

(g)     Prior to receiving any Protected Material under this Order, the Person must execute a copy of the "Agreement to Be Bound by Protective Order" (Exhibit A hereto) and serve it on all Parties.

(h)     An initial failure to object to a Person under this Paragraph 12 shall not preclude the non-objecting Party from later objecting to continued access by that Person for good cause. If an objection is made, the Parties shall meet and confer via telephone or in person within seven (7) days following the objection and attempt in good faith to resolve the dispute informally. If the dispute is not resolved, the Party objecting to the disclosure will have seven (7) days from the date of the meet and confer to seek relief from the Court. The designated Person may continue to have access to information that was provided to such Person prior to the date of the objection. If a later objection is made, no further Protected Material shall be disclosed to the Person until the Court resolves the matter or the Producing Party withdraws its objection. Notwithstanding the foregoing, if the Producing Party fails to move for a protective order within seven (7) business days after the meet and confer, further Protected Material may thereafter be provided to the Person.

## 12.   **CHALLENGING DESIGNATIONS OF PROTECTED MATERIAL**

(a)     A Party shall not be obligated to challenge the propriety of any designation of Discovery Material under this Order at the time the designation is made, and a failure to do so shall not preclude a subsequent challenge thereto.

(b)     Any challenge to a designation of Discovery Material under this Order shall be written, shall be served on outside counsel for the Producing Party, shall particularly identify

the documents or information that the Receiving Party contends should be differently designated, and shall state the grounds for the objection. Thereafter, further protection of such material shall be resolved in accordance with the following procedures:

(i)     The objecting Party shall have the burden of conferring either in person, in writing, or by telephone with the Producing Party claiming protection (as well as any other interested party) in a good faith effort to resolve the dispute. The Producing Party shall have the burden of justifying the disputed designation;

(ii)    Failing agreement, the Receiving Party may bring a motion to the Court for a ruling that the Discovery Material in question is not entitled to the status and protection of the Producing Party's designation. The Parties' entry into this Order shall not preclude or prejudice either Party from arguing for or against any designation, establish any presumption that a particular designation is valid, or alter the burden of proof that would otherwise apply in a dispute over discovery or disclosure of information;

(iii)   Notwithstanding any challenge to a designation, the Discovery Material in question shall continue to be treated as designated under this Order until one of the following occurs: (a) the Party who designated the Discovery Material in question withdraws such designation in writing; or (b) the Court rules that the Discovery Material in question is not entitled to the designation.

13.     **SUBPOENAS OR COURT ORDERS**

(a)     If at any time Protected Material is subpoenaed by any court, arbitral, administrative, or legislative body, the Party to whom the subpoena or other request is directed shall immediately give prompt written notice thereof to every Party who has produced such Discovery Material and to its counsel and shall provide each such Party with an opportunity to

move for a protective order regarding the production of Protected Materials implicated by the subpoena.

14.   **FILING PROTECTED MATERIAL**

(a)   Absent written permission from the Producing Party or a court Order secured after appropriate notice to all interested persons, a Receiving Party may not file or disclose in the public record any Protected Material.

(b)   Any Party is authorized under Del. L.R. 5.1.3 to file under seal with the Court any brief, document or materials that are designated as Protected Material under this Order. However, nothing in this section shall in any way limit or detract from this Order's requirements as to Source Code.

15.   **INADVERTENT DISCLOSURE OF PRIVILEGED MATERIAL**

(a)   The inadvertent production by a Party of Discovery Material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection, despite the Producing Party's reasonable efforts to prescreen such Discovery Material prior to production, will not waive the applicable privilege and/or protection if a request for return of such inadvertently produced Discovery Material is made promptly after the Producing Party learns of its inadvertent production.

(b)   Upon a request from any Producing Party who has inadvertently produced Discovery Material that it believes is privileged and/or protected, each Receiving Party shall immediately return such Protected Material or Discovery Material and all copies to the Producing Party, except for any pages containing privileged markings by the Receiving Party which shall instead be destroyed and certified as such by the Receiving Party to the Producing Party.

(c)    Nothing herein shall prevent the Receiving Party from preparing a record for its own use containing the date, author, addresses, and topic of the inadvertently produced Discovery Material and such other information as is reasonably necessary to identify the Discovery Material and describe its nature to the Court in any motion to compel production of the Discovery Material.

16.    **INADVERTENT FAILURE TO DESIGNATE PROPERLY**

(a)    The inadvertent failure by a Producing Party to designate Discovery Material as Protected Material with one of the designations provided for under this Order shall not waive any such designation provided that the Producing Party notifies all Receiving Parties that such Discovery Material is protected under one of the categories of this Order within fourteen (14) days of the Producing Party learning of the inadvertent failure to designate. The Producing Party shall reproduce the Protected Material with the correct confidentiality designation within seven (7) days upon its notification to the Receiving Parties. Upon receiving the Protected Material with the correct confidentiality designation, the Receiving Parties shall return or securely destroy, at the Producing Party's option, all Discovery Material that was not designated properly.

(b)    A Receiving Party shall not be in breach of this Order for any use of such Discovery Material before the Receiving Party receives such notice that such Discovery Material is protected under one of the categories of this Order, unless an objectively reasonable person would have realized that the Discovery Material should have been appropriately designated with a confidentiality designation under this Order. Once a Receiving Party has received notification of the correct confidentiality designation for the Protected Material with the correct confidentiality designation, the Receiving Party shall treat such Discovery Material (subject to the exception in Paragraph 16(c) below) at the appropriately designated level pursuant to the terms of this Order.

(c)     Notwithstanding the above, a subsequent designation of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL –SOURCE CODE" shall apply on a going forward basis and shall not disqualify anyone who reviewed "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL — SOURCE CODE" materials while the materials were not marked "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" from engaging in the activities set forth in Paragraph 6(b).

17.     **INADVERTENT DISCLOSURE NOT AUTHORIZED BY ORDER**

(a)     In the event of a disclosure of any Discovery Material pursuant to this Order to any person or persons not authorized to receive such disclosure under this Protective Order, the Party responsible for having made such disclosure, and each Party with knowledge thereof, shall immediately notify counsel for the Producing Party whose Discovery Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The responsible disclosing Party shall also promptly take all reasonable measures to retrieve the improperly disclosed Discovery Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made

(b)     Unauthorized or inadvertent disclosure does not change the status of Discovery Material or waive the right to hold the disclosed document or information as Protected.

(c)     The Receiving Party shall promptly notify the Producing Party within 5 days if it becomes aware of any unauthorized access of the Receiving Party or any unauthorized access of a Party having access to the Producing party's materials.

18.    **FINAL DISPOSITION**

(a)    Not later than ninety (90) days after the Final Disposition of this case, each Party shall return all Discovery Material of a Producing Party to the respective outside counsel of the Producing Party or destroy such Material. For purposes of this Order, "Final Disposition" occurs after an order, mandate, or dismissal finally terminating the above-captioned action with prejudice, including all appeals.

(b)    All Parties that have received any such Discovery Material shall certify in writing that all such materials have been returned to the respective outside counsel of the Producing Party or destroyed. Notwithstanding the provisions for return of Discovery Material, outside counsel may retain one set of pleadings, correspondence and attorney and consultant work product (but not document productions) for archival purposes, but must return any pleadings, correspondence, and consultant work product that contain Source Code.

(c)    **[DISPUTED          PROVISION-DEFENDANT'S          PROPOSAL**: Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, correspondence, deposition and trial exhibits, expert reports, even if such materials contain Protected Material. However, any such archival copies that contain or constitute Source Code must be redacted by the Party wishing to maintain such archival copies, and the unredacted versions of such documents must be destroyed. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order.**]**

**[PLAINTIFF'S PROPOSAL**: Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain

subject to this Protective Order.**]**

### 19. <u>**DISCOVERY FROM EXPERTS OR CONSULTANTS**</u>

(a)     Absent good cause, drafts of reports of testifying Experts, and reports and other written materials, including drafts, of consulting Experts, shall not be discoverable.

(b)     Reports and materials exempt from discovery under the foregoing Paragraph shall be treated as attorney work product for the purposes of this case and Protective Order.

(c)     Testifying Experts shall not be subject to discovery with respect to any draft of his or her report(s) in this case. Draft reports, notes, or outlines for draft reports developed and drafted by the testifying Expert and/or his or her staff are also exempt from discovery.

(d)     Discovery of materials provided to testifying experts shall be limited to those materials, facts, consulting expert opinions, and other matters reviewed (regardless of whether such information was relied upon) or relied upon by the testifying expert in forming his or her final report, trial, or deposition testimony or any opinion in this case. For clarity, this provision is not intended to abrogate the protections for draft reports or disclosures under Fed. R. Civ. P. 26. No discovery can be taken from any non-testifying Expert except to the extent that such non-testifying Expert has provided information, opinions, or other materials to a testifying Expert relied upon by that testifying Expert in forming his or her final report(s), trial, and/or deposition testimony or any opinion in this case.

(e)     No conversations or communications between counsel and any testifying or consulting Expert will be subject to discovery unless the conversations or communications are relied upon by such Experts in formulating opinions that are presented in reports or trial or deposition testimony in this case.

(f)     Materials, communications, and other information exempt from discovery under the foregoing Paragraphs 20(a)–(c) shall be treated as attorney-work product for the purposes of this litigation and Order.

(g)     Nothing in Protective Order, including Paragraphs 20(a)–(c), shall alter or change in any way the requirements in Paragraph 11 regarding Source Code, and Paragraph 11 shall control in the event of any conflict.

20.    **MISCELLANEOUS**

(a)     <u>Right to Further Relief</u>. Nothing in this Order abridges the right of any person to seek its modification by the Court in the future. The Parties do not waive the right to argue that certain material may require additional or different confidentiality protections than those set forth herein.

(b)     <u>Termination of Matter and Retention of Jurisdiction</u>. The Parties agree that the terms of this Protective Order shall survive and remain in effect after the Final Determination of the above-captioned matter. The Court shall retain jurisdiction after Final Determination of this matter to hear and resolve any disputes arising out of this Protective Order.

(c)     <u>Successors</u>. This Order shall be binding upon the Parties hereto, their attorneys, and their successors, executors, personal representatives, administrators, heirs, legal representatives, assigns, subsidiaries, divisions, employees, agents, retained consultants and Experts, and any persons or organizations over which they have direct control.

(d)     <u>Right to Assert Other Objections</u>. No Party waives any right it otherwise would have to object to disclosing or producing any information or item. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order. This Order shall not constitute a waiver of the right of any Party to claim in this

action or otherwise that any Discovery Material, or any portion thereof, is privileged or otherwise non-discoverable, or is not admissible in evidence in this action or any other proceeding.

(e) <u>Burdens of Proof</u>. Notwithstanding anything to the contrary above, nothing in this Protective Order shall be construed to change the burdens of proof or legal standards applicable in disputes regarding whether particular Discovery Material is confidential, which level of confidentiality is appropriate, whether disclosure should be restricted, and if so, what restrictions should apply.

(f) <u>Modification by Court</u>. This Order is subject to further court order based upon public policy or other considerations, and the Court may modify this Order *sua sponte* in the interests of justice. The United States District Court for the District of Delaware is responsible for the interpretation and enforcement of this Order. All disputes concerning Protected Material, however designated, produced under the protection of this Order shall be resolved by the United States District Court for the District of Delaware.

(g) <u>Discovery Rules Remain Unchanged</u>. Nothing herein shall alter or change in any way the discovery provisions of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders. Identification of any individual pursuant to this Protective Order does not make that individual available for deposition or any other form of discovery outside of the restrictions and procedures of the Federal Rules of Civil Procedure, the Local Rules for the United States District Court for the District of Delaware, or the Court's own orders.

