IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AUTONOMOUS DEVICES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 22-1466 (MN) |
| | ) |
| TESLA, INC., | ) **REDACTED-** |
| | ) **PUBLIC VERSION** |
| Defendant. | ) |

**TESLA'S LETTER TO THE HONORABLE LAURA D. HATCHER IN OPPOSITION TO AUTONOMOUS DEVICES LLC'S LETTER REGARDING THE <u>ONGOING PROTECTIVE ORDER DISPUTE</u>**

OF COUNSEL:

Anish Desai
Ian Moore
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
(212) 310-8000

Christopher Pepe
Matthew D. Sieger
Eric C. Westerhold
Allison Herzig
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW, Suite 600
Washington, DC 20036
(202) 682-7000

Adrian C. Percer
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065-1175
(650) 802-3000

August 10, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant Tesla, Inc.*

**Confidential Version Filed: 8/10/23**
**Redacted Version Filed: 8/17/23**

Dear Judge Hatcher:

Defendant Tesla, Inc. ("Tesla") submits this letter regarding the parties' second round of disputes over the protective order ("PO"). Tesla addresses the disputed PO provisions below.

As a preliminary matter, AD's letter omits key details to suggest that Tesla has "backtrack[ed]" on agreements previously submitted to the Court. Not so. After the Court's first ruling, AD continued to negotiate the PO *in toto*. AD proposed edits to undermine the Court's rulings on, e.g., printing limits and the location of review. Ex. 1 ¶¶ 11, 11(c)(vii) (AD June 20th PO redline). AD also continued to propose new, substantive edits, such as a proposal that Tesla cannot depose AD's experts on Tesla Source Code or that AD's experts should be able to store printouts in their homes. Ex. 1 ¶ 11(c)(xiv); AD Ex. C ¶ 11(c)(vii). Tesla responded with edits of its own, which AD now characterizes as "reneging." AD has sought to have its cake (bind Tesla to prior drafts) and eat it too (renegotiate prior drafts to its advantage). The Court should not reward AD's gamesmanship.

## I. REVIEW OF SOURCE CODE ON COMPUTERS

### Location of Source Code Review

Tesla produced Source Code at the office of its outside counsel in Palo Alto, California, located just minutes away from the Tesla facility where the Source Code is kept. AD seeks to compel production in Texas, New York, or Washington, D.C.

The parties previously disputed the location of Source Code review. This Court ruled that "*review should take place at an office of the outside counsel for the producing party* or otherwise as agreed to by the parties." Tr. at 69:17-70:4. The Court further stated that review "*might* be able to take place in Texas, which could be slightly less burdensome *for all*." *Id.* (emphasis added).

The burden of traveling to California for review is shared by both parties' counsel and experts, but the burden would be far higher for Tesla in Texas than in California. None of the parties' experts— the primary reviewers of Source Code—is located in Texas. None of Tesla's attorneys on this case is located in Texas. The Tesla Autopilot engineers and InfoSec personnel assisting with this case are not located in Texas. In contrast, Tesla's Autopilot group is based out of California, minutes away from Weil's office.

### Volume of Source Code Production

AD suggests that Tesla's source code production is deficient, which is incorrect and has no bearing on the present dispute. Scheduling Order ¶ 6(b) requires production of "relevant source code"— not all source code—which Tesla has done, producing 45,862 pages of code.

### Format of Source Code Production

Tesla produced Source Code in computer searchable PDF format. AD contends that this violates the prior PO submitted to the Court and makes searching impossible. AD is wrong on both counts.

First, the prior PO does not require production in native format. AD cites paragraph 11, which states "[a]ny Source Code that is produced in discovery shall be made available for inspection, in electronic (*e.g.*, native) format." Ex. C ¶ 11. The use of the term "e.g." clearly reserved flexibility in the production format. So long as Tesla made Source Code available in electronic format— which it unquestionably did—it complied with the express terms of the PO. AD also cites to paragraph 11(c)(iii), which states "[t]he Source Code shall be produced as it is kept in the normal course of business, **or as it would be collected in the normal course of business**." Ex. C

The Honorable Laura D. Hatcher                                                                                                August 10, 2023

¶ 11(c)(iii). Tesla has produced Source Code as it would be collected in the normal course of business, i.e., "computer searchable format." This language is routinely used in protective orders. *E.g.*, Ex. 3 ¶ 25; Ex. 4 ¶ 20(c). Finally, AD cites to provisions regarding software tools, yet none of these provisions requires production in native format.

Second, PDF format does not make searching "impossible." Tesla preserved all content and formatting in its Source Code production. AD's expert, Dr. Rubin, contends that "formatting and syntax"—which is "key to understanding [source code] structure and functionality"—"*will likely* be lost or altered" due to production in PDF format. Ex. F ¶ 9. But Dr. Rubin does not know because he has not yet reviewed the code at issue. AD also concedes that keyword searching is possible but complains that the software review tools it requested—which are designed for native files—do not work on PDFs. If that is the case, AD should identify appropriate tools. Moreover, the fact that native files may allow additional search functionality (when paired with native search tools) does not outweigh Tesla's interest in protecting its Source Code.

Tesla's Source Code is highly confidential and extraordinarily valuable, thus justifying heightened protections. Tesla requires PDF format because such files cannot be compiled and copying PDF code off the Source Code computer is more difficult than copying native code. AD argues that PDF is "not inherently 'more secure' than C ++ files" but does not address either of these points.