**SO ORDERED.**

## EXHIBIT A

I, _____, acknowledge and declare that I have received a copy of the Protective Order ("Order") in *Autonomous Devices LLC v. Tesla, Inc.*, United States District Court, District of Delaware, Civil Action No. 22-1466-MN. Having read and understood the terms of the Order, I agree to be bound by the terms of the Order and consent to the jurisdiction of said Court for the purpose of any proceeding to enforce the terms of the Order.

Name of individual: _____

Present occupation/job description: _____

_____

_____

Name of Company or Firm: _____

Address: _____

Dated: _____

_____
[Signature]

# Exhibit H

## John Holley

| | |
|---|---|
| **From:** | Sieger, Matthew <Matthew.Sieger@weil.com> |
| **Sent:** | Friday, July 14, 2023 4:23 PM |
| **To:** | John Holley; Blair Jacobs; Moore, Ian; Tanya Wood; Autonomous_Tesla; kkeller@shawkeller.com; edibenedetto@shawkeller.com |
| **Cc:** | Tesla_AD; began@mnat.com; Clark, Cameron |
| **Subject:** | RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies |
| **Attachments:** | CBI_TESLA-SCT-001 Filenames.xlsx |

Hi John,

Please see attached.

Thanks,
Matt

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Friday, July 14, 2023 3:40 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

Thank you for delivering the documents.  Will you please provide an index with the file names on the PDFs with the corresponding bates numbers?  My notes reference the PDF file name.

Have a nice weekend,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Friday, July 14, 2023 11:10 AM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>

**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John, Blair,

I plan to deliver the documents around 4 pm ET and will give Elizabeth a call before I arrive.

Thanks,
Matt

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, July 13, 2023 9:50 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

I will be out of the office for my anniversary tomorrow.  Thankfully, Elizabeth Bernard has agreed to come into the office and accept Tesla's tardy production.  As Mr. Jacobs requested, please let us know who from Weil's Silicon Valley office will be dropping off the documents so we can alert the firm's security of their arrival.  Your failure to alert us as to this simple request will raise concerns. Also, out of respect for Ms. Bernard's work-from-home day, please let us know when that lawyer will arrive at our office, and please provide this information as soon as possible.

Separately, we note, to you and your team, that your increasingly emotional diatribes are not helpful.  We respectfully ask that you to step back and take a breath.  Perhaps another member of your team can take over e-mail responsibilities while Mr. Moore is on paternity leave, as your increasing rhetoric is unproductive and not necessary.  We are happy to bring our disputes to the Court in a fair manner and to let the chips fall against Tesla where they may.  This is not a complicated scenario.

As we have pointed out many times now, Tesla agreed to provide the requested documents and it failed to do so by the required June 30th date set forth in the scheduling order.  It is now the middle of July and AD's infringement contentions are due in just over a month.  There is no acceptable reason for Tesla's refusal to comply with its discovery obligations and we need to get discovery moving in a fair and orderly process.  Your overly passionate and inaccurate messages do not change the realities here and, again, we are happy to present your rants to the Court if that is what Tesla desires.  We do not think it will end well for you.  Lastly, your reference to "FedEx" makes no sense.  I was expressly told we would receive a tracking number.

Good night,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Thursday, July 13, 2023 4:34 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

You are grossly mischaracterizing the circumstances.  Tesla is not and has not refused to provide the Source Code Technical Documents.  You visited our offices on Monday and Tuesday of this week (it is now Thursday) and indicated by email that you may also be in our offices on Wednesday.  You are also conveniently leaving out that you traveled from D.C. to California to inspect actual source code, not just technical documents.  You were informed that the documents you requested would be couriered to you at your D.C. office.  You were not told that you would receive the documents the very same day that you requested them.  Nor would that have even been possible because the documents need to be stamped, printed, and sent to the east coast. Your characterization that these are "long-overdue" documents is hyperbolic to the extreme.

Your repeated cavalier treatment of Tesla Source Code continues to be concerning.  We are not simply dropping these documents into FedEx.  An attorney from our firm will be hand delivering these documents to your D.C. office tomorrow, Friday. Please confirm that you will be available to receive the documents and that the documents will be maintained pursuant to the requirements of the protective order.  The attorney will not leave the documents with a receptionist at the front desk.

Thanks,
Matt

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, July 13, 2023 2:18 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

The protective order presented to Judge Hatcher allows five *additional* copies of the Source Code files—six total.  As you know, Tesla has failed to supply even one copy of the Source Code Technical Documents, so we cannot agree to Telsa controlling our ability to make copies promptly.  We will bring this violation of Tesla's prior agreement to the Magistrate's attention.

To that end, Tesla was required to produce the Source Code Related Technical Documents on June 30, 2023.  Tesla agreed to provide those documents without AD first traveling to the source code computer.  *See* Moore to Holley June

23, 2023 (agreeing to FN1, which states, "Defendant will *promptly* provide Plaintiff with printed copies of each Source Code Related Document each time such a document is produced.")  Despite Tesla's obligations and promises, we still do not have the documents and we simply cannot understand why Tesla has refused to provide these documents that it was required by Order to produce.  I traveled from Washington, D.C. to Silicon Valley, CA on July 10, 2023 to request the documents in person as a result of this inexplicable tardiness.  I was informed that a courier would deliver the documents on July 11, 2023, and we would receive tracking information.  We received no tracking information and still do not have the documents.  All of this is in continued disregard of Tesla's discovery obligations.  Yesterday, I asked you when Tesla would comply with its obligations.  You still have not responded.

**Please let us know when we can expect to receive the long-overdue documents or we will ask the Court to compel production and seek discovery sanctions for this unnecessary waste of our time.**

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Thursday, July 13, 2023 11:57 AM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

We disagree with your characterizations below.

Regarding the watermark language, Tesla's position is that, to the extent five copies of the source code is permitted, Tesla will be responsible for printing the copies on anti-copying paper.

Regarding the Exhibit A language, Tesla stands by its proposed language.

Regards,
Matt

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Wednesday, July 12, 2023 8:34 AM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>

**Subject:** Re: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

You are deeply misinformed, and your misguided statements are so wrong that they can only be part of a plan by Tesla to shut down fair discovery at every step.  While I understand that you are just coming onto this aspect of the case, given Mr. Moore's paternity leave, your misleading message is unprofessional and inappropriate.  We plan on bringing Tesla's misconduct, including your misconduct, to the attention of the Court and will do so shortly with a request for appropriate remedies.

Please see my substantive responses in red below. As evidenced by the responses and the fundamental incorrectness of your assertions, it is becoming increasingly obvious that Tesla does not plan to participate fairly in discovery and intends to construct obstacles and to obstruct AD's efforts at every turn – we plan to bring Tesla's continued efforts to the Court's attention on a regular basis and will seek appropriate discovery sanctions if Tesla does not turn its act around and begin to properly comply with discovery obligations.

Separately, please respond to the outstanding requests regarding the "watermark," "Exhibit A," and the identity of the code review tools used by Tesla today, as we need to bring your clients' transgressions to the Court's attention ASAP.

Regards,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Date:** Tuesday, July 11, 2023 at 2:00 PM
**To:** Blair Jacobs <bjacobs@McKoolSmith.com>, John Holley <jholley@McKoolSmith.com>, Moore, Ian <Ian.Moore@weil.com>, Tanya Wood <twood@McKoolSmith.com>, Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>, kkeller@shawkeller.com <kkeller@shawkeller.com>, edibenedetto@shawkeller.com <edibenedetto@shawkeller.com>
**Cc:** Tesla_AD <Tesla.AD@weil.com>, began@mnat.com <began@mnat.com>, Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John, on June 29, 2023 you agreed to abide by the protective order "presented to Judge Hatcher and per her oral orders on the discovery dispute between the parties" until the parties are able to sort through the remaining protective order disputes.  Since then, you have violated or attempted to violate the protective order several times.

- The protective order at 6.c recites, "To ensure compliance with applicable United States Export Administration Regulations, Protected Material may not be exported outside the United States or released to any foreign

national (even if within the United States)" yet on June 29, 2023 you sought access to the Source Code by at least two individuals that appear to be foreign nationals in contravention of this provision.

[JH:  No foreign national accessed any Tesla source code, or CBI for that matter, so your message makes no sense.  Our expert provided us with a list of assistants that work at Harbor Labs and we shared that list with you.  We can assure you that no foreign national will have access to Tesla source code and we have already agreed to limit the number of assistants.  We will provide you with the updated list shortly. We have been advised that none of the assistants working on this matter are foreign nationals so if you have concrete evidence to the contrary, please advise.]

- The protective order recites at 11.(c).vii, "The Receiving Party may request copies of reasonable portions of the Source Code identified in a reasonable manner" yet on July 10, 2023 after reviewing Source Code materials for less than 5 minutes, you requested that Tesla print 47 Source Code documents totaling more than 500 pages.  This is inconsistent with "reasonable portions of the Source Code identified in a reasonable manner." While Source Code Related Technical Documents are not subject to page limits and consecutive page limits, Source Code Related Technical Documents remains Source Code under the protective order you agreed to abide by on June 29, 2023 and should be treated as such. While Tesla is willing to produce to AD a copy of the Source Code Related Technical Documents, indeed all of the Source Code Related Technical Documents if necessary, AD is clearly not acting in good faith by asking for all the documents without even reviewing those documents first.

[JH:  Your complaint here fundamentally misinterprets the distinction between "Source Code" and "Source Code Related Technical Documents."  I requested the latter, which Tesla placed in a folder called "Source Code" (c:\AP\Source Code).  We think the Court will see through Tesla's silly attempt to make transform "Source Code Related Technical Documents" into "Source Code" by placing the technical documents into a folder called "Source Code."  There is no Source Code in the "Source Code" folder, only Source Code Related Technical Documents.

Moreover, the Court permitted AD to have the Source Code Related Technical Documents that are not pure source code.  *See* Hearing Tr. at 70:7-13.  And Mr. Moore already agreed to provide those documents.  *See* Moore to Holley 6.23.2023 (agreeing to FN 1, which in relevant part states "Defendant will promptly provide Plaintiff with printed copies of each Source Code Related Document each time such a document is produced.").Therefore, there is absolutely no basis for your inappropriate rhetoric that "AD is clearly not acting in good faith by asking for all the documents."

As with virtually every aspect of discovery to this point,  Tesla has failed to comply with the Court's order and has not yet provided the Source Code Related Technical Documents it already agreed to provide.  By failing to comply with its agreement, AD was forced to travel to the source code computer to make the request for production of all the Source Code Related Technical Documents.  Please let us know when Tesla will comply with its obligations.

We plan to highlight your recalcitrance and misinformed delays during the next dispute that we raise with the Court. ]

- The protective order recites at 11.(c).ix, "The Receiving Party's Outside Counsel and any person receiving a copy of any Source Code shall maintain and store any paper copies of the Source Code at their offices" yet on July 10, 2023 you asked the paralegal supervising your Source Code inspection to print more than 500 pages of Source Code so that you could take the Source Code back to your hotel room.  This contravenes the protective order and puts at risk highly sensitive Tesla information.   While the parties discussed at the discovery dispute hearing that AD may travel with Source Code Related

Technical Documents for the purpose of a deposition, the parties did not specify travel with those documents in other circumstances.  Indeed, the parties subsequently revised the protective order to make clear that the deposition travel exclusion applies only to Highly Confidential - Source Code documents, and not High Confidential – Source Code Technical Documents. The parties, however, have made no other provisions to travel with High Confidential – Source Code Technical Documents.

[JH:  Your allegations, in line with every point you raise, are simply false.

Regarding whether AD is permitted to have the Source Code Related Technical Documents, please see above and you are clearly wrong on that front.