Finally, AD argues that the use of PDFs containing multiple Source Code files limits AD's ability to request printouts of consecutive pages—an issue raised for the first time in its letter. Tesla will agree to apply the consecutive page limit on a Source-Code-file basis (each PDF page has the corresponding file name at top), rendering this issue moot.

### Software Tools for Review

Tesla proposes that ¶ 11(c)(i)—which permits AD to request commercially available software tools for review—renders other "software tool" provisions redundant ("DISPUTED PROVISION # 2" and "# 4" in Ex. C). AD contends that all three provisions are necessary.

Tesla is not depriving AD of its ability to conduct discovery. Before review began, AD requested three operating systems and fifteen software tools to be installed on the review computers—Tesla obliged. AD complains that Adobe Reader is the "only functional tool provided by Tesla," but that tool was provided at AD's request, and AD has not sought any other PDF review tools. AD remains able to request commercially available software review tools. AD's proposal is thus unwarranted.

## II.   PRINTING AND HANDLING OF SOURCE CODE

### Alleged Mislabeling of Documents and the Definition of "Source Code"

AD asserts that Tesla has identified "source code technical documents" that contain no Source Code. AD Ltr. at 2. AD essentially asks the Court to reconsider its prior ruling regarding the definition of "Source Code." This dispute was central to the first hearing and was resolved in Tesla's favor. Tr. at 68:1-6. Moreover, this repeat-issue was not raised in AD's motion (D.I. 48) or during negotiations.

AD cites four documents as evidence that Tesla designated documents that "contain no source code," even though, as AD acknowledges, they are among "the most important and relevant technical documents." AD Ltr. at 2. AD never requested that Tesla de-designate these documents. In any event, even a cursory review confirms that the documents fit the definition of Source Code. Exhibit I, titled "███████████," includes block diagrams showing inputs and outputs to

2

The Honorable Laura D. Hatcher											August 10, 2023

██████████████████████████████████████████████. Exhibits J and K, titled "████████████████" and "████████████████████████████," list inputs and outputs for software modules involved in Full Self-Driving. Exhibit L, titled "████████████," includes block diagrams showing inputs and outputs, including software variables. Tesla designated just 47 technical documents (537 pages) as Source Code out of more than 1000 documents produced to date (over 9000 pages). Tesla sent two attorneys to California to review document-by-document and make those 47 designations. These documents are "important" because they describe the operation of the Source Code, which justifies the higher level of confidentiality.

AD also argues that these 47 documents "cannot be effectively searched" because they must be searched one-by-one due to an Adobe Reader error. AD did not notify Tesla of this alleged "error" prior to its letter. AD Ltr. at 2. Nevertheless, AD admits it can search the documents and merely argues that it is limited to keyword searches instead of "sophisticated searching" methods. But AD fails to explain why it needs "sophisticated searching" to review **47 documents**. AD is simply unwilling to spend adequate time to search and review the documents. It has had access to the Source Code computer since late June, yet has spent less than five hours reviewing the Source Code. Ex. 2 (Source Code Review log sheet)

Finally, AD claims that Tesla failed to produce technical document printouts "for weeks." AD Ltr. at 2. That is incorrect. PO ¶ 11(c)(vii) provides a "Receiving Party may request copies of reasonable portions of the Source Code identified in a reasonable manner." On July 10, after reviewing the Source Code computer for all of *five minutes*, AD disregarded the reasonableness requirement and requested Tesla print and ship *all* source code technical documents. Despite AD's wanton disregard for the PO terms, Tesla obliged within five days.

### Location and Number of Print Copies

AD writes that "Tesla *now* forbids AD's experts from possessing these technical documents in any manner" and requests that the Court "*maintain* AD's right . . . to share [Source Code printouts] with AD's experts where the expert resides." AD Ltr. at 3 (emphasis added). This suggests a change in Tesla's position and the status quo, which is wrong. The undisputed language presented at the prior hearing was as follows: "The paper copies ***must be kept in a secured location at the offices of the Receiving Party's Outside Counsel at all times***." D.I. 40, Ex. 1 ¶ 11(c)(vii).

AD now proposes that this language should be amended to state, "[t]he paper copies must be kept in a secured, locked and hardened containers (e.g. a safe or lockbox) at the offices of the Receiving Party's Outside Counsel *or the Receiving Party's Experts* at all times." AD, Ex. C ¶ 11(c)(vii). Tesla requests that the Court maintain the status quo, which prevents third-party experts from storing Tesla's most sensitive and confidential information in their homes. *See* Ex. 3 ¶ 33 (EDTX PO reciting "Outside Consultants are prohibited from keeping . . . copy sets at their office.").

AD proposes that it be able to make five additional copies of Source Code printouts for review by its experts and attorneys. Five additional copies is excessive, as AD cannot store printouts outside its outside counsel's offices. Tesla has, at AD's request, transferred printouts from AD's Washington office to its Austin office, and is willing to reasonably transfer printouts as needed to obviate the need for additional copies.

### III.    ADDED LANGUAGE TO EXHIBIT A (PO SIGNATURE PAGE)

Tesla's edit to Exhibit A is to ensure that signatories of the PO understand the gravity of violating it. Tesla has not imposed any additional requirements in the PO itself through this language.

3

The Honorable Laura D. Hatcher                                                                    August 10, 2023

                                                                  Sincerely,

                                                                  */s/ Brian P. Egan*

                                                              Brian P. Egan (#6227)

BPE/bac
Attachments

cc:     Clerk of the Court (via hand delivery; w/attachments)
         All Counsel of Record (via electronic mail; w/attachments)