Regarding your reference to paragraph 11(c)(ix), there is a difference between actual "Source Code" and "Source Code Related Technical Documents" Tesla placed in an inaccurately labeled folder.  Please see above.

Regarding your implied allegation that AD cannot travel with Source Code Technical Documents unless it is for a deposition:  There is nothing in the protective order that precludes AD from traveling with the Source Code Related Technical Documents.  Perhaps you are referring to the travel restrictions in disputed paragraph 11(c)(vii).  If so, that paragraph refers to "Source Code" not "Source Code Related Technical Documents." Those two terms are defined in paragraphs 2(c) and 2(d), respectively and have a very different meaning in the context of the protective order.

Indeed, the Court already ruled that AD can travel with the Source Code Related Technical Documents.  *See* Hearing Tr. at 70:22-71:1 (AD "will, however, be permitted to travel with printed copies of the non-technical code that otherwise fall within that definition of source code that's been advanced by Tesla.").  Moreover, the Source Code Related Technical documents largely appear to contain no actual source code, so reserve the right to travel with the documents per the express statement of Judge Hatcher during the hearing.

Regarding the discussion with the paralegal, I asked him to print the documents in the inaptly named folder, and he stated that he would inform the lawyer of the request.  He immediately confirmed that I was asking for the technical documents, not the actual source code. Later, he informed me that a courier would ship the technical documents to McKool's D.C. office for delivery on Tuesday, July 11.  I was surprised that Tesla would use a courier given Mr. Moore's representation that only a Tesla employee would transfer the Source Code printouts to our office or to depositions of AD experts, and Tesla's previous position that the Source Code Related Technical Documents should be treated substantially like the Source Code documents.  Rather than engage with the paralegal about whether Tesla's surprising choice to use a courier was consistent with the positions Tesla staked out, I quipped that I'm glad Tesla is using a courier because I do not want to carry a box of documents back with me.  This has nothing to do with a request to take documents back to a hotel and your attempt at recasting a clear statement is intentionally false and unprofessional.]

Your lack of sensitivity regarding Tesla Source Code greatly concerns Tesla and highlights the need for a strong protective order.  Tesla's Source Code is incredibly important to the company and inadvertent disclosure of that Source Code could result in hundreds of billions of dollars of damages to the company and substantially affect the viability of the company going forward.

[JH:  Having reviewed your seriously misguided list of false allegations and the continued shifting and stalling of Tesla regarding standard provisions of a Protective Order greatly concerns AD and we plan to highlight your misguided contentions as part of telling the Court why a Protective Order without the draconian and fundamentally prejudicial provisions Tesla continually seeks to add should be entered ASAP and Tesla must be admonished and ordered to follow the rules.

As detailed above, there is no lack of sensitivity regarding Tesla's source code demonstrated by AD and the lack of good faith basis regarding each of the allegations raised in your message reveals continued abuse of the discovery process by Tesla.]

As a separate matter, you requested on July 8, 2023 that in response to Tesla's willingness and cooperation to provide you and your team any and all software tools (within reason) needed by AD to review source code that "Tesla identify and install the tools it uses in the ordinary course of its business for viewing and searching the code produced".  This again demonstrates AD's lack of good faith.  I have been informed that, at your request, and at the cost of inconvenience to Tesla employees, Tesla provided at least the following tools: Windows 10 or 11, dnGrep ([https://github.com/dnGrep/dnGrep/releases](https://github.com/dnGrep/dnGrep/releases)) , Notepad++ ([https://notepad-plus-plus.org/](https://notepad-plus-plus.org/)), Acrobat Reader for PDF files ([https://get.adobe.com/reader/](https://get.adobe.com/reader/)), 7-Zip ([http://www.7-zip.org/](http://www.7-zip.org/)), Visual Studio Code w/ C/C++ and Java Plugins:  [https://www.visualstudio.com/downloads/](https://www.visualstudio.com/downloads/), libreoffice ([https://www.libreoffice.org/](https://www.libreoffice.org/)), Git for Windows ([https://git-scm.com/download/win](https://git-scm.com/download/win)), Eclipse for Java Enterprise and Web Developers ([https://www.eclipse.org/downloads/packages/](https://www.eclipse.org/downloads/packages/)), Eclipse IDE for C/C++ Developers ([https://www.eclipse.org/downloads/packages/](https://www.eclipse.org/downloads/packages/)), and Linux Subsystem for Windows with Ubuntu and Kali Linux and following packages: git, build-essential, vim, binutils, and python.  These tools should be more than sufficient to conduct your Source Code review. You have not articulated any valid reason that you need more than what has been provided. Indeed, you made this request even before reviewing any Source Code, which suggests you are only making this request to cause further make-work and inconvenience to Tesla employees.

[JH:  This is an active dispute that we plan to bring to the Court's attention.  We asked that Tesla's review tools be provided given Tesla's original offer in April to "install tools that are sufficient for viewing and searching the code produced, on the platform produced, *if such tools exist and are presently used in the ordinary course of the Producing Party's business*."  *See* Paragraph 11(c)(1) of the PO submitted to the Court.  Tesla deleted that provision for no apparent reason.  We believe Tesla did this because zero of the code review tools we requested are functional given Tesla's sham decision to produce the C ++ code in PDF form only.

If Tesla uses the tools that are installed on the computer for its code review in the ordinary course of its business, please let us know so we can reduce the number of disputes before the Magistrate.  Otherwise please identify the tools and we plan to inform the Court that Tesla has essentially disabled the potential of reviewing the Code and has under-produced in a shocking and sanctionable manner. If that is the message that you want conveyed to the Court, then maintain your current position and we will alert the Court of the deficiencies as soon as possible.]

Regards,
Matt

---

**From:** Sieger, Matthew
**Sent:** Tuesday, July 11, 2023 10:06 AM
**To:** 'Blair Jacobs' <[bjacobs@McKoolSmith.com](mailto:bjacobs@McKoolSmith.com)>; John Holley <[jholley@McKoolSmith.com](mailto:jholley@McKoolSmith.com)>; Moore, Ian <[Ian.Moore@weil.com](mailto:Ian.Moore@weil.com)>; Tanya Wood <[twood@McKoolSmith.com](mailto:twood@McKoolSmith.com)>; Autonomous_Tesla <[Autonomous_Tesla@mckoolsmith.com](mailto:Autonomous_Tesla@mckoolsmith.com)>; [kkeller@shawkeller.com](mailto:kkeller@shawkeller.com); [edibenedetto@shawkeller.com](mailto:edibenedetto@shawkeller.com)
**Cc:** Tesla_AD <[Tesla.AD@weil.com](mailto:Tesla.AD@weil.com)>; [began@mnat.com](mailto:began@mnat.com); Clark, Cameron <[cclark@morrisnichols.com](mailto:cclark@morrisnichols.com)>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Hi Blair,

We are in receipt of John's messages from July 8 and plan to provide a response by tomorrow.

Thanks,
Matt

---

**From:** Blair Jacobs <bjacobs@McKoolSmith.com>
**Sent:** Tuesday, July 11, 2023 9:57 AM
**To:** John Holley <jholley@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Tesla team, we received the out-of-office message from Ian indicating that he is out for a bit on parental leave and certainly don't intend to bother him. If somebody else on the team could respond to John's messages on July 8 we would appreciate it, as we are seeking to finalize the disputed issues between the parties so we can get the disputes in front of the court for resolution.

Thanks very much,
Blair

**McKool Smith** | Blair Jacobs
Principal | Washington, D.C. | Tel: (202) 370-8302

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** Blair Jacobs <bjacobs@McKoolSmith.com>
**Sent:** Tuesday, July 11, 2023 7:17 AM
**To:** John Holley <jholley@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Hi Ian,

Could you please respond to this and the message that John sent at 1:31 pm on Saturday regarding Tesla's offer to make additional review tools available by tomorrow?

We are in a position where we would like to advance the parties' disputes to the court expeditiously and your response will help us better represent the scope of current disputes.

Thanks very much,
Blair

**McKool Smith** | Blair Jacobs
Principal | Washington | (202) 370-8302

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Saturday, July 8, 2023 3:18 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

We are currently tracking seven disputes between the parties.  To reduce the burden on the Court, please let us know if Telsa is amenable to the following revisions to language Tesla proposed following the first hearing.

**Watermark language**: Tesla added the following language:  "All copies of Source Code shall be printed with an 'anti-copying' watermark that reveals whether such printouts have been photocopied."  We are not sure what "anti-copying" means.  But, as you know, AD's position is Tesla will provide one copy of the paper documents, and AD can make up to five additional copies—which is what a formerly undisputed provision allowed.  Assuming AD prevails on the right to make copies of the paper documents, we are amenable to adding a watermark to any copy that says something such as "No Additional Copies."  Please let us know if this is agreeable to Tesla.

**Exhibit A language**:  Tesla added precautionary language to Exhibit A.  We dispute the need for or appropriateness of Tesla's proposed language.  But, we would be amenable to the following statement, which accomplishes the same goal without the suggested remedies for a PO violation. "I understand and acknowledge that the protective order materials I am accessing in this case represent highly valuable technology, including software, trade secrets, copyrighted material, patented material, and compilations of material not available in the public domain.  I understand that any improper use, disclosure, or publication of this protective order material could result in a violation of the Protective Order."  Please let us know if this revision is agreeable to Tesla.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington | (202) 370-8320

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Saturday, July 8, 2023 1:31 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

In your July 6th message below you said—"If you have additional tools that you would like installed, please let us know."  In response to Tesla's offer, AD requests that Tesla identify and install the tools it uses in the ordinary course of its business for viewing and searching the code produced.

Thanks and have a nice weekend!
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Friday, July 7, 2023 7:05 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

The redline sent yesterday was intended to show what had changed since Tesla's 6/23 draft. Attached is a redline of Tesla's up-to-date edits against AD's 6/20 draft. We do not understand AD's request for a redline against the 5/17 draft submitted to the Court, as multiple of Tesla's edits are responsive to edits proposed by AD. If AD is withdrawing or amending the edits it proposed on 6/14 and 6/20, please let us know so that Tesla may consider AD's revised proposal.

As discussed during the meet and confer, and as stated below, Tesla does not agree that the original PO language requires production in native format. And, at AD's request, we've provided Tesla's reasons for preferring PDF format for production. The parties thus appear to be at an impasse.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Friday, July 7, 2023 11:47 AM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

Setting aside the issues that are not directly addressed in this message, please provide responses to the follow two points by COB today:

(1) Please provide ASAP Tesla's redline over the protective order that was submitted to the Court. We did not agree to Tesla's 6.23 protective order revisions so Tesla's acceptance of those redlines and further revisions over top of those edits is not helpful for framing the dispute. We will either accept Tesla's edits to the PO that was presented to Judge Hatcher or mark the issue as disputed with alternative language.

(2) Regarding the PDF production of source code, we spoke with our source code expert and insist that Tesla produce the code as its kept in its ordinary course of business, just as the rules require. Tesla's "conversion" of the code to PDF is inappropriate because it precludes the ability for the code to be reviewed using standard software development and code review tools and it prevents the sophisticated search ability provided by those tools. The only logical reason for Tesla going through the substantial trouble of "converting" its existing source code would be for improper reasons that make the process unduly burdensome on AD, such as making code review extremely cumbersome and/or functionally impossible. If Tesla will not agree to produce the code in its native format as its kept in the ordinary course of business then we will take this dispute to the Court with an explanation of the extreme prejudice that would result from this change in position by Tesla. Tesla previously represented to the Court that it would produce "Source Code … as it is kept in the normal course of business, or as it would be collected in the normal course of business" and this new position is clearly designed to inflict inefficiency and painful unworkable burdens on AD.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Thursday, July 6, 2023 7:57 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Following up on yesterday's call, the below table identifies Tesla's position for each PO edit that was discussed, along with proposed edits where applicable. The attached redline (tracking changes against Tesla's 6/23 draft) reflects these changes.

Regarding the format of source code production, Tesla provides the following additional information in response to AD's questions:

1. Tesla prefers PDF format because, in the case of any mishandling, PDF cannot be compiled, it makes it difficult to copy useable source code off the source code computer, and it better enables us to watermark the source code pages. Plain text files can be readily compiled, copied in a useable format from device to device, and are indistinguishable from one another.
2. Our understanding is that the native files do not contain links that would be removed upon conversion to PDF.

| AD's characterization of Tesla's edits | Rationale | Tesla's Position |
| --- | --- | --- |
| Edits to ¶4(e).  If documents become public record through trial or otherwise, there is no longer any reason to protect the documents. | The deleted clause is redundant in view of at least the remainder of ¶ 4(e) and ¶ 6(e). | Tesla will agree to drop this edit. |
| Adding that Court reporters have to sign the PO.  ¶7(d). | Court reporters are required to "operate in a manner consistent with this Protective Order." Tesla's addition clarifies that that requires *compliance* with the PO via execution of Exhibit A. | Our understanding is that AD can accept this edit if Tesla manages it (i.e., gives the POs to the court reporters and makes sure they sign them).<br><br>Tesla will agree to manage this requirement if AD accepts the edit. |
| Adding that AD has to clear showing documents to Tesla witnesses in advance.  ¶7(d). | The addition is to protect against inadvertent disclosure of confidential material to an unauthorized person, which would be a violation of the PO.<br><br>There is no requirement in the added language that AD clear its determination *with Tesla* in advance. | Tesla has edited this language to clarify that it is only applicable to "non-Tesla witnesses."<br><br>Please let us know if this is acceptable. |
| Changing ¶8(b)(ii). | Edited for consistency with parallel provisions in ¶ 9(b)(ii) and ¶ 10(c)(ii). | Our understanding is that AD will agree to this edit. |
| Refusing to produce the source code in its native format. ¶11.<br><br>Changing that the code shall be produced "as it is kept in the normal course of business, or as it would be collected in the normal course of business" to "in computer searchable form."  ¶11(c)(iii). | Prior ¶ 11 does not require production in native format but recites "electronic (e.g., native) format." Electronic format is not necessarily text searchable. Accordingly, to allay any concerns, we revised the passages to recite "computer searchable form." | Tesla maintains its position.<br><br>As discussed on the call, however, the original language never required production of source code in native format. Tesla views this as a clarifying edit |

|  |  |  |
|---|---|---|
|  | This language is routinely used in protective orders for specifying the format of source code, including in *Unicorn Energy GmbH v. Tesla, Inc.*, No. 2:20-CV-00338 (E.D. Tex.). | and not a substantive change. |
| Changing the number of review computers from two to one. ¶ 11(c)(i). | Security remains a paramount concern for Tesla. Limiting inspection to a single computer reduces the overall complexity of transporting source code to outside counsel's offices. | Tesla will agree to drop this edit. |
| Removing the requirement that the source code computers can print.  ¶ 11(c)(i).<br><br>Removing all electronic note-taking provisions from ¶11(c)(iii).<br><br>[These two rows have been combined] | Per the protective order, AD identifies source code and requests Tesla to print out that source code. Accordingly, there is no reason for AD to print documents from the source code computers.<br><br>Per the protective order, AD's experts may take handwritten notes. Tesla has agreed not to inspect those notes. However, we cannot give AD unfettered access to print as many "notes" from the source code computer because Tesla has no way of confirming that AD is not printing source code. | Tesla maintains its position. |
| Removing the requirement that Tesla install tools used in the ordinary course of its business.  ¶ 11(c)(i).<br><br>Deleting ¶11(c)(v) in its entirety. | Redundant in view of ¶ 11(c)(i).<br><br>AD has already requested 3 different operating systems and 15 different software tools.  We are not depriving AD of its ability to conduct discovery. If you have additional tools that you would like installed, please let us know. | Tesla maintains its position. |
| Editing the language about handwritten notes.  ¶11(c)(iii). | AD is permitted to take handwritten notes, but Tesla will not permit AD to copy down source code into those notes. This is particularly poignant as AD has identified nine individuals that it wants to review source code. | Tesla maintains its position.<br><br>Please note that, in the latest draft, we've deleted other references in this paragraph to notes containing source code for clarity. |
| Preventing AD from making *any* copies of the paper documents.  ¶11(c)(vi) | The prior protective order requires AD to keep the printed copy at its offices – both parties agreed to this. ¶ 11(c)(vi). There is no need for multiple copies. Note, the prior protective order does not contemplate AD's experts in possession | Tesla maintains its position. |

| | of the source code printouts outside counsel's office. | |
|---|---|---|
| Refusing to agree that reasonable requests for additional pages will not be withheld. ¶11(c)(vi) | This is not an addition by Tesla but a rejection of AD's proposed addition.<br><br>AD's proposed addition undermines the Court's order regarding page limits. The PO submitted to the Court recites that the parties shall meet and confer in good faith. AD's edit seeks to place the burden on Tesla to show why the page limit should be upheld. | Tesla maintains its position. |
| Changing how documents are provided to the Court and requiring AD to tell what documents it will use at trial or in demonstratives in front of the Court.  ¶11(c)(vi) | Tesla's proposed addition is to address trial procedures for use of source code printouts, which the parties have not previously discussed. | Tesla will agree to drop this edit without waiving its right to raise the issue of procedures for safely handling source code at trial at a later date. |
| What is Tesla's basis for reserving the right to bring printed copies of source code to depositions? ¶¶11(c)(xi)-(xii). | This is not an addition by Tesla but a rejection of AD's proposed addition.<br><br>AD's proposed addition conflicts with ¶ 6(e): "Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protective Material."<br><br>As we have consistently stated, Tesla does not want outside counsel traveling with source code printouts. Tesla can nevertheless arrange for the secure transportation of printouts by, e.g., a Tesla employee. Indeed, this is how Tesla will provide the source code printed copies to AD. | Tesla maintains its position. |
| Tesla repeatedly said it is not authorized to travel with code and understands it cannot force AD's experts to travel to Weil's office for a deposition.  So what is the basis for removing the language from ¶11(c)(xv)? | Similar to the above response.<br><br>This is not an addition by Tesla but a rejection of AD's proposed addition, which improperly seeks to shield its experts from being questioned on the substance of their opinions. | Tesla maintains its position. |
| What is the basis of the addition to Exhibit A? | Tesla's edit is to ensure that signatories of the Protective Order understand the gravity of violating it. Tesla has not | Tesla maintains its position. |

| | imposed any additional requirements in the PO itself through this language. | |
|---|---|---|

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Wednesday, July 5, 2023 12:21 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

4:30pm ET works for us. I'll circulate a Zoom invite.

Thanks,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Wednesday, July 5, 2023 10:02 AM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

Is your team available to meet and confer at 4 or 4:30 today?

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Friday, June 30, 2023 9:29 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Tesla disagrees that AD's additions were necessitated by the Court's order. All of AD's proposals could have been raised prior to the hearing. Indeed, AD raised two alternative proposals for the location of the production of source code two days after Tesla sent its letter to the Court.

In advance of next week's meet and confer, Tesla's rationales for its edits are set forth in the below table.

| AD's characterization of Tesla's edits | Rationale |
| --- | --- |
| Edits to ¶4(e).  If documents become public record through trial or otherwise, there is no longer any reason to protect the documents. | The deleted clause is redundant in view of at least the remainder of ¶ 4(e) and ¶ 6(e). |
| Adding that Court reporters have to sign the PO.  ¶7(d). | Court reporters are required to "operate in a manner consistent with this Protective Order." Tesla's addition clarifies that that requires *compliance* with the PO via execution of Exhibit A. |
| Adding that AD has to clear showing documents to Tesla witnesses in advance.  ¶7(d). | The addition is to protect against inadvertent disclosure of confidential material to an unauthorized person, which would be a violation of the PO.<br><br>There is no requirement in the added language that AD clear its determination *with Tesla* in advance. |
| Changing ¶8(b)(ii). | Edited for consistency with parallel provisions in ¶ 9(b)(ii) and ¶ 10(c)(ii). |

17

| | |
|---|---|
| Refusing to produce the source code in its native format. ¶11.<br><br>Changing that the code shall be produced "as it is kept in the normal course of business, or as it would be collected in the normal course of business" to "in computer searchable form." ¶11(c)(iii). | Prior ¶ 11 does not require production in native format but recites "electronic (e.g., native) format." Electronic format is not necessarily text searchable. Accordingly, to allay any concerns, we revised the passages to recite "computer searchable form."<br><br>This language is routinely used in protective orders for specifying the format of source code, including in *Unicorn Energy GmbH v. Tesla, Inc.*, No. 2:20-CV-00338 (E.D. Tex.). |
| Changing the number of review computers from two to one. ¶ 11(c)(i). | Security remains a paramount concern for Tesla. Limiting inspection to a single computer reduces the overall complexity of transporting source code to outside counsel's offices. |
| Removing the requirement that the source code computers can print. ¶ 11(c)(i). | Per the protective order, AD identifies source code and requests Tesla to print out that source code. Accordingly, there is no reason for AD to print documents from the source code computers. |
| Removing all electronic note-taking provisions from ¶11(c)(iii). | Per the protective order, AD's experts may take handwritten notes. Tesla has agreed not to inspect those notes. However, we cannot give AD unfettered access to print as many "notes" from the source code computer because Tesla has no way of confirming that AD is not printing source code. |
| Removing the requirement that Tesla install tools used in the ordinary course of its business. ¶ 11(c)(i).<br><br>Deleting ¶11(c)(v) in its entirety. | Redundant in view of ¶ 11(c)(i).<br><br>AD has already requested 3 different operating systems and 15 different software tools. We are not depriving AD of its ability to conduct discovery. If you have additional tools that you would like installed, please let us know. |
| Editing the language about handwritten notes. ¶11(c)(iii). | AD is permitted to take handwritten notes, but Tesla will not permit AD to copy down source code into those notes. This is particularly poignant as AD has identified nine individuals that it wants to review source code. |
| Preventing AD from making *any* copies of the paper documents. ¶11(c)(vi) | The prior protective order requires AD to keep the printed copy at its offices – both parties agreed to this. ¶ 11(c)(vi). There is no need for multiple copies. Note, the prior protective order does not contemplate AD's experts in possession of the source code printouts outside counsel's office. |
| Refusing to agree that reasonable requests for additional pages will not be withheld. ¶11(c)(vi) | This is not an addition by Tesla but a rejection of AD's proposed addition. |

|  | AD's proposed addition undermines the Court's order regarding page limits. The PO submitted to the Court recites that the parties shall meet and confer in good faith. AD's edit seeks to place the burden on Tesla to show why the page limit should be upheld. |
|---|---|
| Changing how documents are provided to the Court and requiring AD to tell what documents it will use at trial or in demonstratives in front of the Court.  ¶11(c)(vi) | Tesla's proposed addition is to address trial procedures for use of source code printouts, which the parties have not previously discussed. |
| What is Tesla's basis for reserving the right to bring printed copies of source code to depositions? ¶¶11(c)(xi)-(xii). | This is not an addition by Tesla but a rejection of AD's proposed addition.<br><br>AD's proposed addition conflicts with ¶ 6(e): "Nothing in this Order shall restrict in any way a Producing Party's use or disclosure of its own Protective Material."<br><br>As we have consistently stated, Tesla does not want outside counsel traveling with source code printouts. Tesla can nevertheless arrange for the secure transportation of printouts by, e.g., a Tesla employee. Indeed, this is how Tesla will provide the source code printed copies to AD. |
| Tesla repeatedly said it is not authorized to travel with code and understands it cannot force AD's experts to travel to Weil's office for a deposition.  So what is the basis for removing the language from ¶11(c)(xv)? | Similar to the above response.<br><br>This is not an addition by Tesla but a rejection of AD's proposed addition, which improperly seeks to shield its experts from being questioned on the substance of their opinions. |
| What is the basis of the addition to Exhibit A? | Tesla's edit is to ensure that signatories of the Protective Order understand the gravity of violating it. Tesla has not imposed any additional requirements in the PO itself through this language. |

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Wednesday, June 28, 2023 6:32 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla
<Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark,
Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery
Response Deficiencies

Ian,

I will follow up separately with suggested times for the July 5 call—but preliminarily it looks like 4 or 4:30 pm might work on our end. In the meantime, please address each of the edits that AD flagged as improper before by the end of this week so we can prepare for the July 5 meet and confer over the holiday weekend. It is unfair for Tesla to not address the improper edits prior to a meet and confer and we will bring this to the Judge Hatcher's attention if you do not remedy. The parties brought their disputes on the PO to Judge Hatcher's attention previously and this clearly indicates that other portions of the PO were agreed to – Tesla's attempt to undo that agreement at the 11th hour is an egregious discovery violation and we will ensure that Judge Hatcher is fully aware of Tesla's transgressions.

Regarding the one edit that Tesla did address, the parties negotiated and agreed to *Tesla's proposal* from April 18, 2023 that it would add the tools Telsa uses in the ordinary course of its business. There is a very good reason that Tesla put that proposal in the PO originally and that AD agreed to it: Tesla's employees are familiar with Tesla's tools and it will help them and us during their examination. There is no good faith basis for Tesla to walk back its agreement now and it wrongly deprives and impacts the ability of AD to gather evidence. We will bring this to the Court's attention and obtain resolution of the dispute.

As for AD edits that Tesla mentioned in Tesla's message, some of them were discussed with the Court and some are intimately related to the court's rulings, e.g., the ability for Tesla to produce certain documents in paper format:

| Tesla's Characterization | Rationale for adding edit. |
|---|---|
| ¶ 11(c)(vii) – Adding provision to allow the exchange of source code printouts; | N/A. We do not understand what you are referring to here. There were two provisions added to ¶ 11(c)(vii) and they are addressed below. |
| ¶ 11(c)(vii) – Adding "reasonable requests will not be withheld"; | This was discussed with Judge Hatcher. *See* Tr. 39:9-40:1 (urging the parties to meet and confer in good faith if more than 500 pages become reasonably necessary). |
| ¶ 11(c) (vii) n.1 – Adding provision that Tesla will "promptly provide Plaintiff with printed copies . . . each time such a [Source Code Related Technical Document] is produced"; | Is Tesla taking the position that it will not promptly produce in paper form the paper only technical document? |
| ¶ 11(c)(xii) – Adding "neither party may bring printed copies of Source Code to depositions"; | This was from our last meet and confer. It was also discussed with Magistrate Hatcher. Tr. 45 at 3-9; 47:10-15; 48:5-49:7 (Judge Hatcher asking Mr. Desai about the need to depose AD's experts using source code or technical documents; Mr. Desai responding that Tesla can depose AD's experts using their reports).<br><br>As you know, AD will use source code computers for its depositions of Tesla's witnesses. We are not going to |

| | ask Tesla to bring printouts.  And Tesla said it cannot travel with source code or printouts to AD's expert depositions.  Therefore, there is no need to bring printed copies of code to a deposition and it would violate Tesla's own source code protocols and/or contradict representations that Tesla's counsel have made to AD and the Court. |
|---|---|
| ¶ 11(c)(xiv) – Adding "Defendant understands that its current proposed restrictions will prevent Defendant from questioning Plaintiff's expert using source code during deposition." | See discussion above. |

Thanks,
John

**McKool Smith** | John Holley

Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Wednesday, June 28, 2023 4:50 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com>
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

We disagree with your characterization of Tesla's edits. The parties have been negotiating the protective order over the last several weeks. Indeed, AD has raised numerous changes to provisions in the protective order that were "undisputed in front of Judge Hatcher" – including, but not limited to:

- ¶ 11(c)(vii) – Adding provision to allow the exchange of source code printouts;
- ¶ 11(c)(vii) – Adding "reasonable requests will not be withheld";
- ¶ 11(c) (vii) n.1 – Adding provision that Tesla will "promptly provide Plaintiff with printed copies . . . each time such a [Source Code Related Technical Document] is produced";
- ¶ 11(c)(xii) – Adding "neither party may bring printed copies of Source Code to depositions";
- ¶ 11(c)(xiv) – Adding "Defendant understands that its current proposed restrictions will prevent Defendant from questioning Plaintiff's expert using source code during deposition."

These proposed edits could have been raised before the hearing, yet AD waited to raise these until after the hearing. Moreover, to characterize Tesla's edits as "unfair" while ignoring that AD has been proposing its own edits is disingenuous at best. Several of Tesla's edits are intended to streamline the protective order and reduce confusing redundancy. For example, Tesla has already agreed to load on the source code computer

tools identified by AD. Thus, there is no reason to include tools that Tesla uses in the ordinary course of business. If there are additional tools that AD requires, please let us know.

We agree that the parties should meet and confer, and we will make ourselves available on July 5th.  We will be prepared to discuss our rationale for Tesla's edits and we believe the parties can reach common ground on these disputes.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Tuesday, June 27, 2023 12:56 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

We received your most recent message concerning the Protective Order and were surprised by the unfair editing that took place after we already brought disputes regarding the PO to the Magistrate.  This is wasteful, inefficient and inappropriate conduct.  Tesla edited large swaths of the protective order that were never in dispute previously.  This is fair to neither AD nor the Court. We are not going to start over at square one.  Please delete everything Tesla added that was not previously disputed with the Court, as it is improper to create serial disputes on a document previously presented to the Court.  The parties have already expended significant resources on the protective order, and Tesla had numerous opportunities to make edits to the draft along the way.  It is far too late for Tesla to revisit portions of the protective order that it drafted, accepted and never disputed previously and portions that were negotiated and agreed to over many meet and confers.

Most of our team is traveling this week, but please let us know when you are available to meet and confer on July 5 for the few issues that were in dispute following the Court's oral order.

During the meet and confer, we would like to discuss Tesla's basis for:
- Edits to ¶4(e).  If documents become public record through trial or otherwise, there is no longer any reason to protect the documents.  This was undisputed in front of Judge Hatcher.
- Adding that Court reporters have to sign the PO.  ¶7(d).  This was undisputed in front of Judge Hatcher.
- Adding that AD has to clear showing documents to Tesla witnesses in advance. ¶7(d).  This was undisputed in front of Judge Hatcher.
- Changing ¶8(b)(ii).  This was undisputed in front of Judge Hatcher.

- Refusing to produce the source code in its native format. ¶11.  This was undisputed language in front of Judge Hatcher.
- Changing the number of review computers from two to one.  That was never disputed previously and is not something we can agree with.  ¶ 11(c)(i).  This was undisputed language in front of Judge Hatcher.
- Removing the requirement that the source code computers can print.  ¶ 11(c)(i).  This was undisputed language in front of Judge Hatcher.
- Removing the requirement that Tesla install tools used in the ordinary course of its business.  ¶ 11(c)(i).  This was undisputed language in front of Judge Hatcher.
- Changing that the code shall be produced "as it is kept in the normal course of business, or as it would be collected in the normal course of business" to "in computer searchable form."  ¶11(c)(iii). This was undisputed language in front of Judge Hatcher.
- Removing all electronic note-taking provisions from ¶11(c)(iii).  These were undisputed in front of Judge Hatcher.
    - Editing the language about handwritten notes.  ¶11(c)(iii).  This was undisputed language in front of Judge Hatcher.
- Deleting ¶11(c)(v) in its entirety.  This was undisputed in front of Judge Hatcher.
- Refusing to agree that reasonable requests for additional pages will not be withheld. ¶11(c)(vi) (of Tesla's 6.23.2023 draft).
- Preventing AD from making *any* copies of the paper documents.  ¶11(c)(vi) (of Tesla's 6.23.2023 draft).  Tesla previously agreed to 5 copies in front of Judge Hatcher.  ¶11(c)(viii).
    - How are we supposed to provide these documents to our experts?  Does Tesla expect our experts to come to our offices whenever they want to read/review a document and to write their reports?
- Changing how documents are provided to the Court and requiring AD to tell what documents it will use at trial or in demonstratives in front of the Court.  ¶11(c)(vi) (of Tesla's 6.23.2023 draft).  This was undisputed language in front of Judge Hatcher. ¶11(c)(viii)
- What is Tesla's basis for reserving the right to bring printed copies of source code to depositions? ¶¶11(c)(xi)-(xii).  Tesla has repeatedly said its lawyers cannot travel with source code, and AD has stated that it will not bring printed copies of code.  There is no reason to leave the possibility for Tesla to change its mind and travel with code—which is why the Court did not allow AD to have electronic copies of the handful of technical documents Tesla is producing in paper form.
- Tesla repeatedly said it is not authorized to travel with code and understands it cannot force Ad's experts to travel to Weil's office for a deposition.  So what is the basis for removing the language from ¶11(c)(xv)?
- What is the basis of the addition to Exhibit A?  It's unusual and not something that was presented to Judge Hatcher.

We plan to bring these issues to Judge Hatcher's attention to seek appropriate relief ASAP if Tesla refuses to remedy these problems. Please let us know your position immediately and advise if Tesla agrees to withdraw the abovementioned changes.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Friday, June 23, 2023 7:08 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Pursuant to the parties' ongoing negotiation of the protective order, please see attached Tesla's edits to the draft.

In response to AD's proposed additions, Tesla agrees to the edit in ¶ 2(c), the addition in footnote 1, and the addition of "and exhibits thereto" in ¶ 11(c)(xiii).

Regarding the location of source code review, Tesla's proposal is as written: "The Producing Party shall produce Source Code for inspection in computer searchable format at the office of its Outside Counsel in Silicon Valley, California." We do not believe that a further meet and confer is necessary on this point.

Regarding AD's proposed additions in ¶ 11(c)(vii), (xii), and (xiv), Tesla does not agree. We are available to meet and confer regarding these and Tesla's latest proposed edits next week.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Thursday, June 22, 2023 12:59 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Tesla is considering AD's proposals and will provide a response tomorrow.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Tuesday, June 20, 2023 6:41 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Hi Ian,

Attached are AD's proposed edits. We've also responded to your <span style="color:red">red</span> comments in <span style="color:lightblue">light blue</span>.

----------

**Regarding the first topic (Non-Code Technical Documents):**

- AD proposes the following language for ¶2(c)-Travel:  "HIGHLY CONFIDENTIAL — SOURCE CODE MATERIAL" means "Source Code," which is computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs. Notwithstanding this definition and other provisions herein, the Receiving Party may travel with Source Code documents that are not actual source code ("Non-Code Technical Documents")—e.g., formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs.

- AD proposes the following addition to 11(c)(vii)-Printing:
  - In the event that the Receiving Party requests more than 15 consecutive pages, or an aggregate of more than 500 pages, of printouts of Source Code,[FN] the parties shall have a meet and confer in good faith.
    - [FN] For the avoidance of doubt, these printing limits apply to actual source code. The Non-Code Technical Documents may be printed in their entirety without affecting the printing limits set forth in ¶11(c)(vii).
  - <span style="color:red">Tesla has proposed alternative language for these two provisions, which preserves the definition of "Source Code" adopted by the Court.</span>

  <span style="color:lightblue">Tesla's proposed language removes the definition of "Highly Confidential – Source Code," which is used throughout the protective order. We made a minor edit to correct that issue.</span>

- In addition to travel and printing, we discussed whether Tesla would honor its past offer to provide AD with printed copies of each Non-Code Technical Document in a binder without forcing AD to travel to the source code computer to request the Non-Code Technical Documents each time one is produced. We trust that this

is still agreeable to Tesla, but you said you needed to confirm this with your client and would provide us with an answer by COB Friday.

Tesla agrees to this proposal.

- Regarding the production of source code and non-technical source code documents, the due date for producing core technical documents is June 30, 2023.  We understand that you and another associate are traveling to Tesla next week to review the documents and code for production.  Please confirm that Tesla will have the Non-Code Technical Documents on the source code computer so that we can electrically review them at our first review.

Tesla confirms that all documents designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" will be on the source code review computers.

**Regarding the second topic (source code review location):**

- Tesla said it intended to provide the source code computers *only* in Weil's California office. AD asked Tesla to reconsider its position, given the Court's guidance during the June 5, 2023 hearing. For example, Magistrate Hatcher stated:  "I believe, don't know, that outside counsel for both parties have locations in Texas. Texas is arguably somewhat closer than California. Did the parties discuss the option of conducting the review in Texas or is that something that isn't worthy of discussion to alleviate some of the dispute here today?"  In response, Mr. Desai stated that Weil and Tesla have offices in Texas, and Mr. Jacobs stated that "We would certainly be willing to accommodate review in Austin or Dallas." Tr. at 35-37. In the end, Magistrate Hatcher ruled that "For this dispute I think the provision should provide that review should take place at an office of the outside counsel for the producing party or otherwise as agreed to by the parties. In making this ruling I remind the parties that they are of course encouraged to work together on this and that the review, as discussed during the hearing today, might be able to take place in Texas, which could be slightly less burdensome for all rather than exclusively in California." Tr. at 69:17-70:4.

- Consistent with the Court's ruling, we are willing to [work] with Tesla on the review location.  For example, we can conduct our first review in California while Tesla conducts works out how to transport its computer to Austin, Dallas, DC or NY.  And then we can conduct subsequent reviews in the new location.  Please let us know if Tesla is willing to reconsider its stance on only producing the source code computer at Weil's Palo Alto office. If not, let's schedule a lead/local meet and confer ASAP, as we do not believe Tesla's position is consistent with Judge Hatcher's guidance that the parties work together an find a solution that is not reviewing exclusively in California.

The Court ruled that review should take place at an office of the outside counsel for the producing party. The Court neither required Texas nor excluded California.

Tesla does not agree to produce source code outside Weil's California office. Tesla's engineers and IT security personnel involved in the production of source code are located in California, and none of Tesla's counsel for this case is located in Texas. Providing a review computer in Texas would substantially increase Tesla's burden both for production and for future depositions.

Tesla's position is inconsistent with the Court's guidance. We provided two alternative proposals in the attached draft protective order; and clarified Tesla's position, which is the review must occur at Weil's office in Silicon Valley. During the hearing, the Magistrate expressed a clear preference for finding a more convenient location for review, such as Texas. Please let us know if another meet and confer would be helpful or if we should submit the matter to the Court to resolve the dispute.

**Regarding the third topic (Printing/Returning of Actual Source Code):**

- AD proposes the following addition to ¶11(c)(vii):  If the Receiving Party has already requested the aggregate total of printed pages of Source Code set forth above, the Receiving Party may return to the Producing Party any portion of previously printed source code along with a certification that all printed

copies of that selection of source code have been returned to the Producing Party or destroyed and that no electronic copies of that selection of source code exist; for each page of printed source code returned to the Producing Party, the Receiving Party may request an additional page of printed source code.

- You said you needed to confirm the provision with your client and would provide us with an answer by COB Friday.

Tesla does not agree to this proposal. The PO already contemplates the potential need for additional pages by providing that the parties will meet and confer in good faith if the Receiving Party requests more than the limit.

We added clarifying language that reasonable requests for additional pages will not be withheld.


**Regarding the fourth topic (source code exhibits):**

- AD proposes deleting Tesla's addition at the end of ¶11(c)(xiii).

Tesla proposes the following addition:

Unless agreed by the parties, images or copies of Source Code shall be omitted from pleadings, exhibits, and other papers whenever possible and reasonably minimized when not.

That addition is fine, so long as Tesla agrees to AD's addition, which clarifies that source code snippets may be added to exhibits.

**Regarding the fifth topic (Tesla's use of Tesla source code with AD's experts):**

- We discussed the realities of Tesla deposing AD experts about Tesla's source code in a location that is convenient for AD's experts.  Tesla recognized this reality and stated that its attorneys would travel with Tesla's source code to the location of AD's expert depositions.  Please provide draft language that contemplates this possibility in the protective order.

On the meet and confer, I stated that Tesla may want a procedure for questioning AD's experts on Tesla's source code. Tesla has not at this time authorized its attorneys to travel with source code. We don't have a proposal at this time but may address it at a later date.

Thank you for clarifying your position; it is different from our recollection. Regardless, given that Tesla's attorneys cannot travel with source code and AD is not going to ask for printed copies of code to be brought to depositions, we propose the following additions:

- Paragraph 11(c)(xii)—rewritten:      Neither Party may bring copies of any printed copies of Source Code to depositions. This provision does not apply to Source Code Related Technical Documents, which may be brought to depositions.
- Paragraph 11(c)(vx):  At least three (3) days before the date of a deposition, a Receiving Party may request that the witness have access to a Source Code Computer. The Producing Party shall provide a Source Code Computer that the witness can access and an external monitor that allows the questioning attorney to see the files being discussed during the deposition on the condition that the deposition take place at a location of the Producing Party's choosing. The deposition record will identify the file names and file paths being discussed. Defendant's counsel is not currently authorized to travel with Defendant's source code.  Defendant understands that its current proposed restrictions will prevent Defendant from questioning Plaintiff's experts using source code during deposition.


II.  **Notice pursuant to ¶11(b) of the Protective Order**:  AD is providing its 14-day notice that it intends to review Tesla's source code in early July—e.g., the 6th and 7th.
Please identify the individual(s) who will be coming to the review.
Please add me to the list.  I may bring one or two additional people with me and will alert you as soon as possible.  We may also propose an inspection the following week.

III.   **Software review tools identified on May 4, 2023 -- 11(c)(1)**:  We have not heard back from Tesla about the requested tools. Does Tesla need help acquiring any of the tools we identified?

We've passed the requested tools along to Tesla's IT team, who is working on this now. We will follow up if they encounter any difficulties.

Please let us know by the end of this week to ensure that the proper tools are on the computers during the first inspection.

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Friday, June 16, 2023 5:09 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Attached is a draft of the PO with Tesla's mark-ups. I've provided responses to your comments and questions below in red.

- - -

**Regarding the first topic (Non-Code Technical Documents):**

- AD proposes the following language for ¶2(c)-Travel:  "HIGHLY CONFIDENTIAL — SOURCE CODE MATERIAL" means "Source Code," which is computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs. Notwithstanding this definition and other provisions herein, the Receiving Party may travel with Source Code documents that are not actual source code ("Non-Code Technical Documents")—e.g., formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs.

- AD proposes the following addition to 11(c)(vii)-Printing:
  - In the event that the Receiving Party requests more than 15 consecutive pages, or an aggregate of more than 500 pages, of printouts of Source Code,[FN] the parties shall have a meet and confer in good faith.
    - [FN] For the avoidance of doubt, these printing limits apply to actual source code. The Non-Code Technical Documents may be printed in their entirety without affecting the printing limits set forth in ¶11(c)(vii).

  Tesla has proposed alternative language for these two provisions, which preserves the definition of "Source Code" adopted by the Court.

- In addition to travel and printing, we discussed whether Tesla would honor its past offer to provide AD with printed copies of each Non-Code Technical Document in a binder without forcing AD to travel to the source code computer to request the Non-Code Technical Documents each time one is produced. We trust that this

is still agreeable to Tesla, but you said you needed to confirm this with your client and would provide us with an answer by COB Friday.

Tesla agrees to this proposal.

- Regarding the production of source code and non-technical source code documents, the due date for producing core technical documents is June 30, 2023.  We understand that you and another associate are traveling to Tesla next week to review the documents and code for production.  Please confirm that Tesla will have the Non-Code Technical Documents on the source code computer so that we can electrically review them at our first review.

Tesla confirms that all documents designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" will be on the source code review computers.

**Regarding the second topic (source code review location):**

- Tesla said it intended to provide the source code computers *only* in Weil's California office. AD asked Tesla to reconsider its position, given the Court's guidance during the June 5, 2023 hearing. For example, Magistrate Hatcher stated:  "I believe, don't know, that outside counsel for both parties have locations in Texas. Texas is arguably somewhat closer than California. Did the parties discuss the option of conducting the review in Texas or is that something that isn't worthy of discussion to alleviate some of the dispute here today?"  In response, Mr. Desai stated that Weil and Tesla have offices in Texas, and Mr. Jacobs stated that "We would certainly be willing to accommodate review in Austin or Dallas." Tr. at 35-37. In the end, Magistrate Hatcher ruled that "For this dispute I think the provision should provide that review should take place at an office of the outside counsel for the producing party or otherwise as agreed to by the parties. In making this ruling I remind the parties that they are of course encouraged to work together on this and that the review, as discussed during the hearing today, might be able to take place in Texas, which could be slightly less burdensome for all rather than exclusively in California." Tr. at 69:17-70:4.

- Consistent with the Court's ruling, we are willing to with with Tesla on the review location.  For example, we can conduct our first review in California while Tesla conducts works out how to transport its computer to Austin, Dallas, DC or NY.  And then we can conduct subsequent reviews in the new location.  Please let us know if Tesla is willing to reconsider its stance on only producing the source code computer at Weil's Palo Alto office. If not, let's schedule a lead/local meet and confer ASAP, as we do not believe Tesla's position is consistent with Judge Hatcher's guidance that the parties work together an find a solution that is not reviewing exclusively in California.

The Court ruled that review should take place at an office of the outside counsel for the producing party. The Court neither required Texas nor excluded California.

Tesla does not agree to produce source code outside Weil's California office. Tesla's engineers and IT security personnel involved in the production of source code are located in California, and none of Tesla's counsel for this case is located in Texas. Providing a review computer in Texas would substantially increase Tesla's burden both for production and for future depositions.

**Regarding the third topic (Printing/Returning of Actual Source Code):**

- AD proposes the following addition to ¶11(c)(vii):  If the Receiving Party has already requested the aggregate total of printed pages of Source Code set forth above, the Receiving Party may return to the Producing Party any portion of previously printed source code along with a certification that all printed copies of that selection of source code have been returned to the Producing Party or destroyed and that no electronic copies of that selection of source code exist; for each page of printed source code returned to the Producing Party, the Receiving Party may request an additional page of printed source code.

- You said you needed to confirm provision with your client and would provide us with an answer by COB Friday.

Tesla does not agree to this proposal. The PO already contemplates the potential need for additional pages by providing that the parties will meet and confer in good faith if the Receiving Party requests more than the limit.

**Regarding the fourth topic (source code exhibits):**

- AD proposes deleting Tesla's addition at the end of ¶11(c)(xiii).

Tesla proposes the following addition:

> Unless agreed by the parties, images or copies of Source Code shall be omitted from pleadings, exhibits, and other papers whenever possible and reasonably minimized when not.

**Regarding the fifth topic (Tesla's use of Tesla source code with AD's experts):**

- We discussed the realities of Tesla deposing AD experts about Tesla's source code in a location that is convenient for AD's experts.  Tesla recognized this reality and stated that its attorneys would travel with Tesla's source code to the location of AD's expert depositions.  Please provide draft language that contemplates this possibility in the protective order.

On the meet and confer, I stated that Tesla may want a procedure for questioning AD's experts on Tesla's source code. Tesla has not at this time authorized its attorneys to travel with source code. We don't have a proposal at this time but may address it at a later date.

II. **Notice pursuant to ¶11(b) of the Protective Order**:  AD is providing its 14-day notice that it intends to review Tesla's source code in early July—e.g., the 6th and 7th.
Please identify the individual(s) who will be coming to the review.

III. **Software review tools identified on May 4, 2023 -- 11(c)(1)**:  We have not heard back from Tesla about the requested tools. Does Tesla need help acquiring any of the tools we identified?
We've passed the requested tools along to Tesla's IT team, who is working on this now. We will follow up if they encounter any difficulties.

Have a good weekend,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Wednesday, June 14, 2023 6:00 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Subject:** FW: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Ian,

I am writing to summarize today's meet and confer, provide notice pursuant to ¶11(b) of the draft protective order, and inquire about the status of the review tools requested pursuant to 11(c)(1) of the draft protective order on May 4, 2023. I've also attached proposed edits to the PO based on the hearing.

I.   **During the meet and confer, we discussed the following topics:**

1. Language regarding Non-Code Technical Documents (travel and printing).  Tr. at 13:21-16:10; 67:23-68:15.

2. Location of source code review.  Tr. at 68:16-70:4.

3. The print limit and whether printed pages can be returned for additional pages.  Tr. at 40:23-41:24.

4. Source code snippets as exhibits.  Tr. at 52:14-53:4; 72:23-73:3.

5. Tesla's use of its source code with AD's experts.

**Regarding the first topic (Non-Code Technical Documents):**

- AD proposes the following language for ¶2(c)-Travel:  "HIGHLY CONFIDENTIAL — SOURCE CODE MATERIAL" means "Source Code," which is computer code, associated comments, and/or revision histories for computer code, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs. Notwithstanding this definition and other provisions herein, the Receiving Party may travel with Source Code documents that are not actual source code ("Non-Code Technical Documents")—e.g., formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs.

- AD proposes the following addition to 11(c)(vii)-Printing:
    - In the event that the Receiving Party requests more than 15 consecutive pages, or an aggregate of more than 500 pages, of printouts of Source Code,[FN] the parties shall have a meet and confer in good faith.
        - [FN] For the avoidance of doubt, these printing limits apply to actual source code. The Non-Code Technical Documents may be printed in their entirety without affecting the printing limits set forth in ¶11(c)(vii).

- In addition to travel and printing, we discussed whether Tesla would honor its past offer to provide AD with printed copies of each Non-Code Technical Document in a binder without forcing AD to travel to the source code computer to request the Non-Code Technical Documents each time one is produced. We trust that this is still agreeable to Tesla, but you said you needed to confirm this with your client and would provide us with an answer by COB Friday.

- Regarding the production of source code and non-technical source code documents, the due date for producing core technical documents is June 30, 2023.  We understand that you and another associate are traveling to Tesla next week to review the documents and code for production.  Please confirm that Tesla will have the Non-Code Technical Documents on the source code computer so that we can electrically review them at our first review.

**Regarding the second topic (source code review location):**

- Tesla said it intended to provide the source code computers *only* in Weil's California office. AD asked Tesla to reconsider its position, given the Court's guidance during the June 5, 2023 hearing. For example, Magistrate Hatcher stated:  "I believe, don't know, that outside counsel for both parties have locations in Texas. Texas is arguably somewhat closer than California. Did the parties discuss the option of conducting the review in Texas or is that something that isn't worthy of discussion to alleviate some of the dispute here today?"  In response, Mr. Desai stated that Weil and Tesla have offices in Texas, and Mr. Jacobs stated that "We would certainly be willing to accommodate review in Austin or Dallas."  Tr. at 35-37. In the end, Magistrate Hatcher ruled that "For this dispute I think the provision should provide that review should take place at an office of the outside counsel for the producing party or otherwise as agreed to by the parties. In making this ruling I remind the parties that they are of course encouraged to work together on this and that

the review, as discussed during the hearing today, might be able to take place in Texas, which could be slightly less burdensome for all rather than exclusively in California." Tr. at 69:17-70:4.

- Consistent with the Court's ruling, we are willing to with with Tesla on the review location. For example, we can conduct our first review in California while Tesla conducts works out how to transport its computer to Austin, Dallas, DC or NY. And then we can conduct subsequent reviews in the new location. Please let us know if Tesla is willing to reconsider its stance on only producing the source code computer at Weil's Palo Alto office. If not, let's schedule a lead/local meet and confer ASAP, as we do not believe Tesla's position is consistent with Judge Hatcher's guidance that the parties work together an find a solution that is not reviewing exclusively in California.

**Regarding the third topic (Printing/Returning of Actual Source Code):**

- <u>AD proposes the following addition to ¶11(c)(vii):</u> If the Receiving Party has already requested the aggregate total of printed pages of Source Code set forth above, the Receiving Party may return to the Producing Party any portion of previously printed source code along with a certification that all printed copies of that selection of source code have been returned to the Producing Party or destroyed and that no electronic copies of that selection of source code exist; for each page of printed source code returned to the Producing Party, the Receiving Party may request an additional page of printed source code.

- You said you needed to confirm provision with your client and would provide us with an answer by COB Friday.

**Regarding the fourth topic (source code exhibits):**

- AD proposes deleting Tesla's addition at the end of ¶11(c)(xiii).

**Regarding the fifth topic (Tesla's use of Tesla source code with AD's experts):**

- We discussed the realities of Tesla deposing AD experts about Tesla's source code in a location that is convenient for AD's experts. Tesla recognized this reality and stated that its attorneys would travel with Tesla's source code to the location of AD's expert depositions. Please provide draft language that contemplates this possibility in the protective order.

II. <u>**Notice pursuant to ¶11(b) of the Protective Order**</u>: AD is providing its 14-day notice that it intends to review Tesla's source code in early July—e.g., the 6th and 7th.

III. <u>**Software review tools identified on May 4, 2023 -- 11(c)(1)**</u>: We have not heard back from Tesla about the requested tools. Does Tesla need help acquiring any of the tools we identified?

**McKool Smith** ǀ John Holley
Principal ǀ Washington ǀ (202) 370-8320

**McKool Smith** ǀ John Holley
Principal ǀ Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Tuesday, June 13, 2023 5:22 PM
**To:** Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com;

edibenedetto@shawkeller.com
**Subject:** Re: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Hi Ian,

Let's put 11:30 on the books for the PO issue. I'm away from my computer for a while but will send a calendar invite later this evening unless you beat me to it.

We will separately circulate some Friday and Monday options for meeting about the discovery issues.

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** Moore, Ian <Ian.Moore@weil.com>
**Sent:** Monday, June 12, 2023 8:20:31 PM
**To:** John Holley <jholley@McKoolSmith.com>; Tanya Wood <twood@McKoolSmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com <began@mnat.com>
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com <kkeller@shawkeller.com>; edibenedetto@shawkeller.com <edibenedetto@shawkeller.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Tesla is available to meet and confer regarding the Protective Order on Wednesday at any of the times proposed below.

Regarding the discovery issues, Tesla will provide a written response to AD's letter this Thursday. We believe it would be more productive to meet and confer after that response, given the number of issues raised.

Best regards,
Ian



**Ian Moore**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Ian.Moore@weil.com
+1 212 310 8412 Direct

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Monday, June 12, 2023 3:15 PM
**To:** Tanya Wood <twood@McKoolSmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla_AD <Tesla.AD@weil.com>; began@mnat.com

**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Counsel,

I am following up to schedule a meeting regarding the issues identified in Blair's letter and my request related to the protective order.   We are available to meet tomorrow at 11am ET or Wednesday at 11 am, 1:30 pm, or 4pm on Wednesday.  Please let which of those times work on your end, and I'll send a meeting invite.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, June 8, 2023 3:05 PM
**To:** Tanya Wood <twood@McKoolSmith.com>; Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla.AD@weil.com; began@mnat.com
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Counsel,

In addition to the issues identified in Blair's letter, we would also like to meet and confer on the following protective order issues.  Of course, if there are any points you would like to discuss, please let us know before the meeting.

Language regarding Non-Code Technical Documents (travel and printing).  Tr. at 13:21-16:10; 67:23-68:15.

- Will get back to us regarding providing the non-code technical documents
- AD propose language

Location of source code review.  Tr. at 68:16-70:4.

The print limit and whether printed pages can be returned for additional pages.  Tr. at 40:23-41:24.

Source code snippets as exhibits.  Tr. at 52:14-53:4; 72:23-73:3.

Thanks,
John



**John Holley**
**Principal**
Washington, D.C.
Tel: (202) 370-8320
www.mckoolsmith.com

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Tanya Wood <twood@McKoolSmith.com>
**Sent:** Thursday, June 8, 2023 1:59 PM
**To:** Tesla_AD_Attorneys <Tesla.AD.Attorneys@weil.com>; Tesla.AD@weil.com; began@mnat.com
**Cc:** Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Subject:** Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Counsel,

Attached please find correspondence from Blair Jacobs to Anish Desai regarding the above-captioned matter.

Thank you.

Tanya

**McKool Smith** | Tanya Wood
Senior Paralegal | Washington | (202) 370-8331

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly

prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

---

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.

# Exhibit I - L

**Redacted in their Entirety**

# Exhibit M

## John Holley

| | |
|---|---|
| **From:** | John Holley |
| **Sent:** | Thursday, July 27, 2023 3:49 PM |
| **To:** | Sieger, Matthew; Blair Jacobs; Moore, Ian; Tanya Wood; Autonomous_Tesla; kkeller@shawkeller.com; edibenedetto@shawkeller.com |
| **Cc:** | Tesla_AD; began@mnat.com; Clark, Cameron |
| **Subject:** | Re: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies |

Thanks, Matt.  What time do you expect Alex to arrive tomorrow?

**McKool Smith** | John Holley

Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

---

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Thursday, July 27, 2023 3:46:15 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com <kkeller@shawkeller.com>; edibenedetto@shawkeller.com <edibenedetto@shawkeller.com>
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com <began@mnat.com>; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Sorry I missed your call. The documents will unfortunately not arrive today but we anticipate they'll be delivered to your Austin office tomorrow. The name of the person who will deliver the documents is Alex Scogin.

Thanks,
Matt

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, July 27, 2023 3:21 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** Re: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

I tried calling you but got your voicemail.  When do you expect to be able to provide the documents to George?  He is waiting at the office now and has agreed to come in tomorrow if necessary.

Thanks,
John

---

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Thursday, July 27, 2023 2:48:34 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com <kkeller@shawkeller.com>; edibenedetto@shawkeller.com <edibenedetto@shawkeller.com>
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com <began@mnat.com>; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Please wait to destroy the documents in DC. We have had some issues getting the security paper delivered to Austin. I'll give you an update when we know more. We apologize for the inconvenience.

Thanks,
Matt

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Thursday, July 27, 2023 12:12 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Matt,

We are ready to destroy the documents in DC.  Alternatively, until the Court rules on the discovery dispute, please let us know if you are willing to pick up our documents and return them to us anytime we want to look at them within a reasonable time, e.g., around an hour.  If you agree to that solution, we need confirmation that you will not look at our documents.  Please let us know.

Regardless of your choice, please send the digital documents over the internet to Austin, Texas, print them out and deliver them to George as soon as possible. When we speak with Magistrate Judge Hatcher, we will deal with Tesla's improper discovery gambit under rule 37. As we see it, Tesla's excessively complicated demands are designed to harass AD, cause unnecessary delay to AD's ability to develop its theories and work with its experts, and needlessly increase the cost of litigation by forcing lawyers to either traverse the country to review a document or somehow commit the documents to memory. And, as we now know, Weil is not operating under the same restrictions, e.g., you admitted to sending the documents over the Internet a few times.

Thanks,
John

**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Wednesday, July 26, 2023 10:28 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

Everything I said was accurate. You requested the documents on July 10, 2023 when you visited our office. We hand delivered the documents to your offices on July 14, 2023. None of that is a half-truth. We are happy to explain that to the Court. You are again mischaracterizing what we stated, we are not "digitizing" anything. As you are aware, the documents exist in an electronic format; you viewed them on a computer in Silicon Valley. Putting aside the irrelevance of this inquiry, Weil DC came into possession of the documents in the same manner -- via a secure FTP site. The documents were placed on a secure FTP site for approximately 1 minute, sent to D.C., and subsequently deleted from the FTP. Weil DC immediately printed the documents on security paper and deleted the local electronic copies. The documents were then hand delivered by a Weil attorney to your office.

We are OK with you destroying the DC copy of the documents. Please notify us when the documents are destroyed and Ms. Litz will subsequently deliver the documents.

We reiterate, we are not going to be ferrying documents on your "schedule." We are doing this as a one-time courtesy. If you want more time with the documents in DC before we provide the documents to Austin, now is the time to tell us.

Finally, Tesla is not dictating to AD how it puts its contentions together. We are amenable to a reasonable extension of the schedule to accommodate the disputes between the parties. AD has informed us, however, that it does not need to extend the schedule. Accordingly, we expect fulsome preliminary infringement contentions from AD.

Best,
Matt

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Wednesday, July 26, 2023 4:04 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian
<Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla
<Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery
Response Deficiencies

Matt,

No matter how many times you repeat the half-truths and misrepresentations in your message you are not
going to change the fact that the production was late.  You can explain to your position to the Court in the
upcoming dispute hearing and we will do the same.  To frame an important part of that dispute will you please
answer our still-pending question:  *How were the documents you hand delivered to our office received in Weil's
DC office?*  We understand that you are going to digitize the documents and transmit them over the internet
to Austin for printing *this time*.  But we want get to the bottom of how Weil DC came into possession of the
documents that were originally delivered to our DC office.  If you cannot answer the questions, you can say "I
cannot answer that question."  If they were digitized and sent to you, please explain.  We are entitled to and
explanation as this goes directly towards issues previously discussed with the Magistrate.

More importantly, Weil and Tesla do *not* get to dictate how AD puts together its contentions.  Until the Court
rules on the disputes, we have gone above and beyond and told you that lawyers in Texas are putting together
the contentions and lawyers in DC are reviewing/revising those contentions.  We also provided you with a
review/revision schedule.  None of this was required.  But there is no great secret that contention drafting is
an iterative process.  If Tesla cannot accommodate AD's working process under the pretext of Tesla's alleged
"security concerns," please let us know.  But we do not appreciate your *ad hominin* attacks, i.e., "you were not
operating in good faith," and inappropriate commentary, e.g., "your completely unreasonable 'schedule'".

The reality is we have review processes in place and Tesla's unreasonable one-document policy is unduly
burdensome but it is a problem Tesla has created.  A reasonable workaround until the Court rules on the PO
disputes – including Tesla's new dispute on the number of documents AD can possess at one time – is to leave
a set of documents in DC and provide a set in Austin as well.  If not, then Tesla's only option to deal with this
self-created mess is to accommodate the review schedule we graciously provided to you. We intend to bring
all of this before the Magistrate to demonstrate Tesla's continued abuses to the discovery process. Until we
receive the ruling from the Court Tesla needs to accommodate our schedules so that we can perform the
analysis that needs to be performed, as we see fit to perform it.

Also, we've explained several times now, Tesla's byzantine and inappropriate ever-changing limitations on
source code and source code technical document review has made it extremely difficult for AD to provide the
detailed contentions that we would typically provide.  But we can only work with the information provided to
us by Tesla and Tesla's obstructive discovery gambit has made it incredibly challenging to access necessary
information in a manner consistent with normal discovery practices.  We expect the Court to remedy all of this
when we bring our next motion to compel forward.  Until then, we will regularly augment and supplement
after our experts are able to review the documents and Tesla produces the source code and other technical
documents in an appropriate manner for our experts' review.  Once that occurs, we will supplement
accordingly and in a manner consistent with the practice in this district.

Lastly, we will destroy the source code documents ourselves once you confirm delivery to Austin tomorrow morning.  We are not going to give you our working copies with our work product on them.  And, frankly, your request that we destroy our working copies with our notes highlights the ridiculousness of Tesla's one-copy proposal.  We believe that the Court will appreciate this fact and we reserve the right to seek sanctions for Tesla's continuing discovery misconduct.

Thanks,
John


**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Wednesday, July 26, 2023 12:10 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

John,

On July 10, 2023 you asked us to produce certain Source Code – Technical Documents.   We hand delivered those documents to you on July 14, 2023 at your D.C. office at your request.  We are under no obligation to ferry documents between your offices.  Nonetheless, in the spirit of cooperation and good faith, we agreed to transfer the documents to Austin.  It is clear now that you were not operating in good faith.  This is evidence by your completely unreasonable "schedule" that appears manufactured to create as much disruption as possible.  You have now had the documents in your D.C. office for several weeks now, giving you more than ample time to review those 47 documents.  There is no excuse for needing those documents back in your D.C. office for one day before asking for the documents to be transferred back to Austin.  We will not abide by such a schedule.

We are prepared to transfer the documents to your Austin office.  We will hand deliver those documents to someone at your Austin office.  We do not intend to transfer the documents back to your D.C. office.  In advance of delivering those documents to your Austin office, we will pick up the copy you have at your D.C. office and shred the copy ourselves.  Please let us know by COB today whether you want us deliver the documents to your Austin office.

With regards to the remainder of your e-mail, the PO governs how you handle Tesla documents and how we handle AD documents.  It does not govern how Tesla handles its own documents.  That said, as we expressed to Judge Hatcher and as we have repeatedly stated to you in emails and at the meet and confers, Tesla imposes significant restrictions on us as its law firm as well as its own employees.  We accurately discussed those restrictions at the hearing.  From your email, it is clear that you are trying to manufacture an issue to re-litigate the protection afforded to Source Code – Technical Documents.  AD lost that issue.  You also continue to mischaracterize and misconstrue the correspondence between the parties. Contrary to your statement, Mr. Moore's email on July 30th did not state that a Tesla employee would personally deliver source code to AD, only that it would be securely delivered. You conveniently omitted the "e.g."  And I am baffled how you reached the conclusion that we would send the documents to AD by FedEx.  My email to you July

13, 2023 made clear that we would not be doing that – you even cited that statement in your email.  Your only support for us sending the documents to AD by FedEx is a recitation of your emails to us, not emails from us to you.

With regards to how we will transfer the documents to Austin, we will encrypt the documents and transfer them by secure ftp site to Austin.  The documents will live on a secure ftp site for approximately 1 minute before being deleted.  The documents are then printed to security paper and that electronic copy is then destroyed. Tesla is taking all precautions to protect its materials.

You have now had access to the Source Code – Technical Documents since the first week of July.  In addition to all the publicly available information concerning the accused instrumentalities, we also produced ~6,000 pages of Highly Confidential Documents on June 30, 2023.  We expect to received fulsome preliminary infringement contentions from AD on August 18, 2023, not a work-in-progress.  If AD is not prepared to provide fulsome preliminary infringement contentions from AD on August 18, AD should propose, and we will consider, a reasonable shift in the schedule to accommodate additional time for both parties.  If we do not receive fulsome preliminary infringement contentions, we will seek relief from the Court.

Thanks,
Matt

---

**From:** John Holley <jholley@McKoolSmith.com>
**Sent:** Tuesday, July 25, 2023 4:44 PM
**To:** Sieger, Matthew <Matthew.Sieger@weil.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

Counsel,

During yesterday's meet and confer, I again asked how Mr. Sieger received the source code technical documents he delivered to McKool's D.C. office.  *See also* Holley to Sieger July 21, 2023 (asking the same).  Mr. Percer said that a Tesla employee did *not* deliver the documents.  To get a straight answer, I asked again how exactly Mr. Sieger came into possession of the documents.  Mr. Percer refused to answer the question and provided no basis for his refusal to answer.  Please answer the question or provide a basis for your refusal to answer the question by noon ET tomorrow.  We have been asking for this information for days now.  Tesla's continued refusal to respond is obstructing the orderly progress of discovery and dispute resolution.

Tesla's refusal to answer the question is also a significant problem because it certainly implies, at a minimum, that Tesla misled the Court when it stated during our hearing with Judge Hatcher that Tesla treats source code technical documents just as it treats source code.  Specifically, Tesla led the Court to believe that source code technical documents are treated with the same level of security as traditional source code.  Tr. 19:15-20:5.  Counsel for Tesla also represented that a Tesla employee would deliver paper documents to our office and would not use Fedex, which we assume is the level of protection afforded to traditional source code materials.  *See* Moore to Holley June 30, 2023 (a Tesla employee will provide the printouts to AD); *see* Sieger to Holley July 13, 2023 ("We are not simply dropping these documents into FedEx").  Your refusal to directly answer our question suggests that Weil misrepresented to the Court and AD how the documents would be handled in order to secure the current unduly harsh restrictions for reviewing and disseminating those documents.

It appears that Weil shipped Tesla's source code technical documents to Mr. Sieger via US mail.  *See* Holley to Sieger July 13, 2023 (recounting that the paralegal informed me that a courier would ship the technical documents to McKool's D.C.

office for delivery on Tuesday, July 11, 2023, and we would receive tracking information); *see also* Holley to Sieger July 21, 2023 ("We assume you received [the technical documents] in the mailed package with a tracking number. If that is not correct, please let us know by Monday morning."). No one from Tesla's team has refuted our understanding and counsel has refused to answer questions, on a number of occasions, as to how counsel received the documents from Tesla. We will bring this matter to the Court's attention.

We understand that Tesla will deliver the technical documents to our Austin office on Thursday, July 27th. Upon receipt of the documents in Austin, we will destroy the documents in D.C. Given Tesla's instance that AD can only have one copy of these documents at a time, please confirm that Tesla can abide by the following schedule as the contentions are refined between the attorneys in our different offices [Austin-Green / D.C.-Blue].



Please also confirm that the deliveries will be before 9 am local time each day that a delivery is set to occur. We also fully expect to maintain a similar schedule between lawyers and experts as the case progresses. Please let us know if that will be an issue.

Thanks,
John


**McKool Smith** | John Holley
Principal | Washington, D.C. | Tel: (202) 370-8320

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Sieger, Matthew <Matthew.Sieger@weil.com>
**Sent:** Tuesday, July 25, 2023 3:10 PM
**To:** John Holley <jholley@McKoolSmith.com>; Blair Jacobs <bjacobs@McKoolSmith.com>; Moore, Ian <Ian.Moore@weil.com>; Tanya Wood <twood@McKoolSmith.com>; Autonomous_Tesla <Autonomous_Tesla@mckoolsmith.com>; kkeller@shawkeller.com; edibenedetto@shawkeller.com
**Cc:** Tesla_AD <Tesla.AD@weil.com>; began@mnat.com; Clark, Cameron <cclark@morrisnichols.com>
**Subject:** RE: Autonomous Devices, LLC v. Tesla, Inc. [Case No. D. Del. 1:22-cv-01466-MN] - Defendant's Discovery Response Deficiencies

AD Team –

Thanks for the meet and confer yesterday. We have been diligently working on a plan to deliver a copy of the Source Code Technical Documents to your Austin office. While we are still finalizing the logistics, we anticipate that the documents will be delivered on Thursday (7/27) afternoon.